No. 23-11189

# United States Court of Appeals for the Fifth Circuit

James Shepherd, Trustee for the James B. Shepard Trust; New Millennium Concepts, Limited,

*Plaintiffs – Appellants*

v.

Michael S. Regan, Administrator;
Environmental Protection Agency;
Christine Tokarz; David Cobb; Carol Kemker; Keriema Newman,

*Defendants - Appellees*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division

APPELLANTS/PLAINTIFFS' APPENDIX
PART 3, EXHIBITS C, D, E

Warren V. Norred
**Norred Law, PLLC**
Texas Bar Number: 24045094
warren@norredlaw.com
515 E. Border St.
Arlington, TX 76010
(817) 704-3984 (Office)
(817) 524-6686 (Fax)
Counsel for Appellants

I certify that I filed this Part 3 of Appellants/Plaintiffs' Appendix in support of the Motion for Injunction filed this same day, December 10, 2023, serving it through the Court's PACER system to counsel for Appellees/Defendants. - /s/Warren V. Norred

---

**7 USC CHAPTER 6, SUBCHAPTER II: ENVIRONMENTAL PESTICIDE CONTROL**

**From Title 7—AGRICULTURE**
  CHAPTER 6—INSECTICIDES AND ENVIRONMENTAL PESTICIDE CONTROL

---

### SUBCHAPTER II—ENVIRONMENTAL PESTICIDE CONTROL

## §§135 to 135k. Omitted

#### EDITORIAL NOTES

#### CODIFICATION

Sections 135 to 135k, acts June 25, 1947, ch. 125, §§2–13, 61 Stat. 163–172; Aug. 7, 1959, Pub. L. 86–139, §2, 73 Stat. 286; May 12, 1964, Pub. L. 88–305, §§1–6, 78 Stat. 190–193; Oct. 15, 1970, Pub. L. 91–452, title II, §204, 84 Stat. 928; Dec. 30, 1970, Pub. L. 91–601, §6(b), formerly §7(b), 84 Stat. 1673, renumbered, Aug. 13, 1981, Pub. L. 97–35, title XII, §1205(c), 95 Stat. 716, which related to economic poison control, were superseded by the amendments made to act June 25, 1947, by Pub. L. 92–516, Oct. 21, 1972, 86 Stat. 975. See section 4 of Pub. L. 92–516, set out as a note under section 136 of this title. The provisions of act June 25, 1947, as amended by Pub. L. 92–516, are set out in section 136 et seq. of this title.

Section 135 provided definitions for the purposes of this subchapter.

Section 135a related to prohibited acts.

Section 135b related to registration of economic poisons.

Section 135c related to access, inspection, and use in criminal prosecutions of books and records.

Section 135d related to rules and regulations, examination of economic poisons or devices, notification to violators, certification to United States attorney, duty of attorney, and publication of judgments.

Section 135e related to exemptions from penalties.

Section 135f provided for penalties.

Section 135g related to seizure, disposal, and award of costs against claimant.

Section 135h related to refusal of admission of imports.

Section 135i related to delegation of duties.

Section 135j related to authorization of appropriations and expenditure of funds.

Section 135k related to cooperation between departments and agencies.

## §136. Definitions

For purposes of this subchapter—

**(a) Active ingredient**

The term "active ingredient" means—

  (1) in the case of a pesticide other than a plant regulator, defoliant, desiccant, or nitrogen stabilizer, an ingredient which will prevent, destroy, repel, or mitigate any pest;

  (2) in the case of a plant regulator, an ingredient which, through physiological action, will accelerate or retard the rate of growth or rate of maturation or otherwise alter the behavior of ornamental or crop plants or the product thereof;

  (3) in the case of a defoliant, an ingredient which will cause the leaves or foliage to drop from a plant;

  (4) in the case of a desiccant, an ingredient which will artificially accelerate the drying of plant tissue; and

  (5) in the case of a nitrogen stabilizer, an ingredient which will prevent or hinder the process of nitrification, denitrification, ammonia volatilization, or urease production through action affecting soil bacteria.

**(b) Administrator**

The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(c) Adulterated**

The term "adulterated" applies to any pesticide if—

(1) its strength or purity falls below the professed standard of quality as expressed on its labeling under which it is sold;

(2) any substance has been substituted wholly or in part for the pesticide; or

(3) any valuable constituent of the pesticide has been wholly or in part abstracted.

**(d) Animal**

The term "animal" means all vertebrate and invertebrate species, including but not limited to man and other mammals, birds, fish, and shellfish.

**(e) Certified applicator, etc.**

**(1) Certified applicator**

The term "certified applicator" means any individual who is certified under section 136i of this title as authorized to use or supervise the use of any pesticide which is classified for restricted use. Any applicator who holds or applies registered pesticides, or uses dilutions of registered pesticides consistent with subsection (ee), only to provide a service of controlling pests without delivering any unapplied pesticide to any person so served is not deemed to be a seller or distributor of pesticides under this subchapter.

**(2) Private applicator**

The term "private applicator" means a certified applicator who uses or supervises the use of any pesticide which is classified for restricted use for purposes of producing any agricultural commodity on property owned or rented by the applicator or the applicator's employer or (if applied without compensation other than trading of personal services between producers of agricultural commodities) on the property of another person.

**(3) Commercial applicator**

The term "commercial applicator" means an applicator (whether or not the applicator is a private applicator with respect to some uses) who uses or supervises the use of any pesticide which is classified for restricted use for any purpose or on any property other than as provided by paragraph (2).

**(4) Under the direct supervision of a certified applicator**

Unless otherwise prescribed by its labeling, a pesticide shall be considered to be applied under the direct supervision of a certified applicator if it is applied by a competent person acting under the instructions and control of a certified applicator who is available if and when needed, even though such certified applicator is not physically present at the time and place the pesticide is applied.

**(f) Defoliant**

The term "defoliant" means any substance or mixture of substances intended for causing the leaves or foliage to drop from a plant, with or without causing abscission.

**(g) Desiccant**

The term "desiccant" means any substance or mixture of substances intended for artificially accelerating the drying of plant tissue.

**(h) Device**

The term "device" means any instrument or contrivance (other than a firearm) which is intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life (other than man and other than bacteria, virus, or other microorganism on or in living man or other living animals); but not including equipment used for the application of pesticides when sold separately therefrom.

**(i) District court**

The term "district court" means a United States district court, the District Court of Guam, the District Court of the Virgin Islands, and the highest court of American Samoa.

**(j) Environment**

The term "environment" includes water, air, land, and all plants and man and other animals living therein, and the interrelationships which exist among these.

**(k) Fungus**

The term "fungus" means any non-chlorophyll-bearing thallophyte (that is, any non-chlorophyll-bearing plant of a lower order than mosses and liverworts), as for example, rust, smut, mildew, mold, yeast, and bacteria,

except those on or in living man or other animals and those on or in processed food, beverages, or pharmaceuticals.

**(l) Imminent hazard**

The term "imminent hazard" means a situation which exists when the continued use of a pesticide during the time required for cancellation proceeding would be likely to result in unreasonable adverse effects on the environment or will involve unreasonable hazard to the survival of a species declared endangered or threatened by the Secretary pursuant to the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.].

**(m) Inert ingredient**

The term "inert ingredient" means an ingredient which is not active.

**(n) Ingredient statement**

The term "ingredient statement" means a statement which contains—

(1) the name and percentage of each active ingredient, and the total percentage of all inert ingredients, in the pesticide; and

(2) if the pesticide contains arsenic in any form, a statement of the percentages of total and water soluble arsenic, calculated as elementary arsenic.

**(o) Insect**

The term "insect" means any of the numerous small invertebrate animals generally having the body more or less obviously segmented, for the most part belonging to the class insecta, comprising six-legged, usually winged forms, as for example, beetles, bugs, bees, flies, and to other allied classes of arthropods whose members are wingless and usually have more than six legs, as for example, spiders, mites, ticks, centipedes, and wood lice.

**(p) Label and labeling**

**(1) Label**

The term "label" means the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers.

**(2) Labeling**

The term "labeling" means all labels and all other written, printed, or graphic matter—

(A) accompanying the pesticide or device at any time; or

(B) to which reference is made on the label or in literature accompanying the pesticide or device, except to current official publications of the Environmental Protection Agency, the United States Departments of Agriculture and Interior, the Department of Health and Human Services, State experiment stations, State agricultural colleges, and other similar Federal or State institutions or agencies authorized by law to conduct research in the field of pesticides.

**(q) Misbranded**

(1) A pesticide is misbranded if—

(A) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular;

(B) it is contained in a package or other container or wrapping which does not conform to the standards established by the Administrator pursuant to section 136w(c)(3) of this title;

(C) it is an imitation of, or is offered for sale under the name of, another pesticide;

(D) its label does not bear the registration number assigned under section 136e of this title to each establishment in which it was produced;

(E) any word, statement, or other information required by or under authority of this subchapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;

(F) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment;

(G) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment; or

(H) in the case of a pesticide not registered in accordance with section 136a of this title and intended for export, the label does not contain, in words prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) as to render it likely to

be noted by the ordinary individual under customary conditions of purchase and use, the following: "Not Registered for Use in the United States of America".

    (2) A pesticide is misbranded if—

      (A) the label does not bear an ingredient statement on that part of the immediate container (and on the outside container or wrapper of the retail package, if there be one, through which the ingredient statement on the immediate container cannot be clearly read) which is presented or displayed under customary conditions of purchase, except that a pesticide is not misbranded under this subparagraph if—

        (i) the size or form of the immediate container, or the outside container or wrapper of the retail package, makes it impracticable to place the ingredient statement on the part which is presented or displayed under customary conditions of purchase; and

        (ii) the ingredient statement appears prominently on another part of the immediate container, or outside container or wrapper, permitted by the Administrator;

      (B) the labeling does not contain a statement of the use classification under which the product is registered;

      (C) there is not affixed to its container, and to the outside container or wrapper of the retail package, if there be one, through which the required information on the immediate container cannot be clearly read, a label bearing—

        (i) the name and address of the producer, registrant, or person for whom produced;

        (ii) the name, brand, or trademark under which the pesticide is sold;

        (iii) the net weight or measure of the content, except that the Administrator may permit reasonable variations; and

        (iv) when required by regulation of the Administrator to effectuate the purposes of this subchapter, the registration number assigned to the pesticide under this subchapter, and the use classification; and

      (D) the pesticide contains any substance or substances in quantities highly toxic to man, unless the label shall bear, in addition to any other matter required by this subchapter—

        (i) the skull and crossbones;

        (ii) the word "poison" prominently in red on a background of distinctly contrasting color; and

        (iii) a statement of a practical treatment (first aid or otherwise) in case of poisoning by the pesticide.

### (r) Nematode

    The term "nematode" means invertebrate animals of the phylum nemathelminthes and class nematoda, that is, unsegmented round worms with elongated, fusiform, or saclike bodies covered with cuticle, and inhabiting soil, water, plants, or plant parts; may also be called nemas or eelworms.

### (s) Person

    The term "person" means any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not.

### (t) Pest

    The term "pest" means (1) any insect, rodent, nematode, fungus, weed, or (2) any other form of terrestrial or aquatic plant or animal life or virus, bacteria, or other micro-organism (except viruses, bacteria, or other micro-organisms on or in living man or other living animals) which the Administrator declares to be a pest under section 136w(c)(1) of this title.

### (u) Pesticide

    The term "pesticide" means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer, except that the term "pesticide" shall not include any article that is a "new animal drug" within the meaning of section 321(w) [1] of title 21, that has been determined by the Secretary of Health and Human Services not to be a new animal drug by a regulation establishing conditions of use for the article, or that is an animal feed within the meaning of section 321(x) [1] of title 21 bearing or containing a new animal drug. The term "pesticide" does not include liquid chemical sterilant products (including any sterilant or subordinate disinfectant claims on such products) for use on a critical or semi-critical device, as defined in section 321 of title 21. For purposes of the preceding sentence, the term "critical device" includes any device which is introduced directly into the human body, either into or in contact with the bloodstream or normally sterile areas of the body and the term "semi-critical device" includes any device which contacts intact mucous membranes but which does not ordinarily penetrate the blood barrier or otherwise enter normally sterile areas of the body.

### (v) Plant regulator

The term "plant regulator" means any substance or mixture of substances intended, through physiological action, for accelerating or retarding the rate of growth or rate of maturation, or for otherwise altering the behavior of plants or the produce thereof, but shall not include substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants, and soil amendments. Also, the term "plant regulator" shall not be required to include any of such those nutrient mixtures or soil amendments as are commonly known as vitamin-hormone horticultural products, intended for improvement, maintenance, survival, health, and propagation of plants, and as are not for pest destruction and are nontoxic, nonpoisonous in the undiluted packaged concentration.

### (w) Producer and produce

The term "producer" means the person who manufactures, prepares, compounds, propagates, or processes any pesticide or device or active ingredient used in producing a pesticide. The term "produce" means to manufacture, prepare, compound, propagate, or process any pesticide or device or active ingredient used in producing a pesticide. The dilution by individuals of formulated pesticides for their own use and according to the directions on registered labels shall not of itself result in such individuals being included in the definition of "producer" for the purposes of this subchapter.

### (x) Protect health and the environment

The terms "protect health and the environment" and "protection of health and the environment" mean protection against any unreasonable adverse effects on the environment.

### (y) Registrant

The term "registrant" means a person who has registered any pesticide pursuant to the provisions of this subchapter.

### (z) Registration

The term "registration" includes reregistration.

### (aa) State

The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa.

### (bb) Unreasonable adverse effects on the environment

The term "unreasonable adverse effects on the environment" means (1) any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide, or (2) a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the standard under section 346a of title 21. The Administrator shall consider the risks and benefits of public health pesticides separate from the risks and benefits of other pesticides. In weighing any regulatory action concerning a public health pesticide under this subchapter, the Administrator shall weigh any risks of the pesticide against the health risks such as the diseases transmitted by the vector to be controlled by the pesticide.

### (cc) Weed

The term "weed" means any plant which grows where not wanted.

### (dd) Establishment

The term "establishment" means any place where a pesticide or device or active ingredient used in producing a pesticide is produced, or held, for distribution or sale.

### (ee) To use any registered pesticide in a manner inconsistent with its labeling

The term "to use any registered pesticide in a manner inconsistent with its labeling" means to use any registered pesticide in a manner not permitted by the labeling, except that the term shall not include (1) applying a pesticide at any dosage, concentration, or frequency less than that specified on the labeling unless the labeling specifically prohibits deviation from the specified dosage, concentration, or frequency, (2) applying a pesticide against any target pest not specified on the labeling if the application is to the crop, animal, or site specified on the labeling, unless the Administrator has required that the labeling specifically state that the pesticide may be used only for the pests specified on the labeling after the Administrator has determined that the use of the pesticide against other pests would cause an unreasonable adverse effect on the environment, (3) employing any method of application not prohibited by the labeling unless the labeling specifically states that the product may be applied only by the methods specified on the labeling, (4) mixing a pesticide or pesticides with a fertilizer when such mixture is not prohibited by the labeling, (5) any use of a pesticide in conformance with section 136c, 136p, or 136v of this title, or (6) any use of a pesticide in a manner that the Administrator determines to be consistent with the purposes of this subchapter. After March 31, 1979, the term shall not

include the use of a pesticide for agricultural or forestry purposes at a dilution less than label dosage unless before or after that date the Administrator issues a regulation or advisory opinion consistent with the study provided for in section 27(b) of the Federal Pesticide Act of 1978, which regulation or advisory opinion specifically requires the use of definite amounts of dilution.

**(ff) Outstanding data requirement**

**(1) In general**

The term "outstanding data requirement" means a requirement for any study, information, or data that is necessary to make a determination under section 136a(c)(5) of this title and which study, information, or data —

(A) has not been submitted to the Administrator; or

(B) if submitted to the Administrator, the Administrator has determined must be resubmitted because it is not valid, complete, or adequate to make a determination under section 136a(c)(5) of this title and the regulations and guidelines issued under such section.

**(2) Factors**

In making a determination under paragraph (1)(B) respecting a study, the Administrator shall examine, at a minimum, relevant protocols, documentation of the conduct and analysis of the study, and the results of the study to determine whether the study and the results of the study fulfill the data requirement for which the study was submitted to the Administrator.

**(gg) To distribute or sell**

The term "to distribute or sell" means to distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver. The term does not include the holding or application of registered pesticides or use dilutions thereof by any applicator who provides a service of controlling pests without delivering any unapplied pesticide to any person so served.

**(hh) Nitrogen stabilizer**

The term "nitrogen stabilizer" means any substance or mixture of substances intended for preventing or hindering the process of nitrification, denitrification, ammonia volatilization, or urease production through action upon soil bacteria. Such term shall not include—

(1) dicyandiamide;

(2) ammonium thiosulfate; or

(3) any substance or mixture of substances.— [2]

(A) that was not registered pursuant to section 136a of this title prior to January 1, 1992; and

(B) that was in commercial agronomic use prior to January 1, 1992, with respect to which after January 1, 1992, the distributor or seller of the substance or mixture has made no specific claim of prevention or hindering of the process of nitrification, denitrification, ammonia volatilization [3] urease production regardless of the actual use or purpose for, or future use or purpose for, the substance or mixture.

Statements made in materials required to be submitted to any State legislative or regulatory authority, or required by such authority to be included in the labeling or other literature accompanying any such substance or mixture shall not be deemed a specific claim within the meaning of this subsection.

**(jj) [4] Maintenance applicator**

The term "maintenance applicator" means any individual who, in the principal course of such individual's employment, uses, or supervises the use of, a pesticide not classified for restricted use (other than a ready to use consumer products pesticide); for the purpose of providing structural pest control or lawn pest control including janitors, general maintenance personnel, sanitation personnel, and grounds maintenance personnel. The term "maintenance applicator" does not include private applicators as defined in subsection (e)(2); individuals who use antimicrobial pesticides, sanitizers or disinfectants; individuals employed by Federal, State, and local governments or any political subdivisions thereof, or individuals who use pesticides not classified for restricted use in or around their homes, boats, sod farms, nurseries, greenhouses, or other noncommercial property.

**(kk) Service technician**

The term "service technician" means any individual who uses or supervises the use of pesticides (other than a ready to use consumer products pesticide) for the purpose of providing structural pest control or lawn pest control on the property of another for a fee. The term "service technician" does not include individuals who use

antimicrobial pesticides, sanitizers or disinfectants; or who otherwise apply ready to use consumer products pesticides.

**(ll) Minor use**

The term "minor use" means the use of a pesticide on an animal, on a commercial agricultural crop or site, or for the protection of public health where—

(1) the total United States acreage for the crop is less than 300,000 acres, as determined by the Secretary of Agriculture; or

(2) the Administrator, in consultation with the Secretary of Agriculture, determines that, based on information provided by an applicant for registration or a registrant, the use does not provide sufficient economic incentive to support the initial registration or continuing registration of a pesticide for such use and —

(A) there are insufficient efficacious alternative registered pesticides available for the use;

(B) the alternatives to the pesticide use pose greater risks to the environment or human health;

(C) the minor use pesticide plays or will play a significant part in managing pest resistance; or

(D) the minor use pesticide plays or will play a significant part in an integrated pest management program.

The status as a minor use under this subsection shall continue as long as the Administrator has not determined that, based on existing data, such use may cause an unreasonable adverse effect on the environment and the use otherwise qualifies for such status.

**(mm) Antimicrobial pesticide**

**(1) In general**

The term "antimicrobial pesticide" means a pesticide that—

(A) is intended to—

(i) disinfect, sanitize, reduce, or mitigate growth or development of microbiological organisms; or

(ii) protect inanimate objects, industrial processes or systems, surfaces, water, or other chemical substances from contamination, fouling, or deterioration caused by bacteria, viruses, fungi, protozoa, algae, or slime; and

(B) in the intended use is exempt from, or otherwise not subject to, a tolerance under section 346a of title 21 or a food additive regulation under section 348 of title 21.

**(2) Excluded products**

The term "antimicrobial pesticide" does not include—

(A) a wood preservative or antifouling paint product for which a claim of pesticidal activity other than or in addition to an activity described in paragraph (1) is made;

(B) an agricultural fungicide product; or

(C) an aquatic herbicide product.

**(3) Included products**

The term "antimicrobial pesticide" does include any other chemical sterilant product (other than liquid chemical sterilant products exempt under subsection (u)), any other disinfectant product, any other industrial microbiocide product, and any other preservative product that is not excluded by paragraph (2).

**(nn) Public health pesticide**

The term "public health pesticide" means any minor use pesticide product registered for use and used predominantly in public health programs for vector control or for other recognized health protection uses, including the prevention or mitigation of viruses, bacteria, or other microorganisms (other than viruses, bacteria, or other microorganisms on or in living man or other living animal) that pose a threat to public health.

**(oo) Vector**

The term "vector" means any organism capable of transmitting the causative agent of human disease or capable of producing human discomfort or injury, including mosquitoes, flies, fleas, cockroaches, or other insects and ticks, mites, or rats.

(June 25, 1947, ch. 125, §2, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 975; amended Pub. L. 93–205, §13(f), Dec. 28, 1973, 87 Stat. 903; Pub. L. 94–140, §9, Nov. 28, 1975, 89 Stat. 754; Pub. L. 95–396, §1, Sept. 30, 1978, 92 Stat. 819; Pub. L. 100–532, title I, §101, title VI, §601(a), title VIII, §801(a), Oct. 25, 1988, 102 Stat. 2655, 2677, 2679; Pub. L. 102–237, title X, §1006(a)(1), (2), (b)(3)(A), (B), Dec. 13, 1991, 105 Stat. 1894, 1895; Pub. L. 104–170, title I, §§105(a), 120, title II, §§210(a), 221, 230, title III, §304, Aug. 3, 1996, 110 Stat. 1490, 1492, 1493, 1502, 1508, 1512.)

#### EDITORIAL NOTES

### REFERENCES IN TEXT

The Endangered Species Act of 1973, referred to in subsec. (l), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified generally to chapter 35 (§1531 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of Title 16 and Tables.

Section 321 of title 21, referred to in subsec. (u), was subsequently amended, and subsecs. (w) and (x) of section 321 no longer define the terms "new animal drug" and "animal feed", respectively. However, such terms are defined elsewhere in that section.

Section 27(b) of Federal Pesticide Act of 1978, referred to in subsec. (ee), is section 27(b) of Pub. L. 95–396, Sept. 30, 1978, 92 Stat. 841, which was formerly set out as a note under section 136w–4 of this title.

### PRIOR PROVISIONS

A prior section 2 of act June 25, 1947, was classified to section 135 of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

### AMENDMENTS

**1996**—Subsec. (a)(1). Pub. L. 104–170, §105(a)(1)(A), substituted "defoliant, desiccant, or nitrogen stabilizer" for "defoliant, or desiccant".

Subsec. (a)(5). Pub. L. 104–170, §105(a)(1)(B)–(D), added par. (5).

Subsec. (u). Pub. L. 104–170, §§105(a)(2), 221(1), struck out "and" before "(2)", inserted "and (3) any nitrogen stabilizer," after "desiccant,", and inserted at end "The term 'pesticide' does not include liquid chemical sterilant products (including any sterilant or subordinate disinfectant claims on such products) for use on a critical or semi-critical device, as defined in section 321 of title 21. For purposes of the preceding sentence, the term 'critical device' includes any device which is introduced directly into the human body, either into or in contact with the bloodstream or normally sterile areas of the body and the term 'semi-critical device' includes any device which contacts intact mucous membranes but which does not ordinarily penetrate the blood barrier or otherwise enter normally sterile areas of the body."

Subsec. (bb). Pub. L. 104–170, §304, which directed amendment of section 2(bb) by inserting "(1)" after "means" and adding cl. (2), without specifying the Act being amended, was executed to this subsection, which is section 2(bb) of the Federal Insecticide, Fungicide, and Rodenticide Act, to reflect the probable intent of Congress.

Pub. L. 104–170, §230(a), inserted at end "The Administrator shall consider the risks and benefits of public health pesticides separate from the risks and benefits of other pesticides. In weighing any regulatory action concerning a public health pesticide under this subchapter, the Administrator shall weigh any risks of the pesticide against the health risks such as the diseases transmitted by the vector to be controlled by the pesticide."

Subsec. (hh). Pub. L. 104–170, §105(a)(3), added subsec. (hh).

Subsecs. (jj), (kk). Pub. L. 104–170, §120, added subsecs. (jj) and (kk).

Subsec. (ll). Pub. L. 104–170, §210(a), added subsec. (ll).

Subsec. (mm). Pub. L. 104–170, §221(2), added subsec. (mm).

Subsecs. (nn), (oo). Pub. L. 104–170, §230(b), added subsecs. (nn) and (oo).

**1991**—Subsec. (e)(1). Pub. L. 102–237, §1006(a)(1), substituted "section 136i" for "section 136b" and "uses dilutions" for "use dilutions" and made technical amendment to reference to subsection (ee) of this section involving corresponding provision of original act.

Subsec. (e)(2). Pub. L. 102–237, §1006(b)(3)(A), substituted "the applicator or the applicator's" for "him or his".

Subsec. (e)(3). Pub. L. 102–237, §1006(b)(3)(B), substituted "the applicator" for "he".

Subsec. (q)(2)(A)(i). Pub. L. 102–237, §1006(a)(2), substituted "size or form" for "size of form".

**1988**—Subsec. (c). Pub. L. 100–532, §801(a)(1), substituted "if—" for "if:".

Subsec. (p)(2)(B). Pub. L. 100–532, §801(a)(2), substituted "Health and Human Services" for "Health, Education, and Welfare".

Subsec. (q)(2)(A). Pub. L. 100–532, §801(a)(3), substituted "if—" for "if:".

Subsec. (q)(2)(C)(iii). Pub. L. 100–532, §801(a)(4), substituted ", except that" for ": *Provided*, That".

Subsec. (u). Pub. L. 100–532, §801(a)(5), substituted ", except that" for ": *Provided*, That", struck out "(1)(a)" after "include any article" and "or (b)" after "section 321(w) of title 21,", and substituted "Health and Human Services" for "Health, Education, and Welfare", "or that is" for "or (2) that is", and "a new animal drug" for "an article covered by clause (1) of this proviso".

Subsec. (ee). Pub. L. 100–532, §§601(a)(1), 801(a)(6), substituted ", except that" for ": *Provided*, That", inserted "unless the labeling specifically prohibits deviation from the specified dosage, concentration, or frequency" and "unless the labeling specifically states that the product may be applied only by the methods specified on the labeling", substituted "labeling, (4) mixing" for "labeling, or (4) mixing", ", (5)" for ": *Provided further*, That the term also shall not include", "or (6) any use" for "or any use", and ". After" for ": *And provided further*, That after".

Subsec. (ff). Pub. L. 100–532, §101, added subsec. (ff).

Subsec. (gg). Pub. L. 100–532, §601(a)(2), added subsec. (gg).

**1978**—Subsec. (e)(1). Pub. L. 95–396, §1(1), inserted provision deeming an applicator not a seller or distributor of pesticides when providing a service of controlling pests.

Subsec. (e)(3). Pub. L. 95–396, §1(2), substituted "an applicator" for "a certified applicator".

Subsec. (q)(1)(H). Pub. L. 95–396, §1(3), added subpar. (H).

Subsec. (w). Pub. L. 95–396, §1(4), (5), amended definition of "producer" and "produce" to include reference to active ingredient used in producing a pesticide and inserted provision that an individual did not become a producer when there was dilution of a pesticide for personal use according to directions on registered labels.

Subsec. (dd). Pub. L. 95–396, §1(6), inserted "or active ingredient used in producing a pesticide".

Subsec. (ee). Pub. L. 95–396, §1(7), added subsec. (ee).

**1975**—Subsec. (u). Pub. L. 94–140 inserted proviso which excluded from term "pesticide" any article designated as "new animal drug" and any article denominated as animal feed.

**1973**—Subsec. (l). Pub. L. 93–205 substituted "or threatened by the Secretary pursuant to the Endangered Species Act of 1973" for "by the Secretary of the Interior under Public Law 91–135".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–532, title IX, §901, Oct. 25, 1988, 102 Stat. 2688, provided that: "Except as otherwise provided in this Act, the amendments made by this Act [see Short Title of 1988 Amendment note below] shall take effect on the expiration of 60 days after the date of enactment of this Act [Oct. 25, 1988]."

## EFFECTIVE DATE OF 1973 AMENDMENT

Amendment by Pub. L. 93–205 effective Dec. 28, 1973, see section 16 of Pub. L. 93–205, set out as an Effective Date note under section 1531 of Title 16, Conservation.

## EFFECTIVE DATE

Pub. L. 92–516, §4, Oct. 21, 1972, 86 Stat. 998, as amended by Pub. L. 94–140, §4, Nov. 28, 1975, 89 Stat. 752; Pub. L. 95–396, §28, Sept. 30, 1978, 92 Stat. 842, provided that:

"(a) Except as otherwise provided in the Federal Insecticide, Fungicide, and Rodenticide Act [this subchapter], as amended by this Act and as otherwise provided by this section, the amendments made by this Act [see Short Title note set out below] shall take effect at the close of the date of the enactment of this Act [Oct. 21, 1972], provided if regulations are necessary for the implementation of any provision that becomes effective on the date of enactment, such regulations shall be promulgated and shall become effective within 90 days from the date of enactment of this Act.

"(b) The provisions of the Federal Insecticide, Fungicide, and Rodenticide Act [this subchapter] and the regulations thereunder as such existed prior to the enactment of this Act shall remain in effect until superseded by the amendments made by this Act and regulations thereunder.

"(c)(1) Two years after the enactment of this Act the Administrator shall have promulgated regulations providing for the registration and classification of pesticides under the provisions of this Act and thereafter shall register all new applications under such provisions.

"(2) Any requirements that a pesticide be registered for use only by a certified applicator shall not be effective until five years from the date of enactment of this Act.

"(3) A period of five years from date of enactment shall be provided for certification of applicators.

"(A) One year after the enactment of this Act the Administrator shall have prescribed the standards for the certification of applicators.

"(B) Each State desiring to certify applicators shall submit a State plan to the Administrator for the purpose provided by section 4(b).

"(C) As promptly as possible but in no event more than one year after submission of a State plan, the Administrator shall approve the State plan or disapprove it and indicate the reasons for disapproval. Consideration of plans resubmitted by States shall be expedited.

"(4) One year after the enactment of this Act the Administrator shall have promulgated and shall make effective regulations relating to the registration of establishments, permits for experimental use, and the keeping of books and records under the provisions of this Act.

"(d) No person shall be subject to any criminal or civil penalty imposed by the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by this Act, for any act (or failure to act) occurring before the expiration of 60 days after the Administrator has published effective regulations in the Federal Register and taken such other action as may be necessary to permit compliance with the provisions under which the penalty is to be imposed.

"(e) For purposes of determining any criminal or civil penalty or liability to any third person in respect of any act or omission occurring before the expiration of the periods referred to in this section, the Federal Insecticide, Fungicide, and Rodenticide Act shall be treated as continuing in effect as if this Act had not been enacted."

### SHORT TITLE OF 2022 AMENDMENT

Pub. L. 117–328, div. HH, title VI, §701, Dec. 29, 2022, 136 Stat. 5996, provided that: "This title [amending sections 136a, 136a–1, and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as notes under sections 136a, 136a–1, and 136w of this title] may be cited as the 'Pesticide Registration Improvement Act of 2022'."

### SHORT TITLE OF 2019 AMENDMENT

Pub. L. 116–8, §1(a), Mar. 8, 2019, 133 Stat. 484, provided that: "This Act [amending sections 136a–1, 136c, and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as a note under section 136w of this title] may be cited as the 'Pesticide Registration Improvement Extension Act of 2018'."

### SHORT TITLE OF 2012 AMENDMENT

Pub. L. 112–177, §1, Sept. 28, 2012, 126 Stat. 1327, provided that: "This Act [amending sections 136a–1 and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as notes under section 136a–1 of this title] may be cited as the 'Pesticide Registration Improvement Extension Act of 2012'."

### SHORT TITLE OF 2007 AMENDMENT

Pub. L. 110–94, §1, Oct. 9, 2007, 121 Stat. 1000, provided that: "This Act [amending sections 136a, 136a–1, and 136w–8 of this title and section 346a of Title 21, Food and Drugs, and enacting provisions set out as a note under section 136a of this title] may be cited as the 'Pesticide Registration Improvement Renewal Act'."

### SHORT TITLE OF 2004 AMENDMENT

Pub. L. 108–199, div. G, title V, §501(a), Jan. 23, 2004, 118 Stat. 419, provided that: "This section [enacting section 136w–8 of this title, amending sections 136a, 136a–1, 136x, and 136y of this title, and enacting provisions set out as notes under section 136a of this title and section 346a of Title 21, Food and Drugs] may be cited as the 'Pesticide Registration Improvement Act of 2003'."

### SHORT TITLE OF 1996 AMENDMENT

Pub. L. 104–170, §1, Aug. 3, 1996, 110 Stat. 1489, provided that: "This Act [enacting sections 136i–2, 136r–1, and 136w–5 to 136w–7 of this title, amending this section, sections 136a, 136a–1, 136d, 136q,

136s, 136w, 136w–3, 136x, and 136y of this title, and sections 321, 331, 333, 342, and 346a of Title 21, Food and Drugs, and enacting provisions set out as notes under section 136i–2 of this title and sections 301 and 346a of Title 21] may be cited as the 'Food Quality Protection Act of 1996'."

[Another Food Quality Protection Act of 1996 was enacted by Pub. L. 104–170, title IV, 110 Stat. 1513, see section 401(a) of Pub. L. 104–170, set out as a note under section 301 of Title 21, Food and Drugs.]

### SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–532, §1(a), Oct. 25, 1988, 102 Stat. 2654, provided that: "This Act [enacting section 136a–1 of this title, amending this section and sections 136a to 136d, 136f to 136q, 136s, 136v to 136w–2, and 136y of this title, and enacting provisions set out as notes under this section and sections 136m and 136y of this title] may be cited as the 'Federal Insecticide, Fungicide, and Rodenticide Act Amendments of 1988'."

### SHORT TITLE OF 1978 AMENDMENT

Pub. L. 95–396, §29, Sept. 30, 1978, 92 Stat. 842, provided that: "This Act [enacting sections 136w–1 to 136w–4 of this title, amending this section and sections 136a to 136f, 136h, 136j, 136l, 136o, 136q, 136r, 136u to 136w, 136x, and 136y of this title, enacting provisions set out as notes under sections 136a, 136o, and 136w–4 of this title, and amending provisions set out as a note under this section] may be cited as the 'Federal Pesticide Act of 1978'."

### SHORT TITLE

Pub. L. 92–516, §1, Oct. 21, 1972, 86 Stat. 973, provided: "That this Act [amending this subchapter generally, enacting notes set out under this section, and amending sections 1261 and 1471 of Title 15, Commerce and Trade, and sections 321 and 346a of Title 21, Foods and Drugs] may be cited as the 'Federal Environmental Pesticide Control Act of 1972'."

Act June 25, 1947, ch. 125, §1(a), as added by Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 973, provided that: "This Act [enacting this subchapter] may be cited as the 'Federal Insecticide, Fungicide, and Rodenticide Act'."

### EXECUTIVE DOCUMENTS

### TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

### FEDERAL COMPLIANCE WITH POLLUTION CONTROL STANDARDS

For provisions relating to the responsibility of the head of each Executive agency for compliance with applicable pollution control standards, see Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare.

1 See References in Text note below.

2 So in original. Period probably should not appear.

3 So in original. Probably should be followed by ", or".

4 So in original. No subsec. (ii) was enacted.

# §136a. Registration of pesticides

### (a) Requirement of registration

Except as provided by this subchapter, no person in any State may distribute or sell to any person any pesticide that is not registered under this subchapter. To the extent necessary to prevent unreasonable adverse effects on the environment, the Administrator may by regulation limit the distribution, sale, or use in any State of

any pesticide that is not registered under this subchapter and that is not the subject of an experimental use permit under section 136c of this title or an emergency exemption under section 136p of this title.

**(b) Exemptions**

A pesticide which is not registered with the Administrator may be transferred if—

(1) the transfer is from one registered establishment to another registered establishment operated by the same producer solely for packaging at the second establishment or for use as a constituent part of another pesticide produced at the second establishment; or

(2) the transfer is pursuant to and in accordance with the requirements of an experimental use permit.

**(c) Procedure for registration**

**(1) Statement required**

Each applicant for registration of a pesticide shall file with the Administrator a statement which includes—

(A) the name and address of the applicant and of any other person whose name will appear on the labeling;

(B) the name of the pesticide;

(C) a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use;

(D) the complete formula of the pesticide;

(E) a request that the pesticide be classified for general use or for restricted use, or for both; and

(F) except as otherwise provided in paragraph (2)(D), if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:

(i) With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide, except that such permission shall not be required in the case of defensive data.

(ii) The period of exclusive data use provided under clause (i) shall be extended 1 additional year for each 3 minor uses registered after August 3, 1996, and within 7 years of the commencement of the exclusive use period, up to a total of 3 additional years for all minor uses registered by the Administrator if the Administrator, in consultation with the Secretary of Agriculture, determines that, based on information provided by an applicant for registration or a registrant, that—

(I) there are insufficient efficacious alternative registered pesticides available for the use;

(II) the alternatives to the minor use pesticide pose greater risks to the environment or human health;

(III) the minor use pesticide plays or will play a significant part in managing pest resistance; or

(IV) the minor use pesticide plays or will play a significant part in an integrated pest management program.

The registration of a pesticide for a minor use on a crop grouping established by the Administrator shall be considered for purposes of this clause 1 minor use for each representative crop for which data are provided in the crop grouping. Any additional exclusive use period under this clause shall be modified as appropriate or terminated if the registrant voluntarily cancels the product or deletes from the registration the minor uses which formed the basis for the extension of the additional exclusive use period or if the Administrator determines that the registrant is not actually marketing the product for such minor uses.

(iii) Except as otherwise provided in clause (i), with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for reregistration, the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the "applicant") within the fifteen-year period following the date the data were originally submitted only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer. The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration under this subparagraph. If, at the end of ninety days after the date of delivery to the original data submitter of the offer to compensate, the original data submitter and the applicant have neither agreed

on the amount and terms of compensation nor on a procedure for reaching an agreement on the amount and terms of compensation, either person may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. The parties to the arbitration shall share equally in the payment of the fee and expenses of the arbitrator. If the Administrator determines that an original data submitter has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the original data submitter shall forfeit the right to compensation for the use of the data in support of the application. Notwithstanding any other provision of this subchapter, if the Administrator determines that an applicant has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support of which the data were used without further hearing. Before the Administrator takes action under either of the preceding two sentences, the Administrator shall furnish to the affected person, by certified mail, notice of intent to take action and allow fifteen days from the date of delivery of the notice for the affected person to respond. If a registration is denied or canceled under this subparagraph, the Administrator may make such order as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Registration action by the Administrator shall not be delayed pending the fixing of compensation.

(iv) After expiration of any period of exclusive use and any period for which compensation is required for the use of an item of data under clauses (i), (ii), and (iii), the Administrator may consider such item of data in support of an application by any other applicant without the permission of the original data submitter and without an offer having been received to compensate the original data submitter for the use of such item of data.

(v) The period of exclusive use provided under clause (ii) shall not take effect until 1 year after August 3, 1996, except where an applicant or registrant is applying for the registration of a pesticide containing an active ingredient not previously registered.

(vi) With respect to data submitted after August 3, 1996, by an applicant or registrant to support an amendment adding a new use to an existing registration that does not retain any period of exclusive use, if such data relates solely to a minor use of a pesticide, such data shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application for a minor use by another person during the period of 10 years following the date of submission of such data. The applicant or registrant at the time the new minor use is requested shall notify the Administrator that to the best of their knowledge the exclusive use period for the pesticide has expired and that the data pertaining solely to the minor use of a pesticide is eligible for the provisions of this paragraph. If the minor use registration which is supported by data submitted pursuant to this subsection is voluntarily canceled or if such data are subsequently used to support a nonminor use, the data shall no longer be subject to the exclusive use provisions of this clause but shall instead be considered by the Administrator in accordance with the provisions of clause (i), as appropriate.

(G) If the applicant is requesting that the registration or amendment to the registration of a pesticide be expedited, an explanation of the basis for the request must be submitted, in accordance with paragraph (10) of this subsection.

## (2) Data in support of registration

### (A) In general

The Administrator shall publish guidelines specifying the kinds of information which will be required to support the registration of a pesticide and shall revise such guidelines from time to time. If thereafter the Administrator requires any additional kind of information under subparagraph (B) of this paragraph, the Administrator shall permit sufficient time for applicants to obtain such additional information. The Administrator, in establishing standards for data requirements for the registration of pesticides with respect to minor uses, shall make such standards commensurate with the anticipated extent of use, pattern of use, the public health and agricultural need for such minor use, and the level and degree of potential beneficial or adverse effects on man and the environment. The Administrator shall not require a person to submit, in

relation to a registration or reregistration of a pesticide for minor agricultural use under this subchapter, any field residue data from a geographic area where the pesticide will not be registered for such use. In the development of these standards, the Administrator shall consider the economic factors of potential national volume of use, extent of distribution, and the impact of the cost of meeting the requirements on the incentives for any potential registrant to undertake the development of the required data. Except as provided by section 136h of this title, within 30 days after the Administrator registers a pesticide under this subchapter the Administrator shall make available to the public the data called for in the registration statement together with such other scientific information as the Administrator deems relevant to the Administrator's decision.

**(B) Additional data**

(i) If the Administrator determines that additional data are required to maintain in effect an existing registration of a pesticide, the Administrator shall notify all existing registrants of the pesticide to which the determination relates and provide a list of such registrants to any interested person.

(ii) Each registrant of such pesticide shall provide evidence within ninety days after receipt of notification that it is taking appropriate steps to secure the additional data that are required. Two or more registrants may agree to develop jointly, or to share in the cost of developing, such data if they agree and advise the Administrator of their intent within ninety days after notification. Any registrant who agrees to share in the cost of producing the data shall be entitled to examine and rely upon such data in support of maintenance of such registration. The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.

(iii) If, at the end of sixty days after advising the Administrator of their agreement to develop jointly, or share in the cost of developing, data, the registrants have not further agreed on the terms of the data development arrangement or on a procedure for reaching such agreement, any of such registrants may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. All parties to the arbitration shall share equally in the payment of the fee and expenses of the arbitrator. The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.

(iv) Notwithstanding any other provision of this subchapter, if the Administrator determines that a registrant, within the time required by the Administrator, has failed to take appropriate steps to secure the data required under this subparagraph, to participate in a procedure for reaching agreement concerning a joint data development arrangement under this subparagraph or in an arbitration proceeding as required by this subparagraph, or to comply with the terms of an agreement or arbitration decision concerning a joint data development arrangement under this subparagraph, the Administrator may issue a notice of intent to suspend such registrant's registration of the pesticide for which additional data is required. The Administrator may include in the notice of intent to suspend such provisions as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Any suspension proposed under this subparagraph shall become final and effective at the end of thirty days from receipt by the registrant of the notice of intent to suspend, unless during that time a request for hearing is made by a person adversely affected by the notice or the registrant has satisfied the Administrator that the registrant has complied fully with the requirements that served as a basis for the notice of intent to suspend. If a hearing is requested, a hearing shall be conducted under section 136d(d) of this title. The only matters for resolution at that hearing shall be whether the registrant has failed to take the action that served as the basis for the notice of intent to suspend the registration of the pesticide for which additional data is required, and whether the Administrator's determination with respect to the disposition of existing stocks is consistent with this subchapter. If a hearing is held, a decision after completion of such hearing shall be final. Notwithstanding any other provision of this subchapter, a hearing shall be held and a determination made within seventy-five days after receipt of a request for such hearing. Any registration suspended under this subparagraph shall be reinstated by the Administrator if the Administrator determines that the registrant has complied fully with the requirements that served as a basis for the suspension of the registration.

(v) Any data submitted under this subparagraph shall be subject to the provisions of paragraph (1)(D). Whenever such data are submitted jointly by two or more registrants, an agent shall be agreed on at the time of the joint submission to handle any subsequent data compensation matters for the joint submitters of such data.

(vi) Upon the request of a registrant the Administrator shall, in the case of a minor use, extend the deadline for the production of residue chemistry data under this subparagraph for data required solely to support that minor use until the final deadline for submission of data under section 136a–1 of this title for the other uses of the pesticide established as of August 3, 1996, if—

(I) the data to support other uses of the pesticide on a food are being provided;

(II) the registrant, in submitting a request for such an extension, provides a schedule, including interim dates to measure progress, to assure that the data production will be completed before the expiration of the extension period;

(III) the Administrator has determined that such extension will not significantly delay the Administrator's schedule for issuing a reregistration eligibility determination required under section 136a–1 of this title; and

(IV) the Administrator has determined that based on existing data, such extension would not significantly increase the risk of any unreasonable adverse effect on the environment. If the Administrator grants an extension under this clause, the Administrator shall monitor the development of the data and shall ensure that the registrant is meeting the schedule for the production of the data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) regarding the continued registration of the affected products with the minor use and shall inform the public of such action. Notwithstanding the provisions of this clause, the Administrator may take action to modify or revoke the extension under this clause if the Administrator determines that the extension for the minor use may cause an unreasonable adverse effect on the environment. In such circumstance, the Administrator shall provide, in writing to the registrant, a notice revoking the extension of time for submission of data. Such data shall instead be due in accordance with the date established by the Administrator for the submission of the data.

(vii) If the registrant does not commit to support a specific minor use of the pesticide, but is supporting and providing data in a timely and adequate fashion to support uses of the pesticide on a food, or if all uses of the pesticide are nonfood uses and the registrant does not commit to support a specific minor use of the pesticide but is supporting and providing data in a timely and adequate fashion to support other nonfood uses of the pesticide, the Administrator, at the written request of the registrant, shall not take any action pursuant to this clause in regard to such unsupported minor use until the final deadline established as of August 3, 1996, for the submission of data under section 136a–1 of this title for the supported uses identified pursuant to this clause unless the Administrator determines that the absence of the data is significant enough to cause human health or environmental concerns. On the basis of such determination, the Administrator may refuse the request for extension by the registrant. Upon receipt of the request from the registrant, the Administrator shall publish in the Federal Register a notice of the receipt of the request and the effective date upon which the uses not being supported will be voluntarily deleted from the registration pursuant to section 136d(f)(1) of this title. If the Administrator grants an extension under this clause, the Administrator shall monitor the development of the data for the uses being supported and shall ensure that the registrant is meeting the schedule for the production of such data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) of this subparagraph regarding the continued registration of the affected products with the minor and other uses and shall inform the public of such action in accordance with section 136d(f)(2) of this title. Notwithstanding the provisions of this clause, the Administrator may deny, modify, or revoke the temporary extension under this subparagraph if the Administrator determines that the continuation of the minor use may cause an unreasonable adverse effect on the environment. In the event of modification or revocation, the Administrator shall provide, in writing, to the registrant a notice revoking the temporary extension and establish a new effective date by which the minor use shall be deleted from the registration.

(viii)(I) If data required to support registration of a pesticide under subparagraph (A) is requested by a Federal or State regulatory authority, the Administrator shall, to the extent practicable, coordinate data requirements, test protocols, timetables, and standards of review and reduce burdens and redundancy caused to the registrant by multiple requirements on the registrant.

(II) The Administrator may enter into a cooperative agreement with a State to carry out subclause (I).

(III) Not later than 1 year after August 3, 1996, the Administrator shall develop a process to identify and assist in alleviating future disparities between Federal and State data requirements.

### (C) Simplified procedures

Within nine months after September 30, 1978, the Administrator shall, by regulation, prescribe simplified procedures for the registration of pesticides, which shall include the provisions of subparagraph (D) of this paragraph.

### (D) Exemption

No applicant for registration of a pesticide who proposes to purchase a registered pesticide from another producer in order to formulate such purchased pesticide into the pesticide that is the subject of the application shall be required to—

(i) submit or cite data pertaining to such purchased product; or

(ii) offer to pay reasonable compensation otherwise required by paragraph (1)(D) of this subsection for the use of any such data.

### (E) Minor use waiver

In handling the registration of a pesticide for a minor use, the Administrator may waive otherwise applicable data requirements if the Administrator determines that the absence of such data will not prevent the Administrator from determining—

(i) the incremental risk presented by the minor use of the pesticide; and

(ii) that such risk, if any, would not be an unreasonable adverse effect on the environment.

## (3) Application

### (A) In general

The Administrator shall review the data after receipt of the application and shall, as expeditiously as possible, either register the pesticide in accordance with paragraph (5), or notify the applicant of the Administrator's determination that it does not comply with the provisions of the subchapter in accordance with paragraph (6).

### (B) Identical or substantially similar

(i) The Administrator shall, as expeditiously as possible, review and act on any application received by the Administrator that—

(I) proposes the initial or amended registration of an end-use pesticide that, if registered as proposed, would be identical or substantially similar in composition and labeling to a currently-registered pesticide identified in the application, or that would differ in composition and labeling from such currently-registered pesticide only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment; or

(II) proposes an amendment to the registration of a registered pesticide that does not require scientific review of data.

(ii) In expediting the review of an application for an action described in clause (i), the Administrator shall—

(I) review the application in accordance with section 136w–8(f)(4)(B) of this title and, if the application is found to be incomplete, reject the application;

(II) not later than the applicable decision review time established pursuant to section 136w–8(f)(4)(B) of this title, or, if no review time is established, not later than 90 days after receiving a complete application, notify the registrant if the application has been granted or denied; and

(III) if the application is denied, notify the registrant in writing of the specific reasons for the denial of the application.

### (C) Minor use registration

(i) The Administrator shall, as expeditiously as possible, review and act on any complete application—

(I) that proposes the initial registration of a new pesticide active ingredient if the active ingredient is proposed to be registered solely for minor uses, or proposes a registration amendment solely for minor uses to an existing registration; or

(II) for a registration or a registration amendment that proposes significant minor uses.

(ii) For the purposes of clause (i)—

(I) the term "as expeditiously as possible" means that the Administrator shall, to the greatest extent practicable, complete a review and evaluation of all data, submitted with a complete application, within 12 months after the submission of the complete application, and the failure of the Administrator to complete such a review and evaluation under clause (i) shall not be subject to judicial review; and

(II) the term "significant minor uses" means 3 or more minor uses proposed for every nonminor use, a minor use that would, in the judgment of the Administrator, serve as a replacement for any use which has been canceled in the 5 years preceding the receipt of the application, or a minor use that in the opinion of the Administrator would avoid the reissuance of an emergency exemption under section 136p of this title for that minor use.

### (D) Adequate time for submission of minor use data

If a registrant makes a request for a minor use waiver, regarding data required by the Administrator, pursuant to paragraph (2)(E), and if the Administrator denies in whole or in part such data waiver request, the registrant shall have a full-time period for providing such data. For purposes of this subparagraph, the term "full-time period" means the time period originally established by the Administrator for submission of such data, beginning with the date of receipt by the registrant of the Administrator's notice of denial.

**(4) Notice of application**

The Administrator shall publish in the Federal Register, promptly after receipt of the statement and other data required pursuant to paragraphs (1) and (2), a notice of each application for registration of any pesticide if it contains any new active ingredient or if it would entail a changed use pattern. The notice shall provide for a period of 30 days in which any Federal agency or any other interested person may comment.

**(5) Approval of registration**

The Administrator shall register a pesticide if the Administrator determines that, when considered with any restrictions imposed under subsection (d)—
    (A) its composition is such as to warrant the proposed claims for it;
    (B) its labeling and other material required to be submitted comply with the requirements of this subchapter;
    (C) it will perform its intended function without unreasonable adverse effects on the environment; and
    (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

The Administrator shall not make any lack of essentiality a criterion for denying registration of any pesticide. Where two pesticides meet the requirements of this paragraph, one should not be registered in preference to the other. In considering an application for the registration of a pesticide, the Administrator may waive data requirements pertaining to efficacy, in which event the Administrator may register the pesticide without determining that the pesticide's composition is such as to warrant proposed claims of efficacy. If a pesticide is found to be efficacious by any State under section 136v(c) of this title, a presumption is established that the Administrator shall waive data requirements pertaining to efficacy for use of the pesticide in such State.

**(6) Denial of registration**

If the Administrator determines that the requirements of paragraph (5) for registration are not satisfied, the Administrator shall notify the applicant for registration of the Administrator's determination and of the Administrator's reasons (including the factual basis) therefor, and that, unless the applicant corrects the conditions and notifies the Administrator thereof during the 30-day period beginning with the day after the date on which the applicant receives the notice, the Administrator may refuse to register the pesticide. Whenever the Administrator refuses to register a pesticide, the Administrator shall notify the applicant of the Administrator's decision and of the Administrator's reasons (including the factual basis) therefor. The Administrator shall promptly publish in the Federal Register notice of such denial of registration and the reasons therefor. Upon such notification, the applicant for registration or other interested person with the concurrence of the applicant shall have the same remedies as provided for in section 136d of this title.

**(7) Registration under special circumstances**

Notwithstanding the provisions of paragraph (5)—
    (A) The Administrator may conditionally register or amend the registration of a pesticide if the Administrator determines that (i) the pesticide and proposed use are identical or substantially similar to any currently registered pesticide and use thereof, or differ only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment, and (ii) approving the registration or amendment in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment. An applicant seeking conditional registration or amended registration under this subparagraph shall submit such data as would be required to obtain registration of a similar pesticide under paragraph (5). If the applicant is unable to submit an item of data because it has not yet been generated, the Administrator may register or amend the registration of the pesticide under such conditions as will require the submission of such data not later than the time such data are required to be submitted with respect to similar pesticides already registered under this subchapter.
    (B) The Administrator may conditionally amend the registration of a pesticide to permit additional uses of such pesticide notwithstanding that data concerning the pesticide may be insufficient to support an unconditional amendment, if the Administrator determines that (i) the applicant has submitted satisfactory data pertaining to the proposed additional use, and (ii) amending the registration in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment. Notwithstanding the foregoing provisions of this subparagraph, no registration of a pesticide may be amended to permit an additional use of such pesticide if the Administrator has issued a notice

stating that such pesticide, or any ingredient thereof, meets or exceeds risk criteria associated in whole or in part with human dietary exposure enumerated in regulations issued under this subchapter, and during the pendency of any risk-benefit evaluation initiated by such notice, if (I) the additional use of such pesticide involves a major food or feed crop, or (II) the additional use of such pesticide involves a minor food or feed crop and the Administrator determines, with the concurrence of the Secretary of Agriculture, there is available an effective alternative pesticide that does not meet or exceed such risk criteria. An applicant seeking amended registration under this subparagraph shall submit such data as would be required to obtain registration of a similar pesticide under paragraph (5). If the applicant is unable to submit an item of data (other than data pertaining to the proposed additional use) because it has not yet been generated, the Administrator may amend the registration under such conditions as will require the submission of such data not later than the time such data are required to be submitted with respect to similar pesticides already registered under this subchapter.

(C) The Administrator may conditionally register a pesticide containing an active ingredient not contained in any currently registered pesticide for a period reasonably sufficient for the generation and submission of required data (which are lacking because a period reasonably sufficient for generation of the data has not elapsed since the Administrator first imposed the data requirement) on the condition that by the end of such period the Administrator receives such data and the data do not meet or exceed risk criteria enumerated in regulations issued under this subchapter, and on such other conditions as the Administrator may prescribe. A conditional registration under this subparagraph shall be granted only if the Administrator determines that use of the pesticide during such period will not cause any unreasonable adverse effect on the environment, and that use of the pesticide is in the public interest.

## (8) Interim administrative review

Notwithstanding any other provision of this subchapter, the Administrator may not initiate a public interim administrative review process to develop a risk-benefit evaluation of the ingredients of a pesticide or any of its uses prior to initiating a formal action to cancel, suspend, or deny registration of such pesticide, required under this subchapter, unless such interim administrative process is based on a validated test or other significant evidence raising prudent concerns of unreasonable adverse risk to man or to the environment. Notice of the definition of the terms "validated test" and "other significant evidence" as used herein shall be published by the Administrator in the Federal Register.

## (9) Labeling

### (A) Additional statements

Subject to subparagraphs (B) and (C), it shall not be a violation of this subchapter for a registrant to modify the labeling of an antimicrobial pesticide product to include relevant information on product efficacy, product composition, container composition or design, or other characteristics that do not relate to any pesticidal claim or pesticidal activity.

### (B) Requirements

Proposed labeling information under subparagraph (A) shall not be false or misleading, shall not conflict with or detract from any statement required by law or the Administrator as a condition of registration, and shall be substantiated on the request of the Administrator.

### (C) Notification and disapproval

#### (i) Notification

A registration may be modified under subparagraph (A) if—
(I) the registrant notifies the Administrator in writing not later than 60 days prior to distribution or sale of a product bearing the modified labeling; and
(II) the Administrator does not disapprove of the modification under clause (ii).

#### (ii) Disapproval

Not later than 30 days after receipt of a notification under clause (i), the Administrator may disapprove the modification by sending the registrant notification in writing stating that the proposed language is not acceptable and stating the reasons why the Administrator finds the proposed modification unacceptable.

#### (iii) Restriction on sale

A registrant may not sell or distribute a product bearing a disapproved modification.

#### (iv) Objection

A registrant may file an objection in writing to a disapproval under clause (ii) not later than 30 days after receipt of notification of the disapproval.

#### (v) Final action

A decision by the Administrator following receipt and consideration of an objection filed under clause (iv) shall be considered a final agency action.

### (D) Use dilution

The label or labeling required under this subchapter for an antimicrobial pesticide that is or may be diluted for use may have a different statement of caution or protective measures for use of the recommended diluted solution of the pesticide than for use of a concentrate of the pesticide if the Administrator determines that—

(i) adequate data have been submitted to support the statement proposed for the diluted solution uses; and

(ii) the label or labeling provides adequate protection for exposure to the diluted solution of the pesticide.

## (10) Expedited registration of pesticides

(A) Not later than 1 year after August 3, 1996, the Administrator shall, utilizing public comment, develop procedures and guidelines, and expedite the review of an application for registration of a pesticide or an amendment to a registration that satisfies such guidelines.

(B) Any application for registration or an amendment, including biological and conventional pesticides, will be considered for expedited review under this paragraph. An application for registration or an amendment shall qualify for expedited review if use of the pesticide proposed by the application may reasonably be expected to accomplish 1 or more of the following:

(i) Reduce the risks of pesticides to human health.

(ii) Reduce the risks of pesticides to nontarget organisms.

(iii) Reduce the potential for contamination of groundwater, surface water, or other valued environmental resources.

(iv) Broaden the adoption of integrated pest management strategies, or make such strategies more available or more effective.

(C) The Administrator, not later than 30 days after receipt of an application for expedited review, shall notify the applicant whether the application is complete. If it is found to be incomplete, the Administrator may either reject the request for expedited review or ask the applicant for additional information to satisfy the guidelines developed under subparagraph (A).

## (11) Interagency working group

### (A) Definition of covered agency

In this paragraph, the term "covered agency" means any of the following:

(i) The Department of Agriculture.

(ii) The Department of Commerce.

(iii) The Department of the Interior.

(iv) The Council on Environmental Quality.

(v) The Environmental Protection Agency.

### (B) Establishment

The Administrator shall establish an interagency working group, to be comprised of representatives from each covered agency, to provide recommendations regarding, and to implement a strategy for improving, the consultation process required under section 7 of the Endangered Species Act of 1973 (16 U.S.C. 1536) for pesticide registration and registration review.

### (C) Duties

The interagency working group established under subparagraph (B) shall—

(i) analyze relevant Federal law (including regulations) and case law for purposes of providing an outline of the legal and regulatory framework for the consultation process referred to in that subparagraph, including—

(I) requirements under this subchapter and the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(II) Federal case law regarding the intersection of this subchapter and the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.); and

(III) Federal regulations relating to the pesticide consultation process;

(ii) provide advice regarding methods of—

(I) defining the scope of actions of the covered agencies that are subject to the consultation requirement referred to in subparagraph (B); and

(II) properly identifying and classifying effects of actions of the covered agencies with respect to that consultation requirement;

(iii) identify the obligations and limitations under Federal law of each covered agency for purposes of providing a legal and regulatory framework for developing the recommendations referred to in subparagraph (B);

(iv) review practices for the consultation referred to in subparagraph (B) to identify problem areas, areas for improvement, and best practices for conducting that consultation among the covered agencies;

(v) develop scientific and policy approaches to increase the accuracy and timeliness of the process for that consultation, in accordance with requirements of this subchapter and the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), including—

(I) processes to efficiently share data and coordinate analyses among the Department of Agriculture, the Department of Commerce, the Department of the Interior, and the Environmental Protection Agency;

(II) a streamlined process for identifying which actions require no consultation, informal consultation, or formal consultation;

(III) an approach that will provide clarity with respect to what constitutes the best scientific and commercial data available in the fields of pesticide use and ecological risk assessment, pursuant to section 7(a)(2) of the Endangered Species Act of 1973 (16 U.S.C. 1536(a)(2)); and

(IV) approaches that enable the Environmental Protection Agency to better assist the Department of the Interior and the Department of Commerce in carrying out obligations under that section in a timely and efficient manner; and

(vi) propose and implement a strategy to implement approaches to consultations under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) and document that strategy in a memorandum of understanding, revised regulations, or another appropriate format to promote durable cooperation among the covered agencies.

**(D) Reports**

**(i) Progress reports**

**(I) In general**

Not later than 18 months after December 20, 2018, the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing the progress of the working group in developing the recommendations under subparagraph (B).

**(II) Requirements**

The report under this clause shall—
(aa) reflect the perspectives of each covered agency; and
(bb) identify areas of new consensus and continuing topics of disagreement and debate.

**(ii) Results**

**(I) In general**

Not later than 1 year after December 20, 2018, the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing—
(aa) the recommendations developed under subparagraph (B); and
(bb) plans for implementation of those recommendations.

**(II) Requirements**

The report under this clause shall—
(aa) reflect the perspectives of each covered agency; and
(bb) identify areas of consensus and continuing topics of disagreement and debate, if any.

**(iii) Implementation**

Not later than 1 year after the date of submission of the report under clause (i), the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing—

(I) the implementation of the recommendations referred to in that clause;

(II) the extent to which that implementation improved the consultation process referred to in subparagraph (B); and

(III) any additional recommendations for improvements to the process described in subparagraph (B).

### (iv) Other reports

Not later than the date that is 180 days after the date of submission of the report under clause (iii), and not less frequently than once every 180 days thereafter during the 5-year period beginning on that date, the Administrator, in coordination with the head of each other covered agency, shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing—

(I) the implementation of the recommendations referred to in that clause;

(II) the extent to which that implementation improved the consultation process referred to in subparagraph (B); and

(III) any additional recommendations for improvements to the process described in subparagraph (B).

### (E) Consultation with private sector

In carrying out the duties under this paragraph, the working group shall, as appropriate—

(i) consult with, representatives of interested industry stakeholders and nongovernmental organizations; and

(ii) take into consideration factors, such as actual and potential differences in interest between, and the views of, those stakeholders and organizations.

### (F) Chapter 10 of title 5

Chapter 10 of title 5 shall not apply to the working group established under this paragraph.

### (G) Savings clause

Nothing in this paragraph supersedes any provision of—

(i) this subchapter; or

(ii) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), including the requirements under section 7 of that Act (16 U.S.C. 1536).

## (d) Classification of pesticides

### (1) Classification for general use, restricted use, or both

(A) As a part of the registration of a pesticide the Administrator shall classify it as being for general use or for restricted use. If the Administrator determines that some of the uses for which the pesticide is registered should be for general use and that other uses for which it is registered should be for restricted use, the Administrator shall classify it for both general use and restricted use. Pesticide uses may be classified by regulation on the initial classification, and registered pesticides may be classified prior to reregistration. If some of the uses of the pesticide are classified for general use, and other uses are classified for restricted use, the directions relating to its general uses shall be clearly separated and distinguished from those directions relating to its restricted uses. The Administrator may require that its packaging and labeling for restricted uses shall be clearly distinguishable from its packaging and labeling for general uses.

(B) If the Administrator determines that the pesticide, when applied in accordance with its directions for use, warnings and cautions and for the uses for which it is registered, or for one or more of such uses, or in accordance with a widespread and commonly recognized practice, will not generally cause unreasonable adverse effects on the environment, the Administrator will classify the pesticide, or the particular use or uses of the pesticide to which the determination applies, for general use.

(C) If the Administrator determines that the pesticide, when applied in accordance with its directions for use, warnings and cautions and for the uses for which it is registered, or for one or more of such uses, or in accordance with a widespread and commonly recognized practice, may generally cause, without additional regulatory restrictions, unreasonable adverse effects on the environment, including injury to the applicator, the Administrator shall classify the pesticide, or the particular use or uses to which the determination applies, for restricted use:

(i) If the Administrator classifies a pesticide, or one or more uses of such pesticide, for restricted use because of a determination that the acute dermal or inhalation toxicity of the pesticide presents a hazard to the applicator or other persons, the pesticide shall be applied for any use to which the restricted classification applies only by or under the direct supervision of a certified applicator.

(ii) If the Administrator classifies a pesticide, or one or more uses of such pesticide, for restricted use because of a determination that its use without additional regulatory restriction may cause unreasonable

adverse effects on the environment, the pesticide shall be applied for any use to which the determination applies only by or under the direct supervision of a certified applicator, or subject to such other restrictions as the Administrator may provide by regulation. Any such regulation shall be reviewable in the appropriate court of appeals upon petition of a person adversely affected filed within 60 days of the publication of the regulation in final form.

**(2) Change in classification**

If the Administrator determines that a change in the classification of any use of a pesticide from general use to restricted use is necessary to prevent unreasonable adverse effects on the environment, the Administrator shall notify the registrant of such pesticide of such determination at least forty-five days before making the change and shall publish the proposed change in the Federal Register. The registrant, or other interested person with the concurrence of the registrant, may seek relief from such determination under section 136d(b) of this title.

**(3) Change in classification from restricted use to general use**

The registrant of any pesticide with one or more uses classified for restricted use may petition the Administrator to change any such classification from restricted to general use. Such petition shall set out the basis for the registrant's position that restricted use classification is unnecessary because classification of the pesticide for general use would not cause unreasonable adverse effects on the environment. The Administrator, within sixty days after receiving such petition, shall notify the registrant whether the petition has been granted or denied. Any denial shall contain an explanation therefor and any such denial shall be subject to judicial review under section 136n of this title.

**(e) Products with same formulation and claims**

Products which have the same formulation, are manufactured by the same person, the labeling of which contains the same claims, and the labels of which bear a designation identifying the product as the same pesticide may be registered as a single pesticide; and additional names and labels shall be added to the registration by supplemental statements.

**(f) Miscellaneous**

**(1) Effect of change of labeling or formulation**

If the labeling or formulation for a pesticide is changed, the registration shall be amended to reflect such change if the Administrator determines that the change will not violate any provision of this subchapter.

**(2) Registration not a defense**

In no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter. As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter.

**(3) Authority to consult other Federal agencies**

In connection with consideration of any registration or application for registration under this section, the Administrator may consult with any other Federal agency.

**(4) Mixtures of nitrogen stabilizers and fertilizer products**

Any mixture or other combination of—
    (A) 1 or more nitrogen stabilizers registered under this subchapter; and
    (B) 1 or more fertilizer products,

shall not be subject to the provisions of this section or sections 136a–1, 136c, 136e, 136m, and 136o(a)(2) of this title if the mixture or other combination is accompanied by the labeling required under this subchapter for the nitrogen stabilizer contained in the mixture or other combination, the mixture or combination is mixed or combined in accordance with such labeling, and the mixture or combination does not contain any active ingredient other than the nitrogen stabilizer.

**(5) Bilingual labeling**

**(A) Requirement**

**(i) In general**

Subject to clause (ii), not later than the applicable deadline described in subparagraph (B), each registered pesticide product released for shipment shall include—
        (I) the translation of the parts of the labeling contained in the Spanish Translation Guide described in subparagraph (G) on the product container; or

(II) a link to such translation via scannable technology or other electronic methods readily accessible on the product label.

### (ii) Exceptions

Notwithstanding clause (i)—

(I) an antimicrobial pesticide product may, in lieu of including a translation or a link under clause (i), provide a link to the safety data sheets in Spanish via scannable technology or other electronic methods readily accessible on the product label; or

(II) a non-agricultural pesticide product that is not classified by the Administrator as restricted use under subsection (d)(1)(A) may, in lieu of including a translation or a link under clause (i), provide a link to the safety data sheets in Spanish via scannable technology or other electronic methods readily accessible on the product label.

### (B) Deadlines for bilingual labeling

#### (i) Pesticide products classified as restricted use

In the case of pesticide products classified by the Administrator as restricted use under subsection (d)(1)(A), the deadline specified in this subparagraph is the date that is 3 years following December 29, 2022.

#### (ii) Pesticide products not classified as restricted use

In the case of pesticide products not classified by the Administrator as restricted use under subsection (d)(1)(A), the deadline specified in this subparagraph shall be as follows:

#### (I) Agricultural

##### (aa) Acute Toxicity Category I

For agricultural pesticides classified as Acute Toxicity Category I, the date that is 3 years after December 29, 2022.

##### (bb) Acute Toxicity Category II

For agricultural pesticides classified as Acute Toxicity Category II, the date that is 5 years after December 29, 2022.

#### (II) Antimicrobial and non-agricultural

##### (aa) Acute Toxicity Category I

For antimicrobial and non-agricultural pesticide products classified as Acute Toxicity Category I, the date that is 4 years after December 29, 2022.

##### (bb) Acute Toxicity Category II

For antimicrobial and non-agricultural pesticide products classified as Acute Toxicity Category II, the date that is 6 years after December 29, 2022.

#### (III) Other pesticide products

With respect to pesticide products not described in subclause (I) or (II), the date that is 8 years after December 29, 2022.

### (C) Implementation

#### (i) Non-notification

##### (I) In general

In carrying out this paragraph, the Administrator shall allow translations of the parts of the label of a pesticide contained in the Spanish Translation Guide described in subparagraph (G) and scannable technology or other electronic methods to be added using non-notification procedures.

##### (II) Non-notification procedure defined

In this clause, the term "non-notification procedure" refers to a procedure under which a change may be made to a pesticide label without notifying the Administrator.

#### (ii) Cooperation and consultation

In carrying out this paragraph, the Administrator shall cooperate and consult with State lead agencies for pesticide regulation for the purpose of implementing bilingual labeling as provided in this paragraph as expeditiously as possible.

#### (iii) End use labeling

The labeling requirements of this paragraph shall apply to end use product labels.

#### (iv) Incorporation timeframe

After initial translation deadlines provided in subparagraph (B), updates to the Spanish Translation Guide described in subparagraph (G) shall be incorporated into labeling on the earlier of—

    (I) in the case of agricultural use pesticide labels, as determined by the Administrator—

      (aa) 1 year after the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G); or

      (bb) the released for shipment date specified on the EPA Stamped Approved Label after the pesticide label is next changed or amended following the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G); and

    (II) in the case of antimicrobial and non-agricultural use pesticide labels, as determined by the Administrator—

      (aa) 2 years after the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G); or

      (bb) the released for shipment date specified on the EPA Stamped Approved Label after the pesticide label is next changed or amended following the date of publication of the updated Spanish Label Translation Guide described in subparagraph (G).

#### (v) Notification of updates to the Spanish Translation Guide for Pesticide Labeling

Not later than 10 days after updating the Spanish Translation Guide described in subparagraph (G), the Administrator shall notify registrants of the update to such guide.

### (D) Accessibility of bilingual labeling for farm workers

Not later than 180 days after December 29, 2022, to the maximum extent practicable, the Administrator shall seek stakeholder input on ways to make bilingual labeling required under this paragraph accessible to farm workers.

### (E) Plan

Not later than 3 years after December 29, 2022, the Administrator shall implement a plan to ensure that farm workers have access to the bilingual labeling required under this paragraph.

### (F) Reporting

Not later than 2 years after December 29, 2022, the Administrator shall develop and implement, and make publicly available, a plan for tracking the adoption of the bilingual labeling required under this paragraph.

### (G) Spanish Translation Guide described

The Spanish Translation Guide described in this subparagraph is the Spanish Translation Guide for Pesticide Labeling issued in October 2019, as in effect on December 29, 2022, and any successor guides or amendments to such guide.

## (g) Registration review

### (1) General rule

#### (A) Periodic review

##### (i) In general

The registrations of pesticides are to be periodically reviewed.

##### (ii) Regulations

In accordance with this subparagraph, the Administrator shall by regulation establish a procedure for accomplishing the periodic review of registrations.

##### (iii) Initial registration review

The Administrator shall complete the registration review of each pesticide or pesticide case, which may be composed of 1 or more active ingredients and the products associated with the active ingredients, not later than the later of—

    (I) October 1, 2022; or

    (II) the date that is 15 years after the date on which the first pesticide containing a new active ingredient is registered.

##### (iv) Subsequent registration review

Not later than 15 years after the date on which the initial registration review is completed under clause (iii) and each 15 years thereafter, the Administrator shall complete a subsequent registration review for each pesticide or pesticide case.

### (v) Cancellation

No registration shall be canceled as a result of the registration review process unless the Administrator follows the procedures and substantive requirements of section 136d of this title.

## (B) Docketing

### (i) In general

Subject to clause (ii), after meeting with 1 or more individuals that are not government employees to discuss matters relating to a registration review, the Administrator shall place in the docket minutes of the meeting, a list of attendees, and any documents exchanged at the meeting, not later than the earlier of—
(I) the date that is 45 days after the meeting; or
(II) the date of issuance of the registration review decision.

### (ii) Protected information

The Administrator shall identify, but not include in the docket, any confidential business information the disclosure of which is prohibited by section 136h of this title.

## (C) Limitation

Nothing in this subsection shall prohibit the Administrator from undertaking any other review of a pesticide pursuant to this subchapter.

## (2) Data

### (A) Submission required

The Administrator shall use the authority in subsection (c)(2)(B) to require the submission of data when such data are necessary for a registration review.

### (B) Data submission, compensation, and exemption

For purposes of this subsection, the provisions of subsections (c)(1), (c)(2)(B), and (c)(2)(D) shall be utilized for and be applicable to any data required for registration review.

# (h) Registration requirements for antimicrobial pesticides

## (1) Evaluation of process

To the maximum extent practicable consistent with the degrees of risk presented by an antimicrobial pesticide and the type of review appropriate to evaluate the risks, the Administrator shall identify and evaluate reforms to the antimicrobial registration process that would reduce review periods existing as of August 3, 1996, for antimicrobial pesticide product registration applications and applications for amended registration of antimicrobial pesticide products, including—
(A) new antimicrobial active ingredients;
(B) new antimicrobial end-use products;
(C) substantially similar or identical antimicrobial pesticides; and
(D) amendments to antimicrobial pesticide registrations.

## (2) Review time period reduction goal

Each reform identified under paragraph (1) shall be designed to achieve the goal of reducing the review period following submission of a complete application, consistent with the degree of risk, to a period of not more than—
(A) 540 days for a new antimicrobial active ingredient pesticide registration;
(B) 270 days for a new antimicrobial use of a registered active ingredient;
(C) 120 days for any other new antimicrobial product;
(D) 90 days for a substantially similar or identical antimicrobial product;
(E) 90 days for an amendment to an antimicrobial registration that does not require scientific review of data; and
(F) 120 days for an amendment to an antimicrobial registration that requires scientific review of data and that is not otherwise described in this paragraph.

## (3) Implementation

### (A) Proposed rulemaking

#### (i) Issuance

Not later than 270 days after August 3, 1996, the Administrator shall publish in the Federal Register proposed regulations to accelerate and improve the review of antimicrobial pesticide products designed to implement, to the extent practicable, the goals set forth in paragraph (2).

#### (ii) Requirements

Proposed regulations issued under clause (i) shall—

(I) define the various classes of antimicrobial use patterns, including household, industrial, and institutional disinfectants and sanitizing pesticides, preservatives, water treatment, and pulp and paper mill additives, and other such products intended to disinfect, sanitize, reduce, or mitigate growth or development of microbiological organisms, or protect inanimate objects, industrial processes or systems, surfaces, water, or other chemical substances from contamination, fouling, or deterioration caused by bacteria, viruses, fungi, protozoa, algae, or slime;

(II) differentiate the types of review undertaken for antimicrobial pesticides;

(III) conform the degree and type of review to the risks and benefits presented by antimicrobial pesticides and the function of review under this subchapter, considering the use patterns of the product, toxicity, expected exposure, and product type;

(IV) ensure that the registration process is sufficient to maintain antimicrobial pesticide efficacy and that antimicrobial pesticide products continue to meet product performance standards and effectiveness levels for each type of label claim made; and

(V) implement effective and reliable deadlines for process management.

### (iii) Comments

In developing the proposed regulations, the Administrator shall solicit the views from registrants and other affected parties to maximize the effectiveness of the rule development process.

## (B) Final regulations

### (i) Issuance

The Administrator shall issue final regulations not later than 240 days after the close of the comment period for the proposed regulations.

### (ii) Failure to meet goal

If a goal described in paragraph (2) is not met by the final regulations, the Administrator shall identify the goal, explain why the goal was not attained, describe the element of the regulations included instead, and identify future steps to attain the goal.

### (iii) Requirements

In issuing final regulations, the Administrator shall—

(I) consider the establishment of a certification process for regulatory actions involving risks that can be responsibly managed, consistent with the degree of risk, in the most cost-efficient manner;

(II) consider the establishment of a certification process by approved laboratories as an adjunct to the review process;

(III) use all appropriate and cost-effective review mechanisms, including—

(aa) expanded use of notification and non-notification procedures;

(bb) revised procedures for application review; and

(cc) allocation of appropriate resources to ensure streamlined management of antimicrobial pesticide registrations; and

(IV) clarify criteria for determination of the completeness of an application.

## (C) Expedited review

This subsection does not affect the requirements or extend the deadlines or review periods contained in subsection (c)(3).

## (D) Alternative review periods

If the final regulations to carry out this paragraph are not effective 630 days after August 3, 1996, until the final regulations become effective, the review period, beginning on the date of receipt by the Agency of a complete application, shall be—

(i) 2 years for a new antimicrobial active ingredient pesticide registration;

(ii) 1 year for a new antimicrobial use of a registered active ingredient;

(iii) 180 days for any other new antimicrobial product;

(iv) 90 days for a substantially similar or identical antimicrobial product;

(v) 90 days for an amendment to an antimicrobial registration that does not require scientific review of data; and

(vi) 120 days for an amendment to an antimicrobial registration that requires scientific review of data and that is not otherwise described in this subparagraph.

## (E) Wood preservatives

An application for the registration, or for an amendment to the registration, of a wood preservative product for which a claim of pesticidal activity listed in section 136(mm) of this title is made (regardless of any other pesticidal claim that is made with respect to the product) shall be reviewed by the Administrator within the same period as that established under this paragraph for an antimicrobial pesticide product application, consistent with the degree of risk posed by the use of the wood preservative product, if the application requires the applicant to satisfy the same data requirements as are required to support an application for a wood preservative product that is an antimicrobial pesticide.

### (F) Notification

#### (i) In general

Subject to clause (iii), the Administrator shall notify an applicant whether an application has been granted or denied not later than the final day of the appropriate review period under this paragraph, unless the applicant and the Administrator agree to a later date.

#### (ii) Final decision

If the Administrator fails to notify an applicant within the period of time required under clause (i), the failure shall be considered an agency action unlawfully withheld or unreasonably delayed for purposes of judicial review under chapter 7 of title 5.

#### (iii) Exemption

This subparagraph does not apply to an application for an antimicrobial pesticide that is filed under subsection (c)(3)(B) prior to 90 days after August 3, 1996.

#### (iv) Limitation

Notwithstanding clause (ii), the failure of the Administrator to notify an applicant for an amendment to a registration for an antimicrobial pesticide shall not be judicially reviewable in a Federal or State court if the amendment requires scientific review of data within—

(I) the time period specified in subparagraph (D)(vi), in the absence of a final regulation under subparagraph (B); or

(II) the time period specified in paragraph (2)(F), if adopted in a final regulation under subparagraph (B).

### (4) Annual report

#### (A) Submission

Beginning on August 3, 1996, and ending on the date that the goals under paragraph (2) are achieved, the Administrator shall, not later than March 1 of each year, prepare and submit an annual report to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate.

#### (B) Requirements

A report submitted under subparagraph (A) shall include a description of—

(i) measures taken to reduce the backlog of pending registration applications;

(ii) progress toward achieving reforms under this subsection; and

(iii) recommendations to improve the activities of the Agency pertaining to antimicrobial registrations.

(June 25, 1947, ch. 125, §3, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 979; amended Pub. L. 94–140, §12, Nov. 28, 1975, 89 Stat. 755; Pub. L. 95–396, §§2(a), 3–8, Sept. 30, 1978, 92 Stat. 820, 824–827; Pub. L. 100–532, title I, §§102(b), 103, title VI, §601(b)(1), title VIII, §801(b), Oct. 25, 1988, 102 Stat. 2667, 2677, 2680; Pub. L. 101–624, title XIV, §1492, Nov. 28, 1990, 104 Stat. 3628; Pub. L. 102–237, title X, §1006(a)(3), (b)(1), (2), (c), Dec. 13, 1991, 105 Stat. 1894–1896; Pub. L. 104–170, title I, §§105(b), 106(b), title II, §§210(b), (c)(1), (d), (e), (f)(2), 222–224, 231, 250, Aug. 3, 1996, 110 Stat. 1491, 1494–1497, 1499, 1503, 1504, 1508, 1510; Pub. L. 108–199, div. G, title V, §501(b), Jan. 23, 2004, 118 Stat. 419; Pub. L. 110–94, §§2, 3, Oct. 9, 2007, 121 Stat. 1000; Pub. L. 115–334, title X, §10115, Dec. 20, 2018, 132 Stat. 4914; Pub. L. 117–286, §4(a)(21), Dec. 27, 2022, 136 Stat. 4307; Pub. L. 117–328, div. HH, title VI, §702, Dec. 29, 2022, 136 Stat. 5996.)

**EDITORIAL NOTES**

## REFERENCES IN TEXT

The Endangered Species Act of 1973, referred to in subsec. (c)(11)(C)(i)(I), (II), (v), (vi), (G)(ii), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified generally to chapter 35 (§1531 et seq.) of

Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of Title 16 and Tables.

## Prior Provisions

A prior section 3 of act June 25, 1947, was classified to section 135a of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## Amendments

**2022**—Subsec. (c)(11)(F). Pub. L. 117–286 substituted "Chapter 10 of title 5" for "Federal Advisory Committee Act" in heading and "Chapter 10 of title 5" for "The Federal Advisory Committee Act (5 U.S.C. App.)" in text.

Subsec. (f)(5). Pub. L. 117–328 added par. (5).

**2018**—Subsec. (c)(11). Pub. L. 115–334 added par. (11).

**2007**—Subsec. (c)(3)(B)(ii)(I). Pub. L. 110–94, §2(1), substituted "review the application in accordance with section 136w–8(f)(4)(B) of this title and," for "within 45 days after receiving the application, notify the registrant whether or not the application is complete and,".

Subsec. (c)(3)(B)(ii)(II). Pub. L. 110–94, §2(2), substituted "not later than the applicable decision review time established pursuant to section 136w–8(f)(4)(B) of this title, or, if no review time is established, not later than" for "within".

Subsec. (g)(1)(A). Pub. L. 110–94, §3(1), designated first sentence as cl. (i) and inserted heading, designated second sentence as cl. (ii), inserted heading, and substituted "In accordance with this subparagraph, the Administrator" for "The Administrator", added cls. (iii) and (iv), designated fourth sentence as cl. (v) and inserted heading, and struck out third sentence which read as follows: "The goal of these regulations shall be a review of a pesticide's registration every 15 years."

Subsec. (g)(1)(B), (C). Pub. L. 110–94, §3(2), (3), added subpar. (B) and redesignated former subpar. (B) as (C).

**2004**—Subsec. (h)(2)(F). Pub. L. 108–199, §501(b)(1), substituted "120 days" for "90 to 180 days".

Subsec. (h)(3)(D)(vi). Pub. L. 108–199, §501(b)(2)(A), substituted "120 days" for "240 days".

Subsec. (h)(3)(F)(iv). Pub. L. 108–199, §501(b)(2)(B), added cl. (iv).

**1996**—Subsec. (c)(1)(F)(ii) to (vi). Pub. L. 104–170, §210(b), added cls. (ii), (v), and (vi), redesignated former cls. (ii) and (iii) as (iii) and (iv), respectively, and in cl. (iv) substituted "(i), (ii), and (iii)" for "(i) and (ii)".

Subsec. (c)(1)(G). Pub. L. 104–170, §250(1), added subpar. (G).

Subsec. (c)(2)(A). Pub. L. 104–170, §§210(d)(1), 231, inserted heading, inserted "the public health and agricultural need for such minor use," after "pattern of use,", and substituted "potential beneficial or adverse effects on man and the environment" for "potential exposure of man and the environment to the pesticide".

Subsec. (c)(2)(B). Pub. L. 104–170, §210(d)(2), inserted heading.

Subsec. (c)(2)(B)(vi). Pub. L. 104–170, §210(c)(1), added cl. (vi).

Subsec. (c)(2)(B)(vii). Pub. L. 104–170, §210(f)(2), added cl. (vii).

Subsec. (c)(2)(B)(viii). Pub. L. 104–170, §222, added cl. (viii).

Subsec. (c)(2)(C). Pub. L. 104–170, §210(d)(3), inserted heading.

Subsec. (c)(2)(E). Pub. L. 104–170, §210(d)(4), added subpar. (E).

Subsec. (c)(3)(A), (B). Pub. L. 104–170, §210(e)(1), (2), inserted headings.

Subsec. (c)(3)(C), (D). Pub. L. 104–170, §210(e)(3), added subpars. (C) and (D).

Subsec. (c)(9). Pub. L. 104–170, §223, added par. (9).

Subsec. (c)(10). Pub. L. 104–170, §250(2), added par. (10).

Subsec. (f)(4). Pub. L. 104–170, §105(b), added par. (4).

Subsec. (g). Pub. L. 104–170, §106(b), added subsec. (g).

Subsec. (h). Pub. L. 104–170, §224, added subsec. (h).

**1991**—Subsec. (c)(1)(D). Pub. L. 102–237, §1006(a)(3)(B), (C), added subpar. (D) and redesignated former subpar. (D) as (F).

Subsec. (c)(1)(E). Pub. L. 102–237, §1006(a)(3)(A), (C), added subpar. (E) and struck out former subpar. (E) which read as follows: "the complete formula of the pesticide; and".

Subsec. (c)(1)(F). Pub. L. 102–237, §1006(a)(3)(A), (B), (D), redesignated former subpar. (D) as (F), in cl. (i) substituted "With" for "with" and a period for semicolon at end, in cl. (ii) substituted "Except" for "except" and a period for semicolon at end, in cl. (iii) substituted "After" for "after" and

a period for semicolon at end, and struck out former subpar. (F) which read as follows: "a request that the pesticide be classified for general use, for restricted use, or for both."

Subsec. (c)(2)(A). Pub. L. 102–237, §1006(b)(1), (2), substituted "the Administrator" for "he" before "requires", "shall permit", "shall make", and "deems", and substituted "the Administrator's" for "his".

Subsec. (c)(2)(D). Pub. L. 102–237, §1006(c), clarified amendment made by Pub. L. 100–532, §102(b)(2)(A). See 1988 Amendment note below.

Subsec. (c)(3)(A). Pub. L. 102–237, §1006(b)(2), substituted "the Administrator's" for "his".

Subsec. (c)(5). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "determines".

Subsec. (c)(6). Pub. L. 102–237, §1006(b)(1), (2), substituted "the Administrator" for "he" before "shall notify" in two places and "the Administrator's" for "his" in four places.

Subsec. (d)(1). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "shall classify it for both" in subpar. (A), before "will classify" in subpar. (B), and before "shall classify" in subpar. (C).

Subsec. (d)(2). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "shall notify".

**1990**—Subsec. (c)(2)(A). Pub. L. 101–624 inserted after third sentence "The Administrator shall not require a person to submit, in relation to a registration or reregistration of a pesticide for minor agricultural use under this subchapter, any field residue data from a geographic area where the pesticide will not be registered for such use."

**1988**—Subsec. (a). Pub. L. 100–532, §601(b)(1), substituted "Requirement of registration" for "Requirement" in heading and amended text generally. Prior to amendment, text read as follows: "Except as otherwise provided by this subchapter, no person in any State may distribute, sell, offer for sale, hold for sale, ship, deliver for shipment, or receive and (having so received) deliver or offer to deliver, to any person any pesticide which is not registered with the Administrator."

Subsec. (c)(1)(D). Pub. L. 100–532, §801(b)(1)–(4), in introductory provisions, substituted "paragraph (2)(D)" for "subsection (c)(2)(D) of this section", in cl. (i), substituted "(i) With" for "(i) With" and ", except that" for ": *Provided*, That", in cl. (ii), substituted "clause (i)" for "subparagraph (D)(i) of this paragraph", and in cl. (iii), substituted "clauses (i) and (ii)" for "subparagraphs (D)(i) and (D)(ii) of this paragraph".

Subsec. (c)(2)(A). Pub. L. 100–532, §801(b)(5)(A), (B), substituted "(2) Data in support of registration.—

"(A) The"

for "(2)(A) Data in support of registration.—The", and directed that subpar. (A) be aligned with left margin of subsec. (d)(1)(A) of this section.

Subsec. (c)(2)(B). Pub. L. 100–532, §§102(b)(1), 801(b)(5)(C)–(F), substituted "(B)(i) If" for "(B) Additional data to support existing registration.—(i) If", directed that cls. (ii) to (v) be aligned with left margin of subpar. (A), in cls. (ii) and (iii), inserted "The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.", in cl. (iv), substituted "title. The only" for "title: *Provided*, that the only", and in cl. (v), substituted "paragraph (1)(D)" for "subsection (c)(1)(D) of this section".

Subsec. (c)(2)(C). Pub. L. 100–532, §801(b)(5)(G), (H), struck out "Simplified procedures" after "(C)" and directed that text be aligned with left margin of subpar. (A).

Subsec. (c)(2)(D). Pub. L. 100–532, §102(b)(2)(A), and Pub. L. 102–237, §1006(c), substituted "the pesticide that is the subject of the application" for "an end-use product".

Subsec. (c)(2)(D)(i). Pub. L. 100–532, §102(b)(2)(B), struck out "the safety of" after "data pertaining to".

Subsec. (c)(3). Pub. L. 100–532, §103, substituted "(A) The Administrator" for "The Administrator" and added subpar. (B).

Subsec. (c)(7). Pub. L. 100–532, §801(b)(6), in introductory provisions, substituted "paragraph (5)" for "subsection (c)(5) of this section", in subpars. (A) and (B), substituted "paragraph (5). If" for "subsection (c)(5) of this section: *Provided*, That, if", and in subpar. (C), substituted "prescribe. A" for "prescribe: *Provided*, that a".

Subsec. (d)(1)(A). Pub. L. 100–532, §801(b)(7), substituted "restricted use. If" for "restricted use, provided that if" and "restricted uses. The Administrator" for "restricted uses: *Provided, however*, That the Administrator".

Exhibit C-1, pg. 30 of 152

Subsec. (f)(2). Pub. L. 100–532, §801(b)(8), substituted "this subchapter. As" for "this subchapter: *Provided*, That as".

Subsec. (g). Pub. L. 100–532, §801(b)(9), struck out subsec. (g) which read as follows: "The Administrator shall accomplish the reregistration of all pesticides in the most expeditious manner practicable: *Provided*, That, to the extent appropriate, any pesticide that results in a postharvest residue in or on food or feed crops shall be given priority in the reregistration process."

**1978**—Subsec. (c)(1)(D). Pub. L. 95–396, §2(a)(1), added subpar. (D), and struck out provisions which required the applicant for registration of a pesticide to file with the Administrator a statement containing "if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted on or after January 1, 1970, in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 136h(b) of this title. This provision with regard to compensation for producing the test data to be relied upon shall apply with respect to all applications for registration or reregistration submitted on or after October 21, 1972. If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If either party does not agree with said determination, he may, within thirty days, take an appeal to the Federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. Registration shall not be delayed pending the determination of reasonable compensation between the applicants, by the Administrator or by the court.".

Subsec. (c)(2). Pub. L. 95–396, §§2(a)(2)(A)–(D), 3, 4, designated existing provisions as subpar. (A), inserted in second sentence "under subparagraph (B) of this paragraph" after "kind of information", struck out from introductory text of third sentence "subsection (c)(1)(D) of this section and" after "Except as provided by", and inserted provisions relating to establishment of standards for data requirements for registration of pesticides with respect to minor uses and consideration of economic factors in development of standards and cost of development, and added subpars. (B) to (D).

Subsec. (c)(5). Pub. L. 95–396, §5, provided for waiver of data requirements pertaining to efficacy.

Subsec. (c)(7), (8). Pub. L. 95–396, §6, added pars. (7) and (8).

Subsec. (d)(1)(A). Pub. L. 95–396, §7(1), authorized classification of pesticide uses by regulation on the initial classification and registered pesticides prior to reregistration.

Subsec. (d)(2). Pub. L. 95–396, §7(2), substituted "forty-five days" for "30 days".

Subsec. (d)(3). Pub. L. 95–396, §7(3), added par. (3).

Subsec. (g). Pub. L. 95–396, §8, added subsec. (g).

**1975**—Subsec. (c)(1)(D). Pub. L. 94–140 inserted exception relating to test data submitted on or after January 1, 1970, in support of application, inserted provision that compensation for producing test data shall apply to all applications submitted on or after October 21, 1972, and provision relating to delay of registration pending determination of reasonable compensation, struck out requirement that payment determined by court not be less than amount determined by Administrator, and substituted "If either party" for "If the owner of the test data".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 2007 AMENDMENT

Pub. L. 110–94, §6, Oct. 9, 2007, 121 Stat. 1007, provided that: "This Act [see Short Title of 2007 Amendment note set out under section 136 of this title] and the amendments made by this Act take effect on October 1, 2007."

## EFFECTIVE DATE OF 2004 AMENDMENT

Pub. L. 108–199, div. G, title V, §501(h), Jan. 23, 2004, 118 Stat. 434, provided that: "Except as otherwise provided in this section [enacting section 136w–8 of this title, amending this section and sections 136a–1, 136x, and 136y of this title, and enacting provisions set out as notes under sections 136

about:blank    Exhibit C-1, pg. 31 of 152

of this title and section 346a of Title 21, Food and Drugs] and the amendments made by this section, this section and the amendments made by this section take effect on the date that is 60 days after the date of enactment of this Act [Jan. 23, 2004]."

## EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

## EFFECTIVE DATE OF 1978 AMENDMENT

Pub. L. 95–396, §2(b), Sept. 30, 1978, 92 Stat. 824, provided that: "The amendment to section 3(c)(1)(D) of the Federal Insecticide, Fungicide, and Rodenticide Act [subsec. (c)(1)(D) of this section] made by [subsec. (a)(1) of] this section shall apply with respect to all applications for registration approved after the date of enactment of this Act [Sept. 30, 1978]."

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## REGISTRATION REVIEW DEADLINE EXTENSION

Pub. L. 117–328, div. HH, title VI, §711, Dec. 29, 2022, 136 Stat. 6083, provided that:

"(a) IN GENERAL.—Notwithstanding section 3(g)(1)(A)(iii)(I) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a(g)(1)(A)(iii)(I)), the Administrator of the Environmental Protection Agency (referred to in this section as the 'Administrator') shall complete the initial registration review of each pesticide or pesticide case covered by that section not later than October 1, 2026.

"(b) INTERIM REGISTRATION REVIEW DECISION REQUIREMENTS.—

"(1) DEFINITION OF COVERED INTERIM REGISTRATION REVIEW DECISION.—In this subsection, the term 'covered interim registration review decision' means an interim registration review decision—

"(A) that is associated with an initial registration review described in subsection (a);

"(B) that is noticed in the Federal Register during the period beginning on the date of enactment of this Act [Dec. 29, 2022] and ending on October 1, 2026; and

"(C) for which the Administrator has not, as of the date on which the decision is noticed in the Federal Register, made effects determinations or completed any necessary consultation under section 7(a)(2) of the Endangered Species Act of 1973 (16 U.S.C. 1536(a)(2)).

"(2) REQUIREMENTS.—Any covered interim registration review decision shall include, where applicable, measures to reduce the effects of the applicable pesticide on—

"(A) species listed under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.); or

"(B) any designated critical habitat.

"(3) CONSULTATION.—In developing measures described in paragraph (2), the Administrator shall take into account the input received from the Secretary of Agriculture and other members of the interagency working group established under section 3(c)(11) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a(c)(11))."

## BIOLOGICAL PESTICIDE HANDLING STUDY

Pub. L. 101–624, title XIV, §1498, Nov. 28, 1990, 104 Stat. 3631, provided that the National Academy of Sciences would conduct a study of the biological control programs and registration procedures utilized by the Food and Drug Administration, the Animal and Plant Health Inspection Service, and the Environmental Protection Agency, and within 1 year after completion of the study, develop and implement a common process for reviewing and approving biological control applications submitted to such agencies and offices based on the study conducted, the recommendation of the National Academy of Sciences, and other public comment.

## EDUCATION, STUDY, AND REPORT

Pub. L. 100–478, title I, §1010, Oct. 7, 1988, 102 Stat. 2313, provided that:

"(a) EDUCATION.—The Administrator of the Environmental Protection Agency in cooperation with the Secretary of Agriculture and the Secretary of the Interior, promptly upon enactment of this Act [Oct. 7, 1988], shall conduct a program to inform and educate fully persons engaged in agricultural food and fiber commodity production of any proposed pesticide labeling program or requirements

that may be imposed by the Administrator in compliance with the Endangered Species Act [of 1973] (16 U.S.C. 1531 et seq.). The Administrator also shall provide the public with notice of, and opportunity for comment on, the elements of any such program and requirements based on compliance with the Endangered Species Act [of 1973], including (but not limited to) an identification of any pesticides affected by the program; an explanation of the restriction or prohibition on the user or applicator of any such pesticide; an identification of those geographic areas affected by any pesticide restriction or prohibition; an identification of the effects of any restricted or prohibited pesticide on endangered or threatened species; and an identification of the endangered or threatened species along with a general description of the geographic areas in which such species are located wherein the application of a pesticide will be restricted, prohibited, or its use otherwise limited, unless the Secretary of the Interior determines that the disclosure of such information may create a substantial risk of harm to such species or its habitat.

"(b) Study.—The Administrator of the Environmental Protection Agency, jointly with the Secretary of Agriculture and the Secretary of the Interior, shall conduct a study to identify reasonable and prudent means available to the Administrator to implement the endangered species pesticides labeling program which would comply with the Endangered Species Act of 1973, as amended, and which would allow persons to continue production of agricultural food and fiber commodities. Such study shall include investigation by the Administrator of the best available methods to develop maps and the best available alternatives to mapping as means of identifying those circumstances in which use of pesticides may be restricted; identification of alternatives to prohibitions on pesticide use, including, but not limited to, alternative pesticides and application methods and other agricultural practices which can be used in lieu of any pesticides whose use may be restricted by the labeling program; examination of methods to improve coordination among the Environmental Protection Agency, Department of Agriculture, and Department of the Interior in administration of the labeling program; and analysis of the means of implementing the endangered species pesticides labeling program or alternatives to such a program, if any, to promote the conservation of endangered or threatened species and to minimize the impacts to persons engaged in agricultural food and fiber commodity production and other affected pesticide users and applicators.

"(c) Report.—The Administrator of the Environmental Protection Agency in cooperation with the Secretary of Agriculture and the Secretary of the Interior shall submit a report within one year of the date of enactment of this Act [Oct. 7, 1988], presenting the results of the study conducted pursuant to subsection (b) of this section to the Committee on Merchant Marine and Fisheries and the Committee on Agriculture of the United States House of Representatives, and the Committee on Environment and Public Works and the Committee on Agriculture, Nutrition, and Forestry of the United States Senate."

## §136a–1. Reregistration of registered pesticides

### (a) General rule

The Administrator shall reregister, in accordance with this section, each registered pesticide containing any active ingredient contained in any pesticide first registered before November 1, 1984, except for any pesticide as to which the Administrator has determined, after November 1, 1984, and before the effective date of this section, that—

(1) there are no outstanding data requirements; and

(2) the requirements of section 136a(c)(5) of this title have been satisfied.

### (b) Reregistration phases

Reregistrations of pesticides under this section shall be carried out in the following phases:

(1) The first phase shall include the listing under subsection (c) of the active ingredients of the pesticides that will be reregistered.

(2) The second phase shall include the submission to the Administrator under subsection (d) of notices by registrants respecting their intention to seek reregistration, identification by registrants of missing and inadequate data for such pesticides, and commitments by registrants to replace such missing or inadequate data within the applicable time period.

(3) The third phase shall include submission to the Administrator by registrants of the information required under subsection (e).

Exhibit C-1, pg. 33 of 152

(4) The fourth phase shall include an independent, initial review by the Administrator under subsection (f) of submissions under phases two and three, identification of outstanding data requirements, and the issuance, as necessary, of requests for additional data.

(5) The fifth phase shall include the review by the Administrator under subsection (g) of data submitted for reregistration and appropriate regulatory action by the Administrator.

## (c) Phase one

### (1) Priority for reregistration

For purposes of the reregistration of the pesticides described in subsection (a), the Administrator shall list the active ingredients of pesticides and shall give priority to, among others, active ingredients (other than active ingredients for which registration standards have been issued before the effective date of this section) that—

(A) are in use on or in food or feed and may result in postharvest residues;

(B) may result in residues of potential toxicological concern in potable ground water, edible fish, or shellfish;

(C) have been determined by the Administrator before the effective date of this section to have significant outstanding data requirements; or

(D) are used on crops, including in greenhouses and nurseries, where worker exposure is most likely to occur.

### (2) Reregistration lists

For purposes of reregistration under this section, the Administrator shall by order—

(A) not later than 70 days after the effective date of this section, list pesticide active ingredients for which registration standards have been issued before such effective date;

(B) not later than 4 months after such effective date, list the first 150 pesticide active ingredients, as determined under paragraph (1);

(C) not later than 7 months after such effective date, list the second 150 pesticide active ingredients, as determined under paragraph (1); and

(D) not later than 10 months after such effective date, list the remainder of the pesticide active ingredients, as determined under paragraph (1).

Each list shall be published in the Federal Register.

### (3) Judicial review

The content of a list issued by the Administrator under paragraph (2) shall not be subject to judicial review.

### (4) Notice to registrants

On the publication of a list of pesticide active ingredients under paragraph (2), the Administrator shall send by certified mail to the registrants of the pesticides containing such active ingredients a notice of the time by which the registrants are to notify the Administrator under subsection (d) whether the registrants intend to seek or not to seek reregistration of such pesticides.

## (d) Phase two

### (1) In general

The registrant of a pesticide that contains an active ingredient listed under subparagraph (B), (C), or (D) of subsection (c)(2) shall submit to the Administrator, within the time period prescribed by paragraph (4), the notice described in paragraph (2) and any information, commitment, or offer described in paragraph (3).

### (2) Notice of intent to seek or not to seek reregistration

(A) The registrant of a pesticide containing an active ingredient listed under subparagraph (B), (C), or (D) of subsection (c)(2) shall notify the Administrator by certified mail whether the registrant intends to seek or does not intend to seek reregistration of the pesticide.

(B) If a registrant submits a notice under subparagraph (A) of an intention not to seek reregistration of a pesticide, the Administrator shall publish a notice in the Federal Register stating that such a notice has been submitted.

### (3) Missing or inadequate data

Each registrant of a pesticide that contains an active ingredient listed under subparagraph (B), (C), or (D) of subsection (c)(2) and for which the registrant submitted a notice under paragraph (2) of an intention to seek reregistration of such pesticide shall submit to the Administrator—

(A) in accordance with regulations issued by the Administrator under section 136a of this title, an identification of—

(i) all data that are required by regulation to support the registration of the pesticide with respect to such active ingredient;

(ii) data that were submitted by the registrant previously in support of the registration of the pesticide that are inadequate to meet such regulations; and

(iii) data identified under clause (i) that have not been submitted to the Administrator; and

(B) either—

(i) a commitment to replace the data identified under subparagraph (A)(ii) and submit the data identified under subparagraph (A)(iii) within the applicable time period prescribed by paragraph (4)(B); or

(ii) an offer to share in the cost to be incurred by a person who has made a commitment under clause (i) to replace or submit the data and an offer to submit to arbitration as described by section 136a(c)(2) (B) of this title with regard to such cost sharing.

For purposes of a submission by a registrant under subparagraph (A)(ii), data are inadequate if the data are derived from a study with respect to which the registrant is unable to make the certification prescribed by subsection (e)(1)(G) that the registrant possesses or has access to the raw data used in or generated by such study. For purposes of a submission by a registrant under such subparagraph, data shall be considered to be inadequate if the data are derived from a study submitted before January 1, 1970, unless it is demonstrated to the satisfaction of the Administrator that such data should be considered to support the registration of the pesticide that is to be reregistered.

**(4) Time periods**

(A) A submission under paragraph (2) or (3) shall be made—

(i) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(B), not later than 3 months after the date of publication of the listing of such active ingredient;

(ii) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(C), not later than 3 months after the date of publication of the listing of such active ingredient; and

(iii) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(D), not later than 3 months after the date of publication of the listing of such active ingredient.

On application, the Administrator may extend a time period prescribed by this subparagraph if the Administrator determines that factors beyond the control of the registrant prevent the registrant from complying with such period.

(B) A registrant shall submit data in accordance with a commitment entered into under paragraph (3)(B) within a reasonable period of time, as determined by the Administrator, but not more than 48 months after the date the registrant submitted the commitment. The Administrator, on application of a registrant, may extend the period prescribed by the preceding sentence by no more than 2 years if extraordinary circumstances beyond the control of the registrant prevent the registrant from submitting data within such prescribed period. Upon application of a registrant, the Administrator shall, in the case of a minor use, extend the deadline for the production of residue chemistry data under this subparagraph for data required solely to support that minor use until the final deadline for submission of data under this section for the other uses of the pesticide established as of August 3, 1996, if—

(i) the data to support other uses of the pesticide on a food are being provided;

(ii) the registrant, in submitting a request for such an extension provides a schedule, including interim dates to measure progress, to assure that the data production will be completed before the expiration of the extension period;

(iii) the Administrator has determined that such extension will not significantly delay the Administrator's schedule for issuing a reregistration eligibility determination required under this section; and

(iv) the Administrator has determined that based on existing data, such extension would not significantly increase the risk of any unreasonable adverse effect on the environment. If the Administrator grants an extension under this subparagraph, the Administrator shall monitor the development of the data and shall ensure that the registrant is meeting the schedule for the production of the data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) of section 136a(c)(2)(B) of this title or other provisions of this section, as appropriate, regarding the continued registration of the affected products with the minor use and shall inform the public of such action. Notwithstanding the provisions of this subparagraph, the Administrator may take action to modify or revoke the extension under this subparagraph if the Administrator determines that the extension for the minor use may cause an unreasonable adverse effect on the environment. In such circumstance, the Administrator shall provide written notice to the registrant revoking the extension of time for submission of data. Such data shall

instead be due in accordance with the date then established by the Administrator for submission of the data.

**(5) Cancellation and removal**

(A) If the registrant of a pesticide does not submit a notice under paragraph (2) or (3) within the time prescribed by paragraph (4)(A), the Administrator shall issue a notice of intent to cancel the registration of such registrant for such pesticide and shall publish the notice in the Federal Register and allow 60 days for the submission of comments on the notice. On expiration of such 60 days, the Administrator, by order and without a hearing, may cancel the registration or take such other action, including extension of applicable time periods, as may be necessary to enable reregistration of such pesticide by another person.

(B)(i) If—

(I) no registrant of a pesticide containing an active ingredient listed under subsection (c)(2) notifies the Administrator under paragraph (2) that the registrant intends to seek reregistration of any pesticide containing that active ingredient;

(II) no such registrant complies with paragraph (3)(A); or

(III) no such registrant makes a commitment under paragraph (3)(B) to replace or submit all data described in clauses (ii) and (iii) of paragraph (3)(A);

the Administrator shall publish in the Federal Register a notice of intent to remove the active ingredient from the list established under subsection (c)(2) and a notice of intent to cancel the registrations of all pesticides containing such active ingredient and shall provide 60 days for comment on such notice.

(ii) After the 60-day period has expired, the Administrator, by order, may cancel any such registration without hearing, except that the Administrator shall not cancel a registration under this subparagraph if—

(I) during the comment period a person acquires the rights of the registrant in that registration;

(II) during the comment period that person furnishes a notice of intent to reregister the pesticide in accordance with paragraph (2); and

(III) not later than 120 days after the publication of the notice under this subparagraph, that person has complied with paragraph (3) and the fee prescribed by this section has been paid.

**(6) Suspensions and penalties**

The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by section 136a(c)(2)(B)(iv) of this title if the Administrator determines that (A) progress is insufficient to ensure the submission of the data required for such pesticide under a commitment made under paragraph (3)(B) within the time period prescribed by paragraph (4)(B) or (B) the registrant has not submitted such data to the Administrator within such time period. If the registrant does not commit to support a specific minor use of the pesticide, but is supporting and providing data in a timely and adequate fashion to support uses of the pesticide on a food, or if all uses of the pesticide are nonfood uses and the registrant does not commit to support a specific minor use of the pesticide but is supporting and providing data in a timely and adequate fashion to support other nonfood uses of the pesticide, the Administrator, at the written request of the registrant, shall not take any action pursuant to this paragraph in regard to such unsupported minor use until the final deadline established as of August 3, 1996, for the submission of data under this section for the supported uses identified pursuant to this paragraph unless the Administrator determines that the absence of the data is significant enough to cause human health or environmental concerns. On such a determination the Administrator may refuse the request for extension by the registrant. Upon receipt of the request from the registrant, the Administrator shall publish in the Federal Register a notice of the receipt of the request and the effective date upon which the uses not being supported will be voluntarily deleted from the registration pursuant to section 136d(f)(1) of this title. If the Administrator grants an extension under this paragraph, the Administrator shall monitor the development of the data for the uses being supported and shall ensure that the registrant is meeting the schedule for the production of such data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with section 136a(c)(2)(B)(iv) of this title regarding the continued registration of the affected products with the minor and other uses and shall inform the public of such action in accordance with section 136d(f)(2) of this title. Notwithstanding this subparagraph, the Administrator may deny, modify, or revoke the temporary extension under this paragraph if the Administrator determines that the continuation of the minor use may cause an unreasonable adverse effect on the environment. In the event of modification or revocation, the Administrator shall provide, in writing, to the registrant a notice revoking the temporary extension and establish a new effective date by which the minor use shall be deleted from the registration.

**(e) Phase three**

**(1) Information about studies**

7/30/23, 9:54 PM    Case: 23-11189    Document: 12    Page: 37    about:blank    Date Filed: 12/10/2023
Exhibit C-1, pg. 36 of 152
Page 36 of 152

Each registrant of a pesticide that contains an active ingredient listed under subparagraph (B), (C), or (D) of subsection (c)(2) who has submitted a notice under subsection (d)(2) of an intent to seek the reregistration of such pesticide shall submit, in accordance with the guidelines issued under paragraph (4), to the Administrator—

(A) a summary of each study concerning the active ingredient previously submitted by the registrant in support of the registration of a pesticide containing such active ingredient and considered by the registrant to be adequate to meet the requirements of section 136a of this title and the regulations issued under such section;

(B) a summary of each study concerning the active ingredient previously submitted by the registrant in support of the registration of a pesticide containing such active ingredient that may not comply with the requirements of section 136a of this title and the regulations issued under such section but which the registrant asserts should be deemed to comply with such requirements and regulations;

(C) a reformat of the data from each study summarized under subparagraph (A) or (B) by the registrant concerning chronic dosing, oncogenicity, reproductive effects, mutagenicity, neurotoxicity, teratogenicity, or residue chemistry of the active ingredient that were submitted to the Administrator before January 1, 1982;

(D) where data described in subparagraph (C) are not required for the active ingredient by regulations issued under section 136a of this title, a reformat of acute and subchronic dosing data submitted by the registrant to the Administrator before January 1, 1982, that the registrant considers to be adequate to meet the requirements of section 136a of this title and the regulations issued under such section;

(E) an identification of data that are required to be submitted to the Administrator under section 136d(a)(2) of this title, indicating an adverse effect of the pesticide;

(F) an identification of any other information available that in the view of the registrant supports the registration;

(G) a certification that the registrant or the Administrator possesses or has access to the raw data used in or generated by the studies that the registrant summarized under subparagraph (A) or (B);

(H) either—

(i) a commitment to submit data to fill each outstanding data requirement identified by the registrant; or

(ii) an offer to share in the cost of developing such data to be incurred by a person who has made a commitment under clause (i) to submit such data, and an offer to submit to arbitration as described by section 136a(c)(2)(B) of this title with regard to such cost sharing; and

(I) evidence of compliance with section 136a(c)(1)(D)(ii) [1] of this title and regulations issued thereunder with regard to previously submitted data as if the registrant were now seeking the original registration of the pesticide.

A registrant who submits a certification under subparagraph (G) that is false shall be considered to have violated this subchapter and shall be subject to the penalties prescribed by section 136l of this title.

**(2) Time periods**

(A) The information required by paragraph (1) shall be submitted to the Administrator—

(i) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(B), not later than 12 months after the date of publication of the listing of such active ingredient;

(ii) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(C), not later than 12 months after the date of publication of the listing of such active ingredient; and

(iii) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(D), not later than 12 months after the date of publication of the listing of such active ingredient.

(B) A registrant shall submit data in accordance with a commitment entered into under paragraph (1)(H) within a reasonable period of time, as determined by the Administrator, but not more than 48 months after the date the registrant submitted the commitment under such paragraph. The Administrator, on application of a registrant, may extend the period prescribed by the preceding sentence by no more than 2 years if extraordinary circumstances beyond the control of the registrant prevent the registrant from submitting data within such prescribed period. Upon application of a registrant, the Administrator shall, in the case of a minor use, extend the deadline for the production of residue chemistry data under this subparagraph for data required solely to support that minor use until the final deadline for submission of data under this section for the other uses of the pesticide established as of August 3, 1996, if—

(i) the data to support other uses of the pesticide on a food are being provided;

(ii) the registrant, in submitting a request for such an extension provides a schedule, including interim dates to measure progress, to assure that the data production will be completed before the expiration of the extension period;

(iii) the Administrator has determined that such extension will not significantly delay the Administrator's schedule for issuing a reregistration eligibility determination required under this section; and

(iv) the Administrator has determined that based on existing data, such extension would not significantly increase the risk of any unreasonable adverse effect on the environment. If the Administrator grants an extension under this subparagraph, the Administrator shall monitor the development of the data and shall ensure that the registrant is meeting the schedule for the production of the data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) of section 136a(c)(2)(B) of this title or other provisions of this section, as appropriate, regarding the continued registration of the affected products with the minor use and shall inform the public of such action. Notwithstanding the provisions of this subparagraph, the Administrator may take action to modify or revoke the extension under this subparagraph if the Administrator determines that the extension for the minor use may cause an unreasonable adverse effect on the environment. In such circumstance, the Administrator shall provide written notice to the registrant revoking the extension of time for submission of data. Such data shall instead be due in accordance with the date then established by the Administrator for submission of the data.

**(3) Cancellation**

(A) If the registrant of a pesticide fails to submit the information required by paragraph (1) within the time prescribed by paragraph (2), the Administrator, by order and without hearing, shall cancel the registration of such pesticide. If the registrant does not commit to support a specific minor use of the pesticide, but is supporting and providing data in a timely and adequate fashion to support uses of the pesticide on a food, or if all uses of the pesticide are nonfood uses and the registrant does not commit to support a specific minor use of the pesticide but is supporting and providing data in a timely and adequate fashion to support other nonfood uses of the pesticide, the Administrator, at the written request of the registrant, shall not take any action pursuant to this subparagraph in regard to such unsupported minor use until the final deadline established as of August 3, 1996, for the submission of data under this section for the supported uses identified pursuant to this subparagraph unless the Administrator determines that the absence of the data is significant enough to cause human health or environmental concerns. On the basis of such determination, the Administrator may refuse the request for extension by the registrant. Upon receipt of the request from the registrant, the Administrator shall publish in the Federal Register a notice of the receipt of the request and the effective date upon which the uses not being supported will be voluntarily deleted from the registration pursuant to section 136d(f)(1) of this title. If the Administrator grants an extension under this subparagraph, the Administrator shall monitor the development of the data for the uses being supported and shall ensure that the registrant is meeting the schedule for the production of such data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with section 136a(c)(2)(B)(iv) of this title regarding the continued registration of the affected products with the minor and other uses and shall inform the public of such action in accordance with section 136d(f)(2) of this title. Notwithstanding this subparagraph, the Administrator may deny, modify, or revoke the temporary extension under this subparagraph if the Administrator determines that the continuation of the minor use may cause an unreasonable adverse effect on the environment. In the event of modification or revocation, the Administrator shall provide, in writing, to the registrant a notice revoking the temporary extension and establish a new effective date by which the minor use shall be deleted from the registration.

(B)(i) If the registrant of a pesticide submits the information required by paragraph (1) within the time prescribed by paragraph (2) and such information does not conform to the guidelines for submissions established by the Administrator, the Administrator shall determine whether the registrant made a good faith attempt to conform its submission to such guidelines.

(ii) If the Administrator determines that the registrant made a good faith attempt to conform its submission to such guidelines, the Administrator shall provide the registrant a reasonable period of time to make any necessary changes or corrections.

(iii)(I) If the Administrator determines that the registrant did not make a good faith attempt to conform its submission to such guidelines, the Administrator may issue a notice of intent to cancel the registration. Such a notice shall be sent to the registrant by certified mail.

(II) The registration shall be canceled without a hearing or further notice at the end of 30 days after receipt by the registrant of the notice unless during that time a request for a hearing is made by the registrant.

(III) If a hearing is requested, a hearing shall be conducted under section 136d(d) of this title, except that the only matter for resolution at the hearing shall be whether the registrant made a good faith attempt to conform its submission to such guidelines. The hearing shall be held and a determination made within 75 days after receipt of a request for hearing.

**(4) Guidelines**

(A) Not later than 1 year after the effective date of this section, the Administrator, by order, shall issue guidelines to be followed by registrants in—

    (i) summarizing studies;

    (ii) reformatting studies;

    (iii) identifying adverse information; and

    (iv) identifying studies that have been submitted previously that may not meet the requirements of section 136a of this title or regulations issued under such section,

under paragraph (1).

(B) Guidelines issued under subparagraph (A) shall not be subject to judicial review.

### (5) Monitoring

The Administrator shall monitor the progress of registrants in acquiring and submitting the data required under paragraph (1).

## (f) Phase four

### (1) Independent review and identification of outstanding data requirements

(A) The Administrator shall review the submissions of all registrants of pesticides containing a particular active ingredient under subsections (d)(3) and (e)(1) to determine if such submissions identified all the data that are missing or inadequate for such active ingredient. To assist the review of the Administrator under this subparagraph, the Administrator may require a registrant seeking reregistration to submit complete copies of studies summarized under subsection (e)(1).

(B) The Administrator shall independently identify and publish in the Federal Register the outstanding data requirements for each active ingredient that is listed under subparagraph (B), (C), or (D) of subsection (c)(2) and that is contained in a pesticide to be reregistered under this section. The Administrator, at the same time, shall issue a notice under section 136a(c)(2)(B) of this title for the submission of the additional data that are required to meet such requirements.

### (2) Time periods

(A) The Administrator shall take the action required by paragraph (1)—

    (i) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(B), not later than 18 months after the date of the listing of such active ingredient;

    (ii) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(C), not later than 24 months after the date of the listing of such active ingredient; and

    (iii) in the case of a pesticide containing an active ingredient listed under subsection (c)(2)(D), not later than 33 months after the date of the listing of such active ingredient.

(B) If the Administrator issues a notice to a registrant under paragraph (1)(B) for the submission of additional data, the registrant shall submit such data within a reasonable period of time, as determined by the Administrator, but not to exceed 48 months after the issuance of such notice. The Administrator, on application of a registrant, may extend the period prescribed by the preceding sentence by no more than 2 years if extraordinary circumstances beyond the control of the registrant prevent the registrant from submitting data within such prescribed period. Upon application of a registrant, the Administrator shall, in the case of a minor use, extend the deadline for the production of residue chemistry data under this subparagraph for data required solely to support that minor use until the final deadline for submission of data under this section for the other uses of the pesticide established as of August 3, 1996, if—

    (i) the data to support other uses of the pesticide on a food are being provided;

    (ii) the registrant, in submitting a request for such an extension provides a schedule, including interim dates to measure progress, to assure that the data production will be completed before the expiration of the extension period;

    (iii) the Administrator has determined that such extension will not significantly delay the Administrator's schedule for issuing a reregistration eligibility determination required under this section; and

    (iv) the Administrator has determined that based on existing data, such extension would not significantly increase the risk of any unreasonable adverse effect on the environment. If the Administrator grants an extension under this subparagraph, the Administrator shall monitor the development of the data and shall ensure that the registrant is meeting the schedule for the production of the data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) of section 136a(c)(2)(B) of this title or other provisions of this section, as appropriate, regarding the continued registration of the affected products with the minor use and shall inform the public of such action. Notwithstanding the provisions of this subparagraph, the Administrator may take action to modify or revoke the extension under this

subparagraph if the Administrator determines that the extension for the minor use may cause an unreasonable adverse effect on the environment. In such circumstance, the Administrator shall provide written notice to the registrant revoking the extension of time for submission of data. Such data shall instead be due in accordance with the date then established by the Administrator for submission of the data.

**(3) Suspensions and penalties**

The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by section 136a(c)(2)(B)(iv) of this title if the Administrator determines that (A) tests necessary to fill an outstanding data requirement for such pesticide have not been initiated within 1 year after the issuance of a notice under paragraph (1)(B), or (B) progress is insufficient to ensure submission of the data referred to in clause (A) within the time period prescribed by paragraph (2)(B) or the required data have not been submitted to the Administrator within such time period. If the registrant does not commit to support a specific minor use of the pesticide, but is supporting and providing data in a timely and adequate fashion to support uses of the pesticide on a food, or if all uses of the pesticide are nonfood uses and the registrant does not commit to support a specific minor use of the pesticide but is supporting and providing data in a timely and adequate fashion to support other nonfood uses of the pesticide, the Administrator, at the written request of the registrant, shall not take any action pursuant to this paragraph in regard to such unsupported minor use until the final deadline established as of August 3, 1996, for the submission of data under this section for the supported uses identified pursuant to this paragraph unless the Administrator determines that the absence of the data is significant enough to cause human health or environmental concerns. On such a determination the Administrator may refuse the request for extension by the registrant. Upon receipt of the request from the registrant, the Administrator shall publish in the Federal Register a notice of the receipt of the request and the effective date upon which the uses not being supported will be voluntarily deleted from the registration pursuant to section 136d(f)(1) of this title. If the Administrator grants an extension under this paragraph, the Administrator shall monitor the development of the data for the uses being supported and shall ensure that the registrant is meeting the schedule for the production of such data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with section 136a(c)(2)(B)(iv) of this title regarding the continued registration of the affected products with the minor and other uses and shall inform the public of such action in accordance with section 136d(f)(2) of this title. Notwithstanding this subparagraph, the Administrator may deny, modify, or revoke the temporary extension under this paragraph if the Administrator determines that the continuation of the minor use may cause an unreasonable adverse effect on the environment. In the event of modification or revocation, the Administrator shall provide, in writing, to the registrant a notice revoking the temporary extension and establish a new effective date by which the minor use shall be deleted from the registration.

## (g) Phase five

### (1) Data review

The Administrator shall conduct a thorough examination of all data submitted under this section concerning an active ingredient listed under subsection (c)(2) and of all other available data found by the Administrator to be relevant.

### (2) Reregistration and other actions

(A) IN GENERAL.—The Administrator shall make a determination as to eligibility for reregistration—
(i) for all active ingredients subject to reregistration under this section for which tolerances or exemptions from tolerances are required under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.), not later than the last date for tolerance reassessment established under section 408(q)(1)(C) of that Act (21 U.S.C. 346a(q)(1)(C)); and
(ii) for all other active ingredients subject to reregistration under this section, not later than October 3, 2008.

(B) PRODUCT-SPECIFIC DATA.—
(i) IN GENERAL.—Before reregistering a pesticide, the Administrator shall obtain any needed product-specific data regarding the pesticide by use of section 136a(c)(2)(B) of this title and shall review such data within 90 days after its submission.
(ii) TIMING.—
(I) IN GENERAL.—Subject to subclause (II), the Administrator shall require that data under this subparagraph be submitted to the Administrator not later than 8 months after a determination of eligibility under subparagraph (A) has been made for each active ingredient of the pesticide, unless the Administrator determines that a longer period is required for the generation of the data.

(II) Extraordinary circumstances.—In the case of extraordinary circumstances, the Administrator may provide such a longer period, of not more than 2 additional years, for submission of data to the Administrator under this subparagraph.

(C) After conducting the review required by paragraph (1) for each active ingredient of a pesticide and the review required by subparagraph (B) of this paragraph, the Administrator shall determine whether to reregister a pesticide by determining whether such pesticide meets the requirements of section 136a(c)(5) of this title. If the Administrator determines that a pesticide is eligible to be reregistered, the Administrator shall reregister such pesticide within 6 months after the submission of the data concerning such pesticide under subparagraph (B).

(D) Determination to not reregister.—

(i) In general.—If after conducting a review under paragraph (1) or subparagraph (B) of this paragraph the Administrator determines that a pesticide should not be reregistered, the Administrator shall take appropriate regulatory action.

(ii) Timing for regulatory action.—Regulatory action under clause (i) shall be completed as expeditiously as possible.

(E) As soon as the Administrator has sufficient information with respect to the dietary risk of a particular active ingredient, but in any event no later than the time the Administrator makes a determination under subparagraph (C) or (D) with respect to pesticides containing a particular active ingredient, the Administrator shall—

(i) reassess each associated tolerance and exemption from the requirement for a tolerance issued under section 408 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 346a);

(ii) determine whether such tolerance or exemption meets the requirements of that Act [21 U.S.C. 301 et seq.];

(iii) determine whether additional tolerances or exemptions should be issued;

(iv) publish in the Federal Register a notice setting forth the determinations made under this subparagraph; and

(v) commence promptly such proceedings under this subchapter and section 408 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 346a] as are warranted by such determinations.

## (h) Compensation of data submitter

If data that are submitted by a registrant under subsection (d), (e), (f), or (g) are used to support the application of another person under section 136a of this title, the registrant who submitted such data shall be entitled to compensation for the use of such data as prescribed by section 136a(c)(1)(D)$^1$ of this title. In determining the amount of such compensation, the fees paid by the registrant under this section shall be taken into account.

## (i) Fees

### (1) Maintenance fee

(A) In general.—Subject to other provisions of this paragraph, each registrant of a pesticide shall pay an annual fee by January 15 of each year for each registration, except that no fee shall be charged for more than 200 registrations held by any registrant.

(B) In the case of a pesticide that is registered for a minor agricultural use, the Administrator may reduce or waive the payment of the fee imposed under this paragraph if the Administrator determines that the fee would significantly reduce the availability of the pesticide for the use.

(C) Total amount of fees.—The amount of each fee prescribed under subparagraph (A) shall be adjusted by the Administrator to a level that will result in the collection under this paragraph of, to the extent practicable, an average amount of $31,000,000 for each of fiscal years 2019 through 2022, and $42,000,000 for each of fiscal years 2023 through 2027.

(D) Maximum amount of fees for registrants.—The maximum annual fee payable under this paragraph by—

(i) a registrant holding not more than 50 pesticide registrations shall be $129,400 for each of fiscal years 2019 through 2022, and $172,000 for each of fiscal years 2023 through 2027; and

(ii) a registrant holding over 50 registrations shall be $207,000 for each of fiscal years 2019 through 2022, and $277,200 for each of fiscal years 2023 through 2027.

(E) Maximum amount of fees for small businesses.—

(i) In general.—For a small business, the maximum annual fee payable under this paragraph by—

Exhibit C-1, pg. 41 of 152

(I) a registrant holding not more than 50 pesticide registrations shall be $79,100 for each of fiscal years 2019 through 2022, and $105,000 for each of fiscal years 2023 through 2027; and

(II) a registrant holding over 50 pesticide registrations shall be $136,800 for each of fiscal years 2019 through 2022, and $184,800 for each of fiscal years 2023 through 2027.

(ii) DEFINITION OF SMALL BUSINESS.—

(I) IN GENERAL.—In clause (i), the term "small business" means a corporation, partnership, or unincorporated business that—

(aa) has 500 or fewer employees; and

(bb) during the 3-year period prior to the most recent maintenance fee billing cycle, had an average annual global gross revenue from pesticides that did not exceed $60,000,000.

(II) AFFILIATES.—

(aa) IN GENERAL.—In the case of a business entity with 1 or more affiliates, the gross revenue limit under subclause (I)(bb) shall apply to the gross revenue for the entity and all of the affiliates of the entity, including parents and subsidiaries, if applicable.

(bb) AFFILIATED PERSONS.—For the purpose of item (aa), persons are affiliates of each other if, directly or indirectly, either person controls or has the power to control the other person, or a third person controls or has the power to control both persons.

(cc) INDICIA OF CONTROL.—For the purpose of item (aa), indicia of control include interlocking management or ownership, identity of interests among family members, shared facilities and equipment, and common use of employees.

(F) FEE REDUCTION FOR CERTAIN SMALL BUSINESSES.—

(i) DEFINITION.—In this subparagraph, the term "qualified small business entity" means a corporation, partnership, or unincorporated business that—

(I) has 500 or fewer employees;

(II) during the 3-year period prior to the most recent maintenance fee billing cycle, had an average annual global gross revenue from all sources that did not exceed $10,000,000; and

(III) holds not more than 5 pesticide registrations under this paragraph.

(ii) WAIVER.—Except as provided in clause (iii), the Administrator shall waive 25 percent of the fee under this paragraph applicable to the first registration of any qualified small business entity under this paragraph.

(iii) LIMITATION.—The Administrator shall not grant a waiver under clause (ii) to a qualified small business entity if the Administrator determines that the entity has been formed or manipulated primarily for the purpose of qualifying for the waiver.

(G) FARM WORKER TRAINING AND EDUCATION GRANTS.—

(i) SET-ASIDE.—In addition to amounts otherwise available, for fiscal years 2023 through 2027, the Administrator shall use not more than $7,500,000 of the amounts collected under this paragraph to provide grants to organizations described in clause (ii) for purposes of facilitating—

(I) training of farm workers;

(II) education of farm workers with respect to—

(aa) rights of farm workers relating to pesticide safety; and

(bb) the worker protection standard under part 170 of title 40, Code of Federal Regulations (or successor regulations);

(III) the development of new informational materials;

(IV) the development of training modules; and

(V) the development of innovative methods of delivery of such informational materials and training modules.

(ii) ELIGIBILITY.—To be eligible to receive a grant under this subparagraph, an organization shall have demonstrated experience in—

(I) providing training and education services for farm workers or handlers of pesticides; or

(II) developing informational materials for farm workers or handlers of pesticides.

(iii) COMMUNITY-BASED ORGANIZATIONS.—

(I) COMMUNITY-BASED NON-PROFIT FARM WORKER ORGANIZATION GRANTS.—The Administrator shall use funds available under clause (i) to provide grants to community-based non-profit farm worker

organizations.

    (II) APPLICATION OF FUNDS.—The Administrator shall apply the unspent balance of funds available (up to $1,800,000) under clause (i) in fiscal years 2025 through 2027 to carry out subclause (I).

    (iv) INTERIM FUNDING.—In addition to amounts otherwise available, the Administrator may use not more than $1,200,000 in fiscal years 2023 and 2024 to fund existing cooperative agreements that were authorized under section 136w–8(c)(3)(B) of this title, as such section was in effect as of March 8, 2019.

    (v) PARTNERSHIPS.—Organizations described in clause (ii) may apply for a grant under this subparagraph as a partnership with another organization, provided such organizations, at the time of application, have entered into an agreement designating—

    (I) a member of the partnership that will enter into the assistance agreement with the Environmental Protection Agency for the purposes of accountability for the proper expenditure of Federal funds;

    (II) performance of the assistance agreement;

    (III) liability for claims for recovery of unallowable costs incurred under the agreement; and

    (IV) specifying roles in performing the proposed scope of work for the assistance agreement.

    (H) HEALTH CARE PROVIDER TRAINING.—

    (i) SET-ASIDE.—In addition to other amounts available, for the period of fiscal years 2023 through 2027, the Administrator shall use not more than $2,500,000 of the amounts collected under this paragraph to provide grants to nonprofit organizations described in clause (ii) for purposes of facilitating—

    (I) technical assistance and training of health care providers relating to the recognition, treatment, and management of pesticide-related injuries and illnesses;

    (II) the development of informational materials for technical assistance and training described in subclause (I); and

    (III) the development of outreach and delivery methods relating to the recognition, treatment, and management of pesticide-related illnesses.

    (ii) ELIGIBILITY.—To be eligible to receive a grant under this subparagraph, a nonprofit organization shall have demonstrated experience in providing technical assistance and training to health care providers who serve farm worker populations.

    (iii) PARTNERSHIPS.—Organizations described in clause (ii) may apply for a grant under this subparagraph as a partnership with another organization, provided such organizations, at the time of application, have entered into an agreement designating—

    (I) a member of the partnership that will enter into the assistance agreement with the Environmental Protection Agency for the purposes of accountability for the proper expenditure of Federal funds;

    (II) performance of the assistance agreement;

    (III) liability for claims for recovery of unallowable costs incurred under the agreement; and

    (IV) roles in performing the proposed scope of work for the assistance agreement.

    (I) PARTNERSHIP GRANTS.—In addition to funds otherwise available, for each of fiscal years 2023 through 2027, the Administrator shall use not more than $500,000 of the amounts collected under this paragraph for partnership grants.

    (J) PESTICIDE SAFETY EDUCATION PROGRAM.—In addition to amounts otherwise available, for each of fiscal years 2023 through 2027, the Administrator shall use not more than $500,000 of the amounts collected under this paragraph to carry out the pesticide safety education program.

    (K) TECHNICAL ASSISTANCE TO GRANTEES.—

    (i) SET-ASIDE.—In addition to other amounts available, for fiscal years 2023 through 2027, the Administrator shall use not more than $1,750,000 of the amounts collected under this paragraph to provide grants to nonprofit organizations, subject to such conditions as the Administrator establishes to prevent conflicts of interest, to provide easily accessible technical assistance to grantees receiving, and potential grantees applying for, grants under subparagraphs (G) and (H).

    (ii) CONSIDERATIONS.—In evaluating requests for grants under this subparagraph, the Administrator shall consider, at a minimum, the extent to which—

    (I) the organization applying for the grant has experience providing technical assistance to farm worker or clinician-training organizations; and

    (II) the proposed project would make specific technical assistance available to organizations seeking information and assistance concerning—

    (aa) the grant application process;

    (bb) the drafting of grant applications; and

    (cc) compliance with grant management and reporting requirements.

Exhibit C-1, pg. 43 of 152

(iii) No suitable organization.—If no suitable organization requests a grant under this subparagraph, the Administrator shall provide technical assistance described in clause (i) using the amounts made available by that clause.

(iv) Stakeholder input.—In formulating requests for proposals for grants under subparagraphs (G) and (H) for a fiscal year, the Administrator shall solicit and consider, in an open and transparent manner that does not provide a competitive advantage to any person or persons, input from persons who conduct farm worker education and training, or technical assistance and training of clinicians, regarding the request for proposals.

(L) The Administrator shall exempt any public health pesticide from the payment of the fee prescribed under this paragraph if, in consultation with the Secretary of Health and Human Services, the Administrator determines, based on information supplied by the registrant, that the economic return to the registrant from sales of the pesticide does not support the registration or reregistration of the pesticide.

(M) If any fee prescribed by this paragraph with respect to the registration of a pesticide is not paid by a registrant by the time prescribed, the Administrator, by order and without hearing, may cancel the registration.

(N) The authority provided under this paragraph shall terminate on September 30, 2027.

**(2) Other fees**

Except as provided in section 136w–8 of this title, during the period beginning on December 29, 2022, and ending on September 30, 2029, the Administrator may not levy any other fees for the registration of a pesticide under this subchapter or any other action covered under a table specified in section 136w–8(b)(3)(B) of this title, except as provided in paragraph (1).

**(j) Exemption of certain registrants**

The requirements of subsections (d), (e), (f), and (i) (other than subsection (i)(1)) regarding data concerning an active ingredient and fees for review of such data shall not apply to any person who is the registrant of a pesticide to the extent that, under section 136a(c)(2)(D) of this title, the person would not be required to submit or cite such data to obtain an initial registration of such pesticide.

**(k) Reregistration and expedited processing fund**

**(1) Establishment**

There shall be established in the Treasury of the United States a reregistration and expedited processing fund which shall be known as the Reregistration and Expedited Processing Fund.

**(2) Source and use**

(A) All moneys derived from fees collected by the Administrator under subsection (i) shall be deposited in the Reregistration and Expedited Processing Fund and shall be available to the Administrator, without fiscal year limitation, including, to the maximum extent practicable, during periods in which Environmental Protection Agency employees are on shutdown or emergency furlough as a result of a lapse in appropriations, specifically to offset the costs of reregistration and expedited processing of the applications specified in paragraph (3), to offset the costs of registration review under section 136a(g) of this title, including the costs associated with any review under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) required as part of the registration review, to offset the costs associated with tracking and implementing registration review decisions, including registration review decisions designed to reduce risk, for the purposes specified in paragraphs (4) and (5), and to enhance the information systems capabilities to improve the tracking of pesticide registration decisions. The Administrator shall, prior to expending any such moneys derived from fees—

(i) effective October 1, 1997, adopt specific and cost accounting rules and procedures as approved by the Government Accountability Office and the Inspector General of the Environmental Protection Agency to ensure that moneys derived from fees are allocated solely for the purposes specified in the first sentence of this subparagraph;

(ii) prohibit the use of such moneys derived from fees to pay for any costs other than those necessary to achieve the purposes specified in the first sentence of this subparagraph; and

(iii) ensure that personnel and facility costs associated with the functions to be carried out under this paragraph do not exceed agency averages for comparable personnel and facility costs.

(B) The Administrator shall also—

(i) complete the review of unreviewed reregistration studies required to support the reregistration eligibility decisions scheduled for completion in accordance with subsection (l)(2); and

(ii) contract for such outside assistance as may be necessary for review of required studies, using a generally accepted competitive process for the selection of vendors of such assistance.

**(3) Review of registrant submissions not covered by section 136w–8(b)(3)(B) of this title**

Exhibit C-1, pg. 44 of 152

**(A) Definition of submission not covered by section 136w–8(b)(3)(B) of this title**

In this paragraph, the term "submission not covered by section 136w–8(b)(3)(B) of this title" means any submission filed by a registrant with the Administrator relating to a registration that is not covered by a fee table under section 136w–8(b)(3)(B) of this title.

**(B) Set-aside**

**(i) In general**

In addition to amounts otherwise available for each of fiscal years 2023 through 2027, the Administrator shall use approximately 1/8 of the amounts made available to the Administrator in the Reregistration and Expedited Processing Fund for the activities described in clause (ii).

**(ii) Activities**

In addition to amounts otherwise available, the Administrator shall use amounts made available under clause (i) to obtain sufficient personnel and resources to process submissions not covered by section 136w–8(b)(3)(B) of this title to meet the applicable deadlines described in—

(I) the notice of the Administrator entitled "Pesticide Registration Notice (PR) 98–10: Notifications, Non-Notifications and Minor Formulation Amendments" and dated October 22, 1998 (and any successor amendments to such notice); and

(II) subsections (c)(3)(B) and (h) of section 136a of this title.

**(4) Development of public health performance standards for antimicrobial pesticide devices**

**(A) Set-aside**

In addition to amounts otherwise available, for each of fiscal years 2023 through 2027, the Administrator shall use not more than $500,000 of the amounts made available to the Administrator in the Reregistration and Expedited Processing Fund for the activities described in subparagraph (B).

**(B) Antimicrobial pesticide devices**

The Administrator shall use amounts made available under subparagraph (A) to develop efficacy test methods for antimicrobial pesticide devices making public health claims.

**(5) Good laboratory practices inspections**

**(A) Set-aside**

For each of fiscal years 2023 through 2027, the Administrator shall use not more than $500,000 of the amounts made available to the Administrator in the Reregistration and Expedited Processing Fund for the activities described in subparagraph (B).

**(B) Activities**

The Administrator shall use amounts made available under subparagraph (A) for enhancements to the good laboratory practices standards compliance monitoring program established under part 160 of title 40 of the Code of Federal Regulations (or successor regulations), with respect to laboratory inspections and data audits conducted in support of pesticide product registrations under this subchapter. As part of such monitoring program, the Administrator shall make available to each laboratory inspected under such program in support of such registrations a preliminary summary of inspection observations not later than 60 days after the date on which such an inspection is completed.

**(6) Agency training and staff**

**(A) Set-aside**

In addition to amounts otherwise available, for each of fiscal years 2023 through 2027, the Administrator shall use not more than $500,000 of the amounts made available to the Administrator in the Reregistration and Expedited Processing Fund for the activities described in subparagraph (B).

**(B) Activities**

The Administrator shall use amounts made available under subparagraph (A) to carry out the following activities:

**(i) Training for agency employees**

The Administrator shall administer training and education programs for employees of the Environmental Protection Agency, relating to the regulatory responsibilities and policies established by this Act, including programs—

(I) for improving the scientific, technical, and administrative skills of officers and employees authorized to administer programs under this subchapter;

(II) to align competencies identified by the Administrator for mission accomplishment;

(III) for addressing best practices for operational performance and improvement;
(IV) for improving administrative processes and procedures and addressing efficiency issues;
(V) to promote consistent regulatory decision-making; and
(VI) for educating registrants and regulated stakeholders on regulatory procedures.

**(ii) Agreements with institutions of higher education**

Not later than 1 year, to the maximum extent practicable, after December 29, 2022, the Administrator shall establish a competitive grant program to develop training curricula and programs in accordance with clause (i) through financial assistance agreements with 1 or more of the following institutions of higher education:

(I) Non-land-grant colleges of agriculture (as defined in section 3103 of this title).
(II) Land-grant colleges and universities (as defined in section 3103 of this title).
(III) 1994 Institutions (as defined in section 532 of the Equity in Educational Land-Grant Status Act of 1994 (7 U.S.C. 301 note; Public Law 103–382)).

## (7) Vector expedited review vouchers

### (A) Set-aside

In addition to amounts otherwise available, for each of fiscal years 2023 through 2027, the Administrator shall use not more than $500,000 of the amounts made available to the Administrator in the Reregistration and Expedited Processing Fund to establish and carry out the Vector Expedited Review Voucher program in accordance with subparagraph (B).

### (B) Vector Expedited Review Voucher program

#### (i) Definitions

In this subparagraph:

#### (I) Program

The term "program" means the Vector Expedited Review Voucher program established under clause (ii).

#### (II) Voucher

The term "voucher" means a voucher—
(aa) issued under the program by the Administrator to a pesticide registration applicant that entitles the holder to an expedited review described under clause (vi) of a single different pesticide registration action; and
(bb) the entitlement to which may be transferred (including by sale) by the holder of the voucher, without limitation on the number of times the voucher may be transferred, before the voucher is redeemed.

#### (ii) Establishment

Not later than one year after December 29, 2022, the Administrator, acting though the Office of Pesticide Programs, shall establish a program to be known as the Vector Expedited Review Voucher program.

#### (iii) Purpose

The purpose of the program is to incentivize the development of new insecticides to control and prevent the spread of vector borne disease by expediting reviews by decreasing decision review times provided in section 136w–8(b)(3)(B) of this title.

#### (iv) Issuance of vouchers

#### (I) In general

For each of fiscal years 2023 through 2027, the Administrator shall issue a voucher to a pesticide registration applicant for a new active ingredient if the applicant submits and has successfully registered a mosquito-control product that—
(aa) demonstrates a proven efficacy against pyrethroid or other insecticide-resistant mosquitoes;
(bb) prevents, mitigates, destroys, or repels pyrethroid or other insecticide-resistant mosquitoes, with a novel or unique mechanism or mode of action, different from other insecticides already registered by the Administrator for mosquito control;
(cc) targets mosquitoes capable of spreading such diseases as Malaria, Dengue, Zika, Chikungunya, St. Louis encephalitis, Eastern encephalitis, Western encephalitis, West Nile encephalitis, Cache Valley encephalitis, LaCrosse encephalitis, and Yellow Fever;

(dd) the registrant has submitted a global access plan that will be made publicly available for the active ingredient and that includes—

(AA) manufacturing locations, including any licensed third-party manufacturers;

(BB) distribution and procurement processes for malaria vector control programs in selected countries; and

(CC) the prices for common quantities of the product;

(ee) meets the appropriate guidelines as being effective in the primary vector control intervention areas, including insecticide-treated nets and indoor residual spray;

(ff) is made accessible for use in—

(AA) the United States, including territories or possessions of the United States; and

(BB) countries where mosquito-borne diseases, such as malaria, are prevalent;

(gg) meets registration requirements for human health and environmental effects, labeling, and presents no unreasonable adverse effects to the environment;

(hh) broadens the adoption of integrated pest management strategies, such as insecticide resistance management, or makes those strategies more effective;

(ii) is not contained in any pesticide product registered by the Administrator as of December 29, 2022; or

(jj) does not contain as attested to by the registrant, an active ingredient approved in the 2-year period preceding the date of registration by any global stringent regulatory authority for the same uses, vectors, and applications.

### (II) Mosquito vector priority

For each of fiscal years 2023 through 2027, the focus of the program shall be to incentivize the development of insecticides to control and prevent the spread of mosquitoes bearing diseases described in subclause (I)(cc).

### (III) Exception

If the Administrator determines that there is a significant public health benefit, an active ingredient that is registered for agricultural use that is repurposed and submitted for control of mosquitoes and that otherwise meets the requirements of subclause (I) (excluding items (bb) and (jj)) as determined necessary by the Administrator, shall be considered a mosquito control product meeting the criteria specified in such subclause.

### (IV) Eligibility criteria modifications

#### (aa) In general

Beginning in fiscal year 2028, the Administrator shall review the program and recommend—

(AA) modifications to the requirements described in subclause (I); and

(BB) additional vectors to be included in the program, prioritizing vectors that pose the most significant population health risks.

#### (bb) Public involvement

In carrying out item (aa), the Administrator shall solicit the involvement of registrants, nongovernmental organizations, and governmental agencies engaged in vector-borne disease mitigation and treatment.

### (v) Redemption of vouchers

To redeem a voucher, the holder shall—

(I) notify the Administrator of the intent of the holder to submit a pesticide application with a voucher for expedited review not less than 90 days before the submission of the application; and

(II) pay the applicable registration service fee under section 136w–8(b) of this title.

### (vi) Expedited review

On redemption of a voucher, in furtherance of the purpose described in clause (iii), the Administrator shall expedite decision review times as follows:

(I) 6 months less than the decision review time for Category R010, New Active Ingredient, Food use.

(II) 6 months less than the decision review time for Category R020, New Active Ingredient, Food use; reduced risk.

(III) 6 months less than the decision review time for Category R060, New Active Ingredient, Non-food use; outdoor.

(IV) 6 months less than the decision review time for Category R110, New Active Ingredient, Non-food use; indoor.

(V) 4 months less than the decision review time for Category R070, New Active Ingredient, Non-food use; outdoor; reduced risk.

(VI) 2 months less than the decision review time for Category R120, New Active Ingredient, Non-food use; indoor; reduced risk.

### (vii) Reports

Not later than September 30, 2025, and not later than September 30 of each year thereafter, the Administrator shall issue a report on the program, including—

(I) the number of submissions seeking a voucher;

(II) the total time in review for each such submission;

(III) the number of such vouchers awarded;

(IV) the number of such vouchers redeemed; and

(V) with respect to each such redeemed voucher—

(aa) the decision review time for the pesticide application for which the voucher was redeemed; and

(bb) the average standard decision review time for the applicable pesticide category.

### (C) Unused amounts

Any unused amounts made available under this paragraph at the end of each fiscal year shall be made available to the Administrator to carry out other activities for which amounts in the Reregistration and Expedited Processing Fund are authorized to be used.

### (8) Pesticide surveillance program

In addition to amounts otherwise available, for each of fiscal years 2023 through 2027, the Administrator shall use not more than $500,000 of the amounts made available to the Administrator in the Reregistration and Expedited Processing Fund to support the interagency agreement with the National Institute for Occupational Safety and Health to support the Sentinel Event Notification System for Occupational Risk pesticides program—

(A) with a goal of increasing the number of participating States, prioritizing expansion in States with the highest numbers of agricultural workers; and

(B) to improve reporting by participating States.

### (9) Unused funds

Money in the fund not currently needed to carry out this section shall be—

(A) maintained on hand or on deposit;

(B) invested in obligations of the United States or guaranteed thereby; or

(C) invested in obligations, participations, or other instruments that are lawful investments for fiduciary, trust, or public funds.

### (10) Accounting and performance

The Administrator shall take all steps necessary to ensure that expenditures from fees authorized by subsection (i)(1)(C)(ii) [1] are used only for the purposes described in paragraphs (2) through (8) and to carry out the goals established under subsection (l). The Reregistration and Expedited Processing Fund shall be designated as an Environmental Protection Agency component for purposes of section 3515(c) of title 31. The annual audit required under section 3521 of such title of the financial statements of activities under this subchapter under section 3515(b) of such title shall include an audit of the fees collected under subsection (i)(1)(C) and disbursed, of the amount appropriated to match such fees, and of the Administrator's attainment of performance measures and goals established under subsection (l). Such an audit shall also include a review of the reasonableness of the overhead allocation and adequacy of disclosures of direct and indirect costs associated with carrying out the reregistration and expedited processing of the applications specified in paragraph (3), and the basis for and accuracy of all costs paid with moneys derived from such fees. The Inspector General shall conduct the annual audit and report the findings and recommendations of such audit to the Administrator and to the Committees on Agriculture of the House of Representatives and the Senate. The cost of such audit shall be paid for out of the fees collected under subsection (i)(1)(C).

### (l) Performance measures and goals

The Administrator shall establish and publish annually in the Federal Register performance measures and goals. Such measures and goals shall include—

(1) the number of products reregistered, canceled, or amended, the status of reregistration, the number and type of data requests under section 136a(c)(2)(B) of this title issued to support product reregistration by active ingredient, the progress in reducing the number of unreviewed, required reregistration studies, the aggregate status of tolerances reassessed, and the number of applications for registration submitted under subsection (k)(3) that were approved or disapproved;

Exhibit C-1, pg. 48 of 152

(2) the future schedule for reregistrations, including the projection for such schedules that will be issued under subsection (g)(2)(A) and (B) in the current fiscal year and the succeeding fiscal year; and

(3) the projected year of completion of the reregistrations under this section.

## (m) Judicial review

Any failure of the Administrator to take any action required by this section shall be subject to judicial review under the procedures prescribed by section 136n(b) of this title.

## (n) Authorization of funds to develop public health data

### (1) "Secretary" defined

For the purposes of this section, "Secretary" means the Secretary of Health and Human Services, acting through the Public Health Service.

### (2) Consultation

In the case of a pesticide registered for use in public health programs for vector control or for other uses the Administrator determines to be human health protection uses, the Administrator shall, upon timely request by the registrant or any other interested person, or on the Administrator's own initiative may, consult with the Secretary prior to taking final action to suspend registration under section 136a(c)(2)(B)(iv) of this title, or cancel a registration under section 136a–1, 136d(e), or 136d(f) of this title. In consultation with the Secretary, the Administrator shall prescribe the form and content of requests under this section.

### (3) Benefits to support family

The Administrator, after consulting with the Secretary, shall make a determination whether the potential benefits of continued use of the pesticide for public health or health protection purposes are of such significance as to warrant a commitment by the Secretary to conduct or to arrange for the conduct of the studies required by the Administrator to support continued registration under section 136a of this title or reregistration under this section.

### (4) Additional time

If the Administrator determines that such a commitment is warranted and in the public interest, the Administrator shall notify the Secretary and shall, to the extent necessary, amend a notice issued under section 136a(c)(2)(B) of this title to specify additional reasonable time periods for submission of the data.

### (5) Arrangements

The Secretary shall make such arrangements for the conduct of required studies as the Secretary finds necessary and appropriate to permit submission of data in accordance with the time periods prescribed by the Administrator. Such arrangements may include Public Health Service intramural research activities, grants, contracts, or cooperative agreements with academic, public health, or other organizations qualified by experience and training to conduct such studies.

### (6) Support

The Secretary may provide for support of the required studies using funds authorized to be appropriated under this section, the Public Health Service Act [42 U.S.C. 201 et seq.], or other appropriate authorities. After a determination is made under subsection (d), the Secretary shall notify the Committees on Appropriations of the House of Representatives and the Senate of the sums required to conduct the necessary studies.

### (7) Authorization of appropriations

There is authorized to be appropriated to carry out the purposes of this section $12,000,000 for fiscal year 1997, and such sums as may be necessary for succeeding fiscal years.

(June 25, 1947, ch. 125, §4, formerly §3A, as added and renumbered §4, Pub. L. 100–532, title I, §102(a), title VIII, §801(q)(2)(A), Oct. 25, 1988, 102 Stat. 2655, 2683; amended Pub. L. 101–624, title XIV, §1493, Nov. 28, 1990, 104 Stat. 3628; Pub. L. 102–237, title X, §1006(a)(4), (e), (f), Dec. 13, 1991, 105 Stat. 1895–1897; Pub. L. 104–170, title I, §103, title II, §§210(c)(2), (f)(1), 232, 237, title V, §501, Aug. 3, 1996, 110 Stat. 1490, 1496, 1498, 1508, 1509, 1536; Pub. L. 107–73, title III, [(1)–(4)], Nov. 26, 2001, 115 Stat. 686; Pub. L. 108–7, div. K, title III, [(1)–(4)], Feb. 20, 2003, 117 Stat. 513; Pub. L. 108–199, div. G, title V, §501(c), (d)(1), (e), Jan. 23, 2004, 118 Stat. 419, 422; Pub. L. 108–271, §8(b), July 7, 2004, 118 Stat. 814; Pub. L. 110–94, §4(a)–(d)(1), (e), Oct. 9, 2007, 121 Stat. 1001, 1002; Pub. L. 112–177, §2(a)(1), (2)(A), (4), Sept. 28, 2012, 126 Stat. 1327, 1329; Pub. L. 116–8, §§2(a), (b), 3, Mar. 8, 2019, 133 Stat. 484, 485; Pub. L. 117–328, div. HH, title VI, §§703(a), 704, Dec. 29, 2022, 136 Stat. 5999, 6002.)

## Editorial Notes

## REFERENCES IN TEXT

The effective date of this section, referred to in subsecs. (a), (c)(1), (2), and (e)(4)(A), is 60 days after Oct. 25, 1988. See Effective Date note below.

Section 136a(c)(1)(D) of this title, referred to in subsecs. (e)(1)(I) and (h), was redesignated section 136a(c)(1)(F) of this title by Pub. L. 102–237, title X, §1006(a)(3)(B), Dec. 13, 1991, 105 Stat. 1894.

The Federal Food, Drug, and Cosmetic Act, referred to in subsec. (g)(2)(A)(1), (E)(ii), is act June 25, 1938, ch. 675, 52 Stat. 1040, which is classified generally to chapter 9 (§301 et seq.) of Title 21, Food and Drugs. For complete classification of this Act to the Code, see section 301 of Title 21 and Tables.

Section 136w–8(c)(3)(B) of this title, as such section was in effect as of March 8, 2019, referred to in subsec. (i)(1)(G)(iv), means section 136w–8(c)(3)(B) of this title as amended by Pub. L. 116–8, §5(b), and prior to its repeal and reenactment by Pub. L. 117–328, §705(b)(1). See 2022 Amendment note under section 136w–8 of this title.

The Endangered Species Act of 1973, referred to in subsec. (k)(2)(A), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified principally to chapter 35 (§1531 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of Title 16 and Tables.

Subsection (i)(1)(C)(ii) of this section, referred to in subsec. (k)(10), was previously a reference to subsec. (i)(5)(C)(ii), which was repealed and a new subsec. (i)(5)(C)(ii) was added by Pub. L. 108–199, §501(c)(2). Subsec. (i)(5)(C) was amended by Pub. L. 110–94, §4(a), and, as so amended, related to fees but no longer contained a cl. (ii). Subsec. (i)(5) was redesignated (i)(1) by Pub. L. 112–177, §2(a)(1)(C).

The Public Health Service Act, referred to in subsec. (n)(6), is act July 1, 1944, ch. 373, 58 Stat. 682, which is classified generally to chapter 6A (§201 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 201 of Title 42 and Tables.

## PRIOR PROVISIONS

A prior section 4 of act June 25, 1947, which was classified to section 136b of this title was transferred to section 11(a)–(c) of act June 25, 1947, which is classified to section 136i(a)–(c) of this title.

Another prior section 4 of act June 25, 1947, was classified to section 135b of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## AMENDMENTS

**2022**—Subsec. (i)(1)(C). Pub. L. 117–328, §703(a)(1)(A), substituted "2022, and $42,000,000 for each of fiscal years 2023 through 2027" for "2023".

Subsec. (i)(1)(D)(i). Pub. L. 117–328, §703(a)(1)(B)(i), substituted "2022, and $172,000 for each of fiscal years 2023 through 2027" for "2023".

Subsec. (i)(1)(D)(ii). Pub. L. 117–328, §703(a)(1)(B)(ii), substituted "2022, and $277,200 for each of fiscal years 2023 through 2027" for "2023".

Subsec. (i)(1)(E)(i)(I). Pub. L. 117–328, §703(a)(1)(C)(i), substituted "2022, and $105,000 for each of fiscal years 2023 through 2027" for "2023".

Subsec. (i)(1)(E)(i)(II). Pub. L. 117–328, §703(a)(1)(C)(ii), substituted "2022, and $184,800 for each of fiscal years 2023 through 2027" for "2023".

Subsec. (i)(1)(G) to (M). Pub. L. 117–328, §703(a)(1)(D), (E), added subpars. (G) to (K) and redesignated former subpars. (G) and (H) as (L) and (M), respectively. Former subpar. (I) redesignated (N).

Subsec. (i)(1)(N). Pub. L. 117–328, §703(a)(1)(D), (F), redesignated subpar. (I) as (N) and substituted "2027" for "2023".

Subsec. (i)(2). Pub. L. 117–328, §703(a)(2), substituted "December 29, 2022, and ending on September 30, 2029" for "March 8, 2019, and ending on September 30, 2025" and "section 136w–8(b)(3)(B)" for "section 136w–8(b)(3)".

Subsec. (k)(2)(A). Pub. L. 117–328, §704(1), inserted "including, to the maximum extent practicable, during periods in which Environmental Protection Agency employees are on shutdown or emergency furlough as a result of a lapse in appropriations," after "limitation,".

Exhibit C-1, pg. 50 of 152

Subsec. (k)(3), (4). Pub. L. 117–328, §704(2), added pars. (3) and (4) and struck out former pars. (3) and (4) which related, respectively, to use of maintenance fees for review of inert ingredients and expedited processing of similar applications and to expedited rulemaking and guidance development for certain product performance data requirements.

Subsec. (k)(5)(A). Pub. L. 117–328, §704(3), substituted "2023 through 2027" for "2018 through 2023".

Subsec. (k)(6) to (9). Pub. L. 117–328, §704(4), (5), added pars. (6) to (8) and redesignated former par. (6) as (9). Former par. (7) redesignated (10).

Subsec. (k)(10). Pub. L. 117–328, §704(4), (6), redesignated par. (7) as (10) and substituted "paragraphs (2) through (8)" for "paragraphs (2), (3), (4), and (5)".

**2019**—Subsec. (i)(1)(C). Pub. L. 116–8, §2(a)(1), substituted "an average amount of $31,000,000 for each of fiscal years 2019 through 2023" for "an aggregate amount of $27,800,000 for each of fiscal years 2013 through 2017".

Subsec. (i)(1)(D)(i). Pub. L. 116–8, §2(a)(2)(A), substituted "$129,400 for each of fiscal years 2019 through 2023" for "$115,500 for each of fiscal years 2013 through 2017".

Subsec. (i)(1)(D)(ii). Pub. L. 116–8, §2(a)(2)(B), substituted "$207,000 for each of fiscal years 2019 through 2023" for "$184,800 for each of fiscal years 2013 through 2017".

Subsec. (i)(1)(E)(i)(I). Pub. L. 116–8, §2(a)(3)(A), substituted "$79,100 for each of fiscal years 2019 through 2023" for "$70,600 for each of fiscal years 2013 through 2017".

Subsec. (i)(1)(E)(i)(II). Pub. L. 116–8, §2(a)(3)(B), substituted "$136,800 for each of fiscal years 2019 through 2023" for "$122,100 for each of fiscal years 2013 through 2017".

Subsec. (i)(1)(I). Pub. L. 116–8, §2(a)(4), substituted "2023." for "2017.."

Subsec. (i)(2). Pub. L. 116–8, §2(b), substituted "March 8, 2019, and ending on September 30, 2025" for "October 25, 1988, and ending on September 30, 2019" and inserted "or any other action covered under a table specified in section 136w–8(b)(3) of this title," after "registration of a pesticide under this subchapter".

Subsec. (k)(2)(A). Pub. L. 116–8, §3(a)(1), (2), in introductory provisions, substituted "the Reregistration and Expedited Processing Fund" for "the fund" and "paragraph (3), to offset the costs of registration review under section 136a(g) of this title, including the costs associated with any review under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) required as part of the registration review, to offset the costs associated with tracking and implementing registration review decisions, including registration review decisions designed to reduce risk, for the purposes specified in paragraphs (4) and (5), and to enhance the information systems capabilities to improve the tracking of pesticide registration decisions." for "paragraph (3), to enhance the information systems capabilities to improve the tracking of pesticide registration decisions, and to offset the costs of registration review under section 136a(g) of this title. Such moneys derived from fees may not be expended in any fiscal year to the extent such moneys derived from fees would exceed money appropriated for use by the Administrator and expended in such year for such costs of reregistration and expedited processing of such applications."

Subsec. (k)(2)(A)(i). Pub. L. 116–8, §3(a)(3), substituted "are allocated solely for the purposes specified in the first sentence of this subparagraph;" for "are allocated solely to offset the costs of reregistration and expedited processing of the applications specified in paragraph (3), to enhance the information systems capabilities to improve the tracking of pesticide registration decisions, and to offset the costs of registration review under section 136a(g) of this title;".

Subsec. (k)(2)(A)(ii). Pub. L. 116–8, §3(a)(4), substituted "necessary to achieve the purposes specified in the first sentence of this subparagraph;" for "necessary to achieve reregistration and expedited processing of the applications specified in paragraph (3), to enhance the information systems capabilities to improve the tracking of pesticide registration decisions, and to offset the costs of registration review under section 136a(g) of this title;".

Subsec. (k)(3)(A). Pub. L. 116–8, §3(b), in introductory provisions, substituted "For each of fiscal years 2018 through 2023, the Administrator shall use between 1/9 and 1/8 of the maintenance fees collected in such fiscal year to obtain sufficient personnel and resources—" for "The Administrator shall use for each of the fiscal years 2004 through 2006, approximately $3,300,000, and for each of fiscal years 2013 through 2017, between 1/9 and 1/8, of the maintenance fees collected in such fiscal year to obtain sufficient personnel and resources—".

Subsec. (k)(4). Pub. L. 116–8, §3(c), amended par. (4) generally. Prior to amendment, par. (4) related to enhancements of information technology systems for improvement in review of pesticide

applications.

Subsec. (k)(5) to (7). Pub. L. 116–8, §3(d), added par. (5), redesignated former pars. (5) and (6) as (6) and (7), respectively, and substituted "paragraphs (2), (3), (4), and (5)" for "paragraphs (2), (3), and (4)" in par. (7).

**2012**—Subsec. (d)(5)(B)(ii)(III). Pub. L. 112–177, §2(a)(2)(A)(i), substituted "this section" for "subsection (i)(1)".

Subsec. (i)(1) to (4). Pub. L. 112–177, §2(a)(1)(C), (D), redesignated pars. (5) and (6) as (1) and (2), respectively, and struck out former pars. (1) to (4) which related to initial fee for food or feed use pesticide active ingredients, final fee for food or feed use pesticide active ingredients, fees for other pesticide active ingredients, and reduction or waiver of fees for minor use and other pesticides, respectively.

Subsec. (i)(5). Pub. L. 112–177, §2(a)(1)(D), redesignated par. (5) as (1).

Subsec. (i)(5)(C). Pub. L. 112–177, §2(a)(1)(A)(i), substituted "aggregate amount of $27,800,000 for each of fiscal years 2013 through 2017." for "aggregate amount of $22,000,000 for each of fiscal years 2008 through 2012".

Subsec. (i)(5)(D)(i). Pub. L. 112–177, §2(a)(1)(A)(ii)(I), substituted "shall be $115,500 for each of fiscal years 2013 through 2017;" for "shall be $71,000 for each of fiscal years 2008 through 2012;".

Subsec. (i)(5)(D)(ii). Pub. L. 112–177, §2(a)(1)(A)(ii)(II), substituted "shall be $184,800 for each of fiscal years 2013 through 2017." for "shall be $123,000 for each of fiscal years 2008 through 2012."

Subsec. (i)(5)(E)(i)(I). Pub. L. 112–177, §2(a)(1)(A)(iii)(I), substituted "shall be $70,600 for each of fiscal years 2013 through 2017;" for "shall be $50,000 for each of fiscal years 2008 through 2012;".

Subsec. (i)(5)(E)(i)(II). Pub. L. 112–177, §2(a)(1)(A)(iii)(II), substituted "shall be $122,100 for each of fiscal years 2013 through 2017." for "shall be $86,000 for each of fiscal years 2008 through 2012."

Subsec. (i)(5)(F). Pub. L. 112–177, §2(a)(1)(A)(vi), added subpar. (F). Former subpar. (F) redesignated (G).

Pub. L. 112–177, §2(a)(1)(A)(iv), substituted "this paragraph" for "paragraph (3)" and "Human" for "Humans".

Subsec. (i)(5)(G), (H). Pub. L. 112–177, §2(a)(1)(A)(v), redesignated subpars. (F) and (G) as (G) and (H), respectively.

Subsec. (i)(5)(I). Pub. L. 112–177, §2(a)(1)(A)(v), (vii), redesignated subpar. (H) as (I) and substituted "2017" for "2012".

Subsec. (i)(6). Pub. L. 112–177, §2(a)(1)(D), redesignated par. (6) as (2).

Pub. L. 112–177, §2(a)(1)(B), substituted "2019" for "2014" and "paragraph (1)" for "paragraphs (1) through (5)".

Subsec. (i)(7). Pub. L. 112–177, §2(a)(1)(C), struck out par. (7) which related to apportionment of certain fees among registrants of pesticides.

Subsec. (j). Pub. L. 112–177, §2(a)(2)(A)(ii), substituted "subsection (i)(1)" for "subsection (i)(5)".

Subsec. (k)(2)(A). Pub. L. 112–177, §2(a)(4)(A)(i), inserted ", to enhance the information systems capabilities to improve the tracking of pesticide registration decisions," after "paragraph (3)" wherever appearing.

Subsec. (k)(2)(A)(i). Pub. L. 112–177, §2(a)(4)(A)(ii), inserted "offset" before "the costs of reregistration" and struck out "in the same portion as appropriated funds" before semicolon at end.

Subsec. (k)(3)(A). Pub. L. 112–177, §2(a)(4)(B), in introductory provisions, substituted "2013 through 2017, between 1/9 and 1/8" for "2008 through 2012, between 1/8 and 1/7"; in cl. (i), struck out "new" before "inert"; and, in cl. (ii), substituted "any application that—" for "any application that —".

Subsec. (k)(4). Pub. L. 112–177, §2(a)(4)(C)(ii), added par. (4). Former par. (4) redesignated (5).

Subsec. (k)(5). Pub. L. 112–177, §2(a)(4)(C)(i), redesignated par. (4) as (5). Former par. (5) redesignated (6).

Pub. L. 112–177, §2(a)(2)(A)(iii), substituted "subsection (i)(1)(C)(ii)" for "subsection (i)(5)(C)(ii)" and "subsection (i)(1)(C)" for "subsection (i)(5)(C)" in two places.

Subsec. (k)(6). Pub. L. 112–177, §2(a)(4)(C)(i), (iii), redesignated par. (5) as (6) and substituted "for the purposes described in paragraphs (2), (3), and (4) and to carry out the goals established under subsection (l)" for "to carry out the goals established under subsection (l)".

**2007**—Subsec. (i)(5)(C). Pub. L. 110–94, §4(a), which directed substitution of "amount of $22,000,000 for each of fiscal years 2008 through 2012" for "amount of" and all that follows through the end of clause (v), was executed by making the substitution for "amount of—

"(i) for fiscal year 2004, $26,000,000;
"(ii) for fiscal year 2005, $27,000,000;
"(iii) for fiscal year 2006, $27,000,000;
"(iv) for fiscal year 2007, $21,000,000; and
"(v) for fiscal year 2008, $15,000,000."

to reflect the probable intent of Congress. The words "amount of" appeared in the heading and twice in the text.

Subsec. (i)(5)(D)(i). Pub. L. 110–94, §4(b)(1)(A), substituted "shall be $71,000 for each of fiscal years 2008 through 2012; and" for "shall be—

"(I) for fiscal year 2004, $84,000;
"(II) for each of fiscal years 2005 and 2006, $87,000;
"(III) for fiscal year 2007, $68,000; and
"(IV) for fiscal year 2008, $55,000; and".

Subsec. (i)(5)(D)(ii). Pub. L. 110–94, §4(b)(1)(B), substituted "shall be $123,000 for each of fiscal years 2008 through 2012." for "shall be—

"(I) for fiscal year 2004, $145,000;
"(II) for each of fiscal years 2005 and 2006, $151,000;
"(III) for fiscal year 2007, $117,000; and
"(IV) for fiscal year 2008, $95,000."

Subsec. (i)(5)(E)(i)(I). Pub. L. 110–94, §4(b)(2)(A), substituted "shall be $50,000 for each of fiscal years 2008 through 2012; and" for "shall be—

"(aa) for fiscal year 2004, $59,000;
"(bb) for each of fiscal years 2005 and 2006, $61,000;
"(cc) for fiscal year 2007, $48,000; and
"(dd) for fiscal year 2008, $38,500; and".

Subsec. (i)(5)(E)(i)(II). Pub. L. 110–94, §4(b)(2)(B), substituted "shall be $86,000 for each of fiscal years 2008 through 2012." for "shall be—

"(aa) for fiscal year 2004, $102,000;
"(bb) for each of fiscal years 2005 and 2006, $106,000;
"(cc) for fiscal year 2007, $82,000; and
"(dd) for fiscal year 2008, $66,500."

Subsec. (i)(5)(H). Pub. L. 110–94, §4(c), substituted "2012." for "2008".
Subsec. (i)(6). Pub. L. 110–94, §4(d)(1), substituted "2014" for "2010".
Subsec. (k)(2)(A). Pub. L. 110–94, §4(e)(1), inserted "and to offset the costs of registration review under section 136a(g) of this title" after "paragraph (3)" wherever appearing.
Subsec. (k)(3)(A). Pub. L. 110–94, §4(e)(2), substituted "2008 through 2012" for "2007 and 2008".

**2004**—Subsec. (g)(2)(A). Pub. L. 108–199, §501(c)(5)(A), added subpar. (A) and struck out former subpar. (A) which read as follows: "Within 1 year after the submission of all data concerning an active ingredient of a pesticide under subsection (f) of this section, the Administrator shall determine whether pesticides containing such active ingredient are eligible for reregistration. For extraordinary circumstances, the Administrator may extend such period for not more than 1 additional year."

Subsec. (g)(2)(B). Pub. L. 108–199, §501(c)(5)(B), inserted subpar. (B) and cl. (i) headings, designated first sentence of existing provisions as cl. (i), inserted cl. (ii) and subcl. (I) headings, designated second sentence of existing provisions as cl. (ii)(I), substituted "Subject to subclause (II), the Administrator" for "The Administrator" in subcl. (I), and added subcl. (II).

Subsec. (g)(2)(D). Pub. L. 108–199, §501(c)(5)(C), inserted subpar. (D) and cl. (i) headings, designated existing provisions as cl. (i), and added cl. (ii).

Subsec. (i)(5)(A). Pub. L. 108–199, §501(c)(1)(A), inserted subpar. (A) heading and substituted "for each registration" for "of—

"(i) $650 for the first registration; and
"(ii) $1,300 for each additional registration".

Subsec. (i)(5)(C). Pub. L. 108–199, §501(c)(2), struck out cl. (i) designation before "The amount of each", inserted subpar. (C) heading, substituted "aggregate amount of—" for "aggregate amount of

Exhibit C-1, pg. 53 of 152

$21,500,000 for fiscal year 2003.", added cls. (i) to (v), and struck out former cl. (ii), which related to collection of additional fees in fiscal years 1998, 1999, and 2000.

Subsec. (i)(5)(D). Pub. L. 108–199, §501(c)(1)(B), inserted subpar. (D) heading, substituted "shall be—" for "shall be $55,000; and" and added subcls. (I) to (IV) in cl. (i), and substituted "shall be—" for "shall be $95,000." and added subcls. (I) to (IV) in cl. (ii).

Subsec. (i)(5)(E)(i). Pub. L. 108–199, §501(c)(1)(C), inserted subpar. (E) and cl. (i) headings, realigned margins of subcls. (I) and (II), substituted "shall be—" for "shall be $38,500; and" and inserted items (aa) to (dd) in subcl. (I), and substituted "shall be—" for "shall be $66,500." and inserted items (aa) to (dd) in subcl. (II).

Subsec. (i)(5)(E)(ii). Pub. L. 108–199, §501(c)(3), inserted cl. (ii) heading, redesignated existing provisions as subcl. (I), inserted subcl. (I) heading, substituted "In" for "For purposes of" in subcl. (I), redesignated former subcls. (I) and (II) as items (aa) and (bb) respectively, and realigned margins, substituted "500" for "150" in item (aa), substituted "global gross revenue from pesticides that did not exceed $60,000,000." for "gross revenue from chemicals that did not exceed $40,000,000." in item (bb), and added subcl. (II).

Subsec. (i)(5)(H). Pub. L. 108–199, §501(c)(4), substituted "2008" for "2003".

Subsec. (i)(6). Pub. L. 108–199, §501(d)(1), substituted "Except as provided in section 136w–8 of this title, during" for "During", and substituted "2010" for "2003".

Subsec. (k)(2)(A)(i). Pub. L. 108–271 substituted "Government Accountability Office" for "General Accounting Office".

Subsec. (k)(3). Pub. L. 108–199, §501(e)(1), substituted "Review of inert ingredients; expedited" for "Expedited" in par. heading.

Subsec. (k)(3)(A). Pub. L. 108–199, §501(e)(2), substituted "2004 through 2006, approximately $3,300,000, and for each of fiscal years 2007 and 2008, between 1/8 and 1/7, of the maintenance fees" for "1997 through 2003, not more than 1/10 of the maintenance fees", substituted "resources" for "resources to assure the expedited processing and review of any application that", added cl. (i), inserted cl. (ii) designation and introductory provisions, and redesignated former cls. (i) to (iii) as subcls. (I) to (III), respectively, of cl. (ii).

**2003**—Pub. L. 108–7, which directed the amendment of "Section 136a–1 of title 7, U.S.C.", was executed by making the amendments to this section, which is section 4 of the Federal Insecticide, Fungicide, and Rodenticide Act, to reflect the probable intent of Congress. See below.

Subsec. (i)(5)(C)(i). Pub. L. 108–7, [(1)], substituted "$21,500,000 for fiscal year 2003" for "$17,000,000 fiscal year 2002".

Subsec. (i)(5)(H). Pub. L. 108–7, [(2)], substituted "2003" for "2002".

Subsec. (i)(6). Pub. L. 108–7, [(3)], substituted "2003" for "2002".

Subsec. (k)(3)(A). Pub. L. 108–7, [(4)], substituted "2003" for "2002".

**2001**—Pub. L. 107–73, which directed the amendment of "Section 136a–1 of title 7, U.S.C.", was executed by making the amendments to this section, which is section 4 of the Federal Insecticide, Fungicide, and Rodenticide Act, to reflect the probable intent of Congress. See below.

Subsec. (i)(5)(C)(i). Pub. L. 107–73, [(1)], substituted "$17,000,000" for "$14,000,000" and "fiscal year 2002" for "each fiscal year".

Subsec. (i)(5)(H). Pub. L. 107–73, [(2)], substituted "2002" for "2001".

Subsec. (i)(6). Pub. L. 107–73, [(3)], substituted "2002" for "2001".

Subsec. (k)(3)(A). Pub. L. 107–73, [(4)], substituted "2002" for "2001" and "1/10" for "1/7" in introductory provisions.

**1996**—Pub. L. 104–170, §501, which directed amendment of section 4 without specifying the name of the Act being amended, was executed to this section, which is section 4 of the Federal Insecticide, Fungicide, and Rodenticide Act, to reflect the probable intent of Congress.

Subsec. (d)(4)(B). Pub. L. 104–170, §210(c)(2), inserted at end provisions authorizing extension of deadline for production of residue chemistry data in case of minor use and setting forth conditions to be met for such extension in cls. (i) to (iv).

Subsec. (d)(6). Pub. L. 104–170, §210(f)(1)(A), inserted at end provisions delaying upon written request action with regard to unsupported minor uses, authorizing refusal of request where there are health or environmental concerns, authorizing publication of notice in Federal Register and monitoring of development of data, setting forth procedures where registrant is not meeting or has not met schedule for production of data, and authorizing denial, modification, or revocation of

temporary extension where use may cause adverse effect on environment and requiring notice of such revocation to registrant.

Subsec. (e)(2)(B). Pub. L. 104–170, §210(c)(2), inserted at end provisions authorizing extension of deadline for production of residue chemistry data in case of minor use and setting forth conditions to be met for such extension in cls. (i) to (iv).

Subsec. (e)(3)(A). Pub. L. 104–170, §210(f)(1)(B), inserted at end provisions delaying upon written request action with regard to unsupported minor uses, authorizing refusal of request where there are health or environmental concerns, authorizing publication of notice in Federal Register and monitoring of development of data, setting forth procedures where registrant is not meeting or has not met schedule for production of data, and authorizing denial, modification, or revocation of temporary extension where use may cause adverse effect on environment and requiring notice of such revocation to registrant.

Subsec. (f)(2)(B). Pub. L. 104–170, §210(c)(2), inserted at end provisions authorizing extension of deadline for production of residue chemistry data in case of minor use and setting forth conditions to be met for such extension in cls. (i) to (iv).

Subsec. (f)(3). Pub. L. 104–170, §210(f)(1)(A), inserted at end provisions delaying upon written request action with regard to unsupported minor uses, authorizing refusal of request where there are health or environmental concerns, authorizing publication of notice in Federal Register and monitoring of development of data, setting forth procedures where registrant is not meeting or has not met schedule for production of data, and authorizing denial, modification, or revocation of temporary extension where use may cause adverse effect on environment and requiring notice of such revocation to registrant.

Subsec. (g)(2)(E). Pub. L. 104–170, §103, added subpar. (E).

Subsec. (i)(4)(B) to (D). Pub. L. 104–170, §232(1), added subpar. (B) and redesignated former subpars. (B) and (C) as (C) and (D), respectively.

Subsec. (i)(5)(C). Pub. L. 104–170, §501(a)(2), designated existing provisions as cl. (i) and added cl. (ii).

Subsec. (i)(5)(F), (G). Pub. L. 104–170, §232(2), added subpar. (F) and redesignated former subpar. (F) as (G).

Subsec. (i)(5)(H). Pub. L. 104–170, §501(a)(1), substituted "2001" for "1997".

Pub. L. 104–170, §232(2), redesignated subpar. (G) as (H).

Subsec. (i)(6). Pub. L. 104–170, §501(a)(1), substituted "2001" for "1997".

Subsec. (i)(7)(B). Pub. L. 104–170, §232(3), substituted ", to determine the registrant's eligibility" for "or to determine the registrant's eligibility" and inserted before period at end ", or to determine the volume usage for public health pesticides".

Subsec. (k)(1). Pub. L. 104–170, §501(b), inserted "which shall be known as the Reregistration and Expedited Processing Fund" before period at end.

Subsec. (k)(2). Pub. L. 104–170, §501(c), amended heading and text of par. (2) generally. Prior to amendment, text read as follows: "All fees collected by the Administrator under subsection (i) of this section shall be deposited into the fund and shall be available to the Administrator, without fiscal year limitation, to carry out reregistration and expedited processing of similar applications."

Subsec. (k)(3)(A). Pub. L. 104–170, §501(d)(1), which directed the amendment of introductory provisions by substituting "for each of the fiscal years 1997 through 2001, not more than 1/7 of the maintenance fees collected in such fiscal year" for "for each of the fiscal years 1992, 1993, and 1994, 1/7th of the maintenance fees collected, up to 2 million each year", was executed by making the substitution for text which contained the phrase "$2 million", to reflect the probable intent of Congress.

Subsec. (k)(3)(A)(iii). Pub. L. 104–170, §232(4), added cl. (iii).

Subsec. (k)(3)(C). Pub. L. 104–170, §501(d)(2), added subpar. (C).

Subsec. (k)(5). Pub. L. 104–170, §501(e), amended heading and text of par. (5) generally. Prior to amendment, text read as follows: "The Administrator shall—

"(A) provide an annual accounting of the fees collected and disbursed from the fund; and

"(B) take all steps necessary to ensure that expenditures from such fund are used only to carry out this section."

Subsec. (l). Pub. L. 104–170, §501(f), added subsec. (l). Former subsec. (l) redesignated (m).

Subsec. (m). Pub. L. 104–170, §501(f), redesignated subsec. (l) as (m). Former subsec. (m) redesignated (n).

Pub. L. 104–170, §237, added subsec. (m).

Subsec. (n). Pub. L. 104–170, §501(f), redesignated subsec. (m) as (n).

**1991**—Subsec. (f)(3). Pub. L. 102–237, §1006(a)(4), realigned margin.

Subsec. (i)(5). Pub. L. 102–237, §1006(e), amended par. (5) generally, substituting, in subpar. (A), provisions relating to January 15 for provisions relating to March 1, in subpar. (A)(i), provisions relating to fee of $650 for first registration for provisions relating to fee of $425 for each registration for registrants holding not more than 50 registrations, and in subpar. (A)(ii), provisions relating to fee of $1,300 for each additional registration up to 200 registrations, with no fee thereafter, for provisions relating to fee of $425 for each registration up to 50, $100 for each registration over 50, with no fee after 200 registrations, redesignating provisions formerly set out in subpar. (A), following cl. (ii), as subpar. (B), and substituting provisions relating to fee under this par. for provisions relating to fee under this subpar., redesignating former subpar. (B) as (C), striking former subpar. (C), which set maximum annual fee for registrants under subpar. (A)(i) at $20,000, and for registrants under subpar. (A)(ii) at $35,000, adding subpars. (D) and (E), and redesignating former subpars. (D) and (E) as (F) and (G), respectively.

Subsec. (k)(3)(A). Pub. L. 102–237, §1006(f), substituted "for each of the fiscal years 1992, 1993, and 1994, 1/7th of the maintenance fees collected, up to $2 million each year" for "each fiscal year not more than $2,000,000 of the amounts in the fund".

**1990**—Subsec. (i)(5)(A). Pub. L. 101–624 inserted sentence at end relating to reduction or waiver of fee where pesticide is registered for minor agricultural use.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 2012 AMENDMENT

Pub. L. 112–177, §2(c), Sept. 28, 2012, 126 Stat. 1407, provided that: "This section [amending this section, section 136w–8 of this title, and section 346a of Title 21, Food and Drugs, and enacting provisions set out as a note under this section] and the amendments made by this title take effect on October 1, 2012."

## EFFECTIVE DATE OF 2007 AMENDMENT

Amendment by Pub. L. 110–94 effective Oct. 1, 2007, see section 6 of Pub. L. 110–94, set out as a note under section 136a of this title.

## EFFECTIVE DATE OF 2004 AMENDMENT

Amendment by Pub. L. 108–199 effective on the date that is 60 days after Jan. 23, 2004, except as otherwise provided, see section 501(h) of Pub. L. 108–199, set out as a note under section 136a of this title.

## EFFECTIVE DATE

Section effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as an Effective Date of 1988 Amendment note under section 136 of this title.

## IMPLEMENTATION DATES WITH RESPECT TO FEES

Pub. L. 117–328, div. HH, title VI, §708, Dec. 29, 2022, 136 Stat. 6082, provided that:

"(a) FEE INCREASES.—

"(1) REGISTRATION SERVICE FEES.—With respect to amendments made by this title [see Short Title of 2022 Amendment note set out under section 136 of this title] to increase registration service fees specified in section 33 of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136w–8), such increases shall not be effective until the date that is 60 days after the date of the enactment of this title [Dec. 29, 2022], regardless of whether such section 33 specifies (as so amended) that such increases are effective for fiscal year 2023.

"(2) MAINTENANCE FEES.—With respect to amendments made by this title to increase the amount of maintenance fees to be collected under section 4(i) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a–1(i)), such increases shall be effective beginning on October 1, 2022.

"(b) SET-ASIDES.—With respect to any set-asides specified in subsection (i) or (k) of section 4 of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136a–1), such set-asides shall be effective beginning on October 1, 2022."

### EXTENSION OF LIMITATIONS ON FEE AMOUNTS AND USAGE OF FEES

Pub. L. 115–141, div. M, title IV, §401(a), Mar. 23, 2018, 132 Stat. 1049, provided that subsecs. (i)(1) (C)–(E) and (k)(3), (4) of this section and section 136w–8(c)(3)(B) of this title would continue in effect through Sept. 30, 2018.

Pub. L. 115–141, div. M, title IV, §401(b)(1), Mar. 23, 2018, 132 Stat. 1050, extended the authority under subsec. (i)(1) of this section through Sept. 30, 2018.

### RELATIONSHIP OF PUB. L. 112–177 TO OTHER LAW

Pub. L. 112–177, §2(d), Sept. 28, 2012, 126 Stat. 1407, provided that: "In the case of any conflict between this section [amending this section, section 136w–8 of this title, and section 346a of Title 21, Food and Drugs, and enacting provisions set out as a note under this section] (including the amendments made by this section) and a joint resolution making continuing appropriations for fiscal year 2013 (including any amendments made by such a joint resolution), this section and the amendments made by this section shall control."

### ADJUSTMENT OF MAXIMUM ANNUAL FEE PAYABLE BY PESTICIDE REGISTRANTS

Pub. L. 108–11, title II, Apr. 16, 2003, 117 Stat. 603, provided that: "Within 30 days of enactment of this Act [Apr. 16, 2003], the Administrator of the Environmental Protection Agency shall adjust each 'maximum annual fee payable' pursuant to 7 U.S.C. 136a–1(i)(5)(D) and (E) in a manner such that maintenance fee collections made to reach the level authorized in division K of Public Law 108–7 [see Tables for classification] shall be established in the same proportion as those maintenance fee collections authorized in Public Law 107–73 [see Tables for classification]."

$^1$ See References in Text note below.

# §136b. Transferred

EDITORIAL NOTES

### CODIFICATION

Section, act June 25, 1947, ch. 125, §4, as added Oct. 21, 1972, Pub. L. 92–516, §2, 86 Stat. 983; amended Nov. 28, 1975, Pub. L. 94–140, §§5, 11, 89 Stat. 753, 754; Sept. 30, 1978, Pub. L. 95–396, §9, 92 Stat. 827; Oct. 25, 1988, Pub. L. 100–532, title VIII, §801(c), (q)(1)(A), (B), 102 Stat. 2681, 2683, which related to use of restricted use pesticides and certification of applicators, was transferred to subsecs. (a) to (c) of section 11 of act June 25, 1947, by section 801(q)(1)(A) of Pub. L. 100–532 and is classified to section 136i(a) to (c) of this title.

# §136c. Experimental use permits

### (a) Issuance

Any person may apply to the Administrator for an experimental use permit for a pesticide. An application for an experimental use permit for a covered application under section 136w–8(b) of this title shall conform with the requirements of that section. The Administrator shall review the application. After completion of the review, but not later than one hundred and twenty days after receipt of the application and all required supporting data (or in the case of an application for an experimental use permit for a covered application under section 136w–8(b) of this title, not later than the last day of the applicable timeframe for such application specified in such section), the Administrator shall either issue the permit or notify the applicant of the Administrator's determination not to issue the permit and the reasons therefor. The applicant may correct the application or request a waiver of the conditions for such permit within thirty days of receipt by the applicant of such notification. The Administrator may issue an experimental use permit only if the Administrator determines that the applicant needs such permit

Exhibit C-1, pg. 57 of 152

in order to accumulate information necessary to register a pesticide under section 136a of this title. An application for an experimental use permit may be filed at any time.

**(b) Temporary tolerance level**

If the Administrator determines that the use of a pesticide may reasonably be expected to result in any residue on or in food or feed, the Administrator may establish a temporary tolerance level for the residue of the pesticide before issuing the experimental use permit.

**(c) Use under permit**

Use of a pesticide under an experimental use permit shall be under the supervision of the Administrator, and shall be subject to such terms and conditions and be for such period of time as the Administrator may prescribe in the permit.

**(d) Studies**

When any experimental use permit is issued for a pesticide containing any chemical or combination of chemicals which has not been included in any previously registered pesticide, the Administrator may specify that studies be conducted to detect whether the use of the pesticide under the permit may cause unreasonable adverse effects on the environment. All results of such studies shall be reported to the Administrator before such pesticide may be registered under section 136a of this title.

**(e) Revocation**

The Administrator may revoke any experimental use permit, at any time, if the Administrator finds that its terms or conditions are being violated, or that its terms and conditions are inadequate to avoid unreasonable adverse effects on the environment.

**(f) State issuance of permits**

Notwithstanding the foregoing provisions of this section, the Administrator shall, under such terms and conditions as the Administrator may by regulations prescribe, authorize any State to issue an experimental use permit for a pesticide. All provisions of section 136i of this title relating to State plans shall apply with equal force to a State plan for the issuance of experimental use permits under this section.

**(g) Exemption for agricultural research agencies**

Notwithstanding the foregoing provisions of this section, the Administrator may issue an experimental use permit for a pesticide to any public or private agricultural research agency or educational institution which applies for such permit. Each permit shall not exceed more than a one-year period or such other specific time as the Administrator may prescribe. Such permit shall be issued under such terms and conditions restricting the use of the pesticide as the Administrator may require. Such pesticide may be used only by such research agency or educational institution for purposes of experimentation.

(June 25, 1947, ch. 125, §5, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 983; amended Pub. L. 94–140, §10, Nov. 28, 1975, 89 Stat. 754; Pub. L. 95–396, §10, Sept. 30, 1978, 92 Stat. 828; Pub. L. 100–532, title VIII, §801(d), (q)(1)(D), Oct. 25, 1988, 102 Stat. 2681, 2683; Pub. L. 102–237, title X, §1006(b)(1), Dec. 13, 1991, 105 Stat. 1895; Pub. L. 116–8, §4, Mar. 8, 2019, 133 Stat. 487.)

**EDITORIAL NOTES**

**PRIOR PROVISIONS**

A prior section 5 of act June 25, 1947, was classified to section 135c of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

**AMENDMENTS**

**2019**—Subsec. (a). Pub. L. 116–8 substituted "permit for a pesticide. An application for an experimental use permit for a covered application under section 136w–8(b) of this title shall conform with the requirements of that section." for "permit for a pesticide." and inserted "(or in the case of an application for an experimental use permit for a covered application under section 136w–8(b) of this title, not later than the last day of the applicable timeframe for such application specified in such section)" after "all required supporting data".

**1991**—Subsecs. (b), (e), (f). Pub. L. 102–237 substituted "the Administrator" for "he" before "may" in subsec. (b), before "finds" in subsec. (e), and before "may" in subsec. (f).

**1988**—Subsec. (f). Pub. L. 100–532, §801(q)(1)(D), substituted "136i" for "136b".

Subsec. (g). Pub. L. 100–532, §801(d), substituted "require. Such pesticide" for "require: *Provided*, That such pesticide".

**1978**—Subsec. (a). Pub. L. 95–396, §10(1), provided for review of application, issuance or nonissuance of experimental use permit within prescribed period including reasons for denial, correction of application, and waiver of conditions and substituted provision for filing an application for experimental use permit at any time for prior provision for filing at the time of or before or after an application for registration is filed.

Subsec. (f). Pub. L. 95–396, §10(2), substituted in first sentence "shall" for "may" where first appearing.

**1975**—Subsec. (g). Pub. L. 94–140 added subsec. (g).

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136d. Administrative review; suspension

**(a) Existing stocks and information**

**(1) Existing stocks**

The Administrator may permit the continued sale and use of existing stocks of a pesticide whose registration is suspended or canceled under this section, or section 136a or 136a–1 of this title, to such extent, under such conditions, and for such uses as the Administrator determines that such sale or use is not inconsistent with the purposes of this subchapter.

**(2) Information**

If at any time after the registration of a pesticide the registrant has additional factual information regarding unreasonable adverse effects on the environment of the pesticide, the registrant shall submit such information to the Administrator.

**(b) Cancellation and change in classification**

If it appears to the Administrator that a pesticide or its labeling or other material required to be submitted does not comply with the provisions of this subchapter or, when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment, the Administrator may issue a notice of the Administrator's intent either—

(1) to cancel its registration or to change its classification together with the reasons (including the factual basis) for the Administrator's action, or

(2) to hold a hearing to determine whether or not its registration should be canceled or its classification changed.

Such notice shall be sent to the registrant and made public. In determining whether to issue any such notice, the Administrator shall include among those factors to be taken into account the impact of the action proposed in such notice on production and prices of agricultural commodities, retail food prices, and otherwise on the agricultural economy. At least 60 days prior to sending such notice to the registrant or making public such notice, whichever occurs first, the Administrator shall provide the Secretary of Agriculture with a copy of such notice and an analysis of such impact on the agricultural economy. If the Secretary comments in writing to the Administrator regarding the notice and analysis within 30 days after receiving them, the Administrator shall publish in the Federal Register (with the notice) the comments of the Secretary and the response of the Administrator with regard to the Secretary's comments. If the Secretary does not comment in writing to the Administrator regarding the notice and analysis within 30 days after receiving them, the Administrator may notify the registrant and make public the notice at any time after such 30-day period notwithstanding the foregoing 60-day time requirement. The time requirements imposed by the preceding 3 sentences may be waived or modified to the extent agreed upon by the Administrator and the Secretary. Notwithstanding any other provision of this subsection and section 136w(d) of this title, in the event that the Administrator determines that suspension of a pesticide registration is necessary to prevent an imminent hazard to human health, then upon

such a finding the Administrator may waive the requirement of notice to and consultation with the Secretary of Agriculture pursuant to this subsection and of submission to the Scientific Advisory Panel pursuant to section 136w(d) of this title and proceed in accordance with subsection (c). When a public health use is affected, the Secretary of Health and Human Services should provide available benefits and use information, or an analysis thereof, in accordance with the procedures followed and subject to the same conditions as the Secretary of Agriculture in the case of agricultural pesticides. The proposed action shall become final and effective at the end of 30 days from receipt by the registrant, or publication, of a notice issued under paragraph (1), whichever occurs later, unless within that time either (i) the registrant makes the necessary corrections, if possible, or (ii) a request for a hearing is made by a person adversely affected by the notice. In the event a hearing is held pursuant to such a request or to the Administrator's determination under paragraph (2), a decision pertaining to registration or classification issued after completion of such hearing shall be final. In taking any final action under this subsection, the Administrator shall consider restricting a pesticide's use or uses as an alternative to cancellation and shall fully explain the reasons for these restrictions, and shall include among those factors to be taken into account the impact of such final action on production and prices of agricultural commodities, retail food prices, and otherwise on the agricultural economy, and the Administrator shall publish in the Federal Register an analysis of such impact.

## (c) Suspension

### (1) Order

If the Administrator determines that action is necessary to prevent an imminent hazard during the time required for cancellation or change in classification proceedings, the Administrator may, by order, suspend the registration of the pesticide immediately. Except as provided in paragraph (3), no order of suspension may be issued under this subsection unless the Administrator has issued, or at the same time issues, a notice of intention to cancel the registration or change the classification of the pesticide under subsection (b). Except as provided in paragraph (3), the Administrator shall notify the registrant prior to issuing any suspension order. Such notice shall include findings pertaining to the question of "imminent hazard". The registrant shall then have an opportunity, in accordance with the provisions of paragraph (2), for an expedited hearing before the Administrator on the question of whether an imminent hazard exists.

### (2) Expedite hearing

If no request for a hearing is submitted to the Administrator within five days of the registrant's receipt of the notification provided for by paragraph (1), the suspension order may be issued and shall take effect and shall not be reviewable by a court. If a hearing is requested, it shall commence within five days of the receipt of the request for such hearing unless the registrant and the Administrator agree that it shall commence at a later time. The hearing shall be held in accordance with the provisions of subchapter II of chapter 5 of title 5, except that the presiding officer need not be a certified administrative law judge. The presiding officer shall have ten days from the conclusion of the presentation of evidence to submit recommended findings and conclusions to the Administrator, who shall then have seven days to render a final order on the issue of suspension.

### (3) Emergency order

Whenever the Administrator determines that an emergency exists that does not permit the Administrator to hold a hearing before suspending, the Administrator may issue a suspension order in advance of notification to the registrant. The Administrator may issue an emergency order under this paragraph before issuing a notice of intention to cancel the registration or change the classification of the pesticide under subsection (b) and the Administrator shall proceed to issue the notice under subsection (b) within 90 days of issuing an emergency order. If the Administrator does not issue a notice under subsection (b) within 90 days of issuing an emergency order, the emergency order shall expire. In the case of an emergency order, paragraph (2) shall apply except that (A) the order of suspension shall be in effect pending the expeditious completion of the remedies provided by that paragraph and the issuance of a final order on suspension, and (B) no party other than the registrant and the Administrator shall participate except that any person adversely affected may file briefs within the time allotted by the Agency's rules. Any person so filing briefs shall be considered a party to such proceeding for the purposes of section 136n(b) of this title.

### (4) Judicial review

A final order on the question of suspension following a hearing shall be reviewable in accordance with section 136n of this title, notwithstanding the fact that any related cancellation proceedings have not been completed. Any order of suspension entered prior to a hearing before the Administrator shall be subject to immediate review in an action by the registrant or other interested person with the concurrence of the registrant in an appropriate district court, solely to determine whether the order of suspension was arbitrary, capricious or an abuse of discretion, or whether the order was issued in accordance with the procedures established by law. The effect of any order of the court will be only to stay the effectiveness of the suspension

order, pending the Administrator's final decision with respect to cancellation or change in classification. This action may be maintained simultaneously with any administrative review proceedings under this section. The commencement of proceedings under this paragraph shall not operate as a stay of order, unless ordered by the court.

**(d) Public hearings and scientific review**

In the event a hearing is requested pursuant to subsection (b) or determined upon by the Administrator pursuant to subsection (b), such hearing shall be held after due notice for the purpose of receiving evidence relevant and material to the issues raised by the objections filed by the applicant or other interested parties, or to the issues stated by the Administrator, if the hearing is called by the Administrator rather than by the filing of objections. Upon a showing of relevance and reasonable scope of evidence sought by any party to a public hearing, the Hearing Examiner shall issue a subpena to compel testimony or production of documents from any person. The Hearing Examiner shall be guided by the principles of the Federal Rules of Civil Procedure in making any order for the protection of the witness or the content of documents produced and shall order the payment of reasonable fees and expenses as a condition to requiring testimony of the witness. On contest, the subpena may be enforced by an appropriate United States district court in accordance with the principles stated herein. Upon the request of any party to a public hearing and when in the Hearing Examiner's judgment it is necessary or desirable, the Hearing Examiner shall at any time before the hearing record is closed refer to a Committee of the National Academy of Sciences the relevant questions of scientific fact involved in the public hearing. No member of any committee of the National Academy of Sciences established to carry out the functions of this section shall have a financial or other conflict of interest with respect to any matter considered by such committee. The Committee of the National Academy of Sciences shall report in writing to the Hearing Examiner within 60 days after such referral on these questions of scientific fact. The report shall be made public and shall be considered as part of the hearing record. The Administrator shall enter into appropriate arrangements with the National Academy of Sciences to assure an objective and competent scientific review of the questions presented to Committees of the Academy and to provide such other scientific advisory services as may be required by the Administrator for carrying out the purposes of this subchapter. As soon as practicable after completion of the hearing (including the report of the Academy) but not later than 90 days thereafter, the Administrator shall evaluate the data and reports before the Administrator and issue an order either revoking the Administrator's notice of intention issued pursuant to this section, or shall issue an order either canceling the registration, changing the classification, denying the registration, or requiring modification of the labeling or packaging of the article. Such order shall be based only on substantial evidence of record of such hearing and shall set forth detailed findings of fact upon which the order is based.

**(e) Conditional registration**

(1) The Administrator shall issue a notice of intent to cancel a registration issued under section 136a(c)(7) of this title if (A) the Administrator, at any time during the period provided for satisfaction of any condition imposed, determines that the registrant has failed to initiate and pursue appropriate action toward fulfilling any condition imposed, or (B) at the end of the period provided for satisfaction of any condition imposed, that condition has not been met. The Administrator may permit the continued sale and use of existing stocks of a pesticide whose conditional registration has been canceled under this subsection to such extent, under such conditions, and for such uses as the Administrator may specify if the Administrator determines that such sale or use is not inconsistent with the purposes of this subchapter and will not have unreasonable adverse effects on the environment.

(2) A cancellation proposed under this subsection shall become final and effective at the end of thirty days from receipt by the registrant of the notice of intent to cancel unless during that time a request for hearing is made by a person adversely affected by the notice. If a hearing is requested, a hearing shall be conducted under subsection (d) of this section. The only matters for resolution at that hearing shall be whether the registrant has initiated and pursued appropriate action to comply with the condition or conditions within the time provided or whether the condition or conditions have been satisfied within the time provided, and whether the Administrator's determination with respect to the disposition of existing stocks is consistent with this subchapter. A decision after completion of such hearing shall be final. Notwithstanding any other provision of this section, a hearing shall be held and a determination made within seventy-five days after receipt of a request for such hearing.

**(f) General provisions**

**(1) Voluntary cancellation**

(A) A registrant may, at any time, request that a pesticide registration of the registrant be canceled or amended to terminate one or more pesticide uses.

(B) Before acting on a request under subparagraph (A), the Administrator shall publish in the Federal Register a notice of the receipt of the request and provide for a 30-day period in which the public may comment.

(C) In the case of a pesticide that is registered for a minor agricultural use, if the Administrator determines that the cancellation or termination of uses would adversely affect the availability of the pesticide for use, the Administrator—

(i) shall publish in the Federal Register a notice of the receipt of the request and make reasonable efforts to inform persons who so use the pesticide of the request; and

(ii) may not approve or reject the request until the termination of the 180-day period beginning on the date of publication of the notice in the Federal Register, except that the Administrator may waive the 180-day period upon the request of the registrant or if the Administrator determines that the continued use of the pesticide would pose an unreasonable adverse effect on the environment.

(D) Subject to paragraph (3)(B), after complying with this paragraph, the Administrator may approve or deny the request.

**(2) Publication of notice**

A notice of denial of registration, intent to cancel, suspension, or intent to suspend issued under this subchapter or a notice issued under subsection (c)(4) or (d)(5)(A) of section 136a–1 of this title shall be published in the Federal Register and shall be sent by certified mail, return receipt requested, to the registrant's or applicant's address of record on file with the Administrator. If the mailed notice is returned to the Administrator as undeliverable at that address, if delivery is refused, or if the Administrator otherwise is unable to accomplish delivery of the notice to the registrant or applicant after making reasonable efforts to do so, the notice shall be deemed to have been received by the registrant or applicant on the date the notice was published in the Federal Register.

**(3) Transfer of registration of pesticides registered for minor agricultural uses**

In the case of a pesticide that is registered for a minor agricultural use:

(A) During the 180-day period referred to in paragraph (1)(C)(ii), the registrant of the pesticide may notify the Administrator of an agreement between the registrant and a person or persons (including persons who so use the pesticide) to transfer the registration of the pesticide, in lieu of canceling or amending the registration to terminate the use.

(B) An application for transfer of registration, in conformance with any regulations the Administrator may adopt with respect to the transfer of the pesticide registrations, must be submitted to the Administrator within 30 days of the date of notification provided pursuant to subparagraph (A). If such an application is submitted, the Administrator shall approve the transfer and shall not approve the request for voluntary cancellation or amendment to terminate use unless the Administrator determines that the continued use of the pesticide would cause an unreasonable adverse effect on the environment.

(C) If the Administrator approves the transfer and the registrant transfers the registration of the pesticide, the Administrator shall not cancel or amend the registration to delete the use or rescind the transfer of the registration, during the 180-day period beginning on the date of the approval of the transfer unless the Administrator determines that the continued use of the pesticide would cause an unreasonable adverse effect on the environment.

(D) The new registrant of the pesticide shall assume the outstanding data and other requirements for the pesticide that are pending at the time of the transfer.

**(4) Utilization of data for voluntarily canceled pesticide**

When an application is filed with the Administrator for the registration of a pesticide for a minor use and another registrant subsequently voluntarily cancels its registration for an identical or substantially similar pesticide for an identical or substantially similar use, the Administrator shall process, review, and evaluate the pending application as if the voluntary cancellation had not yet taken place except that the Administrator shall not take such action if the Administrator determines that such minor use may cause an unreasonable adverse effect on the environment. In order to rely on this subsection, the applicant must certify that it agrees to satisfy any outstanding data requirements necessary to support the reregistration of the pesticide in accordance with the data submission schedule established by the Administrator.

**(g) Notice for stored pesticides with canceled or suspended registrations**

**(1) In general**

Any producer or exporter of pesticides, registrant of a pesticide, applicant for registration of a pesticide, applicant for or holder of an experimental use permit, commercial applicator, or any person who distributes or sells any pesticide, who possesses any pesticide which has had its registration canceled or suspended under this section shall notify the Administrator and appropriate State and local officials of—

(A) such possession,

(B) the quantity of such pesticide such person possesses, and

(C) the place at which such pesticide is stored.

**(2) Copies**

The Administrator shall transmit a copy of each notice submitted under this subsection to the regional office of the Environmental Protection Agency which has jurisdiction over the place of pesticide storage identified in the notice.

**(h) Judicial review**

Final orders of the Administrator under this section shall be subject to judicial review pursuant to section 136n of this title.

(June 25, 1947, ch. 125, §6, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 984; amended Pub. L. 94–140, §1, Nov. 28, 1975, 89 Stat. 751; Pub. L. 95–251, §2(a)(2), Mar. 27, 1978, 92 Stat. 183; Pub. L. 95–396, §§11, 12, Sept. 30, 1978, 92 Stat. 828; Pub. L. 98–620, title IV, §402(4)(A), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 100–532, title II, §201, title IV, §404, title VIII, §801(e), (q)(2)(B), Oct. 25, 1988, 102 Stat. 2668, 2673, 2681, 2683; Pub. L. 101–624, title XIV, §1494, Nov. 28, 1990, 104 Stat. 3628; Pub. L. 102–237, title X, §1006(a)(5), (b)(1), (2), (3)(C)–(E), Dec. 13, 1991, 105 Stat. 1895, 1896; Pub. L. 104–170, title I, §§102, 106(a), title II, §§210(g), (h), 233, Aug. 3, 1996, 110 Stat. 1489, 1491, 1500, 1509.)

### Editorial Notes

## Codification

"Subchapter II of chapter 5 of title 5", referred to in subsec. (c)(2), was in the original "subchapter II of Title 5", and was editorially changed to reflect the probable intent of Congress.

## Prior Provisions

A prior section 6 of act June 25, 1947, was classified to section 135d of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## Amendments

**1996**—Subsec. (a). Pub. L. 104–170, §106(a)(1), substituted "Existing stocks and information" for "Cancellation after five years" in heading.

Subsec. (a)(1). Pub. L. 104–170, §106(a)(2), amended heading and text generally. Prior to amendment, text read as follows: "The Administrator shall cancel the registration of any pesticide at the end of the five-year period which begins on the date of its registration (or at the end of any five year period thereafter) unless the registrant, or other interested person with the concurrence of the registrant, before the end of such period, requests in accordance with regulations prescribed by the Administrator that the registration be continued in effect. The Administrator may permit the continued sale and use of existing stocks of a pesticide whose registration is canceled under this subsection or subsection (b) of this section to such extent, under such conditions, and for such uses as the Administrator may specify if the Administrator determines that such sale or use is not inconsistent with the purposes of this subchapter and will not have unreasonable adverse effects on the environment. The Administrator shall publish in the Federal Register, at least 30 days prior to the expiration of such five-year period, notice that the registration will be canceled if the registrant or other interested person with the concurrence of the registrant does not request that the registration be continued in effect."

Subsec. (b). Pub. L. 104–170, §233, inserted "When a public health use is affected, the Secretary of Health and Human Services should provide available benefits and use information, or an analysis thereof, in accordance with the procedures followed and subject to the same conditions as the Secretary of Agriculture in the case of agricultural pesticides." before "The proposed action shall become final".

Subsec. (c)(1). Pub. L. 104–170, §102(a), amended second sentence generally. Prior to amendment, second sentence read as follows: "No order of suspension may be issued unless the Administrator has issued or at the same time issues notice of the Administrator's intention to cancel the registration or change the classification of the pesticide."

Subsec. (c)(3). Pub. L. 104–170, §102(b), inserted after first sentence "The Administrator may issue an emergency order under this paragraph before issuing a notice of intention to cancel the registration or change the classification of the pesticide under subsection (b) of this section and the Administrator shall proceed to issue the notice under subsection (b) of this section within 90 days of issuing an emergency order. If the Administrator does not issue a notice under subsection (b) of

this section within 90 days of issuing an emergency order, the emergency order shall expire." and substituted "In the case of an emergency order" for "In that case".

Subsec. (f)(1)(C)(ii). Pub. L. 104–170, §210(g)(1), substituted "180-day" for "90-day" in two places.

Subsec. (f)(3)(A). Pub. L. 104–170, §210(g)(2), substituted "180-day" for "90-day".

Subsec. (f)(4). Pub. L. 104–170, §210(h), added par. (4).

**1991**—Subsec. (a)(1). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "may specify" and before "determines".

Subsec. (a)(2). Pub. L. 102–237, §1006(b)(3)(C), substituted "the registrant" for "he" before "shall".

Subsec. (b). Pub. L. 102–237, §1006(b)(1), (2), substituted "the Administrator's" for "his" in introductory provisions and par. (1), and "the Administrator" for "he" before "shall publish" in last sentence.

Subsec. (c)(1). Pub. L. 102–237, §1006(b)(1), (2), substituted "the Administrator" for "he" before "may" and "the Administrator's" for "his" before "intention".

Subsec. (c)(3). Pub. L. 102–237, §1006(b)(1), (3)(D), substituted "the Administrator" for "he" before "may" and "the Administrator" for "him" after "permit".

Subsec. (d). Pub. L. 102–237, §1006(b)(2), (3)(E), in penultimate sentence substituted "the Administrator's" for "his" and "the Administrator" for "him" before "and issue".

Subsec. (f)(3)(B). Pub. L. 102–237, §1006(a)(5), substituted "adverse effect" for "adverse affect".

**1990**—Subsec. (f)(1). Pub. L. 101–624, §1494(1), amended par. (1) generally. Prior to amendment, par. (1) read as follows: "A registrant at any time may request that any of its pesticide registrations be canceled or be amended to delete one or more uses. Before acting on such request, the Administrator shall publish in the Federal Register a notice of the receipt of the request. Thereafter, the Administrator may approve such a request."

Subsec. (f)(3). Pub. L. 101–624, §1494(2), added par. (3).

**1988**—Subsec. (a)(1). Pub. L. 100–532, §801(e)(1), substituted "effect. The Administrator" for "effect: *Provided*, That the Administrator".

Subsec. (c). Pub. L. 100–532, §801(e)(2)–(4), in par. (1) directed that undesignated paragraph beginning "Except as provided" be run into sentence ending "of the pesticide." and substituted "before the Administrator" for "before the Agency", in par. (2) substituted "submitted to the Administrator" for "submitted to the Agency" and "and the Administrator" for "and the Agency", and in par. (3) substituted "(A)" for "(i)", "and the Administrator" for "and the Agency", and "(B)" for "(ii)".

Subsec. (e). Pub. L. 100–532, §801(e)(5), (6), in par. (1), substituted "met. The Administrator" for "met: *Provided*, That the Administrator", and in par. (2), substituted "section. The only" for "section: *Provided*, That the only".

Subsec. (f). Pub. L. 100–532, §201, added subsec. (f). Former subsec. (f) redesignated (h).

Subsec. (f)(2). Pub. L. 100–532, §801(q)(2)(B), made a technical amendment to the reference to section 136a–1 of this title to reflect the renumbering of the corresponding section of the original act.

Subsec. (g). Pub. L. 100–532, §404, added subsec. (g).

Subsec. (h). Pub. L. 100–532, §201, redesignated former subsec. (f) as (h).

**1984**—Subsec. (c)(4). Pub. L. 98–620 struck out provisions requiring petitions to review orders on the issue of suspension to be advanced on the docket of the court of appeals.

**1978**—Subsec. (b). Pub. L. 95–396, §11, required the Administrator, in taking any final action under subsec. (b), to consider restricting a pesticide's use or uses as an alternative to cancellation and to fully explain the reasons for the restrictions.

Subsec. (c)(2). Pub. L. 95–251 substituted "administrative law judge" for "hearing examiner".

Subsecs. (e), (f). Pub. L. 95–396, §12, added subsec. (e) and redesignated former subsec. (e) as (f).

**1975**—Subsec. (b). Pub. L. 94–140 established criteria which Administrator must use in determining the issuance of a suspension of registration notice and the time periods relating to such notice, set forth required procedures to be followed by Administrator prior to publication of such notice, required procedures when the Secretary elects to comment or fails to comment on suspension notice, waiver or modification of time periods in specified required procedures, required procedures for waiver of notice and consent by Secretary for suspension of registration, and established criteria for Secretary taking any final action.

STATUTORY NOTES AND RELATED SUBSIDIARIES

### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620, set out as an Effective Date note under section 1657 of Title 28, Judiciary and Judicial Procedure.

### Effective Date

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136e. Registration of establishments

**(a) Requirement**

No person shall produce any pesticide subject to this subchapter or active ingredient used in producing a pesticide subject to this subchapter in any State unless the establishment in which it is produced is registered with the Administrator. The application for registration of any establishment shall include the name and address of the establishment and of the producer who operates such establishment.

**(b) Registration**

Whenever the Administrator receives an application under subsection (a), the Administrator shall register the establishment and assign it an establishment number.

**(c) Information required**

(1) Any producer operating an establishment registered under this section shall inform the Administrator within 30 days after it is registered of the types and amounts of pesticides and, if applicable, active ingredients used in producing pesticides—
   (A) which the producer is currently producing;
   (B) which the producer has produced during the past year; and
   (C) which the producer has sold or distributed during the past year.

The information required by this paragraph shall be kept current and submitted to the Administrator annually as required under such regulations as the Administrator may prescribe.

(2) Any such producer shall, upon the request of the Administrator for the purpose of issuing a stop sale order pursuant to section 136k of this title, inform the Administrator of the name and address of any recipient of any pesticide produced in any registered establishment which the producer operates.

**(d) Confidential records and information**

Any information submitted to the Administrator pursuant to subsection (c) other than the names of the pesticides or active ingredients used in producing pesticides produced, sold, or distributed at an establishment shall be considered confidential and shall be subject to the provisions of section 136h of this title.

(June 25, 1947, ch. 125, §7, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 987; amended Pub. L. 95–396, §13, Sept. 30, 1978, 92 Stat. 829; Pub. L. 102–237, title X, §1006(b)(1), (3)(F), (G), Dec. 13, 1991, 105 Stat. 1895, 1896.)

### Editorial Notes

### Prior Provisions

A prior section 7 of act June 25, 1947, was classified to section 135e of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

### Amendments

**1991**—Subsec. (b). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "shall".

Subsec. (c)(1)(A) to (C). Pub. L. 102–237, §1006(b)(3)(F), substituted "the producer" for "he".

Exhibit C-1, pg. 65 of 152

Subsec. (c)(2). Pub. L. 102–237, §1006(b)(3)(G), substituted "the Administrator" for "him" after "inform" and "the producer" for "he".

**1978**—Subsec. (a). Pub. L. 95–396, §13(1), made requirement of registration applicable to production of active ingredient used in producing a pesticide subject to this subchapter.

Subsec. (c)(1). Pub. L. 95–396, §13(2), required information pertaining to types and amounts of active ingredients used in producing pesticides where applicable.

Subsec. (d). Pub. L. 95–396, §13(3), considered names of pesticides or active ingredients used in producing pesticides produced, sold, or distributed at an establishment as not being confidential information.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

# §136f. Books and records

### (a) Requirements

The Administrator may prescribe regulations requiring producers, registrants, and applicants for registration to maintain such records with respect to their operations and the pesticides and devices produced as the Administrator determines are necessary for the effective enforcement of this subchapter and to make the records available for inspection and copying in the same manner as provided in subsection (b). No records required under this subsection shall extend to financial data, sales data other than shipment data, pricing data, personnel data, and research data (other than data relating to registered pesticides or to a pesticide for which an application for registration has been filed).

### (b) Inspection

For the purposes of enforcing the provisions of this subchapter, any producer, distributor, carrier, dealer, or any other person who sells or offers for sale, delivers or offers for delivery any pesticide or device subject to this subchapter, shall, upon request of any officer or employee of the Environmental Protection Agency or of any State or political subdivision, duly designated by the Administrator, furnish or permit such person at all reasonable times to have access to, and to copy: (1) all records showing the delivery, movement, or holding of such pesticide or device, including the quantity, the date of shipment and receipt, and the name of the consignor and consignee; or (2) in the event of the inability of any person to produce records containing such information, all other records and information relating to such delivery, movement, or holding of the pesticide or device. Any inspection with respect to any records and information referred to in this subsection shall not extend to financial data, sales data other than shipment data, pricing data, personnel data; and research data (other than data relating to registered pesticides or to a pesticide for which an application for registration has been filed). Before undertaking an inspection under this subsection, the officer or employee must present to the owner, operator, or agent in charge of the establishment or other place where pesticides or devices are held for distribution or sale, appropriate credentials and a written statement as to the reason for the inspection, including a statement as to whether a violation of the law is suspected. If no violation is suspected, an alternate and sufficient reason shall be given in writing. Each such inspection shall be commenced and completed with reasonable promptness.

(June 25, 1947, ch. 125, §8, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 987; amended Pub. L. 95–396, §14, Sept. 30, 1978, 92 Stat. 829; Pub. L. 100–532, title III, §301, Oct. 25, 1988, 102 Stat. 2668; Pub. L. 102–237, title X, §1006(b)(1), Dec. 13, 1991, 105 Stat. 1895.)

### EDITORIAL NOTES

## PRIOR PROVISIONS

A prior section 8 of act June 25, 1947, was classified to section 135f of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## AMENDMENTS

**1991**—Subsec. (a). Pub. L. 102–237 substituted "the Administrator" for "he" before "determines".

**1988**—Subsec. (a). Pub. L. 100–532 inserted ", registrants, and applicants for registration" after "requiring producers" and "and to make the records available for inspection and copying in the same manner as provided in subsection (b) of this section" before period at end of first sentence.

**1978**—Subsec. (b). Pub. L. 95–396 required, in connection with inspection of records and information, the presentation of credentials, written statement as to the reason for inspection, including statement of suspected violation, or an alternative but sufficient reason, and commencement and completion of inspection with reasonable promptness.

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136g. Inspection of establishments, etc.

**(a) In general**

(1) For purposes of enforcing the provisions of this subchapter, officers or employees of the Environmental Protection Agency or of any State duly designated by the Administrator are authorized to enter at reasonable times (A) any establishment or other place where pesticides or devices are held for distribution or sale for the purpose of inspecting and obtaining samples of any pesticides or devices, packaged, labeled, and released for shipment, and samples of any containers or labeling for such pesticides or devices, or (B) any place where there is being held any pesticide the registration of which has been suspended or canceled for the purpose of determining compliance with section 136q of this title.

(2) Before undertaking such inspection, the officers or employees must present to the owner, operator, or agent in charge of the establishment or other place where pesticides or devices are held for distribution or sale, appropriate credentials and a written statement as to the reason for the inspection, including a statement as to whether a violation of the law is suspected. If no violation is suspected, an alternate and sufficient reason shall be given in writing. Each such inspection shall be commenced and completed with reasonable promptness. If the officer or employee obtains any samples, prior to leaving the premises, the officer or employee shall give to the owner, operator, or agent in charge a receipt describing the samples obtained and, if requested, a portion of each such sample equal in volume or weight to the portion retained. If an analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or agent in charge.

**(b) Warrants**

For purposes of enforcing the provisions of this subchapter and upon a showing to an officer or court of competent jurisdiction that there is reason to believe that the provisions of this subchapter have been violated, officers or employees duly designated by the Administrator are empowered to obtain and to execute warrants authorizing—

(1) entry, inspection, and copying of records for purposes of this section or section 136f of this title;

(2) inspection and reproduction of all records showing the quantity, date of shipment, and the name of consignor and consignee of any pesticide or device found in the establishment which is adulterated, misbranded, not registered (in the case of a pesticide) or otherwise in violation of this subchapter and in the event of the inability of any person to produce records containing such information, all other records and information relating to such delivery, movement, or holding of the pesticide or device; and

(3) the seizure of any pesticide or device which is in violation of this subchapter.

**(c) Enforcement**

**(1) Certification of facts to Attorney General**

The examination of pesticides or devices shall be made in the Environmental Protection Agency or elsewhere as the Administrator may designate for the purpose of determining from such examinations whether they comply with the requirements of this subchapter. If it shall appear from any such examination that they fail to comply with the requirements of this subchapter, the Administrator shall cause notice to be

Exhibit C-1, pg. 67 of 152

given to the person against whom criminal or civil proceedings are contemplated. Any person so notified shall be given an opportunity to present the person's views, either orally or in writing, with regard to such contemplated proceedings, and if in the opinion of the Administrator it appears that the provisions of this subchapter have been violated by such person, then the Administrator shall certify the facts to the Attorney General, with a copy of the results of the analysis or the examination of such pesticide for the institution of a criminal proceeding pursuant to section 136(b) of this title or a civil proceeding under section 136l(a) of this title, when the Administrator determines that such action will be sufficient to effectuate the purposes of this subchapter.

**(2) Notice not required**

The notice of contemplated proceedings and opportunity to present views set forth in this subsection are not prerequisites to the institution of any proceeding by the Attorney General.

**(3) Warning notices**

Nothing in this subchapter shall be construed as requiring the Administrator to institute proceedings for prosecution of minor violations of this subchapter whenever the Administrator believes that the public interest will be adequately served by a suitable written notice of warning.

(June 25, 1947, ch. 125, §9, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 988; amended Pub. L. 100–532, title III, §302, Oct. 25, 1988, 102 Stat. 2669; Pub. L. 102–237, title X, §1006(b)(1), (3)(H), (I), Dec. 13, 1991, 105 Stat. 1895, 1896.)

### EDITORIAL NOTES

### PRIOR PROVISIONS

A prior section 9 of act June 25, 1947, was classified to section 135g of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

### AMENDMENTS

**1991**—Subsec. (a)(2). Pub. L. 102–237, §1006(b)(3)(H), substituted "the officer or employee" for "he" before "shall" in fourth sentence.

Subsec. (c)(1). Pub. L. 102–237, §1006(b)(3)(I), substituted "the person's" for "his" in third sentence.

Subsec. (c)(3). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "believes".

**1988**—Subsec. (a). Pub. L. 100–532, §302(a), substituted "(1) For purposes of" for "For purposes of", inserted "of the Environmental Protection Agency or of any State", substituted "at reasonable times (A)" for "at reasonable times,", added cl. (B), and substituted "(2) Before" for "Before".

Subsec. (b)(1). Pub. L. 100–532, §302(b), amended par. (1) generally, substituting "entry, inspection, and copying of records for purposes of this section or section 136f of this title" for "entry for the purpose of this section".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136h. Protection of trade secrets and other information

**(a) In general**

In submitting data required by this subchapter, the applicant may (1) clearly mark any portions thereof which in the applicant's opinion are trade secrets or commercial or financial information and (2) submit such market

material separately from other material required to be submitted under this subchapter.

**(b) Disclosure**

Notwithstanding any other provision of this subchapter and subject to the limitations in subsections (d) and (e) of this section, the Administrator shall not make public information which in the Administrator's judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential, except that, when necessary to carry out the provisions of this subchapter, information relating to formulas of products acquired by authorization of this subchapter may be revealed to any Federal agency consulted and may be revealed at a public hearing or in findings of fact issued by the Administrator.

**(c) Disputes**

If the Administrator proposes to release for inspection information which the applicant or registrant believes to be protected from disclosure under subsection (b), the Administrator shall notify the applicant or registrant, in writing, by certified mail. The Administrator shall not thereafter make available for inspection such data until thirty days after receipt of the notice by the applicant or registrant. During this period, the applicant or registrant may institute an action in an appropriate district court for a declaratory judgment as to whether such information is subject to protection under subsection (b).

**(d) Limitations**

(1) All information concerning the objectives, methodology, results, or significance of any test or experiment performed on or with a registered or previously registered pesticide or its separate ingredients, impurities, or degradation products, and any information concerning the effects of such pesticide on any organism or the behavior of such pesticide in the environment, including, but not limited to, data on safety to fish and wildlife, humans and other mammals, plants, animals, and soil, and studies on persistence, translocation and fate in the environment, and metabolism, shall be available for disclosure to the public. The use of such data for any registration purpose shall be governed by section 136a of this title. This paragraph does not authorize the disclosure of any information that—

(A) discloses manufacturing or quality control processes,

(B) discloses the details of any methods for testing, detecting, or measuring the quantity of any deliberately added inert ingredient of a pesticide, or

(C) discloses the identity or percentage quantity of any deliberately added inert ingredient of a pesticide,

unless the Administrator has first determined that disclosure is necessary to protect against an unreasonable risk of injury to health or the environment.

(2) Information concerning production, distribution, sale, or inventories of a pesticide that is otherwise entitled to confidential treatment under subsection (b) of this section may be publicly disclosed in connection with a public proceeding to determine whether a pesticide, or any ingredient of a pesticide, causes unreasonable adverse effects on health or the environment, if the Administrator determines that such disclosure is necessary in the public interest.

(3) If the Administrator proposes to disclose information described in clause (A), (B), or (C) of paragraph (1) or in paragraph (2) of this subsection, the Administrator shall notify by certified mail the submitter of such information of the intent to release such information. The Administrator may not release such information, without the submitter's consent, until thirty days after the submitter has been furnished such notice. Where the Administrator finds that disclosure of information described in clause (A), (B), or (C) of paragraph (1) of this subsection is necessary to avoid or lessen an imminent and substantial risk of injury to the public health, the Administrator may set such shorter period of notice (but not less than ten days) and such method of notice as the Administrator finds appropriate. During such period the data submitter may institute an action in an appropriate district court to enjoin or limit the proposed disclosure. The court may enjoin disclosure, or limit the disclosure or the parties to whom disclosure shall be made, to the extent that—

(A) in the case of information described in clause (A), (B), or (C) of paragraph (1) of this subsection, the proposed disclosure is not required to protect against an unreasonable risk of injury to health or the environment; or

(B) in the case of information described in paragraph (2) of this subsection, the public interest in availability of the information in the public proceeding does not outweigh the interests in preserving the confidentiality of the information.

**(e) Disclosure to contractors**

Information otherwise protected from disclosure to the public under subsection (b) of this section may be disclosed to contractors with the United States and employees of such contractors if, in the opinion of the Administrator, such disclosure is necessary for the satisfactory performance by the contractor of a contract with the United States for the performance of work in connection with this subchapter and under such conditions as the Administrator may specify. The Administrator shall require as a condition to the disclosure of information

under this subsection that the person receiving it take such security precautions respecting the information as the Administrator shall by regulation prescribe.

**(f) Penalty for disclosure by Federal employees**

(1) Any officer or employee of the United States or former officer or employee of the United States who, by virtue of such employment or official position, has obtained possession of, or has access to, material the disclosure of which is prohibited by subsection (b) of this section, and who, knowing that disclosure of such material is prohibited by such subsection, willfully discloses the material in any manner to any person not entitled to receive it, shall be fined not more than $10,000 or imprisoned for not more than one year, or both. Section 1905 of title 18 shall not apply with respect to the publishing, divulging, disclosure, or making known of, or making available, information reported or otherwise obtained under this subchapter. Nothing in this subchapter shall preempt any civil remedy under State or Federal law for wrongful disclosure of trade secrets.

(2) For the purposes of this section, any contractor with the United States who is furnished information as authorized by subsection (e) of this section, or any employee of any such contractor, shall be considered to be an employee of the United States.

**(g) Disclosure to foreign and multinational pesticide producers**

(1) The Administrator shall not knowingly disclose information submitted by an applicant or registrant under this subchapter to any employee or agent of any business or other entity engaged in the production, sale, or distribution of pesticides in countries other than the United States or in addition to the United States or to any other person who intends to deliver such data to such foreign or multinational business or entity unless the applicant or registrant has consented to such disclosure. The Administrator shall require an affirmation from any person who intends to inspect data that such person does not seek access to the data for purposes of delivering it or offering it for sale to any such business or entity or its agents or employees and will not purposefully deliver or negligently cause the data to be delivered to such business or entity or its agents or employees. Notwithstanding any other provision of this subsection, the Administrator may disclose information to any person in connection with a public proceeding under law or regulation, subject to restrictions on the availability of information contained elsewhere in this subchapter, which information is relevant to a determination by the Administrator with respect to whether a pesticide, or any ingredient of a pesticide, causes unreasonable adverse effects on health or the environment.

(2) The Administrator shall maintain records of the names of persons to whom data are disclosed under this subsection and the persons or organizations they represent and shall inform the applicant or registrant of the names and affiliations of such persons.

(3) Section 1001 of title 18 shall apply to any affirmation made under paragraph (1) of this subsection.

(June 25, 1947, ch. 125, §10, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 989; amended Pub. L. 95–396, §15, Sept. 30, 1978, 92 Stat. 829; Pub. L. 98–620, title IV, §402(4)(B), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 100–532, title VIII, §801(f), Oct. 25, 1988, 102 Stat. 2682; Pub. L. 102–237, title X, §1006(b)(1), (2), (3)(J), Dec. 13, 1991, 105 Stat. 1895, 1896.)

EDITORIAL NOTES

## PRIOR PROVISIONS

A prior section 10 of act June 25, 1947, was classified to section 135h of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## AMENDMENTS

**1991**—Subsec. (a). Pub. L. 102–237, §1006(b)(3)(J), substituted "the applicant's" for "his".

Subsec. (b). Pub. L. 102–237, §1006(b)(2), substituted "the Administrator's" for "his".

Subsec. (c). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "shall notify".

**1988**—Subsec. (d). Pub. L. 100–532 in par. (1), substituted "public. The use" for "public: *Provided*, That the use" and "title. This paragraph" for "title: *Provided further*, That this paragraph", and in par. (3), "notice. Where" for "notice: *Provided*, That where".

**1984**—Subsec. (d)(3). Pub. L. 98–620 struck out provisions requiring the court to give expedited consideration to actions involving injunctions or limitations of proposed disclosure.

**1978**—Subsec. (b). Pub. L. 95–396, §15(1), made disclosure of information by the Administrator subject to the limitations of subsecs. (d) and (e) of this section.

Subsecs. (d) to (g). Pub. L. 95–396, §15(2), added subsecs. (d) to (g).

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620, set out as an Effective Date note under section 1657 of Title 28, Judiciary and Judicial Procedure.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136i. Use of restricted use pesticides; applicators

**(a) Certification procedure**

**(1) Federal certification**

In any State for which a State plan for applicator certification has not been approved by the Administrator, the Administrator, in consultation with the Governor of such State, shall conduct a program for the certification of applicators of pesticides. Such program shall conform to the requirements imposed upon the States under the provisions of subsection (a)(2) of this section and shall not require private applicators to take any examination to establish competency in the use of pesticides. Prior to the implementation of the program, the Administrator shall publish in the Federal Register for review and comment a summary of the Federal plan for applicator certification and shall make generally available within the State copies of the plan. The Administrator shall hold public hearings at one or more locations within the State if so requested by the Governor of such State during the thirty days following publication of the Federal Register notice inviting comment on the Federal plan. The hearings shall be held within thirty days following receipt of the request from the Governor. In any State in which the Administrator conducts a certification program, the Administrator may require any person engaging in the commercial application, sale, offering for sale, holding for sale, or distribution of any pesticide one or more uses of which have been classified for restricted use to maintain such records and submit such reports concerning the commercial application, sale, or distribution of such pesticide as the Administrator may by regulation prescribe. Subject to paragraph (2), the Administrator shall prescribe standards for the certification of applicators of pesticides. Such standards shall provide that to be certified, an individual must be determined to be competent with respect to the use and handling of the pesticides, or to the use and handling of the pesticide or class of pesticides covered by such individual's certification. The certification standard for a private applicator shall, under a State plan submitted for approval, be deemed fulfilled by the applicator completing a certification form. The Administrator shall further assure that such form contains adequate information and affirmations to carry out the intent of this subchapter, and may include in the form an affirmation that the private applicator has completed a training program approved by the Administrator so long as the program does not require the private applicator to take, pursuant to a requirement prescribed by the Administrator, any examination to establish competency in the use of the pesticide. The Administrator may require any pesticide dealer participating in a certification program to be licensed under a State licensing program approved by the Administrator.

**(2) State certification**

If any State, at any time, desires to certify applicators of pesticides, the Governor of such State shall submit a State plan for such purpose. The Administrator shall approve the plan submitted by any State, or any modification thereof, if such plan in the Administrator's judgment—

(A) designates a State agency as the agency responsible for administering the plan throughout the State;

(B) contains satisfactory assurances that such agency has or will have the legal authority and qualified personnel necessary to carry out the plan;

(C) gives satisfactory assurances that the State will devote adequate funds to the administration of the plan;

(D) provides that the State agency will make such reports to the Administrator in such form and containing such information as the Administrator may from time to time require; and

(E) contains satisfactory assurances that State standards for the certification of applicators of pesticides conform with those standards prescribed by the Administrator under paragraph (1).

Any State certification program under this section shall be maintained in accordance with the State plan approved under this section.

**(b) State plans**

If the Administrator rejects a plan submitted under subsection (a)(2), the Administrator shall afford the State submitting the plan due notice and opportunity for hearing before so doing. If the Administrator approves a plan submitted under subsection (a)(2), then such State shall certify applicators of pesticides with respect to such State. Whenever the Administrator determines that a State is not administering the certification program in accordance with the plan approved under this section, the Administrator shall so notify the State and provide for a hearing at the request of the State, and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such plan.

**(c) Instruction in integrated pest management techniques**

Standards prescribed by the Administrator for the certification of applicators of pesticides under subsection (a), and State plans submitted to the Administrator under subsection (a), shall include provisions for making instructional materials concerning integrated pest management techniques available to individuals at their request in accordance with the provisions of section 136u(c) of this title, but such plans may not require that any individual receive instruction concerning such techniques or to be shown to be competent with respect to the use of such techniques. The Administrator and States implementing such plans shall provide that all interested individuals are notified on the availability of such instructional materials.

**(d) In general**

No regulations prescribed by the Administrator for carrying out the provisions of this subchapter shall require any private applicator to maintain any records or file any reports or other documents.

**(e) Separate standards**

When establishing or approving standards for licensing or certification, the Administrator shall establish separate standards for commercial and private applicators.

(June 25, 1947, ch. 125, §11, formerly §§4, 11, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 983, 989; amended Pub. L. 94–140, §§5, 11, Nov. 28, 1975, 89 Stat. 753, 754; Pub. L. 95–396, §9, Sept. 30, 1978, 92 Stat. 827; Pub. L. 100–532, title VIII, §801(c), (q)(1)(A)–(C), Oct. 25, 1988, 102 Stat. 2681, 2683; Pub. L. 102–237, title X, §1006(a)(6), (b)(1), (2), (3)(K), Dec. 13, 1991, 105 Stat. 1895, 1896.)

**EDITORIAL NOTES**

## CODIFICATION

Pub. L. 100–532, §801(q)(1)(A), transferred subsecs. (a) to (c) of section 4 of act June 25, 1947, which was classified to section 136b of this title, to subsecs. (a) to (c) of this section.

## PRIOR PROVISIONS

A prior section 11 of act June 25, 1947, was classified to section 135i of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## AMENDMENTS

**1991**—Pub. L. 102–237, §1006(a)(6)(A), substituted "applicators" for "appplicators" in section catchline.

Subsec. (a)(1). Pub. L. 102–237, §1006(b)(3)(K), substituted "the applicator" for "his" in ninth sentence and "the Administrator" for "him" before period at end.

Subsec. (a)(2). Pub. L. 102–237, §1006(b)(2), substituted "the Administrator's" for "his" in introductory provisions.

Subsec. (b). Pub. L. 102–237, §1006(a)(6)(B), (b)(1), substituted "subsection (a)(2) of this section" for "this paragraph" in two places and "the Administrator" for "he" before "shall afford" and before "shall so notify".

Subsec. (c). Pub. L. 102–237, §1006(a)(6)(C), substituted "subsection (a)" for "subsections (a) and (b)" after "Administrator under".

**1988**—Pub. L. 100–532, §801(q)(1)(A), (C), substituted section catchline for one which read: "Standards applicable to pesticide applicators", redesignated subsecs. (a) and (b) as (d) and (e), respectively, and transferred subsecs. (a) to (c) of section 136b of this title to subsecs. (a) to (c), respectively, of this section.

Subsec. (a)(1). Pub. L. 100–532, §801(c), substituted "pesticides. Such program" for "pesticides: *Provided*, That such program" and "certification. The certification" for "certification: *Provided, however*, That the certification".

**1978**—Subsec. (a)(1). Pub. L. 95–396 required that, in any State without a State plan for applicator certification approved by the Administrator, the Administrator, in consultation with the Governor of the State, shall conduct a program for the certification of applicators of pesticides under a Federal plan for applicator certification, and also that in such a State records be maintained and reports submitted by persons engaged in commercial application, sale or distribution of pesticides classified for restricted use.

**1975**—Subsec. (a)(1). Pub. L. 94–140, §5, inserted proviso relating to Administrator's powers and duties with respect to the certification forms and requirement for pesticide dealers participating in certification program.

Subsec. (c). Pub. L. 94–140, §11, added subsec. (c).

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136i–1. Pesticide recordkeeping

**(a) Requirements**

(1) The Secretary of Agriculture, in consultation with the Administrator of the Environmental Protection Agency, shall require certified applicators of restricted use pesticides (of the type described under section 136a(d)(1)(C) of this title) to maintain records comparable to records maintained by commercial applicators of pesticides in each State. If there is no State requirement for the maintenance of records, such applicator shall maintain records that contain the product name, amount, approximate date of application, and location of application of each such pesticide used for a 2-year period after such use.

(2) Within 30 days of a pesticide application, a commercial certified applicator shall provide a copy of records maintained under paragraph (1) to the person for whom such application was provided.

**(b) Access**

Records maintained under subsection (a) shall be made available to any Federal or State agency that deals with pesticide use or any health or environmental issue related to the use of pesticides, on the request of such agency. Each such Federal agency shall conduct surveys and record the data from individual applicators to facilitate statistical analysis for environmental and agronomic purposes, but in no case may a government agency release data, including the location from which the data was derived, that would directly or indirectly reveal the identity of individual producers. In the case of Federal agencies, such access to records maintained under subsection (a) shall be through the Secretary of Agriculture, or the Secretary's designee. State agency requests for access to records maintained under subsection (a) shall be through the lead State agency so designated by the State.

**(c) Health care personnel**

When a health professional determines that pesticide information maintained under this section is necessary to provide medical treatment or first aid to an individual who may have been exposed to pesticides for which the information is maintained, upon request persons required to maintain records under subsection (a) shall promptly provide record and available label information to that health professional. In the case of an emergency, such record information shall be provided immediately.

**(d) Penalty**

The Secretary of Agriculture shall be responsible for the enforcement of subsections (a), (b), and (c). A violation of such subsection shall—

    (1) in the case of the first offense, be subject to a fine of not more than $500; and

    (2) in the case of subsequent offenses, be subject to a fine of not less than $1,000 for each violation, except that the penalty shall be less than $1,000 if the Secretary determines that the person made a good faith effort to comply with such subsection.

**(e) Federal or State provisions**

The requirements of this section shall not affect provisions of other Federal or State laws.

**(f) Surveys and reports**

The Secretary of Agriculture and the Administrator of the Environmental Protection Agency, shall survey the records maintained under subsection (a) to develop and maintain a data base that is sufficient to enable the Secretary and the Administrator to publish annual comprehensive reports concerning agricultural and nonagricultural pesticide use. The Secretary and Administrator shall enter into a memorandum of understanding to define their respective responsibilities under this subsection in order to avoid duplication of effort. Such reports shall be transmitted to Congress not later than April 1 of each year.

**(g) Regulations**

The Secretary of Agriculture and the Administrator of the Environmental Protection Agency shall promulgate regulations on their respective areas of responsibility implementing this section within 180 days after November 28, 1990.

(Pub. L. 101–624, title XIV, §1491, Nov. 28, 1990, 104 Stat. 3627; Pub. L. 102–237, title X, §1006(d), Dec. 13, 1991, 105 Stat. 1896.)

EDITORIAL NOTES

CODIFICATION

Section was enacted as part of the Conservation Program Improvements Act, and also as part of the Food, Agriculture, Conservation, and Trade Act of 1990, and not as part of the Federal Insecticide, Fungicide, and Rodenticide Act which comprises this subchapter.

AMENDMENTS

**1991**—Subsec. (a)(1). Pub. L. 102–237, §1006(d)(1), inserted closing parenthesis after "section 136a(d)(1)(C) of this title".

Subsec. (d)(1). Pub. L. 102–237, §1006(d)(2), inserted "of" after "fine".

## §136i–2. Collection of pesticide use information

**(a) In general**

The Secretary of Agriculture shall collect data of statewide or regional significance on the use of pesticides to control pests and diseases of major crops and crops of dietary significance, including fruits and vegetables.

**(b) Collection**

The data shall be collected by surveys of farmers or from other sources offering statistically reliable data.

**(c) Coordination**

The Secretary of Agriculture shall, as appropriate, coordinate with the Administrator of the Environmental Protection Agency in the design of the surveys and make available to the Administrator the aggregate results of the surveys to assist the Administrator.

(Pub. L. 104–170, title III, §302, Aug. 3, 1996, 110 Stat. 1512.)

EDITORIAL NOTES

CODIFICATION

Section was enacted as part of the Food Quality Protection Act of 1996, and not as part of the Federal Insecticide, Fungicide, and Rodenticide Act which comprises this subchapter.

STATUTORY NOTES AND RELATED SUBSIDIARIES

## PESTICIDE USE INFORMATION STUDY

Pub. L. 104–170, title III, §305, Aug. 3, 1996, 110 Stat. 1512, required the Secretary of Agriculture, in consultation with the Administrator of the Environmental Protection Agency, to prepare a report to Congress evaluating the current status and potential improvements in Federal pesticide use information gathering activities and to submit the report not later than 1 year following Aug. 3, 1996.

# §136j. Unlawful acts

**(a) In general**

(1) Except as provided by subsection (b), it shall be unlawful for any person in any State to distribute or sell to any person—

(A) any pesticide that is not registered under section 136a of this title or whose registration has been canceled or suspended, except to the extent that distribution or sale otherwise has been authorized by the Administrator under this subchapter;

(B) any registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as a part of the statement required in connection with its registration under section 136a of this title;

(C) any registered pesticide the composition of which differs at the time of its distribution or sale from its composition as described in the statement required in connection with its registration under section 136a of this title;

(D) any pesticide which has not been colored or discolored pursuant to the provisions of section 136w(c)(5) of this title;

(E) any pesticide which is adulterated or misbranded; or

(F) any device which is misbranded.

(2) It shall be unlawful for any person—

(A) to detach, alter, deface, or destroy, in whole or in part, any labeling required under this subchapter;

(B) to refuse to—

(i) prepare, maintain, or submit any records required by or under section 136c, 136e, 136f, 136i, or 136q of this title;

(ii) submit any reports required by or under section 136c, 136d, 136e, 136f, 136i, or 136q of this title; or

(iii) allow any entry, inspection, copying of records, or sampling authorized by this subchapter;

(C) to give a guaranty or undertaking provided for in subsection (b) which is false in any particular, except that a person who receives and relies upon a guaranty authorized under subsection (b) may give a guaranty to the same effect, which guaranty shall contain, in addition to the person's own name and address, the name and address of the person residing in the United States from whom the person received the guaranty or undertaking;

(D) to use for the person's own advantage or to reveal, other than to the Administrator, or officials or employees of the Environmental Protection Agency or other Federal executive agencies, or to the courts, or to physicians, pharmacists, and other qualified persons, needing such information for the performance of their duties, in accordance with such directions as the Administrator may prescribe, any information acquired by authority of this subchapter which is confidential under this subchapter;

(E) who is a registrant, wholesaler, dealer, retailer, or other distributor to advertise a product registered under this subchapter for restricted use without giving the classification of the product assigned to it under section 136a of this title;

(F) to distribute or sell, or to make available for use, or to use, any registered pesticide classified for restricted use for some or all purposes other than in accordance with section 136a(d) of this title and any regulations thereunder, except that it shall not be unlawful to sell, under regulations issued by the Administrator, a restricted use pesticide to a person who is not a certified applicator for application by a certified applicator;

(G) to use any registered pesticide in a manner inconsistent with its labeling;

(H) to use any pesticide which is under an experimental use permit contrary to the provisions of such permit;

(I) to violate any order issued under section 136k of this title;

(J) to violate any suspension order issued under section 136a(c)(2)(B), 136a–1, or 136d of this title;

(K) to violate any cancellation order issued under this subchapter or to fail to submit a notice in accordance with section 136d(g) of this title;

(L) who is a producer to violate any of the provisions of section 136e of this title;

(M) to knowingly falsify all or part of any application for registration, application for experimental use permit, any information submitted to the Administrator pursuant to section 136e of this title, any records required to be maintained pursuant to this subchapter, any report filed under this subchapter, or any information marked as confidential and submitted to the Administrator under any provision of this subchapter;

(N) who is a registrant, wholesaler, dealer, retailer, or other distributor to fail to file reports required by this subchapter;

(O) to add any substance to, or take any substance from, any pesticide in a manner that may defeat the purpose of this subchapter;

(P) to use any pesticide in tests on human beings unless such human beings (i) are fully informed of the nature and purposes of the test and of any physical and mental health consequences which are reasonably foreseeable therefrom, and (ii) freely volunteer to participate in the test;

(Q) to falsify all or part of any information relating to the testing of any pesticide (or any ingredient, metabolite, or degradation product thereof), including the nature of any protocol, procedure, substance, organism, or equipment used, observation made, or conclusion or opinion formed, submitted to the Administrator, or that the person knows will be furnished to the Administrator or will become a part of any records required to be maintained by this subchapter;

(R) to submit to the Administrator data known to be false in support of a registration; or

(S) to violate any regulation issued under section 136a(a) or 136q of this title.

## (b) Exemptions

The penalties provided for a violation of paragraph (1) of subsection (a) shall not apply to—

(1) any person who establishes a guaranty signed by, and containing the name and address of, the registrant or person residing in the United States from whom the person purchased or received in good faith the pesticide in the same unbroken package, to the effect that the pesticide was lawfully registered at the time of sale and delivery to the person, and that it complies with the other requirements of this subchapter, and in such case the guarantor shall be subject to the penalties which would otherwise attach to the person holding the guaranty under the provisions of this subchapter;

(2) any carrier while lawfully shipping, transporting, or delivering for shipment any pesticide or device, if such carrier upon request of any officer or employee duly designated by the Administrator shall permit such officer or employee to copy all of its records concerning such pesticide or device;

(3) any public official while engaged in the performance of his official duties as a public official;

(4) any person using or possessing any pesticide as provided by an experimental use permit in effect with respect to such pesticide and such use or possession; or

(5) any person who ships a substance or mixture of substances being put through tests in which the purpose is only to determine its value for pesticide purposes or to determine its toxicity or other properties and from which the user does not expect to receive any benefit in pest control from its use.

(June 25, 1947, ch. 125, §12, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 989; amended Pub. L. 95–396, §16, Sept. 30, 1978, 92 Stat. 832; Pub. L. 100–532, title VI, §§601(b)(2), 603, title VIII, §801(g), (q)(2)(B), Oct. 25, 1988, 102 Stat. 2677, 2678, 2682, 2683; Pub. L. 102–237, title X, §1006(a)(7), (b)(3)(L)–(O), Dec. 13, 1991, 105 Stat. 1895, 1896.)

### Editorial Notes

## Prior Provisions

A prior section 12 of act June 25, 1947, was classified to section 135j of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## Amendments

**1991**—Subsec. (a)(2)(C). Pub. L. 102–237, §1006(b)(3)(L), substituted "the person's" for "his" and "the person" for "he" before "received".

Subsec. (a)(2)(D). Pub. L. 102–237, §1006(b)(3)(M), substituted "the person's" for "his".

Subsec. (a)(2)(F). Pub. L. 102–237, §1006(a)(7)(A), substituted "thereunder, except that it" for "thereunder. It".

Subsec. (a)(2)(O). Pub. L. 102–237, §1006(a)(7)(B), struck out "or" after semicolon at end.

Subsec. (a)(2)(P). Pub. L. 102–237, §1006(a)(7)(C), substituted a semicolon for period at end.

Subsec. (b)(1). Pub. L. 102–237, §1006(b)(3)(N), substituted "the person" for "he" after "from whom" and for "him" after "delivery to".

Subsec. (b)(3). Pub. L. 102–237, §1006(b)(3)(O), substituted "the official duties of the public official" for "his official duties".

**1988**—Subsec. (a)(1). Pub. L. 100–532, §601(b)(2)(A), in introductory provisions, substituted "distribute or sell to any person" for "distribute, sell, offer for sale, hold for sale, ship, deliver for shipment, or receive and (having so received) deliver or offer to deliver, to any person".

Subsec. (a)(1)(A). Pub. L. 100–532, §603(1), added subpar. (A) and struck out former subpar. (A) which read as follows: "any pesticide which is not registered under section 136a of this title, except as provided by section 136d(a)(1) of this title;".

Subsec. (a)(2)(B). Pub. L. 100–532, §603(2)(A), added subpar. (B) and struck out former subpar. (B) which read as follows: "to refuse to keep any records required pursuant to section 136f of this title, or to refuse to allow inspection of any records or establishment pursuant to section 136f or 136g of this title, or to refuse to allow an officer or employee of the Environmental Protection Agency to take a sample of any pesticide pursuant to section 136g of this title;".

Subsec. (a)(2)(F). Pub. L. 100–532, §§601(b)(2)(B), 801(g), substituted "to distribute or sell, or to make" for "to make" and "thereunder, It" for "thereunder: *Provided*, That it".

Subsec. (a)(2)(J). Pub. L. 100–532, §801(q)(2)(B), made a technical amendment to the reference to section 136a–1 of this title to reflect the renumbering of the corresponding section of the original act.

Pub. L. 100–532, §603(2)(B), added subpar. (J) and struck out former subpar. (J) which read as follows: "to violate any suspension order issued under section 136d of this title;".

Subsec. (a)(2)(K). Pub. L. 100–532, §603(2)(B), added subpar. (K) and struck out former subpar. (K) which read as follows: "to violate any cancellation of registration of a pesticide under section 136d of this title, except as provided by section 136d(a)(1) of this title;".

Subsec. (a)(2)(M). Pub. L. 100–532, §603(2)(C), substituted "this subchapter" for "section 136f of this title".

Subsec. (a)(2)(Q), (R), (S). Pub. L. 100–532, §603(2)(D), added subpars. (Q), (R), and (S).

**1978**—Subsec. (a)(2)(F). Pub. L. 95–396 inserted proviso exempting from prohibition the sale, under regulations issued by the Administrator, of a restricted use pesticide to a person who is not a certified applicator for application by a certified applicator.

#### Statutory Notes and Related Subsidiaries

### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### Effective Date

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136k. Stop sale, use, removal, and seizure

### (a) Stop sale, etc., orders

Whenever any pesticide or device is found by the Administrator in any State and there is reason to believe on the basis of inspection or tests that such pesticide or device is in violation of any of the provisions of this subchapter, or that such pesticide or device has been or is intended to be distributed or sold in violation of any such provisions, or when the registration of the pesticide has been canceled by a final order or has been suspended, the Administrator may issue a written or printed "stop sale, use, or removal" order to any person who owns, controls, or has custody of such pesticide or device, and after receipt of such order no person shall

sell, use, or remove the pesticide or device described in the order except in accordance with the provisions of the order.

**(b) Seizure**

Any pesticide or device that is being transported or, having been transported, remains unsold or in original unbroken packages, or that is sold or offered for sale in any State, or that is imported from a foreign country, shall be liable to be proceeded against in any district court in the district where it is found and seized for confiscation by a process in rem for condemnation if—

  (1) in the case of a pesticide—

    (A) it is adulterated or misbranded;

    (B) it is not registered pursuant to the provisions of section 136a of this title;

    (C) its labeling fails to bear the information required by this subchapter;

    (D) it is not colored or discolored and such coloring or discoloring is required under this subchapter; or

    (E) any of the claims made for it or any of the directions for its use differ in substance from the representations made in connection with its registration;

  (2) in the case of a device, it is misbranded; or

  (3) in the case of a pesticide or device, when used in accordance with the requirements imposed under this subchapter and as directed by the labeling, it nevertheless causes unreasonable adverse effects on the environment.

In the case of a plant regulator, defoliant, or desiccant, used in accordance with the label claims and recommendations, physical or physiological effects on plants or parts thereof shall not be deemed to be injury, when such effects are the purpose for which the plant regulator, defoliant, or desiccant was applied.

**(c) Disposition after condemnation**

If the pesticide or device is condemned it shall, after entry of the decree, be disposed of by destruction or sale as the court may direct and the proceeds, if sold, less the court costs, shall be paid into the Treasury of the United States, but the pesticide or device shall not be sold contrary to the provisions of this subchapter or the laws of the jurisdiction in which it is sold. On payment of the costs of the condemnation proceedings and the execution and delivery of a good and sufficient bond conditioned that the pesticide or device shall not be sold or otherwise disposed of contrary to the provisions of the subchapter or the laws of any jurisdiction in which sold, the court may direct that such pesticide or device be delivered to the owner thereof. The proceedings of such condemnation cases shall conform, as near as may be to the proceedings in admiralty, except that either party may demand trial by jury of any issue of fact joined in any case, and all such proceedings shall be at the suit of and in the name of the United States.

**(d) Court costs, etc.**

When a decree of condemnation is entered against the pesticide or device, court costs and fees, storage, and other proper expenses shall be awarded against the person, if any, intervening as claimant of the pesticide or device.

(June 25, 1947, ch. 125, §13, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 991; amended Pub. L. 100–532, title VIII, §801(h), Oct. 25, 1988, 102 Stat. 2682.)

### Editorial Notes

## Prior Provisions

A prior section 13 of act June 25, 1947, was classified to section 135k of this title prior to amendment of act June 25, 1947, by Pub. L. 92–516.

## Amendments

**1988**—Subsec. (b). Pub. L. 100–532, §801(h)(1), directed that sentence beginning "In the case of" be moved from par. (3) and become a full measure sentence after par. (3).

Subsec. (c). Pub. L. 100–532, §801(h)(2), substituted "sold. On" for "sold: *Provided*, That upon".

### Statutory Notes and Related Subsidiaries

## Effective Date of 1988 Amendment

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

# §136*l*. Penalties

## (a) Civil penalties

### (1) In general

Any registrant, commercial applicator, wholesaler, dealer, retailer, or other distributor who violates any provision of this subchapter may be assessed a civil penalty by the Administrator of not more than $5,000 for each offense.

### (2) Private applicator

Any private applicator or other person not included in paragraph (1) who violates any provision of this subchapter subsequent to receiving a written warning from the Administrator or following a citation for a prior violation, may be assessed a civil penalty by the Administrator of not more than $1,000 for each offense, except that any applicator not included under paragraph (1) of this subsection who holds or applies registered pesticides, or uses dilutions of registered pesticides, only to provide a service of controlling pests without delivering any unapplied pesticide to any person so served, and who violates any provision of this subchapter may be assessed a civil penalty by the Administrator of not more than $500 for the first offense nor more than $1,000 for each subsequent offense.

### (3) Hearing

No civil penalty shall be assessed unless the person charged shall have been given notice and opportunity for a hearing on such charge in the county, parish, or incorporated city of the residence of the person charged.

### (4) Determination of penalty

In determining the amount of the penalty, the Administrator shall consider the appropriateness of such penalty to the size of the business of the person charged, the effect on the person's ability to continue in business, and the gravity of the violation. Whenever the Administrator finds that the violation occurred despite the exercise of due care or did not cause significant harm to health or the environment, the Administrator may issue a warning in lieu of assessing a penalty.

### (5) References to Attorney General

In case of inability to collect such civil penalty or failure of any person to pay all, or such portion of such civil penalty as the Administrator may determine, the Administrator shall refer the matter to the Attorney General, who shall recover such amount by action in the appropriate United States district court.

## (b) Criminal penalties

### (1) In general

(A) Any registrant, applicant for a registration, or producer who knowingly violates any provision of this subchapter shall be fined not more than $50,000 or imprisoned for not more than 1 year, or both.

(B) Any commercial applicator of a restricted use pesticide, or any other person not described in subparagraph (A) who distributes or sells pesticides or devices, who knowingly violates any provision of this subchapter shall be fined not more than $25,000 or imprisoned for not more than 1 year, or both.

### (2) Private applicator

Any private applicator or other person not included in paragraph (1) who knowingly violates any provision of this subchapter shall be guilty of a misdemeanor and shall on conviction be fined not more than $1,000, or imprisoned for not more than 30 days, or both.

### (3) Disclosure of information

Any person, who, with intent to defraud, uses or reveals information relative to formulas of products acquired under the authority of section 136a of this title, shall be fined not more than $10,000, or imprisoned for not more than three years, or both.

### (4) Acts of officers, agents, etc.

When construing and enforcing the provisions of this subchapter, the act, omission, or failure of any officer, agent, or other person acting for or employed by any person shall in every case be also deemed to be the act, omission, or failure of such person as well as that of the person employed.

(June 25, 1947, ch. 125, §14, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 992; amended Pub. L. 95–396, §17, Sept. 30, 1978, 92 Stat. 832; Pub. L. 100–532, title VI, §604, Oct. 25, 1988, 102 Stat. 2678; Pub. L. 102–237, title X, §1006(a)(8), Dec. 13, 1991, 105 Stat. 1895.)

### EDITORIAL NOTES

### AMENDMENTS

**1991**—Subsec. (a)(2). Pub. L. 102–237 substituted ", except that" for ": *Provided*, That" and "uses" for "use".

**1988**—Subsec. (b)(1). Pub. L. 100–532 amended par. (1) generally. Prior to amendment, par. (1) read as follows: "Any registrant, commercial applicator, wholesaler, dealer, retailer, or other distributor who knowingly violates any provision of this subchapter shall be guilty of a misdemeanor and shall on conviction be fined not more than $25,000, or imprisoned for not more than one year, or both."

**1978**—Subsec. (a)(2). Pub. L. 95–396, §17(1), authorized assessment of a civil penalty of not more than $500 for a first offense and not more than $1,000 for each subsequent offense against any applicator providing a service of controlling pests for violations of this subchapter.

Subsec. (a)(3). Pub. L. 95–396, §17(2), struck out provision respecting certain considerations when determining amount of penalty, now covered in par. (4).

Subsec. (a)(4). Pub. L. 95–396, §17(4), reenacted second sentence of par. (3) as par. (4) and authorized Administrator to issue a warning in lieu of assessing a penalty. Former par. (4) redesignated (5).

Subsec. (a)(5). Pub. L. 95–396, §17(3), redesignated former par. (4) as (5).

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136m. Indemnities

### (a) General indemnification

#### (1) In general

Except as otherwise provided in this section, if—

(A) the Administrator notifies a registrant under section 136d(c)(1) of this title that the Administrator intends to suspend a registration or that an emergency order of suspension of a registration under section 136d(c)(3) of this title has been issued;

(B) the registration in question is suspended under section 136d(c) of this title, and thereafter is canceled under section 136d(b), 136d(d), or 136d(f) of this title; and

(C) any person who owned any quantity of the pesticide immediately before the notice to the registrant under subparagraph (A) suffered losses by reason of suspension or cancellation of the registration;

the Administrator shall make an indemnity payment to the person.

#### (2) Exception

Paragraph (1) shall not apply if the Administrator finds that the person—

(A) had knowledge of facts that, in themselves, would have shown that the pesticide did not meet the requirements of section 136a(c)(5) of this title for registration; and

(B) continued thereafter to produce the pesticide without giving timely notice of such facts to the Administrator.

### (3) Report

If the Administrator takes an action under paragraph (1) that requires the payment of indemnification, the Administrator shall report to the Committee on Agriculture of the House of Representatives, the Committee on Agriculture, Nutrition, and Forestry of the Senate, and the Committees on Appropriations of the House of Representatives and the Senate on—

(A) the action taken that requires the payment of indemnification;

(B) the reasons for taking the action;

(C) the estimated cost of the payment; and

(D) a request for the appropriation of funds for the payment.

### (4) Appropriation

The Administrator may not make a payment of indemnification under paragraph (1) unless a specific line item appropriation of funds has been made in advance for the payment.

## (b) Indemnification of end users, dealers, and distributors

### (1) End users

If—

(A) the Administrator notifies a registrant under section 136d(c)(1) of this title that the Administrator intends to suspend a registration or that an emergency order of suspension of a registration under section 136d(c)(3) of this title has been issued;

(B) the registration in question is suspended under section 136d(c) of this title, and thereafter is canceled under section 136d(b), 136d(d), or 136d(f) of this title; and

(C) any person who, immediately before the notice to the registrant under subparagraph (A), owned any quantity of the pesticide for purposes of applying or using the pesticide as an end user, rather than for purposes of distributing or selling it or further processing it for distribution or sale, suffered a loss by reason of the suspension or cancellation of the pesticide;

the person shall be entitled to an indemnity payment under this subsection for such quantity of the pesticide.

### (2) Dealers and distributors

(A) Any registrant, wholesaler, dealer, or other distributor (hereinafter in this paragraph referred to as a "seller") of a registered pesticide who distributes or sells the pesticide directly to any person not described as an end user in paragraph (1)(C) shall, with respect to any quantity of the pesticide that such person cannot use or resell as a result of the suspension or cancellation of the pesticide, reimburse such person for the cost of first acquiring the pesticide from the seller (other than the cost of transportation, if any), unless the seller provided to the person at the time of distribution or sale a notice, in writing, that the pesticide is not subject to reimbursement by the seller.

(B) If—

(i) the Administrator notifies a registrant under section 136d(c)(1) of this title that the Administrator intends to suspend a registration or that an emergency order of suspension of a registration under section 136d(c)(3) of this title has been issued;

(ii) the registration in question is suspended under section 136d(c) of this title, and thereafter is canceled under section 136d(b), 136d(d), or 136d(f) of this title;

(iii) any person who, immediately before the notice to the registrant under clause (i)—

(I) had not been notified in writing by the seller, as provided under subparagraph (A), that any quantity of the pesticide owned by such person is not subject to reimbursement by the seller in the event of suspension or cancellation of the pesticide; and

(II) owned any quantity of the pesticide for purposes of—

(aa) distributing or selling it; or

(bb) further processing it for distribution or sale directly to an end user;

suffered a loss by reason of the suspension or cancellation of the pesticide; and

(iv) the Administrator determines on the basis of a claim of loss submitted to the Administrator by the person, that the seller—

(I) did not provide the notice specified in subparagraph (A) to such person; and

(II) is and will continue to be unable to provide reimbursement to such person, as provided under subparagraph (A), for the loss referred to in clause (iii), as a result of the insolvency or bankruptcy of the

seller and the seller's resulting inability to provide such reimbursement;

the person shall be entitled to an indemnity payment under this subsection for such quantity of the pesticide.

   (C) If an indemnity payment is made by the United States under this paragraph, the United States shall be subrogated to any right that would otherwise be held under this paragraph by a seller who is unable to make a reimbursement in accordance with this paragraph with regard to reimbursements that otherwise would have been made by the seller.

**(3) Source**

   Any payment required to be made under paragraph (1) or (2) shall be made from the appropriation provided under section 1304 of title 31.

**(4) Administrative settlement**

   An administrative settlement of a claim for such indemnity may be made in accordance with the third paragraph of section 2414 of title 28 and shall be regarded as if it were made under that section for purposes of section 1304 of title 31.

**(c) Amount of payment**

   **(1) In general**

   The amount of an indemnity payment under subsection (a) or (b) to any person shall be determined on the basis of the cost of the pesticide owned by the person (other than the cost of transportation, if any) immediately before the issuance of the notice to the registrant referred to in subsection (a)(1)(A), (b)(1)(A), or (b)(2)(B)(i), except that in no event shall an indemnity payment to any person exceed the fair market value of the pesticide owned by the person immediately before the issuance of the notice.

   **(2) Special rule**

   Notwithstanding any other provision of this subchapter, the Administrator may provide a reasonable time for use or other disposal of the pesticide. In determining the quantity of any pesticide for which indemnity shall be paid under this section, proper adjustment shall be made for any pesticide used or otherwise disposed of by the owner.

(June 25, 1947, ch. 125, §15, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 993; amended Pub. L. 100–532, title V, §501(a), Oct. 25, 1988, 102 Stat. 2674.)

### Editorial Notes

## Amendments

   **1988**—Pub. L. 100–532 amended section generally, in subsec. (a), substituting provisions relating to general indemnification for provisions relating to requirements for payment, adding subsec. (b), and redesignating provisions of former subsec. (b), with further amendment, as subsec. (c).

### Statutory Notes and Related Subsidiaries

## Effective Date of 1988 Amendment

   Pub. L. 100–532, title V, §501(a), Oct. 25, 1988, 102 Stat. 2674, provided that amendment made by Pub. L. 100–532 is effective 180 days after Oct. 25, 1988.

## Effective Date

   For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## Interim Payments

   Pub. L. 100–532, title V, §501(b), Oct. 25, 1988, 102 Stat. 2676, provided that:

   "(1) Source.—Any obligation of the Administrator to pay an indemnity arising under section 15 [this section], as it existed prior to the effective date of the amendment made by this section [see Effective Date of 1988 Amendment note above], shall be made from the appropriation provided under section 1304 of title 31, United States Code.

   "(2) Administrative settlement.—An administrative settlement of a claim for such indemnity may be made in accordance with the third paragraph of section 2414 of title 28, United States Code, and

shall be regarded as if it were made under that section for purposes of section 1304 of title 31, United States Code."

## §136n. Administrative procedure; judicial review

#### (a) District court review

Except as otherwise provided in this subchapter, the refusal of the Administrator to cancel or suspend a registration or to change a classification not following a hearing and other final actions of the Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States.

#### (b) Review by court of appeals

In the case of actual controversy as to the validity of any order issued by the Administrator following a public hearing, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has a place of business, within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Administrator or any officer designated by the Administrator for that purpose, and thereupon the Administrator shall file in the court the record of the proceedings on which the Administrator based the Administrator's order, as provided in section 2112 of title 28. Upon the filing of such petition the court shall have exclusive jurisdiction to affirm or set aside the order complained of in whole or in part. The court shall consider all evidence of record. The order of the Administrator shall be sustained if it is supported by substantial evidence when considered on the record as a whole. The judgment of the court affirming or setting aside, in whole or in part, any order under this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28. The commencement of proceedings under this section shall not, unless specifically ordered by the court to the contrary, operate as a stay of an order.

#### (c) Jurisdiction of district courts

The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of, this subchapter.

#### (d) Notice of judgments

The Administrator shall, by publication in such manner as the Administrator may prescribe, give notice of all judgments entered in actions instituted under the authority of this subchapter.

(June 25, 1947, ch. 125, §16, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 994; amended Pub. L. 98–620, title IV, §402(4)(C), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 100–532, title VIII, §801(i), Oct. 25, 1988, 102 Stat. 2682; Pub. L. 102–237, title X, §1006(b)(1), (2), (3)(P), Dec. 13, 1991, 105 Stat. 1895, 1896.)

### EDITORIAL NOTES

### AMENDMENTS

**1991**—Subsec. (b). Pub. L. 102–237, §1006(b)(1), (2), (3)(P), substituted "the Administrator" for "he" before "based", "the Administrator's" for "his", and "the Administrator" for "him" after "designated by".

Subsec. (d). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "may".

**1988**—Subsec. (a). Pub. L. 100–532 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "Except as is otherwise provided in this subchapter, Agency refusals to cancel or suspend registrations or change classifications not following a hearing and other final Agency actions not committed to Agency discretion by law are judicially reviewable in the district courts."

**1984**—Subsec. (b). Pub. L. 98–620 struck out provisions requiring the court to advance on the docket and expedite the disposition of all cases filed pursuant to this section.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Exhibit C-1, pg. 83 of 152

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

## EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620, set out as an Effective Date note under section 1657 of Title 28, Judiciary and Judicial Procedure.

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

# §136o. Imports and exports

**(a) Pesticides and devices intended for export**

Notwithstanding any other provision of this subchapter, no pesticide or device or active ingredient used in producing a pesticide intended solely for export to any foreign country shall be deemed in violation of this subchapter—

(1) when prepared or packed according to the specifications or directions of the foreign purchaser, except that producers of such pesticides and devices and active ingredients used in producing pesticides shall be subject to sections 136(p), 136(q)(1)(A), (C), (D), (E), (G), and (H), 136(q)(2)(A), (B), (C)(i) and (iii), and (D), 136e, and 136f of this title; and

(2) in the case of any pesticide other than a pesticide registered under section 136a or sold under section 136d(a)(1) of this title, if, prior to export, the foreign purchaser has signed a statement acknowledging that the purchaser understands that such pesticide is not registered for use in the United States and cannot be sold in the United States under this subchapter.

A copy of that statement shall be transmitted to an appropriate official of the government of the importing country.

**(b) Cancellation notices furnished to foreign governments**

Whenever a registration, or a cancellation or suspension of the registration of a pesticide becomes effective, or ceases to be effective, the Administrator shall transmit through the State Department notification thereof to the governments of other countries and to appropriate international agencies. Such notification shall, upon request, include all information related to the cancellation or suspension of the registration of the pesticide and information concerning other pesticides that are registered under section 136a of this title and that could be used in lieu of such pesticide.

**(c) Importation of pesticides and devices**

**(1) In general**

The Secretary of the Treasury shall notify the Administrator of the arrival of pesticides and devices and shall deliver to the Administrator, upon the Administrator's request, samples of pesticides or devices which are being imported into the United States, giving notice to the owner or consignee, who may appear before the Administrator and have the right to introduce testimony. If it appears from the examination of a sample that it is adulterated, or misbranded or otherwise violates the provisions set forth in this subchapter, or is otherwise injurious to health or the environment, the pesticide or device may be refused admission, and the Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any pesticide or device refused delivery which shall not be exported by the consignee within 90 days from the date of notice of such refusal under such regulations as the Secretary of the Treasury may prescribe. The Secretary of the Treasury may deliver to the consignee such pesticide or device pending examination and decision in the matter on execution of bond for the amount of the full invoice value of such pesticide or device, together with the duty thereon, and on refusal to return such pesticide or device for any cause to the custody of the Secretary of the Treasury, when demanded, for the purpose of excluding them from the country, or for any other purpose, said consignee shall forfeit the full amount of said bond. All charges for storage, cartage, and labor on pesticides or devices which are refused admission or delivery shall be paid by the owner or consignee, and in default of such payment shall constitute a lien against any future importation made by such owner or consignee.

**(2) Importation of seed**

Exhibit C-1, pg. 84 of 152

Notwithstanding any other provision of law, no person is required to notify the Administrator of the arrival of a plant-incorporated protectant (as defined in section 174.3 of title 40, Code of Federal Regulations (or any successor regulation)) that is contained in a seed, if—

(A) that plant-incorporated protectant is registered under section 136a of this title;

(B) the Administrator has issued an experimental use permit for that plant-incorporated protectant under section 136c of this title; or

(C) the seed is covered by a permit (as defined in part 340 of title 7, Code of Federal Regulations (or any successor regulation)) or a notification.

**(3) Cooperation**

**(A) In general**

In response to a request from the Administrator, the Secretary of Agriculture shall provide to the Administrator a list of seed containing plant-incorporated protectants (as defined in section 174.3 of title 40, Code of Federal Regulations (or any successor regulation)) if the importation of that seed into the United States has been approved under a permit or notification referred to in paragraph (2).

**(B) Contents**

The list under subparagraph (A) shall be provided in a form and at such intervals as may be agreed to by the Secretary and the Administrator.

**(4) Applicability**

Nothing in this subsection precludes or limits the authority of the Secretary of Agriculture with respect to the importation or movement of plants, plant products, or seeds under—

(A) the Plant Protection Act (7 U.S.C. 7701 et seq.); and

(B) the Federal Seed Act (7 U.S.C. 1551 et seq.).

**(d) Cooperation in international efforts**

**(1) In general**

The Administrator shall, in cooperation with the Department of State and any other appropriate Federal agency, participate and cooperate in any international efforts to develop improved pesticide research and regulations.

**(2) Department of State expenses**

Any expenses incurred by an employee of the Environmental Protection Agency who participates in any international technical, economic, or policy review board, committee, or other official body that is meeting in relation to an international treaty shall be paid by the Department of State.

**(e) Regulations**

The Secretary of the Treasury, in consultation with the Administrator, shall prescribe regulations for the enforcement of subsection (c) of this section.

(June 25, 1947, ch. 125, §17, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 995; amended Pub. L. 95–396, §18(a), Sept. 30, 1978, 92 Stat. 833; Pub. L. 100–532, title VIII, §801(j), Oct. 25, 1988, 102 Stat. 2682; Pub. L. 102–237, title X, §1006(a)(9), (b)(2), Dec. 13, 1991, 105 Stat. 1895; Pub. L. 110–234, title XIV, §14209(a), May 22, 2008, 122 Stat. 1463; Pub. L. 110–246, §4(a), title XIV, §14209(a), June 18, 2008, 122 Stat. 1664, 2225; Pub. L. 113–79, title X, §10008, Feb. 7, 2014, 128 Stat. 948.)

**EDITORIAL NOTES**

## REFERENCES IN TEXT

The Plant Protection Act, referred to in subsec. (c)(4)(A), is title IV of Pub. L. 106–224, June 20, 2000, 114 Stat. 438, which is classified principally to chapter 104 (§7701 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 7701 of this title and Tables.

The Federal Seed Act, referred to in subsec. (c)(4)(B), is act Aug. 9, 1939, ch. 615, 53 Stat. 1275, which is classified generally to chapter 37 (§1551 et seq.) of this title. For complete classification of this Act to the Code, see section 1551 of this title and Tables.

## CODIFICATION

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## AMENDMENTS

**2014**—Subsec. (c). Pub. L. 113–79 designated existing provisions as par. (1), inserted heading, and added pars. (2) to (4).

**2008**—Subsec. (d). Pub. L. 110–246, §14209(a), designated existing provisions as par. (1), inserted heading, and added par. (2).

**1991**—Subsec. (a). Pub. L. 102–237, §1006(a)(9), removed last sentence from par. (2) and placed it as a full measure sentence under par. (2).

Subsec. (c). Pub. L. 102–237, §1006(b)(2), substituted "the Administrator's" for "his".

**1988**—Subsec. (c). Pub. L. 100–532 substituted "prescribe. The Secretary" for "prescribe: *Provided*, That the Secretary" and "bond. All" for "bond: *And provided further*, That all".

**1978**—Subsec. (a). Pub. L. 95–396, §18(a)(1), amended subsec. (a) generally.

Subsec. (b). Pub. L. 95–396, §18(a)(2), inserted sentence at end relating to information to be included in notification.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 2008 AMENDMENT

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of this title.

## EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

## EFFECTIVE DATE OF 1978 AMENDMENT

Pub. L. 95–396, §18(b), Sept. 30, 1978, 92 Stat. 833, provided that: "The amendment made by subsection (a)(1) of this section [amending this section] shall become effective one hundred and eighty days after the date of enactment of this Act [Sept. 30, 1978]."

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

# §136p. Exemption of Federal and State agencies

The Administrator may, at the Administrator's discretion, exempt any Federal or State agency from any provision of this subchapter if the Administrator determines that emergency conditions exist which require such exemption. The Administrator, in determining whether or not such emergency conditions exist, shall consult with the Secretary of Agriculture and the Governor of any State concerned if they request such determination.

(June 25, 1947, ch. 125, §18, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 995; amended Pub. L. 94–140, §8, Nov. 28, 1975, 89 Stat. 754; Pub. L. 100–532, title VIII, §801(k), Oct. 25, 1988, 102 Stat. 2682; Pub. L. 102–237, title X, §1006(b)(1), (2), Dec. 13, 1991, 105 Stat. 1895.)

### EDITORIAL NOTES

## AMENDMENTS

**1991**—Pub. L. 102–237 substituted "the Administrator" for "he" before "determines" and "the Administrator's" for "his".

**1988**—Pub. L. 100–532 substituted "and" for "or" in section catchline, and directed that sentence beginning "The Administrator, in" be run in after first sentence beginning "The Administrator may".

**1975**—Pub. L. 94–140 inserted provision requiring Administrator to consult with Secretary of Agriculture and Governor of State concerned in determining whether an emergency situation exists.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

# §136q. Storage, disposal, transportation, and recall

**(a) Storage, disposal, and transportation**

**(1) Data requirements and registration of pesticides**

The Administrator may require under section 136a or 136d of this title that—

(A) the registrant or applicant for registration of a pesticide submit or cite data or information regarding methods for the safe storage and disposal of excess quantities of the pesticide to support the registration or continued registration of a pesticide;

(B) the labeling of a pesticide contain requirements and procedures for the transportation, storage, and disposal of the pesticide, any container of the pesticide, any rinsate containing the pesticide, or any other material used to contain or collect excess or spilled quantities of the pesticide; and

(C) the registrant of a pesticide provide evidence of sufficient financial and other resources to carry out a recall plan under subsection (b), and provide for the disposition of the pesticide, in the event of suspension and cancellation of the pesticide.

**(2) Pesticides**

The Administrator may by regulation, or as part of an order issued under section 136d of this title or an amendment to such an order—

(A) issue requirements and procedures to be followed by any person who stores or transports a pesticide the registration of which has been suspended or canceled;

(B) issue requirements and procedures to be followed by any person who disposes of stocks of a pesticide the registration of which has been suspended; and

(C) issue requirements and procedures for the disposal of any pesticide the registration of which has been canceled.

**(3) Containers, rinsates, and other materials**

The Administrator may by regulation, or as part of an order issued under section 136d of this title or an amendment to such an order—

(A) issue requirements and procedures to be followed by any person who stores or transports any container of a pesticide the registration of which has been suspended or canceled, any rinsate containing the pesticide, or any other material used to contain or collect excess or spilled quantities of the pesticide;

(B) issue requirements and procedures to be followed by any person who disposes of stocks of any container of a pesticide the registration of which has been suspended, any rinsate containing the pesticide, or any other material used to contain or collect excess or spilled quantities of the pesticide; and

(C) issue requirements and procedures for the disposal of any container of a pesticide the registration of which has been canceled, any rinsate containing the pesticide, or any other material used to contain or collect excess or spilled quantities of the pesticide.

**(4) Container recycling**

The Secretary may promulgate a regulation for the return and recycling of disposable pesticide containers used for the distribution or sale of registered pesticide products in interstate commerce. Any such regulation requiring recycling of disposable pesticide containers shall not apply to antimicrobial pesticides (as defined in section 136 of this title) or other pesticide products intended for non-agricultural uses.

**(b) Recalls**

**(1) In general**

If the registration of a pesticide has been suspended and canceled under section 136d of this title, and if the Administrator finds that recall of the pesticide is necessary to protect health or the environment, the

Administrator shall order a recall of the pesticide in accordance with this subsection.

### (2) Voluntary recall

If, after determining under paragraph (1) that a recall is necessary, the Administrator finds that voluntary recall by the registrant and others in the chain of distribution may be as safe and effective as a mandatory recall, the Administrator shall request the registrant of the pesticide to submit, within 60 days of the request, a plan for the voluntary recall of the pesticide. If such a plan is requested and submitted, the Administrator shall approve the plan and order the registrant to conduct the recall in accordance with the plan unless the Administrator determines, after an informal hearing, that the plan is inadequate to protect health or the environment.

### (3) Mandatory recall

If, after determining under paragraph (1) that a recall is necessary, the Administrator does not request the submission of a plan under paragraph (2) or finds such a plan to be inadequate, the Administrator shall issue a regulation that prescribes a plan for the recall of the pesticide. A regulation issued under this paragraph may apply to any person who is or was a registrant, distributor, or seller of the pesticide, or any successor in interest to such a person.

### (4) Recall procedure

A regulation issued under this subsection may require any person that is subject to the regulation to—

(A) arrange to make available one or more storage facilities to receive and store the pesticide to which the recall program applies, and inform the Administrator of the location of each such facility;

(B) accept and store at such a facility those existing stocks of such pesticide that are tendered by any other person who obtained the pesticide directly or indirectly from the person that is subject to such regulation;

(C) on the request of a person making such a tender, provide for proper transportation of the pesticide to a storage facility; and

(D) take such reasonable steps as the regulation may prescribe to inform persons who may be holders of the pesticide of the terms of the recall regulation and how those persons may tender the pesticide and arrange for transportation of the pesticide to a storage facility.

### (5) Contents of recall plan

A recall plan established under this subsection shall include—

(A) the level in the distribution chain to which the recall is to extend, and a schedule for recall; and

(B) the means to be used to verify the effectiveness of the recall.

### (6) Requirements or procedures

No requirement or procedure imposed in accordance with paragraph (2) of subsection (a) may require the recall of existing stocks of the pesticide except as provided by this subsection.

## (c) Storage costs

### (1) Submission of plan

A registrant who wishes to become eligible for reimbursement of storage costs incurred as a result of a recall prescribed under subsection (b) for a pesticide whose registration has been suspended and canceled shall, as soon as practicable after the suspension of the registration of the pesticide, submit to the Administrator a plan for the storage and disposal of the pesticide that meets criteria established by the Administrator by regulation.

### (2) Reimbursement

Within a reasonable period of time after such storage costs are incurred and paid by the registrant, the Administrator shall reimburse the registrant, on request, for—

(A) none of the costs incurred by the registrant before the date of submission of the plan referred to in paragraph (1) to the Administrator;

(B) 100 percent of the costs incurred by the registrant after the date of submission of the plan to the Administrator or the date of cancellation of the registration of the pesticide, whichever is later, but before the approval of the plan by the Administrator;

(C) 50 percent of the costs incurred by the registrant during the 1-year period beginning on the date of the approval of the plan by the Administrator or the date of cancellation of the registration of the pesticide, whichever is later;

(D) none of the costs incurred by the registrant during the 3-year period beginning on the 366th day following approval of the plan by the Administrator or the date of cancellation of the registration of the pesticide, whichever is later; and

about:blank          Exhibit C-1, pg. 88 of 152

(E) 25 percent of the costs incurred by the registrant during the period beginning on the first day of the 5th year following the date of the approval of the plan by the Administrator or the date of cancellation of the registration of the pesticide, whichever is later, and ending on the date that a disposal permit for the pesticide is issued by a State or an alternative plan for disposal of the pesticide in accordance with applicable law has been developed.

### (d) Administration of storage, disposal, transportation, and recall programs

#### (1) Voluntary agreements

Nothing in this section shall be construed as preventing or making unlawful any agreement between a seller and a buyer of any pesticide or other substance regarding the ultimate allocation of the costs of storage, transportation, or disposal of a pesticide.

#### (2) Rule and regulation review

Section 136w(a)(4) of this title shall not apply to any regulation issued under subsection (a)(2) or (b).

#### (3) Limitations

No registrant shall be responsible under this section for a pesticide the registration of which is held by another person. No distributor or seller shall be responsible under this section for a pesticide that the distributor or seller did not hold or sell.

#### (4) Seizure and penalties

If the Administrator finds that a person who is subject to a regulation or order under subsection (a)(2) or (b) has failed substantially to comply with that regulation or order, the Administrator may take action under section 136k or 136l of this title or obtain injunctive relief under section 136n(c) of this title against such person or any successor in interest of any such person.

### (e) Container design

#### (1) Procedures

(A) Not later than 3 years after the effective date of this subsection, the Administrator shall, in consultation with the heads of other interested Federal agencies, promulgate regulations for the design of pesticide containers that will promote the safe storage and disposal of pesticides.
(B) The regulations shall ensure, to the fullest extent practicable, that the containers—
(i) accommodate procedures used for the removal of pesticides from the containers and the rinsing of the containers;
(ii) facilitate the safe use of the containers, including elimination of splash and leakage of pesticides from the containers;
(iii) facilitate the safe disposal of the containers; and
(iv) facilitate the safe refill and reuse of the containers.

#### (2) Compliance

The Administrator shall require compliance with the regulations referred to in paragraph (1) not later than 5 years after the effective date of this subsection.

### (f) Pesticide residue removal

#### (1) Procedures

(A) Not later than 3 years after the effective date of this subsection, the Administrator shall, in consultation with the heads of other interested Federal agencies, promulgate regulations prescribing procedures and standards for the removal of pesticides from containers prior to disposal.
(B) The regulations may—
(i) specify, for each major type of pesticide container, procedures and standards providing for, at a minimum, triple rinsing or the equivalent degree of pesticide removal;
(ii) specify procedures that can be implemented promptly and easily in various circumstances and conditions;
(iii) provide for reuse, whenever practicable, or disposal of rinse water and residue; and
(iv) be coordinated with requirements for the rinsing of containers imposed under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.).

(C) The Administrator may, at the discretion of the Administrator, exempt products intended solely for household use from the requirements of this subsection.

#### (2) Compliance

Effective beginning 5 years after the effective date of this subsection, a State may not exercise primary enforcement responsibility under section 136w–1 of this title, or certify an applicator under section 136i of this title, unless the Administrator determines that the State is carrying out an adequate program to ensure compliance with this subsection.

**(3) Solid Waste Disposal Act**

Nothing in this subsection shall affect the authorities or requirements concerning pesticide containers under the Solid Waste Disposal Act (42 U.S.C. 6901).

## (g) Pesticide container study

**(1) Study**

(A) The Administrator shall conduct a study of options to encourage or require—

(i) the return, refill, and reuse of pesticide containers;

(ii) the development and use of pesticide formulations that facilitate the removal of pesticide residues from containers; and

(iii) the use of bulk storage facilities to reduce the number of pesticide containers requiring disposal.

(B) In conducting the study, the Administrator shall—

(i) consult with the heads of other interested Federal agencies, State agencies, industry groups, and environmental organizations; and

(ii) assess the feasibility, costs, and environmental benefits of encouraging or requiring various measures or actions.

**(2) Report**

Not later than 2 years after the effective date of this subsection, the Administrator shall submit to Congress a report describing the results of the study required under paragraph (1).

## (h) Relationship to Solid Waste Disposal Act

**(1) In general**

Nothing in this section shall diminish the authorities or requirements of the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.).

**(2) Antimicrobial products**

A household, industrial, or institutional antimicrobial product that is not subject to regulation under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) shall not be subject to the provisions of subsections (a), (e), and (f), unless the Administrator determines that such product must be subject to such provisions to prevent an unreasonable adverse effect on the environment.

(June 25, 1947, ch. 125, §19, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 995; amended Pub. L. 95–396, §19, Sept. 30, 1978, 92 Stat. 833; Pub. L. 100–532, title IV, §§401–403, title VIII, §801(q)(1)(D), Oct. 25, 1988, 102 Stat. 2669, 2672, 2683; Pub. L. 104–170, title II, §225, Aug. 3, 1996, 110 Stat. 1507; Pub. L. 110–234, title XIV, §14209(b), May 22, 2008, 122 Stat. 1463; Pub. L. 110–246, §4(a), title XIV, §14209(b), June 18, 2008, 122 Stat. 1664, 2225.)

### Editorial Notes

## References in Text

The effective date of this subsection, referred to in subsecs. (e), (f)(1)(A), (2), and (g)(2), is 60 days after Oct. 25, 1988, the effective date of Pub. L. 100–532. See Effective Date of 1988 Amendment note below.

The Solid Waste Disposal Act, referred to in subsecs. (f)(1)(B)(iv), (3) and (h), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, §2, Oct. 21, 1976, 90 Stat. 2795, which is classified generally to chapter 82 (§6901 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of Title 42 and Tables.

## Codification

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## AMENDMENTS

**2008**—Subsec. (a)(4). Pub. L. 110–246, §14209(b), added par. (4).

**1996**—Subsec. (h). Pub. L. 104–170 designated existing provisions as par. (1), inserted heading, and added par. (2).

**1988**—Pub. L. 100–532, §401, amended section generally, in subsec. (a) substituting provisions which related to storage, disposal, and transportation, for provisions which directed Secretary to establish procedures for disposal or storage, in subsec. (b) substituting provisions which related to recalls, for provisions which directed Administrator to provide advice to Secretary of Transportation, in subsec. (c) substituting provisions which related to storage costs, for provisions which related to disposal of unused quantities, and adding subsec. (d).

Subsec. (a)(3). Pub. L. 100–532, §402, added par. (3).

Subsecs. (e), (f). Pub. L. 100–532, §403, added subsecs. (e) and (f).

Subsec. (f)(2). Pub. L. 100–532, §801(q)(1)(D), substituted "136i" for "136b".

Subsecs. (g), (h). Pub. L. 100–532, §403, added subsecs. (g) and (h).

**1978**—Subsec. (c). Pub. L. 95–396 added subsec. (c).

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of this title.

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

# §136r. Research and monitoring

### (a) Research

The Administrator shall undertake research including research by grant or contract with other Federal agencies, universities, or others as may be necessary to carry out the purposes of this subchapter, and the Administrator shall conduct research into integrated pest management in coordination with the Secretary of Agriculture. The Administrator shall also take care to ensure that such research does not duplicate research being undertaken by any other Federal agency.

### (b) National monitoring plan

The Administrator shall formulate and periodically revise, in cooperation with other Federal, State, or local agencies, a national plan for monitoring pesticides.

### (c) Monitoring

The Administrator shall undertake such monitoring activities, including, but not limited to monitoring in air, soil, water, man, plants, and animals, as may be necessary for the implementation of this subchapter and of the national pesticide monitoring plan. The Administrator shall establish procedures for the monitoring of man and animals and their environment for incidental [1] pesticide exposure, including, but not limited to, the quantification of incidental human and environmental pesticide pollution and the secular trends thereof, and identification of the sources of contamination and their relationship to human and environmental effects. Such activities shall be carried out in cooperation with other Federal, State, and local agencies.

(June 25, 1947, ch. 125, §20, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 996; amended Pub. L. 95–396, §20, Sept. 30, 1978, 92 Stat. 834; Pub. L. 102–237, title X, §1006(a)(10), (b)(1), Dec. 13, 1991, 105 Stat. 1895.)

## AMENDMENTS

**1991**—Subsec. (a). Pub. L. 102–237 substituted "ensure" for "insure" and "the Administrator" for "he" before "shall conduct".

**1978**—Subsec. (a). Pub. L. 95–396, §20(1), substituted in first sentence "shall conduct research into integrated pest managing in coordination with the Secretary of Agriculture" for "shall give priority to research to develop biologically integrated alternatives for pest control".

Subsec. (c). Pub. L. 95–396, §20(2), inserted provision requiring establishment of monitoring procedures and the carrying out of the activities in cooperation with other Federal, State, and local agencies.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## AVAILABILITY OF GRANTS

Pub. L. 106–74, title III, Oct. 20, 1999, 113 Stat. 1081, provided in part: "That notwithstanding 7 U.S.C. 136r and 15 U.S.C. 2609, beginning in fiscal year 2000 and thereafter, grants awarded under section 20 of the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C. 136r], as amended, and section 10 of the Toxic Substances Control Act [15 U.S.C. 2609], as amended, shall be available for research, development, monitoring, public education, training, demonstrations, and studies".

[1] So in original. Probably should be "incidental".

## §136r–1. Integrated Pest Management

The Secretary of Agriculture, in cooperation with the Administrator, shall implement research, demonstration, and education programs to support adoption of Integrated Pest Management. Integrated Pest Management is a sustainable approach to managing pests by combining biological, cultural, physical, and chemical tools in a way that minimizes economic, health, and environmental risks. The Secretary of Agriculture and the Administrator shall make information on Integrated Pest Management widely available to pesticide users, including Federal agencies. Federal agencies shall use Integrated Pest Management techniques in carrying out pest management activities and shall promote Integrated Pest Management through procurement and regulatory policies, and other activities.

(Pub. L. 104–170, title III, §303, Aug. 3, 1996, 110 Stat. 1512.)

### EDITORIAL NOTES

## CODIFICATION

Section was enacted as part of the Food Quality Protection Act of 1996, and not as part of the Federal Insecticide, Fungicide, and Rodenticide Act which comprises this subchapter.

## §136s. Solicitation of comments; notice of public hearings

### (a) Secretary of Agriculture

The Administrator, before publishing regulations under this subchapter, shall solicit the views of the Secretary of Agriculture in accordance with the procedure described in section 136w(a) of this title.

### (b) Secretary of Health and Human Services

The Administrator, before publishing regulations under this subchapter for any public health pesticide, shall solicit the views of the Secretary of Health and Human Services in the same manner as the views of the

Secretary of Agriculture are solicited under section 136w(a)(2) of this title.

**(c) Views**

In addition to any other authority relating to public hearings and solicitation of views, in connection with the suspension or cancellation of a pesticide registration or any other actions authorized under this subchapter, the Administrator may, at the Administrator's discretion, solicit the views of all interested persons, either orally or in writing, and seek such advice from scientists, farmers, farm organizations, and other qualified persons as the Administrator deems proper.

**(d) Notice**

In connection with all public hearings under this subchapter the Administrator shall publish timely notice of such hearings in the Federal Register.

(June 25, 1947, ch. 125, §21, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 996; amended Pub. L. 94–140, §2(b), Nov. 28, 1975, 89 Stat. 752; Pub. L. 100–532, title VIII, §801(l), Oct. 25, 1988, 102 Stat. 2682; Pub. L. 102–237, title X, §1006(b)(1), (2), Dec. 13, 1991, 105 Stat. 1895; Pub. L. 104–170, title II, §234, Aug. 3, 1996, 110 Stat. 1509.)

#### EDITORIAL NOTES

### AMENDMENTS

**1996**—Subsecs. (b) to (d). Pub. L. 104–170 added subsec. (b) and redesignated former subsecs. (b) and (c) as (c) and (d), respectively.

**1991**—Subsec. (b). Pub. L. 102–237 substituted "the Administrator" for "he" before "deems" and "the Administrator's" for "his".

**1988**—Pub. L. 100–532, §801(l), inserted headings for subsecs. (a) to (c).

**1975**—Subsec. (a). Pub. L. 94–140 inserted "in accordance with the procedure described in section 136w(a) of this title" after "Secretary of Agriculture".

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136t. Delegation and cooperation

**(a) Delegation**

All authority vested in the Administrator by virtue of the provisions of this subchapter may with like force and effect be executed by such employees of the Environmental Protection Agency as the Administrator may designate for the purpose.

**(b) Cooperation**

The Administrator shall cooperate with Department of Agriculture, any other Federal agency, and any appropriate agency of any State or any political subdivision thereof, in carrying out the provisions of this subchapter, and in securing uniformity of regulations.

(June 25, 1947, ch. 125, §22, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 996.)

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136u. State cooperation, aid, and training

**(a) Cooperative agreements**

The Administrator may enter into cooperative agreements with States and Indian tribes—

(1) to delegate to any State or Indian tribe the authority to cooperate in the enforcement of this subchapter through the use of its personnel or facilities, to train personnel of the State or Indian tribe to cooperate in the enforcement of this subchapter, and to assist States and Indian tribes in implementing cooperative enforcement programs through grants-in-aid; and

(2) to assist States in developing and administering State programs, and Indian tribes that enter into cooperative agreements, to train and certify applicators consistent with the standards the Administrator prescribes.

Effective with the fiscal year beginning October 1, 1978, there are authorized to be appropriated annually such funds as may be necessary for the Administrator to provide through cooperative agreements an amount equal to 50 percent of the anticipated cost to each State or Indian tribe, as agreed to under such cooperative agreements, of conducting training and certification programs during such fiscal year. If funds sufficient to pay 50 percent of the costs for any year are not appropriated, the share of each State and Indian tribe shall be reduced in a like proportion in allocating available funds.

**(b) Contracts for training**

In addition, the Administrator may enter into contracts with Federal, State, or Indian tribal agencies for the purpose of encouraging the training of certified applicators.

**(c) Information and education**

The Administrator shall, in cooperation with the Secretary of Agriculture, use the services of the cooperative State extension services to inform and educate pesticide users about accepted uses and other regulations made under this subchapter.

(June 25, 1947, ch. 125, §23, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 996; amended Pub. L. 95–396, §21, Sept. 30, 1978, 92 Stat. 834.)

### Editorial Notes

### Amendments

**1978**—Subsec. (a). Pub. L. 95–396 extended provisions to Indian tribes, authorized annual appropriation of funds for training and certification programs, and required proportionate reduction of shares in the allocation of available funds when appropriations do not cover 50 percent of the annual costs.

Subsec. (b). Pub. L. 95–396 authorized contracts with Indian tribal agencies.

Subsec. (c). Pub. L. 95–396 substituted "shall" for "may", substituted "use" for "utilize", and "to inform and educate pesticide users about accepted uses and other regulations" for "for informing farmers of accepted uses and other regulations".

### Statutory Notes and Related Subsidiaries

### Effective Date

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

### Availability of Grants for Pesticide Program Development and Implementation

Pub. L. 105–276, title III, Oct. 21, 1998, 112 Stat. 2499, provided in part: "That beginning in fiscal year 1999 and thereafter, pesticide program implementation grants under section 23(a)(1) of the Federal Insecticide, Fungicide and Rodenticide Act, as amended [7 U.S.C. 136u(a)(1)], shall be available for pesticide program development and implementation, including enforcement and compliance activities".

## §136v. Authority of States

**(a) In general**

   A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

**(b) Uniformity**

   Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

**(c) Additional uses**

   (1) A State may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs in accord with the purposes of this subchapter and if registration for such use has not previously been denied, disapproved, or canceled by the Administrator. Such registration shall be deemed registration under section 136a of this title for all purposes of this subchapter, but shall authorize distribution and use only within such State.

   (2) A registration issued by a State under this subsection shall not be effective for more than ninety days if disapproved by the Administrator within that period. Prior to disapproval, the Administrator shall, except as provided in paragraph (3) of this subsection, advise the State of the Administrator's intention to disapprove and the reasons therefor, and provide the State time to respond. The Administrator shall not prohibit or disapprove a registration issued by a State under this subsection (A) on the basis of lack of essentiality of a pesticide or (B) except as provided in paragraph (3) of this subsection, if its composition and use patterns are similar to those of a federally registered pesticide.

   (3) In no instance may a State issue a registration for a food or feed use unless there exists a tolerance or exemption under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.] that permits the residues of the pesticides on the food or feed. If the Administrator determines that a registration issued by a State is inconsistent with the Federal Food, Drug, and Cosmetic Act, or the use of, a pesticide under a registration issued by a State constitutes an imminent hazard, the Administrator may immediately disapprove the registration.

   (4) If the Administrator finds, in accordance with standards set forth in regulations issued under section 136w of this title, that a State is not capable of exercising adequate controls to assure that State registration under this section will be in accord with the purposes of this subchapter or has failed to exercise adequate controls, the Administrator may suspend the authority of the State to register pesticides until such time as the Administrator is satisfied that the State can and will exercise adequate controls. Prior to any such suspension, the Administrator shall advise the State of the Administrator's intention to suspend and the reasons therefor and provide the State time to respond.

(June 25, 1947, ch. 125, §24, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 997; amended Pub. L. 95–396, §22, Sept. 30, 1978, 92 Stat. 835; Pub. L. 100–532, title VIII, §801(m), Oct. 25, 1988, 102 Stat. 2682.)

### EDITORIAL NOTES

## REFERENCES IN TEXT

   The Federal Food, Drug, and Cosmetic Act, referred to in subsec. (c)(3), is act June 25, 1938, ch. 675, 52 Stat. 1040, which is classified generally to chapter 9 (§301 et seq.) of Title 21, Food and Drugs. For complete classification of this Act to the Code, see section 301 of Title 21 and Tables.

## AMENDMENTS

   **1988**—Pub. L. 100–532, §801(m), inserted headings for subsecs. (a) to (c) and realigned margins of pars. (1) to (4) of subsec. (c).

   **1978**—Subsec. (a). Pub. L. 95–396 inserted "federally registered" before "pesticide or device".

   Subsec. (b). Pub. L. 95–396 substituted "labeling or packaging" and "required under" for "labeling and packaging" and "required pursuant to", respectively.

   Subsec. (c)(1). Pub. L. 95–396 incorporated existing text in provisions designated par. (1) and substituted "registration for additional uses of federally registered pesticides" for "registration for pesticides".

   Subsec. (c)(2). Pub. L. 95–396 incorporated existing text in provisions designated par. (2), conditioned disapproval of registration on communication of intention to disapprove and reasons

for disapproval and provision for time to respond, and restricted authority of Administrator to prohibit or disapprove a State registration.

Subsec. (c)(3). Pub. L. 95–396 added par. (3).

Subsec. (c)(4). Pub. L. 95–396 incorporated existing text in provisions designated par. (4) and authorized suspension of registration authority of the State based on findings of inability or failure to exercise adequate controls following an indication of intention to suspend and reasons for the suspension and provision for time to respond.

STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## §136w. Authority of Administrator

**(a) In general**

**(1) Regulations**

The Administrator is authorized, in accordance with the procedure described in paragraph (2), to prescribe regulations to carry out the provisions of this subchapter. Such regulations shall take into account the difference in concept and usage between various classes of pesticides, including public health pesticides, and differences in environmental risk and the appropriate data for evaluating such risk between agricultural, nonagricultural, and public health pesticides.

**(2) Procedure**

**(A) Proposed regulations**

At least 60 days prior to signing any proposed regulation for publication in the Federal Register, the Administrator shall provide the Secretary of Agriculture with a copy of such regulation. If the Secretary comments in writing to the Administrator regarding any such regulation within 30 days after receiving it, the Administrator shall publish in the Federal Register (with the proposed regulation) the comments of the Secretary and the response of the Administrator with regard to the Secretary's comments. If the Secretary does not comment in writing to the Administrator regarding the regulation within 30 days after receiving it, the Administrator may sign such regulation for publication in the Federal Register any time after such 30-day period notwithstanding the foregoing 60-day time requirement.

**(B) Final regulations**

At least 30 days prior to signing any regulation in final form for publication in the Federal Register, the Administrator shall provide the Secretary of Agriculture with a copy of such regulation. If the Secretary comments in writing to the Administrator regarding any such final regulation within 15 days after receiving it, the Administrator shall publish in the Federal Register (with the final regulation) the comments of the Secretary, if requested by the Secretary, and the response of the Administrator concerning the Secretary's comments. If the Secretary does not comment in writing to the Administrator regarding the regulation within 15 days after receiving it, the Administrator may sign such regulation for publication in the Federal Register at any time after such 15-day period notwithstanding the foregoing 30-day time requirement. In taking any final action under this subsection, the Administrator shall include among those factors to be taken into account the effect of the regulation on production and prices of agricultural commodities, retail food prices, and otherwise on the agricultural economy, and the Administrator shall publish in the Federal Register an analysis of such effect.

**(C) Time requirements**

The time requirements imposed by subparagraphs (A) and (B) may be waived or modified to the extent agreed upon by the Administrator and the Secretary.

**(D) Publication in the Federal Register**

The Administrator shall, simultaneously with any notification to the Secretary of Agriculture under this paragraph prior to the issuance of any proposed or final regulation, publish such notification in the Federal Register.

### (3) Congressional committees

At such time as the Administrator is required under paragraph (2) of this subsection to provide the Secretary of Agriculture with a copy of proposed regulations and a copy of the final form of regulations, the Administrator shall also furnish a copy of such regulations to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate.

### (4) Congressional review of regulations

Simultaneously with the promulgation of any rule or regulation under this subchapter, the Administrator shall transmit a copy thereof to the Secretary of the Senate and the Clerk of the House of Representatives. The rule or regulation shall not become effective until the passage of 60 calendar days after the rule or regulation is so transmitted.

## (b) Exemption of pesticides

The Administrator may exempt from the requirements of this subchapter by regulation any pesticide which the Administrator determines either (1) to be adequately regulated by another Federal agency, or (2) to be of a character which is unnecessary to be subject to this subchapter in order to carry out the purposes of this subchapter.

## (c) Other authority

The Administrator, after notice and opportunity for hearing, is authorized—

(1) to declare a pest any form of plant or animal life (other than man and other than bacteria, virus, and other micro-organisms on or in living man or other living animals) which is injurious to health or the environment;

(2) to determine any pesticide which contains any substance or substances in quantities highly toxic to man;

(3) to establish standards (which shall be consistent with those established under the authority of the Poison Prevention Packaging Act (Public Law 91–601) [15 U.S.C. 1471 et seq.]) with respect to the package, container, or wrapping in which a pesticide or device is enclosed for use or consumption, in order to protect children and adults from serious injury or illness resulting from accidental ingestion or contact with pesticides or devices regulated by this subchapter as well as to accomplish the other purposes of this subchapter;

(4) to specify those classes of devices which shall be subject to any provision of section 136(q)(1) or section 136e of this title upon the Administrator's determination that application of such provision is necessary to effectuate the purposes of this subchapter;

(5) to prescribe regulations requiring any pesticide to be colored or discolored if the Administrator determines that such requirement is feasible and is necessary for the protection of health and the environment; and

(6) to determine and establish suitable names to be used in the ingredient statement.

## (d) Scientific advisory panel

### (1) In general

The Administrator shall submit to an advisory panel for comment as to the impact on health and the environment of the action proposed in notices of intent issued under section 136d(b) of this title and of the proposed and final form of regulations issued under subsection (a) within the same time periods as provided for the comments of the Secretary of Agriculture under such section 136d(b) and subsection (a) of this section. The time requirements for notices of intent and proposed and final forms of regulation may not be modified or waived unless in addition to meeting the requirements of section 136d(b) of this title or subsection (a) of this section, as applicable, the advisory panel has failed to comment on the proposed action within the prescribed time period or has agreed to the modification or waiver. The Administrator shall also solicit from the advisory panel comments, evaluations, and recommendations for operating guidelines to improve the effectiveness and quality of scientific analyses made by personnel of the Environmental Protection Agency that lead to decisions by the Administrator in carrying out the provisions of this subchapter. The comments, evaluations, and recommendations of the advisory panel submitted under this subsection and the response of the Administrator shall be published in the Federal Register in the same manner as provided for publication of the comments of the Secretary of Agriculture under such sections. The chairman of the advisory panel, after consultation with the Administrator, may create temporary subpanels on specific projects to assist the full advisory panel in expediting and preparing its evaluations, comments, and recommendations. The subpanels may be composed of scientists other than members of the advisory panel, as deemed necessary for the purpose of evaluating scientific studies relied upon by the Administrator with respect to proposed

action. Such additional scientists shall be selected by the advisory panel. The panel referred to in this subsection shall consist of 7 members appointed by the Administrator from a list of 12 nominees, 6 nominated by the National Institutes of Health and 6 by the National Science Foundation, utilizing a system of staggered terms of appointment. Members of the panel shall be selected on the basis of their professional qualifications to assess the effects of the impact of pesticides on health and the environment. To the extent feasible to insure multidisciplinary representation, the panel membership shall include representation from the disciplines of toxicology, pathology, environmental biology, and related sciences. If a vacancy occurs on the panel due to expiration of a term, resignation, or any other reason, each replacement shall be selected by the Administrator from a group of 4 nominees, 2 submitted by each of the nominating entities named in this subsection. The Administrator may extend the term of a panel member until the new member is appointed to fill the vacancy. If a vacancy occurs due to resignation, or reason other than expiration of a term, the Administrator shall appoint a member to serve during the unexpired term utilizing the nomination process set forth in this subsection. Should the list of nominees provided under this subsection be unsatisfactory, the Administrator may request an additional set of nominees from the nominating entities. The Administrator may require such information from the nominees to the advisory panel as the Administrator deems necessary, and the Administrator shall publish in the Federal Register the name, address, and professional affiliations of each nominee. Each member of the panel shall receive per diem compensation at a rate not in excess of that fixed for GS–18 of the General Schedule as may be determined by the Administrator, except that any such member who holds another office or position under the Federal Government the compensation for which exceeds such rate may elect to receive compensation at the rate provided for such other office or position in lieu of the compensation provided by this subsection. In order to assure the objectivity of the advisory panel, the Administrator shall promulgate regulations regarding conflicts of interest with respect to the members of the panel. The advisory panel established under this section shall be permanent. In performing the functions assigned by this subchapter, the panel shall consult and coordinate its activities with the Science Advisory Board established under the Environmental Research, Development, and Demonstration Authorization Act of 1978 [42 U.S.C. 4365]. Whenever the Administrator exercises authority under section 136d(c) of this title to immediately suspend the registration of any pesticide to prevent an imminent hazard, the Administrator shall promptly submit to the advisory panel for comment, as to the impact on health and the environment, the action taken to suspend the registration of such pesticide.

**(2) Science Review Board**

There is established a Science Review Board to consist of 60 scientists who shall be available to the Scientific Advisory Panel to assist in reviews conducted by the Panel. Members of the Board shall be selected in the same manner as members of temporary subpanels created under paragraph (1). Members of the Board shall be compensated in the same manner as members of the Panel.

**(e) Peer review**

The Administrator shall, by written procedures, provide for peer review with respect to the design, protocols, and conduct of major scientific studies conducted under this subchapter by the Environmental Protection Agency or by any other Federal agency, any State or political subdivision thereof, or any institution or individual under grant, contract, or cooperative agreement from or with the Environmental Protection Agency. In such procedures, the Administrator shall also provide for peer review, using the advisory panel established under subsection (d) of this section or appropriate experts appointed by the Administrator from a current list of nominees maintained by such panel, with respect to the results of any such scientific studies relied upon by the Administrator with respect to actions the Administrator may take relating to the change in classification, suspension, or cancellation of a pesticide. Whenever the Administrator determines that circumstances do not permit the peer review of the results of any such scientific study prior to the Administrator's exercising authority under section 136d(c) of this title to immediately suspend the registration of any pesticide to prevent an imminent hazard, the Administrator shall promptly thereafter provide for the conduct of peer review as provided in this sentence. The evaluations and relevant documentation constituting the peer review that relate to the proposed scientific studies and the results of the completed scientific studies shall be included in the submission for comment forwarded by the Administrator to the advisory panel as provided in subsection (d). As used in this subsection, the term "peer review" shall mean an independent evaluation by scientific experts, either within or outside the Environmental Protection Agency, in the appropriate disciplines.

(June 25, 1947, ch. 125, §25, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 997; amended Pub. L. 94–140, §§2(a), 6, 7, Nov. 28, 1975, 89 Stat. 751, 753; Pub. L. 95–396, §23, Sept. 30, 1978, 92 Stat. 836; Pub. L. 96–539, §§1, 2(a), 4, Dec. 17, 1980, 94 Stat. 3194, 3195; Pub. L. 98–201, §1, Dec. 2, 1983, 97 Stat. 1379; Pub. L. 98–620, title IV, §402(4)(D), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 100–352, §6(i), June 27, 1988, 102 Stat. 664; Pub. L. 100–532, title VI, §§602, 605, title VIII, §801(n), Oct. 25, 1988, 102 Stat. 2678, 2679, 2683; Pub. L. 102–237, title X, §1006(b)(1), (2), Dec. 13, 1991, 105 Stat. 1895; Pub. L. 104–170, title I, §104, title II, §235, Aug. 3, 1996, 110 Stat. 1490, 1509.)

EDITORIAL NOTES

## REFERENCES IN TEXT

The Poison Prevention Packaging Act, referred to in subsec. (c)(3), probably means the Poison Prevention Packaging Act of 1970, Pub. L. 91–601, Dec. 30, 1970, 84 Stat. 1670, which is classified principally to chapter 39A (§1471 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1471 of Title 15, and Tables.

References in subsec. (c)(4) to "section 136(q)(1)" was, in the original, a reference to "paragraph 2(q)(1)" and has been editorially translated as "section 136(q)(1)" as the probable intent of Congress.

The Environmental Research, Development, and Demonstration Authorization Act of 1978, referred to in subsec. (d), is Pub. L. 95–155, Nov. 8, 1977, 91 Stat. 1257. Provisions of the Act establishing the Science Advisory Board are classified to section 4365 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Tables.

## AMENDMENTS

**1996**—Subsec. (a)(1). Pub. L. 104–170, §235, inserted ", including public health pesticides," after "various classes of pesticides" and substituted ", nonagricultural, and public health pesticides" for "and nonagricultural pesticides".

Subsec. (d). Pub. L. 104–170, §104, designated existing text as par. (1), inserted heading, and added par. (2).

**1991**—Subsec. (a)(3). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "shall".

Subsec. (b). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "determines".

Subsec. (c)(4). Pub. L. 102–237, §1006(b)(2), substituted "the Administrator's" for "his".

Subsec. (c)(5). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "determines".

Subsec. (d). Pub. L. 102–237, §1006(b)(1), substituted "the Administrator" for "he" before "deems necessary" and before "shall publish".

**1988**—Subsec. (a). Pub. L. 100–532, §801(n)(1), amended heading and directed that pars. (1) to (3) be aligned at left margin with subsec. (c)(1), and that subpars. (A) to (D) of par. (2) be indented, and in par. (3) substituted "Committee on Agriculture, Nutrition, and Forestry" for "Committee on Agriculture and Forestry".

Subsec. (a)(4). Pub. L. 100–532, §605, amended par. (4) generally, substituting single unlettered par. (4) for former subpars. (A) to (E).

Pub. L. 100–352, in subpar. (E), struck out "(i)" before "Any interested" and struck out cl. (ii) which provided that notwithstanding any other provision of law, any decision on a matter certified under cl. (i) of this subparagraph be reviewable by appeal directly to the Supreme Court of the United States, with such appeal to be brought not later than 20 days after the decision of the court of appeals.

Subsec. (d). Pub. L. 100–532, §602, substituted "section shall be permanent" for "subsection shall terminate September 30, 1987".

Subsec. (e). Pub. L. 100–532, §801(n)(2), substituted "pesticide. Whenever" for "pesticide: *Provided*, That whenever".

**1984**—Subsec. (a)(4)(E)(iii). Pub. L. 98–620 struck out cl. (iii) requiring the court of appeals and the Supreme Court to advance on the docket and expedite the disposition of any matter certified under cl. (i) of this subparagraph.

**1983**—Subsec. (d). Pub. L. 98–201 in fourth sentence, inserted "under this subsection" after "submitted"; in eighth sentence, provided for utilization of a system of staggered terms of appointment and substituted "7" and "6" for "seven" and "six", respectively, and inserted ninth through fourteenth sentences respecting basis for selection of members, multidisciplinary representation, appointments to fill vacancies, extension of term pending filling of vacancies, appointment for unexpired term, and request for additional set of nominees from nominating

PageID #: 100    Exhibit C-1, pg. 99 of 152

entities; and in present eighteenth, formerly twelfth sentence, extended termination date to Sept. 30, 1987, from Sept. 30, 1981.

**1980**—Subsec. (a)(4). Pub. L. 96–539, §4, added par. (4).

Subsec. (d). Pub. L. 96–539, §1, inserted provisions relating to composition of subpanels and submissions to advisory panels respecting registration suspensions.

Subsec. (e). Pub. L. 96–539, §2(a), added subsec. (e).

**1978**—Subsec. (a)(1). Pub. L. 95–396, §23(1), required regulations to take into account differences in environmental risk and appropriate data for evaluating such risk between agricultural and nonagricultural pesticides.

Subsec. (a)(2)(B). Pub. L. 95–396, §23(2), required the Administrator, before taking any final action, to consider certain factors bearing on the agricultural economy and to publish an analysis of the effect in the Federal Register.

Subsec. (d). Pub. L. 95–396, §23(3), (4), required the Administrator to solicit operating guidelines from the scientific advisory panel to improve scientific analyses made by personnel of the Environmental Protection Agency that lead to decisions by the Administrator in carrying out this subchapter; extended requirement of publication in the Federal Register to evaluations and recommendations of the advisory panel; authorized creation of temporary subpanels on specific projects to assist in accelerating the work of the advisory panel; set forth Sept. 30, 1981, as the termination date of the advisory panel; and required the panel to consult and coordinate its activities with the Science Advisory Board established under section 4365 of title 42.

**1975**—Subsec. (a)(1). Pub. L. 94–140, §2(a)(1), (2), redesignated existing provision as subsec. (a)(1) and inserted ", in accordance with the procedure described in paragraph (2)," after "is authorized".

Subsec. (a)(2). Pub. L. 94–140, §2(a)(3), added par. (2).

Subsec. (a)(3). Pub. L. 94–140, §6, added par. (3).

Subsec. (d). Pub. L. 94–140, §7, added subsec. (d).

STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

Amendment by Pub. L. 100–352 effective ninety days after June 27, 1988, except that such amendment not to apply to cases pending in Supreme Court on such effective date or affect right to review or manner of reviewing judgment or decree of court which was entered before such effective date, see section 7 of Pub. L. 100–352, set out as a note under section 1254 of Title 28, Judiciary and Judicial Procedure.

## EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620, set out as an Effective Date note under section 1657 of Title 28, Judiciary and Judicial Procedure.

## EFFECTIVE DATE OF 1980 AMENDMENT

Pub. L. 96–539, §2(b), Dec. 17, 1980, 94 Stat. 3195, provided that: "The provisions of this section [amending this section] shall become effective upon publication in the Federal Register of final procedures for peer review as provided in this section, but in no event shall such provisions become effective later than one year after the date of enactment of this Act [Dec. 17, 1980]."

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

## REFERENCES IN OTHER LAWS TO GS–16, 17, OR 18 PAY RATES

References in laws to the rates of pay for GS–16, 17, or 18, or to maximum rates of pay under the General Schedule, to be considered references to rates payable under specified sections of

Title 5, Government Organization and Employees, see section 529 [title I, §101(c)(1)] of Pub. L. 101–509, set out in a note under section 5376 of Title 5.

## INFORMATION

Pub. L. 117–328, div. HH, title VI, §707, Dec. 29, 2022, 136 Stat. 6082, provided that: "Not later than 180 days after the date of enactment of this title [Dec. 29, 2022], the Administrator of the Environmental Protection Agency shall post on a single webpage of the website of the Environmental Protection Agency aggregated information on pesticide regulation under the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136 et seq.), including—

"(1) all guidance relating to risk assessment, risk mitigation, benefits assessments, and cost-benefit balancing;

"(2) hyperlinks to resources, including the Department of Agriculture's 'national list of allowed and prohibited substances' for organic crop and livestock production;

"(3) biopesticides and pesticides exempt pursuant to section 25(b) of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136w(b)); and

"(4) integrated pest management principles developed under section 28(c) of such Act (7 U.S.C. 136w–3(c)), including technical assistance for implementation of those principles."

## AGRICULTURAL WORKER PROTECTION STANDARD; CERTIFICATION OF PESTICIDE APPLICATORS

Pub. L. 116–8, §7(a), (b), Mar. 8, 2019, 133 Stat. 578, provided that:

"(a) IN GENERAL.—Except as provided in subsection (b), during the period beginning on the date of enactment of this Act [Mar. 8, 2019] and ending not earlier than October 1, 2021, the Administrator of the Environmental Protection Agency (referred to in this section as the 'Administrator')—

"(1) shall carry out—

"(A) the final rule of the Administrator entitled 'Pesticides; Agricultural Worker Protection Standard Revisions' (80 Fed. Reg. 67496 (November 2, 2015)); and

"(B) the final rule of the Administrator entitled 'Pesticides; Certification of Pesticide Applicators' (82 Fed. Reg. 952 (January 4, 2017)); and

"(2) shall not revise or develop revisions to the rules described in subparagraphs (A) and (B) of paragraph (1).

"(b) EXCEPTIONS.—Prior to October 1, 2021, the Administrator may propose, and after a notice and public comment period of not less than 90 days, promulgate revisions to the final rule described in subsection (a)(1)(A) addressing application exclusion zones under part 170 of title 40, Code of Federal Regulations, consistent with the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136 et seq.)."

## USER FEES

Pub. L. 101–508, title I, §1204(e), Nov. 5, 1990, 104 Stat. 1388–11, provided that: "Notwithstanding any provision of the Omnibus Budget Reconciliation Act of 1990 [Pub. L. 101–508, see Tables for classification], nothing in this title or the other provisions of this Act shall be construed to require or authorize the Administrator of the Environmental Protection Agency to assess or collect any fees or charges for services and activities authorized under the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136 et seq.)."

## §136w–1. State primary enforcement responsibility

### (a) In general

For the purposes of this subchapter, a State shall have primary enforcement responsibility for pesticide use violations during any period for which the Administrator determines that such State—

(1) has adopted adequate pesticide use laws and regulations, except that the Administrator may not require a State to have pesticide use laws that are more stringent than this subchapter;

(2) has adopted and is implementing adequate procedures for the enforcement of such State laws and regulations; and

about:blank     Exhibit C-1, pg. 101 of 152

(3) will keep such records and make such reports showing compliance with paragraphs (1) and (2) of this subsection as the Administrator may require by regulation.

**(b) Special rules**

Notwithstanding the provisions of subsection (a) of this section, any State that enters into a cooperative agreement with the Administrator under section 136u of this title for the enforcement of pesticide use restrictions shall have the primary enforcement responsibility for pesticide use violations. Any State that has a plan approved by the Administrator in accordance with the requirements of section 136i of this title that the Administrator determines meets the criteria set out in subsection (a) of this section shall have the primary enforcement responsibility for pesticide use violations. The Administrator shall make such determinations with respect to State plans under section 136i of this title in effect on September 30, 1978, not later than six months after that date.

**(c) Administrator**

The Administrator shall have primary enforcement responsibility for those States that do not have primary enforcement responsibility under this subchapter. Notwithstanding the provisions of section 136(e)(1) of this title, during any period when the Administrator has such enforcement responsibility, section 136f(b) of this title shall apply to the books and records of commercial applicators and to any applicator who holds or applies pesticides, or uses dilutions of pesticides, only to provide a service of controlling pests without delivering any unapplied pesticide to any person so served, and section 136g(a) of this title shall apply to the establishment or other place where pesticides or devices are held for application by such persons with respect to pesticides or devices held for such application.

(June 25, 1947, ch. 125, §26, as added Pub. L. 95–396, §24(2), Sept. 30, 1978, 92 Stat. 836; amended Pub. L. 100–532, title VIII, §801(o), (q)(1)(D), Oct. 25, 1988, 102 Stat. 2683; Pub. L. 102–237, title X, §1006(a)(11), Dec. 13, 1991, 105 Stat. 1895.)

**EDITORIAL NOTES**

## PRIOR PROVISIONS

A prior section 26 of act June 25, 1947, ch. 125, was renumbered section 34 and is classified to section 136x of this title.

## AMENDMENTS

**1991**—Subsec. (c). Pub. L. 102–237 substituted "uses" for "use".

**1988**—Subsec. (a). Pub. L. 100–532, §801(o)(1), (2), inserted heading and substituted "regulations. The Administrator" for "regulations; *Provided*, That the Administrator" in par. (1).

Subsec. (b). Pub. L. 100–532, §801(o)(3), (q)(1)(D), inserted heading and substituted "136i" for "136b" in two places.

Subsec. (c). Pub. L. 100–532, §801(o)(4), inserted heading.

**STATUTORY NOTES AND RELATED SUBSIDIARIES**

## EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

## §136w–2. Failure by the State to assure enforcement of State pesticide use regulations

**(a) Referral**

Upon receipt of any complaint or other information alleging or indicating a significant violation of the pesticide use provisions of this subchapter, the Administrator shall refer the matter to the appropriate State officials for their investigation of the matter consistent with the requirements of this subchapter. If, within thirty days, the State has not commenced appropriate enforcement action, the Administrator may act upon the complaint or information to the extent authorized under this subchapter.

**(b) Notice**

Whenever the Administrator determines that a State having primary enforcement responsibility for pesticide use violations is not carrying out (or cannot carry out due to the lack of adequate legal authority) such responsibility, the Administrator shall notify the State. Such notice shall specify those aspects of the administration of the State program that are determined to be inadequate. The State shall have ninety days after receipt of the notice to correct any deficiencies. If after that time the Administrator determines that the State program remains inadequate, the Administrator may rescind, in whole or in part, the State's primary enforcement responsibility for pesticide use violations.

**(c) Construction**

Neither section 136w–1 of this title nor this section shall limit the authority of the Administrator to enforce this subchapter, where the Administrator determines that emergency conditions exist that require immediate action on the part of the Administrator and the State authority is unwilling or unable adequately to respond to the emergency.

(June 25, 1947, ch. 125, §27, as added Pub. L. 95–396, §24(2), Sept. 30, 1978, 92 Stat. 837; amended Pub. L. 100–532, title VIII, §801(p), Oct. 25, 1988, 102 Stat. 2683.)

EDITORIAL NOTES

PRIOR PROVISIONS

A prior section 27 of act June 25, 1947, ch. 125, was renumbered section 35 and is classified to section 136y of this title.

AMENDMENTS

**1988**—Pub. L. 100–532 inserted headings for subsecs. (a) to (c).

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–532 effective on expiration of 60 days after Oct. 25, 1988, see section 901 of Pub. L. 100–532, set out as a note under section 136 of this title.

## §136w–3. Identification of pests; cooperation with Department of Agriculture's program

**(a) In general**

The Administrator, in coordination with the Secretary of Agriculture, shall identify those pests that must be brought under control. The Administrator shall also coordinate and cooperate with the Secretary of Agriculture's research and implementation programs to develop and improve the safe use and effectiveness of chemical, biological, and alternative methods to combat and control pests that reduce the quality and economical production and distribution of agricultural products to domestic and foreign consumers.

**(b) Pest control availability**

**(1) In general**

The Administrator, in cooperation with the Secretary of Agriculture, shall identify—
(A) available methods of pest control by crop or animal;
(B) minor pest control problems, both in minor crops and minor or localized problems in major crops; and
(C) factors limiting the availability of specific pest control methods, such as resistance to control methods and regulatory actions limiting the availability of control methods.

**(2) Report**

The Secretary of Agriculture shall, not later than 180 days after November 28, 1990, and annually thereafter, prepare a report and send the report to the Administrator. The report shall—
(A) contain the information described in paragraph (1);
(B) identify the crucial pest control needs where a shortage of control methods is indicated by the information described in paragraph (1); and
(C) describe in detail research and extension efforts designed to address the needs identified in subparagraph (B).

**(c) Integrated pest management**

 The Administrator, in cooperation with the Secretary of Agriculture, shall develop approaches to the control of pests based on integrated pest management that respond to the needs of producers, with a special emphasis on minor pests.

**(d) Public health pests**

 The Administrator, in coordination with the Secretary of Agriculture and the Secretary of Health and Human Services, shall identify pests of significant public health importance and, in coordination with the Public Health Service, develop and implement programs to improve and facilitate the safe and necessary use of chemical, biological, and other methods to combat and control such pests of public health importance.

(June 25, 1947, ch. 125, §28, as added Pub. L. 95–396, §24(2), Sept. 30, 1978, 92 Stat. 838; amended Pub. L. 101–624, title XIV, §1495, Nov. 28, 1990, 104 Stat. 3629; Pub. L. 104–127, title VIII, §862(b)(1), Apr. 4, 1996, 110 Stat. 1174; Pub. L. 104–170, title II, §236, Aug. 3, 1996, 110 Stat. 1509.)

### Editorial Notes

### Amendments

 **1996**—Subsec. (b)(2)(A). Pub. L. 104–127 struck out "and the information required by section 5882 of this title" after "paragraph (1)".

 Subsec. (d). Pub. L. 104–170 added subsec. (d).

 **1990**—Pub. L. 101–624 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).


# §136w–4. Omitted

### Editorial Notes

### Codification

 Section, act June 25, 1947, ch. 125, §29, as added Pub. L. 95–396, §24(2), Sept. 30, 1978, 92 Stat. 838, which required the Administrator of the Environmental Protection Agency to submit an annual report to Congress relating to applications filed for conditional registration under section 136a(c)(7)(B), (C) of this title, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, page 164 of House Document No. 103–7.


# §136w–5. Minimum requirements for training of maintenance applicators and service technicians

 Each State may establish minimum requirements for training of maintenance applicators and service technicians. Such training may include instruction in the safe and effective handling and use of pesticides in accordance with the Environmental Protection Agency approved labeling, and instruction in integrated pest management techniques. The authority of the Administrator with respect to minimum requirements for training of maintenance applicators and service technicians shall be limited to ensuring that each State understands the provisions of this section.

(June 25, 1947, ch. 125, §30, as added Pub. L. 104–170, title I, §121(2), Aug. 3, 1996, 110 Stat. 1492.)

### Editorial Notes

### Prior Provisions

 A prior section 30 of act June 25, 1947, ch. 125, was renumbered section 34 and is classified to section 136x of this title.

## §136w–6. Environmental Protection Agency minor use program

(a) The Administrator shall assure coordination of minor use issues through the establishment of a minor use program within the Office of Pesticide Programs. Such office shall be responsible for coordinating the development of minor use programs and policies and consulting with growers regarding minor use issues and registrations and amendments which are submitted to the Environmental Protection Agency.

(b) The Office of Pesticide Programs shall prepare a public report concerning the progress made on the registration of minor uses, including implementation of the exclusive use as an incentive for registering new minor uses, within 3 years of the passage of the Food Quality Protection Act of 1996.

(June 25, 1947, ch. 125, §31, as added Pub. L. 104–170, title II, §210(i), Aug. 3, 1996, 110 Stat. 1500.)

**EDITORIAL NOTES**

**REFERENCES IN TEXT**

The passage of the Food Quality Protection Act of 1996, referred to in subsec. (b), probably means the date of enactment of Pub. L. 104–170, which was approved Aug. 3, 1996.

**PRIOR PROVISIONS**

A prior section 31 of act June 25, 1947, ch. 125, was renumbered section 35 and is classified to section 136y of this title.

## §136w–7. Department of Agriculture minor use program

### (a) In general

The Secretary of Agriculture (hereinafter in this section referred to as the "Secretary") shall assure the coordination of the responsibilities of the Department of Agriculture related to minor uses of pesticides, including—

(1) carrying out the Inter-Regional Project Number 4 (IR–4) as described in section 2 of Public Law 89–106 (7 U.S.C. 450i(e))[1] and the national pesticide resistance monitoring program established under section 1651[1] of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 5882);

(2) supporting integrated pest management research;

(3) consulting with growers to develop data for minor uses; and

(4) providing assistance for minor use registrations, tolerances, and reregistrations with the Environmental Protection Agency.

### (b) Minor use pesticide data and revolving fund

#### (1) Minor use pesticide data

##### (A) Grant authority

The Secretary, in consultation with the Administrator, shall establish a program to make grants for the development of data to support minor use pesticide registrations and reregistrations. The amount of any such grant shall not exceed ½ of the cost of the project for which the grant is made.

##### (B) Applicants

Any person who wants to develop data to support minor use pesticide registrations and reregistrations may apply for a grant under subparagraph (A). Priority shall be given to an applicant for such a grant who does not directly receive funds from the sale of pesticides registered for minor uses.

##### (C) Data ownership

Any data that is developed under a grant under subparagraph (A) shall be jointly owned by the Department of Agriculture and the person who received the grant. Such a person shall enter into an agreement with the Secretary under which such person shall share any fee paid to such person under section 136a(c)(1)(F) of this title.

#### (2) Minor Use Pesticide Data Revolving Fund

##### (A) Establishment

There is established in the Treasury of the United States a revolving fund to be known as the Minor Use Pesticide Data Revolving Fund. The Fund shall be available without fiscal year limitation to carry out the authorized purposes of this subsection.

### (B) Contents of the Fund

There shall be deposited in the Fund—

(i) such amounts as may be appropriated to support the purposes of this subsection; and

(ii) fees collected by the Secretary for any data developed under a grant under paragraph (1)(A).

### (C) Authorizations of appropriations

There are authorized to be appropriated for each fiscal year to carry out the purposes of this subsection $10,000,000 to remain available until expended.

(June 25, 1947, ch. 125, §32, as added Pub. L. 104–170, title II, §210(j), Aug. 3, 1996, 110 Stat. 1501.)

**EDITORIAL NOTES**

## REFERENCES IN TEXT

Section 2 of Public Law 89–106, referred to in subsec. (a)(1), was formerly classified to secton 450i of this title prior to editorial reclassification and renumbering as section 3157 of this title.

Section 1651 of the Food, Agriculture, Conservation, and Trade Act of 1990, referred to in subsec. (a)(1), was classified to section 5882 of this title prior to repeal by Pub. L. 104–127, title VIII, §862(a), Apr. 4, 1996, 110 Stat. 1174.

$^1$ See References in Text note below.

# §136w–8. Pesticide registration service fees

### (a) Definition of costs

In this section, the term "costs", when used with respect to review and decisionmaking pertaining to an application for which registration service fees are paid under this section, means—

(1) costs to the extent that—

(A) officers and employees provide direct support for the review and decisionmaking for covered pesticide applications, associated tolerances, and corresponding risk and benefits information and analyses;

(B) persons and organizations under contract with the Administrator engage in the review of the applications, and corresponding risk and benefits information and assessments; and

(C) advisory committees and other accredited persons or organizations, on the request of the Administrator, engage in the peer review of risk or benefits information associated with covered pesticide applications;

(2) costs of management of information, and the acquisition, maintenance, and repair of computer and telecommunication resources (including software), used to support review of pesticide applications, associated tolerances, and corresponding risk and benefits information and analyses; and

(3) costs of collecting registration service fees under subsections (b) and (c) and reporting, auditing, and accounting under this section.

### (b) Fees

#### (1) In general

Effective beginning on the effective date of the Pesticide Registration Improvement Act of 2003, the Administrator shall assess and collect covered pesticide registration service fees in accordance with this section.

#### (2) Covered applications

##### (A) In general

An application for the registration of a pesticide covered by this subchapter that is received by the Administrator on or after the effective date of the Pesticide Registration Improvement Act of 2003 or for any other action covered by a table specified in paragraph (3)(B) shall be subject to a registration service fee under this section.

about:blank
Exhibit C-1, pg. 106 of 152

### (B) Existing applications

#### (i) In general

Subject to clause (ii), an application for the registration of a pesticide that was submitted to the Administrator before the effective date of the Pesticide Registration Improvement Act of 2003 and is pending on that effective date shall be subject to a service fee under this section if the application is for the registration of a new active ingredient that is not listed in the Registration Division 2003 Work Plan of the Office of Pesticide Programs of the Environmental Protection Agency.

#### (ii) Tolerance or exemption fees

The amount of any fee otherwise payable for an application described in clause (i) under this section shall be reduced by the amount of any fees paid to support the related petition for a pesticide tolerance or exemption under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.).

### (C) Documentation

An application subject to a registration service fee under this section shall be submitted with documentation certifying—

(i) payment of the registration service fee; or

(ii) payment of at least 25 percent of the registration service fee and a request for a waiver from or reduction of the remaining amount of the registration service fee.

### (D) Payment

The registration service fee required under this subsection shall be due upon submission of the application.

### (E) Applications subject to additional fees

An application may be subject to additional fees if—

(i) the applicant identified the incorrect registration service fee and decision review period;

(ii) after review of a waiver request, the Administrator denies the waiver request; or

(iii) on completion of, where appropriate, the initial screening of the contents of the application or the preliminary technical screening of the application, the Administrator determines that a different registration service fee and decision review period apply to the application.

### (F) Effect of failure to pay fees

The Administrator shall reject any application submitted without the required registration service fee.

### (G) Non-refundable portion of fees

#### (i) In general

The Administrator shall retain 25 percent of the applicable registration service fee.

#### (ii) Limitation

Any waiver, refund, credit or other reduction in the registration service fee shall not exceed 75 percent of the registration service fee.

### (H) Collection of unpaid fees

In any case in which the Administrator does not receive payment of a registration service fee (or applicable portion of the registration service fee) by the date that is 30 days after the fee is due, the fee shall be treated as a claim of the United States Government subject to subchapter II of chapter 37 of title 31.

## (3) Schedule of covered applications and other actions and their registration service fees

### (A) Data evaluation records

At the decision review time under a fee table specified in subparagraph (B) or as agreed upon under subsection (f)(5), for each covered application under a fee table specified in such subparagraph (B), the Administrator shall—

(i) complete data evaluation records for studies submitted by the applicant in support of the application; and

(ii) release those data evaluation records to the applicant, using appropriate protections for confidential business information.

### (B) Schedule, actions, and fees

Subject to paragraph (6), the schedule of registration applications and other covered actions and their corresponding registration service fees shall be as follows:

## TABLE 1. — REGISTRATION DIVISION (RD) — NEW ACTIVE INGREDIENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R010 | 1 | New Active Ingredient, Food use. (2)(3) | 36 | 1,079,356 |
| R020 | 2 | New Active Ingredient, Food use; reduced risk. (2)(3) | 27 | 899,464 |
| R040 | 3 | New Active Ingredient, Food use; Experimental Use Permit application; establish temporary tolerance; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 18 | 662,883 |
| R060 | 4 | New Active Ingredient, Non-food use; outdoor. (2)(3) | 30 | 749,886 |
| R070 | 5 | New Active Ingredient, Non-food use; outdoor; reduced risk. (2)(3) | 24 | 624,905 |
| R090 | 6 | New Active Ingredient, Non-food use; outdoor; Experimental Use Permit application; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 16 | 463,930 |
| R110 | 7 | New Active Ingredient, Non-food use; indoor. (2)(3)(4) | 20 | 417,069 |
| R120 | 8 | New Active Ingredient, Non-food use; indoor; reduced risk. (2)(3)(4) | 14 | 347,556 |
| R121 | 9 | New Active Ingredient, Non-food use; indoor; Experimental Use Permit application; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 18 | 261,322 |
| R122 | 10 | Enriched isomer(s) of registered mixed-isomer active ingredient. (2)(3) | 27 | 454,526 |
| R123 | 11 | New Active Ingredient, Seed treatment only; includes agricultural and non-agricultural seeds; non-food use, not requiring a tolerance. (2)(3) | 27 | 676,296 |
| R126 (new) | 12 | New Active Ingredient, Seed treatment only; limited uptake into raw agricultural commodities; use requiring a tolerance. (2)(3) | 31 | 743,925 |
| R125 | 13 | New Active Ingredient, Seed treatment; Experimental Use Permit application; submitted before application for registration; credit 45% of fee toward new active ingredient application that follows. (3)(4) | 16 | 463,930 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient application. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the

Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

### TABLE 2. — REGISTRATION DIVISION (RD) — NEW USES

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R130 | 14 | First food use; indoor; food/food handling. (2)(3)(5) | 23 | 274,388 |
| R140 | 15 | Additional food use; Indoor; food/food handling. (3)(4)(5) | 17 | 64,028 |
| R150 | 16 | First food use. (2)(3)(5) | 23 | 454,490 |
| R155 | 17 | First food use, Experimental Use Permit application; active ingredient registered for non-food use. (3)(4)(5) | 21 | 378,742 |
| R160 | 18 | First food use; reduced risk. (2)(3)(5) | 18 | 378,742 |
| R170 | 19 | Additional food use. (3)(4)(5) | 17 | 113,728 |
| R175 | 20 | Additional food uses covered within a crop group resulting from the conversion of existing approved crop group(s) to one or more revised crop groups. (3)(4)(5) | 14 | 94,774 |
| R180 | 21 | Additional food use; reduced risk. (3)(4)(5) | 12 | 94,774 |
| R190 | 22 | Additional food uses; 6 or more submitted in one application. (3)(4)(5) | 17 | 682,357 |
| R200 | 23 | Additional Food Use; 6 or more submitted in one application; Reduced Risk. (3)(4)(5) | 12 | 568,632 |
| R210 | 24 | Additional food use; Experimental Use Permit application; establish temporary tolerance; no credit toward new use registration. (3)(4)(5) | 12 | 70,210 |
| R220 | 25 | Additional food use; Experimental Use Permit application; crop destruct basis; no credit toward new use registration. (3)(4)(5) | 6 | 28,434 |
| R230 | 26 | Additional use; non-food; outdoor. (3)(4)(5) | 16 | 45,453 |
| R240 | 27 | Additional use; non-food; outdoor; reduced risk. (3)(4)(5) | 10 | 37,878 |
| R250 | 28 | Additional use; non-food; outdoor; Experimental Use Permit application; no credit toward new use registration. (3)(4)(5) | 6 | 28,434 |
| R251 | 29 | Experimental Use Permit application which requires no changes to the tolerance(s); non-crop destruct basis. (3)(5) | 8 | 28,434 |
| R260 | 30 | New use; non-food; indoor. (3)(4)(5) | 12 | 21,954 |
| R270 | 31 | New use; non-food; indoor; reduced risk. (3)(4)(5) | 9 | 18,296 |
| R271 | 32 | New use; non-food; indoor; Experimental Use Permit application; no credit toward new use registration. (3)(4)(5) | 6 | 13,940 |
| R273 | 33 | Additional use; seed treatment only; use not requiring a new tolerance; includes crops with established tolerances (e.g., for soil or foliar application). (3)(4)(5) | 12 | 72,302 |
| R274 | 34 | Additional use; seed treatment only; 6 or more submitted in one application; uses not requiring new tolerances; includes crops with established tolerances (e.g., for soil or foliar application). (3)(4)(5) | 12 | 433,793 |
| R276 (new) | 35 | Additional use, seed treatment only; limited uptake into raw agricultural commodities; use requiring a tolerance. (3)(4)(5) | 14 | 79,560 |

about:blank
Exhibit C-1, pg. 109 of 152

| R277 | 36 (new) | Additional use, seed treatment only; 6 or more submitted in one application; limited uptake into raw agricultural commodities; use requiring a tolerance. (3)(4)(5) | | 14 | 477,360 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor) uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 3. — REGISTRATION DIVISION (RD) — IMPORT AND OTHER TOLERANCES

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R280 | 37 | Establish tolerances for residues in imported commodities; new active ingredient or first food use. (2) | 22 | 457,311 |
| R290 | 38 | Establish tolerances for residues in imported commodities; Additional new food use. | 16 | 91,465 |
| R291 | 39 | Establish tolerances for residues in imported commodities; additional food uses; 6 or more crops submitted in one petition. | 16 | 548,773 |
| R292 | 40 | Amend an established tolerance (e.g., decrease or increase) and/or harmonize established tolerances with Codex Maximum Residue Limits; domestic or import; applicant-initiated. | 12 | 64,987 |
| R293 | 41 | Establish tolerance(s) for inadvertent residues in one crop; applicant-initiated. | 13 | 76,656 |
| R294 | 42 | Establish tolerances for inadvertent residues; 6 or more crops submitted in one application; applicant-initiated. | 13 | 459,922 |
| R295 | 43 | Establish tolerance(s) for residues in one rotational crop in response to a specific rotational crop application; submission of corresponding label amendments which specify the necessary plant-back restrictions; applicant-initiated. (3)(4) | 16 | 94,774 |
| R296 | 44 | Establish tolerances for residues in rotational crops in response to a specific rotational crop petition; 6 or more crops submitted in one application; submission of corresponding label amendments which specify the necessary plant-back restrictions; applicant-initiated. (3)(4) | 16 | 568,632 |
| R297 | 45 | Amend 6 or more established tolerances (e.g., decrease or increase) in one petition; domestic or import; applicant-initiated. | 12 | 389,897 |
| R298 | 46 | Amend an established tolerance (e.g., decrease or increase); domestic or import; submission of corresponding amended labels (requiring science review). (3)(4) | 14 | 83,940 |
| R299 | 47 | Amend 6 or more established tolerances (e.g., decrease or increase); domestic or import; submission of corresponding amended labels (requiring science review). (3)(4) | 14 | 408,853 |
| R281 (new) | 48 | Establish tolerances for residues in imported commodities; additional new food use; submission of residue chemistry data review conducted by Codex or other competent national regulatory authority. | 12 | 68,599 |
| R282 (new) | 49 | Establish tolerances for residues in imported commodities; additional new food uses; 6 or more crops submitted in one petition; submission of residue chemistry data review conducted by Codex or other competent national regulatory authority. | 12 | 411,580 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and

about:blank     Exhibit C-1, pg. 111 of 152

decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) Amendment applications to add the revised use pattern(s) to registered product labels are covered by the base fee for the category. All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the amendment application package is subject to the registration service fee for a new product or a new inert approval. However, if an amendment application only proposes to register the amendment for a new product and there are no amendments in the application, then review of one new product application is covered by the base fee. All such associated applications that are submitted together will be subject to the category decision review time.

TABLE 4. — REGISTRATION DIVISION (RD) — NEW PRODUCTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R300 | 50 | New product; or similar combination product (already registered) to an identical or substantially similar in composition and use to a registered product; registered source of active ingredient; no data review on acute toxicity, efficacy or child-resistant packaging — only product chemistry data; cite-all data citation, or selective data citation where applicant owns all required data, or applicant submits specific authorization letter from data owner. Category also includes 100% re-package of registered end-use or manufacturing-use product that requires no data submission nor data matrix. (2)(3) | 4 | 2,270 |
| R301 | 51 | New product; or similar combination product (already registered) to an identical or substantially similar in composition and use to a registered product; registered source of active ingredient; selective data citation only for data on product chemistry and/or acute toxicity and/or public health pest efficacy (identical data citation and claims to cited product(s)), where applicant does not own all required data and does not have a specific authorization letter from data owner. (2)(3) | 4 | 2,720 |
| R310 | 52 | New end-use or manufacturing-use product with registered source(s) of active ingredient(s); includes products containing two or more registered active ingredients previously combined in other registered products; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>4.[sic] Child-resistant packaging and/or<br>4. pest(s) requiring efficacy – for up to 3 target pests. (2)(3)(4) | 7 | 10,466 |
| R314 | 53 | New end-use product containing up to three registered active ingredients never before registered as this combination in a formulated product; | 8 | 12,364 |

new product label is identical or substantially similar to the labels of
currently registered products which separately contain the respective
component active ingredients; excludes products requiring or citing an
animal safety study; requires review of data package within RD only;
includes data and/or waivers of data for only:
1. product chemistry and/or
2. acute toxicity and/or
3. child resistant packaging and/or
4. pest(s) requiring efficacy (4) for up to 3 target pests. (2)(3)

| R319 | 54 | New end-use product containing up to three registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy (4) - for 4 to 7 target pests. (2)(3) | 10 | 18,097 |
| R318 | 55 | New end-use product containing four or more registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy – for up to 3 target pests. (2)(3)(4) | 9 | 18,994 |
| R321 | 56 | New end-use product containing four or more registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy (4) - for 4 to 7 target pests. (2)(3) | 11 | 24,727 |
| R315 | 57 | New end-use on-animal product, registered source of active ingredient(s) with submission of data and/or waivers for only:<br>1. animal safety and<br>2. pest(s) requiring efficacy and/or<br>3. product chemistry and/or<br>4. acute toxicity and/or<br>5. child resistant packaging. (2)(3)(4) | 9 | 14,075 |
| R316 | 58 | New end-use or manufacturing-use product with registered source(s) of active ingredient(s) including products containing two or more registered active ingredients previously combined in other registered products; excludes products requiring or citing an animal safety study; and requires review of data and/or waivers for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. child resistant packaging and/or<br>4. pest(s) requiring efficacy - for 4 to 7 target pests. (2)(3)(4) | 9 | 16,199 |
| R317 | 59 | New end-use or manufacturing-use product with registered source(s) of active ingredient(s) including products containing two or more | 10 | 21,932 |

about:blank

Exhibit C-1, pg. 113 of 152

registered active ingredients previously combined in other registered products; excludes products requiring or citing an animal safety study; and requires review of data and/or waivers for only:
1. product chemistry and/or
2. acute toxicity and/or
3. child resistant packaging and/or
4. Pest(s) requiring efficacy - for greater than 7 target pests, (2)(3)(4)

| | | | | |
|---|---|---|---|---|
| R320 | 60 | New product; new physical form; requires data review in science divisions. (2)(3)(5) | 12 | 18,958 |
| R331 | 61 | New product; repack of identical registered end-use product as a manufacturing-use product; same registered uses only. (2)(3) | 3 | 3,627 |
| R332 | 62 | New manufacturing-use product; registered active ingredient; unregistered source of active ingredient; submission of completely new generic data package; registered uses only; requires review in RD and science divisions. (2)(3) | 24 | 405,919 |
| R333 | 63 | New product; manufacturing-use product or end-use product with unregistered source of active ingredient; requires science data review; new physical form; etc. Cite-all or selective data citation where applicant owns all required data. (2)(3) | 11 | 28,434 |
| R334 | 64 | New product; manufacturing-use product or end-use product with unregistered source of the active ingredient; requires science data review; new physical form; etc. Selective data citation. (2)(3) | 12 | 33,108 |
| R361 (new) | 65 | New end-use product containing up to three registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. Child resistant packaging and/or<br>4. pest(s) requiring efficacy – for more than 7 target pests. (2)(3)(4) | 12 | 23,400 |
| R362 (new) | 66 | New end-use product containing four or more registered active ingredients never before registered as this combination in a formulated product; new product label is identical or substantially similar to the labels of currently registered products which separately contain the respective component active ingredients; excludes products requiring or citing an animal safety study; requires review of data package within RD only; includes data and/or waivers of data for only:<br>1. product chemistry and/or<br>2. acute toxicity and/or<br>3. Child resistant packaging and/or<br>4. pest(s) requiring efficacy – for more than 7 target pests. (2)(3)(4) | 13 | 25,350 |
| R363 (new) | 67 | New product; repack of identical registered manufacturing-use product as an end-use product; same registered uses only, with no additional data. (2)(3) | 6 | 7,800 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-

about:blank     Exhibit C-1, pg. 114 of 152

stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) For the purposes of classifying proposed registration actions into PRIA categories, "pest(s) requiring efficacy" are both invertebrate and vertebrate pests. Invertebrate public health pests (e.g., ticks, mosquitoes, cockroaches, flies, etc.), structural pests (e.g., termites, carpenter ants, and wood-boring beetles) and certain invasive invertebrate species (e.g., Asian Longhorned beetle, Emerald Ashborer) are listed in the product performance rule, subpart R of part 158 of title 40, Code of Federal Regulations. This list may be updated/refined as invasive pest needs arise. All other pests (e.g., vertebrates) are listed in the Pesticide Registration Notice 2002-1. To determine the number of pests for the PRIA categories, pest groups, subgroups, and pest specific claims as listed in part 158 of title 40, Code of Federal Regulations, should be counted as follows. If seeking a label claim against a general pest group (e.g., cockroaches, mosquitoes, termites, etc.), each group will count as 1. If seeking a claim against a pest subgroup (e.g., small biting flies, filth flies, etc.) or specific pests (e.g., smokybrown cockroach, house fly, etc.) without a general claim, then each subgroup or specific pest will count as 1.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

## TABLE 5. — REGISTRATION DIVISION (RD) — AMENDMENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R340 | 68 | Amendment requiring data review within RD (e.g., changes to precautionary label statements); includes adding/modifying pest(s) claims for up to 2 target pests; excludes products requiring or citing an animal safety study. (2)(3) | 4 | 7,150 |
| R341 | 69 | Amendment requiring data review within RD (e.g., changes to precautionary label statements), includes adding/modifying pest(s) claims for greater than 2 target pests; excludes products requiring or citing an animal safety study. (2)(3) | 6 | 8,584 |
| R345 | 70 | Amending on-animal products previously registered, with the submission of data and/or waivers for only: 1. animal safety and 2. pest(s) requiring efficacy and/or 3. product chemistry and/or 4. acute toxicity and/or 5. child resistant packaging. (2)(3)(4) | 7 | 12,643 |
| R350 | 71 | Amendment requiring data review in science divisions (e.g., changes to Restricted Entry Interval, or Personal Protective Equipment, or Preharvest Interval, or use rate, or number of applications; or add aerial application; or modify Ground Water/Surface Water advisory statement). (2)(3)(5) | 9 | 18,958 |
| R351 | 72 | Amendment adding a new unregistered source of active ingredient. (2)(3) | 8 | 18,958 |
| R352 | 73 | Amendment adding already approved uses; selective method of support; does not apply if the applicant owns all cited data. (2)(3) | 8 | 18,958 |
| R371 | 74 | Amendment to Experimental Use Permit; (does not include extending a permit's time period). (3) | 6 | 14,463 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under PR Notices, such as PR Notice 98–10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) For the purposes of classifying proposed registration actions into PRIA categories, "pest(s) requiring efficacy" are both invertebrate and vertebrate pests. Invertebrate public health pests (e.g., ticks, mosquitoes, cockroaches, flies, etc.), structural pests (e.g., termites, carpenter ants, and wood-boring beetles) and certain invasive invertebrate species (e.g., Asian Longhorned beetle, Emerald Ashborer) are listed in the product performance rule, subpart R of part 158 of title 40, Code of Federal Regulations. This list may be updated/refined as invasive pest needs arise. All other pests (e.g., vertebrates) are listed in the Pesticide Registration Notice 2002-1. To determine the number of pests for the PRIA categories, pest groups, subgroups, and pest specific claims as listed in part 158 of title 40, Code of Federal Regulations, should be counted as follows. If seeking a label claim against a general pest group (e.g., cockroaches, mosquitoes, termites, etc.), each group will count as 1. If seeking a claim against a pest subgroup (e.g., small biting flies, filth flies, etc.) or specific pests (e.g., smokybrown cockroach, house fly, etc.) without a general claim, then each subgroup or specific pest will count as 1.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 6. — REGISTRATION DIVISION (RD) — OTHER ACTIONS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| R124 | 75 | Conditional Ruling on Pre-application Study Waivers; applicant-initiated. | 6 | 3,627 |
| R272 | 76 | Review of Study Protocol applicant-initiated; excludes Data Analysis Reporting Tool, pre-registration conference, Rapid Response review, developmental neurotoxicity protocol review, protocol needing Human Studies Review Board review, companion animal safety protocol. | 3 | 3,627 |
| R275 | 77 | Rebuttal of Agency reviewed protocol, applicant initiated. | 3 | 3,627 |
| R278 | 78 (new) | Review of Protocol for companion animal safety study. | 5 | 4,927 |
| R279 | 79 (new) | Comparative product determination for reduced risk submission, applicant initiated; submitted before application for reduced risk new active ingredient or reduced risk new use. | 3 | 5,200 |

about:blank
Exhibit C-1, pg. 116 of 152

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

### TABLE 7. — ANTIMICROBIAL DIVISION (AD) — NEW ACTIVE INGREDIENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| A380 | 80 | New Active Ingredient; Indirect Food use; establish tolerance or tolerance exemption if required. (2)(3)(4) | 26 | 227,957 |
| A390 | 81 | New Active Ingredient; Direct Food use; establish tolerance or tolerance exemption if required. (2)(3)(4) | 26 | 329,265 |
| A410 | 82 | New Active Ingredient Non-food use. (2)(3)(4) | 23 | 278,659 |
| A431 | 83 | New Active Ingredient, Non-food use; low-risk. (2)(3)(4) | 14 | 114,984 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

### TABLE 8. — ANTIMICROBIAL DIVISION (AD) — NEW USES

| EPA No. | New CR No. | Action | Decision Review Time | Registration Service Fee |
|---|---|---|---|---|

about:blank

Exhibit C-1, pg. 1

| | | | (Months) (1) | ($) |
|---|---|---|---|---|
| A440 | 84 | New Use, Indirect Food Use, establish tolerance or tolerance exemption. (2)(3)(4)(6) | 23 | 45,737 |
| A441 | 85 | Additional Indirect food uses; establish tolerances or tolerance exemptions if required; 6 or more submitted in one application. (3)(4)(5)(6) | 23 | 164,639 |
| A450 | 86 | New use, Direct food use, establish tolerance or tolerance exemption. (2)(3)(4)(6) | 23 | 137,198 |
| A451 | 87 | Additional Direct food uses; establish tolerances or tolerance exemptions if required; 6 or more submitted in one application. (3)(4)(5)(6) | 22 | 261,333 |
| A500 | 88 | New use, non-food. (4)(5)(6) | 15 | 45,737 |
| A501 | 89 | New use, non-food; 6 or more submitted in one application. (4)(5)(6) | 17 | 109,764 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) If EPA data rules are amended to newly require clearance under section 408 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 346a) for an ingredient of an antimicrobial product where such ingredient was not previously subject to such a clearance, then review of the data for such clearance of such product is not subject to a registration service fee for the tolerance action for two years from the effective date of the rule.

(4) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(5) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to

submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor) uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(6) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

### TABLE 9. — ANTIMICROBIAL DIVISION (AD) — NEW PRODUCTS AND AMENDMENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| A530 | 90 | New product, identical or substantially similar in composition and use to a registered product; no data review or only product chemistry data; cite all data citation or selective data citation where applicant owns all required data; or applicant submits specific authorization letter from data owner. Category also includes 100% re-package of registered end-use or manufacturing-use product that requires no data submission nor data matrix. (2)(3) | 4 | 1,833 |
| A531 | 91 | New product; identical or substantially similar in composition and use to a registered product; registered source of active ingredient: selective data citation only for data on product chemistry and/or acute toxicity and/or public health pest efficacy, where applicant does not own all required data and does not have a specific authorization letter from data owner. (2)(3) | 4 | 2,616 |
| A532 | 92 | New product; identical or substantially similar in composition and use to a registered product; registered active ingredient; unregistered source of active ingredient; cite-all data citation except for product chemistry; product chemistry data submitted. (2)(3) | 5 | 7,322 |
| A550 | 93 | New end-use product; uses other than FIFRA §2(mm); non-FQPA product. (2)(3)(5) | 9 | 18,958 |
| A560 | 94 | New manufacturing-use product; registered active ingredient; selective data citation. (2)(3) | 6 | 18,054 |
| A565 | 95 | New manufacturing-use product; registered active ingredient; unregistered source of active ingredient; submission of new generic data package; registered uses only; requires science review. (2)(3) | 18 | 26,135 |
| A572 | 96 | New Product or amendment requiring data review for risk assessment by Science Branch (e.g., changes to Restricted Entry Interval, or Personal Protective Equipment, or use rate). (2)(3)(4)(7) | 9 | 18,958 |
| A460 (new) | 97 | New end-use product; FIFRA §2(mm) uses only; 0 to 10 public health organisms. (2)(3)(5)(6) | 5 | 7,322 |
| A461 (new) | 98 | New end-use product; FIFRA §2(mm) uses only; 11 to 20 public health organisms. (2)(3)(5)(6) | 6 | 10,158 |
| A462 (new) | 99 | New end-use product; FIFRA §2(mm) uses only; 21 to 30 public health organisms. (2)(3)(5)(6) | 7 | 12,995 |
| A463 (new) | 100 | New end-use product; FIFRA §2(mm) uses only; 31 to 40 public health organisms. (2)(3)(5)(6) | 9 | 15,831 |
| A464 (new) | 101 | New end-use product; FIFRA §2(mm) uses only; 41 to 50 public health organisms. (2)(3)(5)(6) | 10 | 18,668 |

Exhibit C-1, pg. 119 of 152

| EPA No. | New CR No. | Action | Decision Review Time | Registration Service Fee |
|---|---|---|---|---|
| A465 (new) | 102 | New end-use product; FIFRA §2(mm) uses only; 51 or more public health organisms. (2)(3)(5)(6) | 11 | 21,505 |
| A470 (new) | 103 | Label amendment requiring data review; 0 to 10 public health organisms. (3)(4)(5)(6) | 4 | 5,493 |
| A471 (new) | 104 | Label amendment requiring data review; 11 to 20 public health organisms. (3)(4)(5)(6) | 5 | 8,506 |
| A472 (new) | 105 | Label amendment requiring data review; 21 to 30 public health organisms. (3)(4)(5)(6) | 6 | 10,219 |
| A473 (new) | 106 | Label amendment requiring data review; 31 to 40 public health organisms. (3)(4)(5)(6) | 7 | 11,933 |
| A474 (new) | 107 | Label amendment requiring data review; 41 to 50 public health organisms. (3)(4)(5)(6) | 8 | 13,646 |
| A475 (new) | 108 | Label amendment requiring data review; 51 or more public health organisms. (3)(4)(5)(6) | 9 | 15,766 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under Pesticide Registration (PR) Notices, such as PR Notice 98–10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(5) The applicant must identify the substantially similar product if opting to use cite-all or the selective method to support acute toxicity data requirements.

(6) Once an application for an amendment or a new product with public health organisms has been submitted and classified into any of categories A460 through A465 or A470 through A475, additional organisms submitted for the same product before the first application is granted will result in combination and reclassification of both the original and subsequent submissions into the appropriate new category based on the sum of the number of organisms in both submissions. Submission of additional organisms would result in a new PRIA start date and may require additional fees to meet the fee of a new category.

(7) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 10. — ANTIMICROBIAL DIVISION (AD) — EXPERIMENTAL USE PERMITS AND OTHER ACTIONS

| EPA No. | New CR No. | Action | Decision Review Time | Registration Service Fee |
|---|---|---|---|---|

| | | | (Months) (1) | ($) |
|---|---|---|---|---|
| A520 | 109 | Experimental Use Permit application, non-food use. (2)(3) | 9 | 9,151 |
| A521 | 110 | Review of public health efficacy study protocol within AD, per AD Internal Guidance for the Efficacy Protocol Review Process; Code will also include review of public health efficacy study protocol; applicant-initiated; Tier 1. | 6 | 6,776 |
| A522 | 111 | Review of public health efficacy study protocol outside AD by members of AD Efficacy Protocol Review Expert Panel; Code will also include review of public health efficacy study protocol; applicant-initiated; Tier 2. | 12 | 17,424 |
| A537 | 112 | New Active Ingredient/New Use, Experimental Use Permit application; Direct food use; Establish tolerance or tolerance exemption if required. Credit 45% of fee toward new active ingredient/new use application that follows. (3) | 18 | 219,512 |
| A538 | 113 | New Active Ingredient/New Use, Experimental Use Permit application; Indirect food use; Establish tolerance or tolerance exemption if required Credit 45% of fee toward new active ingredient/new use application that follows. (3) | 18 | 137,198 |
| A539 | 114 | New Active Ingredient/New Use, Experimental Use Permit application; Nonfood use. Credit 45% of fee toward new active ingredient/new use application that follows. (3) | 15 | 132,094 |
| A529 | 115 | Amendment to Experimental Use Permit; requires data review or risk assessment. (2)(3) | 9 | 16,383 |
| A523 | 116 | Review of protocol other than a public health efficacy study (i.e., Toxicology or Exposure Protocols). | 9 | 17,424 |
| A571 | 117 | Science reassessment: refined ecological risk, and/or endangered species; applicant-initiated. (3) | 18 | 137,198 |
| A533 | 118 | Exemption from the requirement of an Experimental Use Permit. (2) | 4 | 3,559 |
| A534 | 119 | Rebuttal of Agency reviewed protocol, applicant initiated. | 4 | 6,776 |
| A535 | 120 | Conditional ruling on pre-application study waiver or data bridging argument; applicant-initiated. | 6 | 3,454 |
| A536 | 121 | Conditional ruling on pre-application direct food, indirect food, nonfood use determination; applicant-initiated. | 4 | 3,559 |
| A575 (new) | 122 | Efficacy similarity determination; if two products can be bridged or if confirmatory efficacy data are needed. | 4 | 3,389 |

   (1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.
   (2) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.
   3) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

### TABLE 11. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW ACTIVE INGREDIENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B580 | 123 | New active ingredient; petition to establish a tolerance. (2)(3)(4) | 22 | 73,173 |
| B590 | 124 | New active ingredient; petition to establish a tolerance exemption. (2)(3)(4) | 20 | 45,737 |
| B600 | 125 | New active ingredient; no change to a permanent tolerance or tolerance exemption (includes non-food uses). (2)(3)(4) | 15 | 27,443 |
| B610 | 126 | New active ingredient; Experimental Use Permit application; petition to establish a permanent or temporary tolerance or temporary tolerance exemption. (3)(4) | 12 | 18,296 |
| B620 | 127 | New active ingredient; Experimental Use Permit application; non-food use (includes crop destruct). (3)(4) | 9 | 9,151 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

### TABLE 12. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW USES

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B630 | 128 | First food use; petition to establish/amend a tolerance exemption. (2)(4)(5) | 13 | 18,296 |
| B640 | 129 | First food use; petition to establish/amend a tolerance. (2)(4)(5) | 19 | 27,443 |
| B644 | 130 | New use, no change to an established tolerance or tolerance exemption (includes non-food uses). (3)(4)(5) | 8 | 18,296 |
| B645 | 131 | New use; Experimental Use Permit; petition to establish a permanent or temporary tolerance or tolerance exemption. (4)(5) | 12 | 18,296 |
| B646 | 132 | New use; Experimental Use Permit; non-food use (includes crop destruct). (4)(5) | 7 | 9,151 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor) uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screen, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(4) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described

in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(5) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 13. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — NEW PRODUCTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B660 | 133 | New product; registered source of active ingredient(s); identical or substantially similar in composition and use to a registered product; no change in an established tolerance or tolerance exemption; no data submission or data matrix (or submission of product chemistry data only). (2)(3) | 6 | 1,833 |
| B670 | 134 | New product; registered source of active ingredient(s); no change in an established tolerance or tolerance exemption; (including non-food); Must address Product-Specific Data Requirements. (2)(3) | 9 | 7,322 |
| B672 | 135 | New product; unregistered source of at least one active ingredient (or registered source with new generic data package; no change in an established tolerance or tolerance exemption (including non-food); must address Product-Specific and Generic Data Requirements. (2)(3) | 15 | 13,069 |
| B673 | 136 | New product; unregistered source of active ingredient(s); citation of Technical Grade Active Ingredient (TGAI) data previously reviewed and accepted by the Agency; requires an Agency determination that the cited data support the new product. (2)(3) | 12 | 7,322 |
| B674 | 137 | New product; repack of identical registered end-use product or repack of an end-use product as a manufacturing-use product; same registered uses only. (2)(3) | 4 | 1,833 |
| B677 | 138 | New end-use non-food animal product with submission of two or more target animal safety studies; includes data and/or waivers of data for only: 1. product chemistry and/or 2. acute toxicity and/or 3. public health pest efficacy and/or 4. animal safety studies and/or 5. child resistant packaging. (2)(3) | 12 | 12,643 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described

in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

TABLE 14. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — AMENDMENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B621 | 139 | Amendment; Experimental Use Permit; no change to an established temporary or permanent tolerance or tolerance exemption. (3) (4) | 7 | 7,322 |
| B622 | 140 | Amendment; Experimental Use Permit; petition to amend a permanent or temporary tolerance or tolerance exemption. (3)(4) | 11 | 18,296 |
| B641 | 141 | Amendment; changes to an established tolerance or tolerance exemption. (4) | 13 | 18,296 |
| B680 | 142 | Amendment; registered sources of active ingredient(s); no new use(s); no changes to an established tolerance or tolerance exemption; requires data submission. (2)(3) | 5 | 7,322 |
| B681 | 143 | Amendment; unregistered source of active ingredient; no change to an established tolerance or tolerance exemption; requires data submission. (2)(3) | 7 | 8,714 |
| B683 | 144 | Amendment; no change to an established tolerance or tolerance exemption; requires review/update of previous risk assessment(s) without data submission (e.g., labeling changes to Restricted Entry Interval, Personal Protective Equipment, Preharvest Interval). (2)(3) | 6 | 7,322 |
| B684 | 145 | Amending non-food animal product that includes submission of target animal safety data; previously registered. (2)(3) | 8 | 12,643 |
| B685 | 146 | Amendment; add a new biochemical unregistered source of active ingredient or a new microbial production site; requires submission of analysis of samples data and source/production site-specific manufacturing process description. (3) | 5 | 7,322 |

    (1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.
    (2) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under Pesticide Registration (PR) Notices, such as PR Notice 98-10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.
    (3) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(4) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

TABLE 15. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — STRAIGHT-CHAIN LEPIDOPTERAN PHEROMONES (SCLP)

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B690 | 147 | SCLP; new active ingredient; food or non-food use. (2)(6)(7) | 7 | 3,662 |
| B700 | 148 | SCLP; Experimental Use Permit application; new active ingredient or new use. (6)(7) | 7 | 1,833 |
| B701 | 149 | SCLP; Extend or amend Experimental Use Permit. (6)(7) | 4 | 1,833 |
| B710 | 150 | SCLP; new product; registered source of active ingredient(s); identical or substantially similar in composition and use to a registered product; no change in an established tolerance or tolerance exemption; no data submission or data matrix (or only product chemistry data); (Includes 100% re-pack; repack of registered end-use product as a manufacturing-use product). (3)(6) | 4 | 1,833 |
| B720 | 151 | SCLP; new product; registered source of active ingredient(s); no change in an established tolerance or tolerance exemption (including non-food); Must address Product-Specific Data Requirements. (3)(6) | 5 | 1,833 |
| B721 | 152 | SCLP: new product; unregistered source of active ingredient; no change in an established tolerance or tolerance exemption (including non-food); must address Product-Specific and Generic Data Requirements. (3)(6) | 7 | 3,836 |
| B722 | 153 | SCLP; new use and/or amendment; petition to establish a tolerance or tolerance exemption. (4)(5)(6)(7) | 7 | 3,552 |
| B730 | 154 | SCLP; amendment requiring data submission. (4)(6) | 5 | 1,833 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) All requests for new uses (food and/or nonfood) contained in any application for a new active ingredient or a first food use are covered by the base fee for that new active ingredient or first food use application and retain the same decision time review period as the new active ingredient or first food use application. The application must be received by the Agency in one package. The base fee for the category covers a maximum of five new products. Each application for an additional new product registration and new inert approval that is submitted in the new active ingredient application package or first food use application package is subject to the registration service fee for a new product or a new inert approval. All such associated applications that are submitted together will be subject to the new active ingredient or first food use decision review time. In the case of a new active ingredient application, until that new active ingredient is approved, any subsequent application for another new product containing the same active ingredient or an amendment to the proposed labeling will be deemed a new active ingredient application, subject to the registration service fee and decision review time for a new active ingredient. In the case of a first food use application, until that first food use is approved, any subsequent application for an additional new food use or uses will be subject to the registration service fee and decision review time for a first food use. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new active ingredient or first food use application.

(3) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

(4) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to

registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments handled by notification under Pesticide Registration (PR) Notices, such as PR Notice 98-10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(5) Amendment applications to add the new use(s) to registered product labels are covered by the base fee for the new use(s). All items in the covered application must be submitted together in one package. Each application for an additional new product registration and new inert approval(s) that is submitted in the new use application package is subject to the registration service fee for a new product or a new inert approval. However, if a new use application only proposes to register the new use for a new product and there are no amendments in the application, then review of one new product application is covered by the new use fee. All such associated applications that are submitted together will be subject to the new use decision review time. Any application for a new product or an amendment to the proposed labeling (a) submitted subsequent to submission of the new use application and (b) prior to conclusion of its decision review time and (c) containing the same new uses, will be deemed a separate new-use application, subject to a separate registration service fee and new decision review time for a new use. If the new-use application includes non-food (indoor and/or outdoor), and food (outdoor and/or indoor), uses, the appropriate fee is due for each type of new use and the longest decision review time applies to all of the new uses requested in the application. Any information that (a) was neither requested nor required by the Agency, and (b) is submitted by the applicant at the applicant's initiative to support the application after completion of the preliminary technical screening, and (c) is not itself a covered registration application, must be assessed 25% of the full registration service fee for the new use application.

(6) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(7) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

### TABLE 16. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — OTHER ACTIONS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---------|-----------|--------|-----------------------------------|------------------------------|
| B614 | 155 | Pre-application; Conditional Ruling on rationales for addressing a data requirement in lieu of data; applicant-initiated; applies to one (1) rationale at a time. | 3 | 3,627 |
| B682 | 156 | Protocol review; applicant initiated; excludes time for Human Studies Review Board review (Includes rebuttal of protocol review). | 3 | 3,487 |
| B616 | 157 (new) | Pre-application; Conditional Ruling on a non-food use determination. | 5 | 4,715 |
| B617 | 158 (new) | Pre-application; biochemical classification determination. | 5 | 4,715 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

TABLE 17. — BIOPESTICIDES AND POLLUTION PREVENTION DIVISION (BPPD) — PLANT-INCORPORATED PROTECTANTS (PIP)

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| B740 | 159 | Experimental Use Permit application; no petition for tolerance/tolerance exemption; includes:<br>1. non-food/feed use(s) for a new (2) or registered (3) PIP (12);<br>2. food/feed use(s) for a new or registered PIP with crop destruct;<br>3. food/feed use(s) for a new or registered PIP in which an established tolerance/tolerance exemption exists for the intended use(s). (4)(5)(12) | 9 | 137,198 |
| B750 | 160 | Experimental Use Permit application; with a petition to establish a temporary or permanent tolerance/tolerance exemption for the active ingredient. Includes new food/feed use for a registered (3) PIP. (4)(12) | 12 | 182,927 |
| B771 | 161 | Experimental Use Permit application; new (2) PIP; with petition to establish a temporary tolerance/tolerance exemption for the active ingredient; credit 75% of B771 fee toward registration application for a new active ingredient that follows. (5)(12) | 13 | 182,927 |
| B772 | 162 | Application to amend or extend a PIP Experimental Use Permit; no petition since the established tolerance/tolerance exemption for the active ingredient is unaffected. (12) | 3 | 18,296 |
| B773 | 163 | Application to amend or extend a PIP Experimental Use Permit; with petition to extend a temporary tolerance/tolerance exemption for the active ingredient. (12) | 9 | 45,737 |
| B780 | 164 | Registration application; new (2) PIP; non-food/feed or food/feed without tolerance petition based on an existing permanent tolerance exemption. (5)(12)(14) | 16 | 228,657 |
| B800 | 165 | Registration application; new (2) PIP; with petition to establish permanent tolerance/tolerance exemption for the active ingredient based on an existing temporary tolerance/tolerance exemption. (5)(12)(14) | 17 | 246,949 |
| B820 | 166 | Registration application; new (2) PIP; with petition to establish or amend a permanent tolerance/tolerance exemption of an active ingredient. (5)(12)(14) | 19 | 292,682 |
| B851 | 167 | Registration application; new event of a previously registered PIP active ingredient(s); no petition since permanent tolerance/tolerance exemption is already established for the active ingredient(s). (12) | 9 | 182,927 |
| B870 | 168 | Registration application; registered (3) PIP; new product; new use; no petition since a permanent tolerance/tolerance exemption is already established for the active ingredient. (4)(12)(14) | 9 | 54,881 |
| B880 | 169 | Registration application; registered (3) PIP; new product or new terms of registration; additional data submitted; no petition since a permanent tolerance/tolerance exemption is already established for the active ingredient(s). (5)(6)(7)(12)(14) | 9 | 45,737 |
| B883 | 170 | Registration application; new (2) PIP, seed increase with negotiated acreage cap and time-limited registration; with petition to establish a permanent tolerance/tolerance exemption for the active ingredient based on an existing temporary tolerance/tolerance exemption. (5)(8)(12)(14) | 13 | 182,927 |
| B884 | 171 | Registration application; new (2) PIP, seed increase with negotiated acreage cap and time-limited registration; with petition to establish a permanent tolerance/tolerance exemption for the active ingredient. (5)(8)(12)(14) | 19 | 228,657 |
| B885 | 172 | Registration application; registered (2) PIP, seed increase; breeding stack of previously approved PIPs, same crop; no petition since a | 6 | 45,737 |

| | | | | |
|---|---|---|---|---|
| | | permanent tolerance/tolerance exemption is already established for the active ingredient(s). (9)(12) | | |
| B890 | 173 | Application to amend a seed increase registration; converts registration to commercial registration; no petition since permanent tolerance/tolerance exemption is already established for the active ingredient(s). (5)(12)(14) | 9 | 91,465 |
| B900 | 174 | Application to amend a registration, including actions such as modifying an IRM plan, or adding an insect to be controlled. (5)(10)(11)(12) | 6 | 18,296 |
| B902 | 175 | PIP Protocol review. | 3 | 9,151 |
| B903 | 176 | Inert ingredient permanent tolerance exemption; e.g., a marker such as NPT II; reviewed in BPPD. | 12 | 91,465 |
| B904 | 177 | Import tolerance or tolerance exemption; processed commodities/food only (inert or active ingredient). | 12 | 182,927 |
| B905 | 178 | FIFRA Scientific Advisory Panel Review. | 6 | 91,465 |
| B906 | 179 | Petition to establish a temporary tolerance/tolerance exemption for one or more active ingredients. | 9 | 45,733 |
| B907 | 180 | Petition to establish a permanent tolerance/tolerance exemption for one or more active ingredients based on an existing temporary tolerance/tolerance exemption. | 9 | 18,296 |
| B909 (new) | 181 | PIP tolerance exemption determination; applicant-initiated; request to determine if an existing tolerance exemption applies to a PIP. | 6 | 18,296 |
| B910 (new) | 182 | Biotechnology Notification for small-scale field testing of genetically engineered microbes. | 3 | 9,151 |
| B921 (new) | 183 | Experimental Use Permit application; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); non-food/feed. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. Credit 75% of B921 fee toward registration application for the new active ingredient that follows (B922). (5)(12)(13) | 12 | 182,927 |
| B922 (new) | 184 | Registration application; new active ingredient; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); non-food/feed. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. (5)(12)(13)(14) | 16 | 228,657 |
| B923 (new) | 185 | Experimental Use Permit application; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); with petition to establish a temporary or permanent tolerance/tolerance exemption of an active ingredient. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. Credit 75% of B923 fee toward registration application for the new active ingredient that follows (B924). (5)(12)(13)(14) | 15 | 228,658 |
| B924 (new) | 186 | Registration application; new active ingredient; genetic modifications in animals intended for use as a pesticide (e.g., for pest population control); with petition to establish a permanent tolerance/tolerance exemption of an active ingredient. This category would cover substances produced and used in animals that are intended for use as a pesticide, such as for pest population control, including the genetic material in such animals. (5)(12)(13)(14) | 19 | 292,682 |
| B925 (new) | 187 | Experimental Use Permit application; exogenous applications of RNA to elicit the RNA interference pathway in pests; non-food/feed; credit 75% of B925 fee toward registration application for the new active ingredient that follows (B926). (5)(12) | 11 | 27,452 |

| | | | | |
|---|---|---|---|---|
| B926 188 (new) | Registration application; new active ingredient; exogenous applications of RNA to elicit the RNA interference pathway in pests; non-food/feed. (5)(12)(14) | | 17 | 82,329 |
| B927 189 (new) | Experimental Use Permit application; exogenous applications of RNA to elicit the RNA interference pathway in pests; with petition to establish a temporary or permanent tolerance/tolerance exemption of an active ingredient; credit 75% of B927 fee toward registration application for the new active ingredient that follows (B928). (5)(12) | | 14 | 54,889 |
| B928 190 (new) | Registration application; new active ingredient; exogenous applications of RNA to elicit the RNA interference pathway in pests; with petition to establish a permanent tolerance/tolerance exemption of an active ingredient. (5)(12)(14) | | 22 | 137,210 |
| B929 191 (new) | Registration application; new product, registered active ingredient; exogenous applications of RNA to elicit the RNA interference pathway in pests; no petition since a permanent tolerance/tolerance exemption is already established for the active ingredient(s). (5)(12) | | 10 | 7,322 |
| B930 192 (new) | Application to amend or extend a non-PIP Emerging Technologies Experimental Use Permit; no petition since the established tolerance/tolerance exemption for the active ingredient is unaffected. (12) | | 3 | 18,296 |
| B931 193 (new) | Application to amend or extend a non-PIP Emerging Technologies Experimental Use Permit; with petition to extend a temporary tolerance/tolerance exemption for the active ingredient. (12) | | 9 | 45,737 |
| B932 194 (new) | Amendment; application to amend a non-PIP Emerging Technologies registration. (4)(5)(12) | | 6 | 18,296 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) "New PIP" means a PIP with an active ingredient that has not been registered.

(3) "Registered PIP" means a PIP with an active ingredient that is currently registered.

(4) Transfer registered PIP through conventional breeding for new food/feed use, such as from field corn to sweet corn.

(5) If, during review of the application, it is determined that review by the FIFRA Scientific Advisory Panel (SAP) is needed, the applicant will submit an application for category B905, which will be processed concurrently, and the decision review time for both applications will be the longer of the two associated applications. The scientific data involved in this category are complex. EPA often seeks technical advice from the SAP on risks that pesticides pose to wildlife, farm workers, pesticide applicators, non-target species, insect resistance, and novel scientific issues surrounding new technologies. The scientists of the SAP neither make nor recommend policy decisions. They provide advice on the science used to make these decisions. Their advice is invaluable to the EPA as it strives to protect humans and the environment from risks posed by pesticides. Due to the time it takes to schedule and prepare for meetings with the SAP, additional time and costs are needed.

(6) Registered PIPs stacked through conventional breeding.

(7) Deployment of a registered PIP with a different Insecticide Resistance Management (IRM) plan (e.g., seed blend).

(8) The negotiated acreage cap will depend upon EPA's determination of the potential environmental exposure, risk(s) to non-target organisms, and the risk of targeted pest developing resistance to the pesticidal substance. The uncertainty of these risks may reduce the allowable acreage, based upon the quantity and type of non-target organism data submitted and the lack of insect resistance management data, which is usually not required for seed-increase registrations. Registrants are encouraged to consult with EPA prior to submission of a registration application in this category.

(9) Application can be submitted prior to or concurrently with an application for commercial registration.

(10) For example, IRM plan modifications that are applicant-initiated.

(11) (a) EPA-initiated amendments shall not be charged registration service fees. (b) Registrant-initiated fast-track amendments are to be completed within the timelines specified in section 3(c)(3)(B) and are not subject to registration service fees. (c) Registrant-initiated fast-track amendments handled by the Antimicrobials Division are to be completed within the timelines specified in section 3(h) and are not subject to registration service fees. (d) Registrant initiated amendments submitted by notification under Pesticide Registration (PR) Notices, such

as PR Notice 98-10, continue under PR Notice timelines and are not subject to registration service fees. (e) Submissions with data and requiring data review are subject to registration service fees.

(12) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

(13) This category does not include genetic modifications in animals not intended for use as a pesticide, e.g., genetic modifications in animals intended for food use or animals intended for use as companion animals.

(14) If the Administrator determines that endangered species analysis is required for this action, using guidance finalized according to section 33(c)(3)(B) for this specific type of action, the decision review time can be extended for endangered species assessment one time only for up to 50%, upon written notification to the applicant, prior to completion of the technical screening. To the extent practicable, any reason for renegotiation should be resolved during the same extension.

### TABLE 18. — INERT INGREDIENTS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| I001 | 195 | Approval of new food use inert ingredient. (2)(3) | 15 | 38,698 |
| I002 | 196 | Amend currently approved inert ingredient tolerance or exemption from tolerance; new data. (2) | 13 | 10,750 |
| I003 | 197 | Amend currently approved inert ingredient tolerance or exemption from tolerance; no new data. (2) | 11 | 4,742 |
| I004 | 198 | Approval of new non-food use inert ingredient. (2) | 6 | 15,803 |
| I005 | 199 | Amend currently approved non-food use inert ingredient with new use pattern; new data. (2) | 6 | 7,903 |
| I006 | 200 | Amend currently approved non-food use inert ingredient with new use pattern; no new data. (2) | 4 | 4,742 |
| I007 | 201 | Approval of substantially similar non-food use inert ingredients when original inert is compositionally similar with similar use pattern. (2) | 5 | 2,371 |
| I008 | 202 | Approval of new or amended polymer inert ingredient, food use. (2) | 7 | 5,374 |
| I009 | 203 | Approval of new or amended polymer inert ingredient, non-food use. (2) | 4 | 4,427 |
| I010 | 204 | Petition to amend a single tolerance exemption descriptor, or single non-food use descriptor, to add ≤ 10 CASRNs; no new data. (2) | 7 | 2,371 |
| I011 | 205 | Approval of new food use safener with tolerance or exemption from tolerance. (2) | 26 | 856,631 |
| I012 | 206 | Approval of new non-food use safener. (2) | 21 | 595,147 |
| I013 | 207 | Approval of additional food use for previously approved safener with tolerance or exemption from tolerance. (2) | 17 | 90,260 |
| I014 | 208 | Approval of additional non-food use for previously approved safener. (2) | 15 | 36,074 |
| I015 | 209 | Approval of new generic data for previously approved food use safener. (2) | 26 | 386,589 |
| I016 | 210 | Approval of amendment(s) to tolerance and label for previously approved safener. (2) | 15 | 79,942 |

| | | | | |
|---|---|---|---|---|
| I017 | 211 (new) | Add new source of previously approved safener. | 8 | 18,958 |
| I018 | 212 (new) | Petition to add one approved inert ingredient (CASRN) to the Commodity Inert Ingredient List; no data. (4) | 3 | 2,371 |

(1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

(2) If another covered application is submitted that depends upon an application to approve an inert ingredient, each application will be subject to its respective registration service fee. The decision review time for both submissions will be the longest of the associated applications. If the application covers multiple ingredients grouped by EPA into one chemical class, a single registration service fee will be assessed for approval of those ingredients.

(3) If EPA data rules are amended to newly require clearance under section 408 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 346a) for an ingredient of an antimicrobial product where such ingredient was not previously subject to such a clearance, then review of the data for such clearance of such product is not subject to a registration service fee for the tolerance action for two years from the effective date of the rule.

(4) Due to low fee and short time frame this category is not eligible for small business waivers.

### TABLE 19. — EXTERNAL REVIEW AND MISCELLANEOUS ACTIONS

| EPA No. | New CR No. | Action | Decision Review Time (Months) (1) | Registration Service Fee ($) |
|---|---|---|---|---|
| M001 | 213 | Study protocol requiring Human Studies Review Board review as defined in 40 CFR Part 26 in support of a currently registered active ingredient. | 14 | 11,378 |
| M002 | 214 | Completed study requiring Human Studies Review Board review as defined in 40 CFR Part 26 in support of an active ingredient. (2) | 14 | 11,378 |
| M003 | 215 | External technical peer review of new active ingredient, product, or amendment (e.g., consultation with FIFRA Scientific Advisory Panel) for an action with a decision timeframe of less than 12 months. Applicant initiated request based on a requirement of the Administrator, as defined by FIFRA §25(d), in support of a novel active ingredient, or unique use pattern or application technology. Excludes PIP active .ingredients. (3) | 12 | 91,651 |
| M004 | 216 | External technical peer review of new active ingredient, product, or amendment (e.g., consultation with FIFRA Scientific Advisory Panel) for an action with a decision timeframe of greater than 12 months. Applicant initiated request based on a requirement of the Administrator, as defined by FIFRA §25(d), in support of a novel active ingredient, or unique use pattern or application technology. Excludes PIP active ingredients. (3) | 18 | 91,651 |
| M005 | 217 | New Product: Combination, Contains a combination of active ingredients from a registered and/or unregistered source; conventional, antimicrobial and/or biopesticide. Requires coordination with other regulatory divisions to conduct review of data, label and/or verify the validity of existing data as cited. Only existing uses for each active ingredient in the combination product. (4)(5)(6) | 9 | 31,604 |
| M006 | 218 | Request for up to 5 letters of certification (Gold Seal) for one actively registered product (excludes distributor products). (7) | 1 | 398 |
| M007 | 219 | Request to extend Exclusive Use of data as provided by FIFRA Section 3(c)(1)(F)(ii). | 12 | 7,903 |
| M008 | 220 | Request to grant Exclusive Use of data as provided by FIFRA Section 3(c)(1)(F)(vi) for a minor use, when a FIFRA Section 2(ll)(2) determination is required. | 15 | 2,371 |
| M009 | 221 | Non-FIFRA Regulated Determination; applicant-initiated, per product. | 6 | 3,389 |

| M010 | 222 | Conditional ruling on pre-application, product substantial similarity. | 4 | 3,389 |
| M011 | 223 | Label amendment to add the DfE logo; requires data review; no other label changes. (8) | 4 | 5,230 |
| M012 (new) | 224 | Request for up to 5 letters of certification (Certificate of Establishment) for one actively registered product or one product produced for export (excludes distributor products). (7) | 1 | 398 |
| M013 (new) | 225 | Cancer reassessment; applicant-initiated. | 18 | 284,144 |
| M014 (new) | 227 | Pre-application nano-particle determination. | 8 | 17,424 |

   (1) A decision review time that would otherwise end on a Saturday, Sunday, or Federal holiday, will be extended to end on the next business day.

   (2) Any other covered application that is associated with and dependent on the review by the Human Studies Review Board will be subject to its separate registration service fee. The decision review times for the associated actions run concurrently, but will end at the date of the latest review time.

   (3) Any other covered application that is associated with and dependent on the FIFRA Scientific Advisory Panel review will be subject to its separate registration service fee. The decision review time for the associated action will be extended by the decision review time for the SAP review.

   (4) If another covered application is submitted that depends upon an application to approve an inert ingredient, each application will be subject to its respective registration service fee. The decision review time for both submissions will be the longest of the associated applications. If the application covers multiple ingredients grouped by EPA into one chemical class, a single registration service fee will be assessed for approval of those ingredients.

   (5) An application for a new end-use product using a source of active ingredient that (a) is not yet registered but (b) has an application pending with the Agency for review, will be considered an application for a new product with an unregistered source of active ingredient.

   (6) Where the action involves approval of a new or amended label, on or before the end date of the decision review time, the Agency shall provide to the applicant a draft accepted label, including any changes made by the Agency that differ from the applicant-submitted label and relevant supporting data reviewed by the Agency. The applicant will notify the Agency that the applicant either (a) agrees to all of the terms associated with the draft accepted label as amended by the Agency and requests that it be issued as the accepted final Agency-stamped label; or (b) does not agree to one or more of the terms of the draft accepted label as amended by the Agency and requests additional time to resolve the difference(s); or (c) withdraws the application without prejudice for subsequent resubmission, but forfeits the associated registration service fee. For cases described in (b), the applicant shall have up to 30 calendar days to reach agreement with the Agency on the final terms of the Agency-accepted label. If the applicant agrees to all of the terms of the accepted label as in (a), including upon resolution of differences in (b), the Agency shall provide an accepted final Agency-stamped label to the registrant within 2 business days following the registrant's written or electronic confirmation of agreement to the Agency.

   (7) Due to low fee and short time frame this category is not eligible for small business waivers.

   (8) This category includes amendments the sole purpose of which is to add "Design for the Environment" (DfE) (or equivalent terms that do not use "safe" or derivatives of "safe") logos to a label. DfE is a voluntary program. A label bearing a DfE logo is not considered an Agency endorsement because the ingredients in the qualifying product must meet objective, scientific criteria established and widely publicized by EPA.

   **(4) Pending pesticide registration applications**

   **(A) In general**

   An applicant that submitted a registration application to the Administrator before the effective date of the Pesticide Registration Improvement Act of 2003, but that is not required to pay a registration service fee under paragraph (2)(B), may, on a voluntary basis, pay a registration service fee in accordance with paragraph (2)(B).

   **(B) Voluntary fee**

   The Administrator may not compel payment of a registration service fee for an application described in subparagraph (A).

   **(C) Documentation**

   An application for which a voluntary registration service fee is paid under this paragraph shall be submitted with documentation certifying—

(i) payment of the registration service fee; or

(ii) a request for a waiver from or reduction of the registration service fee.

**(5) Resubmission of covered applications**

If a covered application is submitted by a person that paid the fee for the application under paragraph (2), is determined by the Administrator to be complete, and is not approved or is withdrawn (without a waiver or refund), the submission of the same covered application by the same person (or a licensee, assignee, or successor of the person) shall not be subject to a fee under paragraph (2).

**(6) Fee adjustment**

**(A) In general**

Subject to the following sentence, effective for a covered application received during the period beginning on October 1, 2024, and ending on September 30, 2026, the Administrator may increase by 5 percent the registration service fee payable for the application under paragraph (3).[1] No adjustment may be made under the preceding sentence until the date on which the Administrator begins to implement clauses (i) and (ii) of subsection (k)(2)(A).

**(B) Additional adjustment**

Subject to the following sentence, effective for a covered application received on or after October 1, 2026, the Administrator may increase by an additional 5 percent the registration service fee in effect as of September 30, 2026. No adjustment may be made under the preceding sentence until the date on which the Administrator begins to implement any recommendations for process improvements contained in the report under subsection (c)(4), as appropriate.

**(C) Publication**

The Administrator shall publish in the Federal Register the service fee schedules revised pursuant to this paragraph.

**(7) Waivers and reductions**

**(A) In general**

An applicant for a covered application may request the Administrator to waive or reduce the amount of a registration service fee payable under this section under the circumstances described in subparagraphs (D) through (G), except that no waiver or fee reduction shall be provided in connection with a request for a letter of certification (including a Gold Seal letter and a Certificate of Establishment).

**(B) Documentation**

**(i) In general**

A request for a waiver from or reduction of the registration service fee shall be accompanied by appropriate documentation demonstrating the basis for the waiver or reduction.

**(ii) Certification**

The applicant shall provide to the Administrator a written certification, signed by a responsible officer, that the documentation submitted to support the waiver or reduction request is accurate.

**(iii) Inaccurate documentation**

An application shall be subject to the applicable registration service fee payable under paragraph (3)(B) if, at any time, the Administrator determines that—

(I) the documentation supporting the waiver or reduction request is not accurate; or

(II) based on the documentation or any other information, the waiver or reduction should not have been granted or should not be granted.

**(C) Determination to grant or deny request**

As soon as practicable, but not later than 60 days, after the date on which the Administrator receives a request for a waiver or reduction of a registration service fee under this paragraph, the Administrator shall—

(i) determine whether to grant or deny the request; and

(ii) notify the applicant of the determination.

**(D) Minor uses**

**(i) In general**

The Administrator may exempt from, or waive a portion of, the registration service fee for an application for minor uses for a pesticide.

**(ii) Supporting documentation**

An applicant requesting a waiver or exemption under this subparagraph shall provide supporting documentation that demonstrates, to the satisfaction of the Administrator, that anticipated revenues from the uses that are the subject of the application would be insufficient to justify imposition of the full application fee.

**(E) IR–4 exemption**

The Administrator shall exempt an application from the registration service fee if the Administrator determines that—

(i) the application is solely associated with a tolerance petition submitted in connection with the Inter-Regional Project Number 4 (IR–4) as described in section 2 of Public Law 89–106 (7 U.S.C. 450i(e)); [1] and

(ii) the exemption is in the public interest.

**(F) Small businesses**

**(i) In general**

The Administrator shall waive 50 percent of the registration service fees payable by an entity for a covered application under this section if the entity is a small business (as defined in section 136a–1(i)(1)(E)(ii) of this title) at the time of application.

**(ii) Waiver of fees**

The Administrator shall waive 75 percent of the registration service fees payable by an entity under this section if the entity—

(I) is a small business (as defined in section 136a–1(i)(1)(E)(ii) of this title) at the time of application; and

(II) has average annual global gross revenues described in section 136a–1(i)(1)(E)(ii)(I)(bb) of this title that does not exceed $10,000,000, at the time of application.

**(iii) Formation for waiver**

The Administrator shall not grant a waiver under this subparagraph if the Administrator determines that the entity submitting the application has been formed or manipulated primarily for the purpose of qualifying for the waiver.

**(iv) Documentation**

An entity requesting a waiver under this subparagraph shall provide to the Administrator—

(I) documentation demonstrating that the entity is a small business (as defined in section 136a–1(i)(1)(E)(ii) of this title) at the time of application; and

(II) if the entity is requesting a waiver of 75 percent of the applicable registration service fees payable under this section, documentation demonstrating that the entity has an average annual global gross revenue described in section 136a–1(i)(1)(E)(ii)(I)(bb) of this title that does not exceed $10,000,000, at the time of application.

**(G) Federal and State agency exemptions**

An agency of the Federal Government or a State government shall be exempt from covered registration service fees under this section.

**(8) Refunds**

**(A) Early withdrawals**

If, during the first 60 days after the beginning of the applicable decision time review period under subsection (f)(3), a covered application is withdrawn by the applicant, the Administrator shall refund all but 25 percent.[2] of the total registration service fee payable under paragraph (3)(B) for the application.

**(B) Withdrawals after the first 60 days of decision review time period**

**(i) In general**

If a covered application is withdrawn after the first 60 days of the applicable decision time review period, the Administrator shall determine what portion, if any, of the total registration service fee payable under paragraph (3)(B) for the application may be refunded based on the proportion of the work completed at the time of withdrawal.

**(ii) Timing**

The Administrator shall—

(I) make the determination described in clause (i) not later than 90 days after the date the application is withdrawn; and

(II) provide any refund as soon as practicable after the determination.

### (C) Discretionary refunds

#### (i) In general

In the case of a covered application that has been filed with the Administrator and has not been withdrawn by the applicant, but for which the Administrator has not yet made a final determination, the Administrator may refund a portion of a covered registration service fee if the Administrator determines that the refund is justified.

#### (ii) Basis

The Administrator may provide a refund for an application under this subparagraph—

(I) on the basis that, in reviewing the application, the Administrator has considered data submitted in support of another covered application;

(II) on the basis that the Administrator completed portions of the review of the application before the effective date of this section; or

(III) on the basis that the Administrator rejected the application under subsection (f)(4)(B).

### (D) Credited fees

In determining whether to grant a refund under this paragraph, the Administrator shall take into account any portion of the registration service fees credited under paragraph (2) or (4).

## (c) Pesticide Registration Fund

### (1) Establishment

There is established in the Treasury of the United States a Pesticide Registration Fund to be used in carrying out this section (referred to in this section as the "Fund"), consisting of—

(A) such amounts as are deposited in the Fund under paragraph (2);

(B) any interest earned on investment of amounts in the Fund under paragraph (5); and

(C) any proceeds from the sale or redemption of investments held in the Fund.

### (2) Deposits in Fund

Subject to paragraph (4), the Administrator shall deposit fees collected under this section in the Fund.

### (3) Expenditures from Fund

#### (A) In general

Subject to subparagraphs (B) and (C) and paragraph (4), the Administrator may make expenditures from the Fund—

(i) to cover the costs associated with the review and decisionmaking pertaining to all applications for which registration service fees have been paid under this section; and

(ii) to otherwise carry out this section.

#### (B) Endangered species review of outdoor use of pesticide products

##### (i) In general

The Administrator shall use the amounts made available in the Fund to develop, receive comments with respect to, and finalize, guidance to registrants regarding analysis necessary to support the review of outdoor uses of pesticide products under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

##### (ii) Deadlines for guidance

The Administrator shall issue final guidance required by clause (i) in accordance with the following:

(I) With respect to new active ingredients or any registration review decision proposed for 1 or more outdoor uses, not later than 9 months after December 29, 2022.

(II) With respect to new outdoor uses of a registered pesticide, not later than 1 year after December 29, 2022.

(III) With respect to antimicrobial pesticide products, not later than 3 years after December 29, 2022.

#### (C) Independent third party assessments

##### (i) In general

The Administrator shall use the amounts made available in the Fund to carry out the activities described in clauses (ii) and (iii).

**(ii) Workforce assessment**

**(I) In general**

The Administrator shall procure a competitive contract with a qualified, independent contractor with expertise in assessing public sector workforce data analysis and reporting to conduct an assessment of current methodologies and data or metrics available to represent the workforce implementing the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act, including an assessment of filled and vacant positions and full-time equivalent employees relating to that implementation.

**(II) Report**

Not later than 2 years after December 29, 2022—

(aa) the contractor selected under subclause (I) shall submit to the Administrator a report describing—

(AA) the findings from the assessment under that subclause; and

(BB) recommendations for improved methodologies to represent full-time equivalent resources described in that subclause; and

(bb) the Administrator shall publish the report submitted under item (aa) on the website of the Environmental Protection Agency.

**(iii) Process assessment**

**(I) In general**

**(aa) Contracts**

Within 1 year of December 29, 2022, to the extent practicable, the Administrator shall issue a competitive contract to a private, independent consulting firm—

(AA) to conduct the assessment described in subclause (II); and

(BB) to submit to the Administrator a report describing the findings of the assessment and the processes and performance of the Environmental Protection Agency relating to the implementation of the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act.

**(bb) Eligibility**

The firm described in item (aa) shall be capable of performing the technical analysis, management assessment, and program evaluation tasks required to address the scope of the assessment under subclause (II).

**(II) Assessment**

**(aa) In general**

The Administrator, applicants, and registrants shall participate in a targeted assessment of the process for the review of applications submitted under this subchapter.

**(bb) Consultation**

The firm selected under subclause (I) shall consult with the Administrator and applicants at the start of the assessment under item (aa) and prior to submission of the report under subclause (I)(aa)(BB).

**(cc) Requirements**

The assessment under item (aa) shall evaluate and make recommendations regarding—

(AA) the initial content screen;

(BB) the preliminary technical screen;

(CC) performance, processes, and progress toward reducing renegotiation rates and the average length of renegotiations;

(DD) performance, processes, and progress toward eliminating the backlog of registrant submissions not covered by subsection (b)(3);

(EE) performance, processes, and progress toward ensuring that all registrant submissions not covered by subsection (b)(3) are completed by the applicable deadlines described in the notice of the Administrator entitled "Pesticide Registration Notice (PR) 98–10: Notifications, Non-Notifications and Minor Formulation Amendments" and dated October 22, 1998 (and any successor amendments to that notice) and described in subsections (c)(3)(B) and (h) of section 136a of this title;

(FF) compliance with the provisions of this subchapter relating to renegotiations and registrant submissions not covered by subsection (b)(3);

(GG) information technology systems;

about:blank
Exhibit C-1, pg. 137 of 152

(HH) recommended improvements to employee training;

(II) performance, progress, and processes in completing registration review; and

(JJ) other appropriate issues, such as submissions by inert suppliers and fast-track amendments under subsections (c)(3)(B) and (h) of section 136a of this title.

### (III) Report to Congress

Not later than 1 year after the receipt of an assessment required under this section, the Administrator shall submit to the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives—

(aa) a copy of each such assessment; and

(bb) the Administrator's evaluation of the findings and recommendations contained in each such assessment.

### (IV) Recommendations

The Administrator shall include with the report submitted under subclause (III) a classification of each recommendation described in the report as—

(aa) can be implemented through administrative action of the Administrator; or

(bb) requires a statutory change.

## (4) Collections and appropriations Acts

The fees authorized by this section and amounts deposited in the Fund—

(A) shall be collected and made available for obligation only to the extent provided in advance in appropriations Acts;

(B) shall be available during periods in which Environmental Protection Agency employees are on shutdown or emergency furlough as a result of a lapse in appropriations; and

(C) shall be available without fiscal year limitation.

## (5) Unused funds

### (A) In general

Amounts in the Fund not currently needed to carry out this section shall be—

(i) maintained readily available or on deposit;

(ii) invested in obligations of the United States or guaranteed by the United States; or

(iii) invested in obligations, participations, or other instruments that are lawful investments for fiduciary, trust, or public funds.

### (B) Use of investment income

After consultation with the Secretary of the Treasury, the Administrator may use income from investments described in clauses (ii) and (iii) of subparagraph (A) to carry out this section.

## (d) Assessment of fees

### (1) Definition of covered functions

In this subsection, the term "covered functions" means functions of the Office of Pesticide Programs of the Environmental Protection Agency, as identified in key programs and projects of the final operating plan for the Environmental Protection Agency submitted as part of the budget process for fiscal year 2002, regardless of any subsequent transfer of 1 or more of the functions to another office or agency or the subsequent transfer of a new function to the Office of Pesticide Programs.

### (2) Minimum amount of appropriations

Registration service fees may not be assessed for a fiscal year under this section unless the amount of appropriations for salaries, contracts, and expenses for the functions of the Office of Pesticide Programs of the Environmental Protection Agency for the fiscal year (excluding the amount of any fees appropriated for the fiscal year) are equal to or greater than $166,000,000.

### (3) Use of fees

Registration service fees authorized by this section shall be available, in the aggregate, only to defray increases in the costs associated with the review and decisionmaking for the review of pesticide registration applications and associated tolerances (including increases in the number of full-time equivalent positions in the Environmental Protection Agency engaged in those activities) over the costs for fiscal year 2002, excluding costs paid from fees appropriated for the fiscal year.

### (4) Subsequent authority

If the Administrator does not assess registration service fees under subsection (b) during any portion of a fiscal year as the result of paragraph (2) and is subsequently permitted to assess the fees under subsection

Exhibit C-1, pg. 138 of 152

(b) during the fiscal year, the Administrator shall assess and collect the fees, without any modification in rate, at any time during the fiscal year, notwithstanding any provisions of subsection (b) relating to the date fees are to be paid.

### (e) Reforms to reduce decision time review periods and prevent double payment of registration fees

#### (1) Reduction of decision time review periods

To the maximum extent practicable consistent with the degrees of risk presented by pesticides and the type of review appropriate to evaluate risks, the Administrator shall identify and evaluate reforms to the pesticide registration process under this subchapter with the goal of reducing decision review periods in effect on the effective date of the Pesticide Registration Improvement Extension Act of 2018 for pesticide registration actions for covered pesticide registration applications (including reduced risk applications). Such reforms shall include identifying opportunities for streamlining review processes for applications for a new active ingredient or a new use and providing prompt feedback to applicants during such review process.

#### (2) Prevention of double payment of registration service fees

The Administrator shall develop and implement a process to determine the appropriate fee category or categories for an application that qualifies for more than one fee category in order to assist applicants and prevent unnecessary payment of fees for multiple categories for a single application.

### (f) Decision time review periods

#### (1) In general

Not later than 30 days after the effective date of the Pesticide Registration Improvement Act of 2022, the Administrator shall make publicly available a schedule of decision review periods for covered pesticide registration actions or for any other action covered by a table specified in subsection (b)(3)(B) and corresponding registration service fees under this subchapter.

#### (2) Report

The schedule shall be the same as the applicable schedule provided under subsection (b)(3)(B).

#### (3) Applications subject to decision time review periods

The decision time review periods specified in paragraph (1) shall apply to—
(A) covered pesticide registration applications subject to registration service fees under subsection (b)(2);
(B) covered pesticide registration applications for which an applicant has voluntarily paid registration service fees under subsection (b)(4); and
(C) applications for any other action covered by a table specified in subsection (b)(3)(B).

#### (4) Start of decision time review period

##### (A) In general

Except as provided in subparagraphs (C), (D), and (E), in the case of a covered application accompanied by the registration service fee required under this section, the decision time review period begins 21 days after the date on which the Administrator receives the covered application and fee.

##### (B) Initial content and preliminary technical screenings

###### (i) Screenings

###### (I) Initial content

Not later than 21 days after receiving an application and the required registration service fee, the Administrator shall conduct an initial screening of the contents of the application in accordance with clause (iii).

###### (II) Preliminary technical screening

After conducting the initial content screening described in subclause (I) and in accordance with clause (iv), the Administrator shall conduct a preliminary technical screening—
(aa) not later than 45 days after the date on which the decision time review period begins (for applications with decision time review periods of not more than 180 days); and
(bb) not later than 90 days after the date on which the decision time review period begins (for applications with decision time review periods greater than 180 days).

###### (III) Final fee category

The fee category of a covered application or other actions may not be changed, without providing the information to the applicant, after completion of the preliminary technical screening described in clause (iv).

about:blank
Exhibit C-1, pg. 139 of 152

### (ii) Rejection

#### (I) In general

If the Administrator determines at any time before the Administrator completes the preliminary technical screening under clause (i)(II) that the application failed the initial content or preliminary technical screening and the applicant does not correct the failure before the date that is 10 business days after the applicant receives a notification of the failure, the Administrator shall reject the application.

#### (II) Written notification

The Administrator shall make every effort to provide a written notification of a rejection under subclause (I) during the 10-day period that begins on the date the Administrator completes the preliminary technical screening.

### (iii) Requirements of initial content screening

In conducting an initial content screening of an application, the Administrator shall automate the process, to the maximum extent practicable, and determine whether—

(I)(aa) the applicable registration service fee has been paid; or

(bb) at least 25 percent of the applicable registration service fee has been paid and the application contains a waiver or refund request for the outstanding amount and documentation establishing the basis for the waiver request; and

(II) the application appears to contain all the necessary forms, data, and draft labeling, formatted in accordance with guidance published by the Administrator.

### (iv) Requirements of preliminary technical screening

In conducting a preliminary technical screening of an application, the Administrator shall—

(I) determine if the application and the data and information submitted with the application are accurate and complete;

(II) determine if the application, data, and information are consistent with the proposed labeling and any proposal for a tolerance or exemption from the requirement for a tolerance under section 408 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 346a), and are such that, subject to full review under the standards of this subchapter, could result in the granting of the application;

(III) determine, if applicable, whether an application qualifies for a reduced risk determination under subsection (c)(10) or (h) of section 136a of this title;

(IV) grant or deny any data waiver requests submitted by the applicant with the application;

(V) verify and validate the accuracy of the fee category selected by the applicant; and

(VI) notify the applicant, in writing, if a new or different fee category is required and calculate the new decision review time based on the original submission date.

## (C) Applications with waiver or reduction requests

### (i) In general

In the case of an application submitted with a request for a waiver or reduction of registration service fees under subsection (b)(7), the decision time review period shall be determined in accordance with this subparagraph.

### (ii) Request granted with no additional fees required

If the Administrator grants the waiver or reduction request and no additional fee is required, the decision time review period begins on the earlier of—

(I) the date on which the Administrator grants the request; or

(II) the date that is 60 days after the date of receipt of the application.

### (iii) Request granted with additional fees required

If the Administrator grants the waiver or reduction request, in whole or in part, but an additional registration service fee is required, the decision time review period begins on the date on which the Administrator receives certification of payment of the applicable registration service fee.

### (iv) Request denied

If the Administrator denies the waiver or reduction request, the decision time review period begins on the date on which the Administrator receives certification of payment of the applicable registration service fee.

## (D) Pending applications

### (i) In general

The start of the decision time review period for applications described in clause (ii) shall be the date on which the Administrator receives certification of payment of the applicable registration service fee.

### (ii) Applications

Clause (i) applies to—

(I) covered pesticide registration applications for which voluntary fees have been paid under subsection (b)(4); and

(II) covered pesticide registration applications received on or after the effective date of the Pesticide Registration Improvement Act of 2003 but submitted without the applicable registration service fee required under this section due to the inability of the Administrator to assess fees under subsection (d)(1).

## (E) Applications for reduced risk

### (i) Fee

If an application for a reduced risk new active ingredient or a reduced risk new use is determined not to qualify as reduced risk, the applicant shall pay the difference in fee for the corresponding non-reduced risk application.

### (ii) Decision review time period

After receipt by the Administrator of the original covered reduced risk application and fee, the decision time review period for the corresponding non-reduced risk application shall begin within the time periods described in subparagraph (A), based on the submission date of the original covered reduced risk application.

## (5) Extension of decision time review period

### (A) Notification

If the Administrator cannot meet a decision time review period under this subsection, the Administrator shall notify the applicant, in writing, of—

(i) the reasons why additional time is needed; and

(ii) the number of days needed that would allow the Administrator to make a regulatory decision.

### (B) Extension by negotiation or mutual agreement

The Administrator, acting solely through the Director of the Office of Pesticide Programs, and the applicant may mutually agree, in writing, to extend a decision time review period under this subsection if—

(i) there is new or additional data or information from the applicant that is necessary for the Administrator to make a decision on the application that cannot be made available within the original decision time review period; or

(ii) a public comment period associated with the application generates significant comments that cannot be addressed within the original decision time review period.

### (C) Priority

Once a decision time review period for a covered action described in subsection (b)(3)(B) is missed or extended, the Administrator shall make any action on the application a priority.

## (g) Judicial review

### (1) In general

Any applicant adversely affected by the failure of the Administrator to make a determination on the application of the applicant for registration of a new active ingredient or new use for which a registration service fee is paid under this section may obtain judicial review of the failure solely under this section.

### (2) Scope

#### (A) In general

In an action brought under this subsection, the only issue on review is whether the Administrator failed to make a determination on the application specified in paragraph (1) by the end of the applicable decision time review period required under subsection (f) for the application.

#### (B) Other actions

No other action authorized or required under this section shall be judicially reviewable by a Federal or State court.

### (3) Timing

#### (A) In general

about:blank

Exhibit C-1, pg. 141 of 152

A person may not obtain judicial review of the failure of the Administrator to make a determination on the application specified in paragraph (1) before the expiration of the 2-year period that begins on the date on which the decision time review period for the application ends.

**(B) Meeting with Administrator**

To be eligible to seek judicial review under this subsection, a person seeking the review shall first request in writing, at least 120 days before filing the complaint for judicial review, a decision review meeting with the Administrator.

### (4) Remedies

The Administrator may not be required or permitted to refund any portion of a registration service fee paid in response to a complaint that the Administrator has failed to make a determination on the covered pesticide registration application specified in paragraph (1) by the end of the applicable decision review period.

## (h) Accounting

The Administrator shall—

(1) provide an annual accounting of the registration service fees paid to the Administrator and disbursed from the Fund, by providing financial statements in accordance with—

(A) the Chief Financial Officers Act of 1990 (Public Law 101–576; 104 Stat. 2838) and amendments made by that Act; and

(B) the Government Management Reform Act of 1994 (Public Law 103–356; 108 Stat. 3410) and amendments made by that Act;

(2) provide an accounting describing expenditures from the Fund authorized under subsection (c); and

(3) provide an annual accounting describing collections and expenditures authorized under subsection (d).

## (i) Auditing

### (1) Financial statements of agencies

For the purpose of section 3515(c) of title 31, the Fund shall be considered a component of an executive agency.

### (2) Components

The annual audit required under sections 3515(b) and 3521 of that title of the financial statements of activities under this section shall include an analysis of—

(A) the fees collected under subsection (b) and disbursed;

(B) compliance with subsection (f);

(C) the amount appropriated to meet the requirements of subsection (d)(1); and

(D) the reasonableness of the allocation of the overhead allocation of costs associated with the review and decisionmaking pertaining to applications under this section.

### (3) Inspector General

The Inspector General of the Environmental Protection Agency shall—

(A) conduct the annual audit required under this subsection; and

(B) report the findings and recommendations of the audit to the Administrator and to the appropriate committees of Congress.

## (j) Personnel levels

All full-time equivalent positions supported by fees authorized and collected under this section shall not be counted against the agency-wide personnel level goals of the Environmental Protection Agency.

## (k) Reports and information technology

### (1) Reports

#### (A) In general

Not later than 120 days after the last day of each of fiscal years 2023 through 2027, the Administrator shall publish an annual report describing—

(i) actions taken under this section;

(ii) registrant submissions not covered by subsection (b)(3)(B);

(iii) the initial content and preliminary technical screenings required in subsection (f)(4)(B); and

(iv) staffing relating to implementing the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act.

#### (B) Contents

Each report published under subparagraph (A) shall include a summary of the following information:

**(i) Actions under this section**

To the extent practicable, data for each action taken under this section that is completed during the fiscal year covered by the report or pending at the conclusion of that fiscal year, organized by registering division, including—

(I) the Action Code;

(II) the application receipt date;

(III) the electronic portal tracking number assigned to the application at the time of submission to the electronic submission portal or the Environmental Protection Agency tracking number;

(IV) the original decision due date based on the Action Code;

(V) the dates of any renegotiations and the renegotiated due dates, if applicable;

(VI) the reasons for each renegotiation, if applicable;

(VII) if the submission had to be recoded, reassigned codes, if applicable;

(VIII) the date that the submission was recoded, if applicable;

(IX) the decision completion date, if the action has been completed;

(X) the status of the action, which may be—

(aa) failed initial content screen;

(bb) failed preliminary technical screen;

(cc) approved;

(dd) withdrawn;

(ee) denied;

(ff) do not grant; or

(gg) pending;

(XI) the reason for any denial or do not grant decision, if applicable;

(XII) a review of the progress made in carrying out each requirement of subsections (e) and (f), including, to the extent determined appropriate by the Administrator and consistent with the authorities of the Administrator and limitations on delegation of functions by the Administrator, recommendations for the allowance and use of summaries of acute toxicity studies;

(XIII) a review of the progress in carrying out section 136a(g) of this title, including—

(aa) [3] the number of pesticides or pesticide cases reviewed and the number of registration review decisions completed, including—

(AA) the number of cases cancelled;

(BB) the number of cases requiring risk mitigation measures;

(CC) the number of cases removing risk mitigation measures;

(DD) the number of cases with no risk mitigation needed; and

(EE) the number of cases in which risk mitigation has been fully implemented;

(XIV) a review of the progress made toward implementing enhancements to—

(aa) the electronic tracking of conditional registrations; and

(bb) the endangered species database;

(XV) a review of the progress made in updating the Pesticide Incident Data System, including progress toward making the information contained in the System available to the public (as the Administrator determines is appropriate);

(XVI) an assessment of the public availability of summary pesticide usage data;

(XVII) the number of the active ingredients approved, new uses, and pesticide end use products granted in connection with the Design for the Environment program (or any successor program) of the Environmental Protection Agency;

(XVIII) with respect to funds in the Reregistration and Expedited Processing Fund described under section 136a–1(k) of this title, a review that includes—

(aa) a description of the amount and use of such funds—

(AA) to carry out activities relating to worker protection under subparagraphs (G) and (H) of section 136a–1(i)(1) of this title;

(BB) to award partnership grants under subparagraph (I) of such section; and

(CC) to carry out the pesticide safety education program under subparagraph (J) of such section;

(bb) an evaluation of the appropriateness and effectiveness of the activities, grants, and program under subparagraphs (G), (H), (I), and (J) of such section;

(cc) a description of how stakeholders are engaged in the decision to fund such activities, grants, and program in accordance with the stakeholder input provided under such subparagraphs; and

    (dd) with respect to activities relating to worker protection carried out under subparagraphs (G) and (H) of section 136a–1(i)(1) of this title, a summary of the analyses from stakeholders, including from worker community-based organizations, on the appropriateness and effectiveness of such activities.

    (XIX) beginning two years after enactment, report on the progress of meeting the deadlines listed in paragraph (5) of section 136a(f) of this title; and

    (XX) a review of progress made in implementing the pesticide surveillance program referred to in paragraph (8) of section 136a–1(k) of this title.

### (ii) Registrant submissions not covered by subsection (b)(3)(B)

    Each registrant submission not covered by subsection (b)(3)(B), that is completed during the fiscal year covered by the report or pending at the conclusion of that fiscal year, organized by registering division, including—

    (I) the submission date;

    (II) the electronic portal tracking number assigned to the application at the time of the submission of the application to the electronic submission portal;

    (III) the type of regulatory action, as defined by statute or guidance document, and the specific label action;

    (IV) the status of the action;

    (V) the due date;

    (VI) the reason for the outcome; and

    (VII) the completion date, if applicable.

### (iii) Screening process

    Data for the initial content screens and preliminary technical screens that are completed during the fiscal year covered by the report or pending at the conclusion of that fiscal year, organized by registering division, including—

    (I) the number of applications successfully passing each type of screen;

    (II) the number of applications that failed the screening process for each type of screen;

    (III) the number of notifications issued by the Administrator under subsection (f)(4)(B)(ii)(II);

    (IV) the number of notifications issued by the Administrator under subsection (f)(4)(B)(ii)(I) and the number of applications resulting in a rejection; and

    (V) the number of notifications issued under section 152.105 of title 40, Code of Federal Regulations (or successor regulations), and to the extent practicable, the reasons for that issuance.

### (iv) Staffing

    Data on the staffing relating to work covered under the Pesticide Registration Improvement Act of 2022 and the amendments made by that Act, organized by registering division, including—

    (I) the number of new hires and personnel departures;

    (II) the number of full-time equivalents at the end of each fiscal year;

    (III) the number of full-time equivalents working on registration review activities; and

    (IV) the number of full-time equivalents working on registrant submissions not covered by subsection (b)(3)(B).

### (C) Publication

    The Administrator shall publish each report under subparagraph (A)—

    (i) on the website of the Environmental Protection Agency; and

    (ii) by such other methods as the Administrator determines to be the most effective for efficiently disseminating the report.

### (2) Information technology

### (A) System

    Not later than 1 year after December 29, 2022, the Administrator shall establish an information technology system that—

    (i) includes all registering divisions in the Office of Pesticide Programs;

    (ii) provides a real-time, accurate, tracking system for all regulatory submissions to the Office of Pesticide Programs;

    (iii) provides a [4] real-time, accessible information [5] that provides each applicant confidential, online access to the status and progress of the regulatory submissions of the applicant; and

    (iv) updates the electronic submission portal—

(I) to ensure that label reviews are limited to current label changes, to the maximum extent practicable;

(II) to automate, to the extent practicable, minor, low risk regulatory actions; and

(III) to allow self-certification of certain regulatory actions, as determined by the Administrator.

**(B) Access to registration data and decisions**

The Administrator shall implement efforts to expand existing, and develop new, information technology tools and databases to improve access by Environmental Protection Agency employees to data used to fulfill registrations, and public access to information about regulatory decisionmaking tools, including opportunities for—

(i) analysis of the impact of submitted studies on Environmental Protection Agency assessments and decisions;

(ii) facilitation of read-across or computational model development to help fill information gaps;

(iii) tracking and reporting submission and decision metrics relating to the use and acceptance of test methods; and

(iv) drafting and publication of policies communicating Environmental Protection Agency acceptance of novel technologies or approaches.

**(l) Savings clause**

Nothing in this section affects any other duties, obligations, or authorities established by any other section of this subchapter, including the right to judicial review of duties, obligations, or authorities established by any other section of this subchapter.

**(m) Termination of effectiveness**

**(1) In general**

Except as provided in paragraph (2), the authority provided by this section terminates on September 30, 2027.

**(2) Phase out**

**(A) Fiscal year 2028**

During fiscal year 2028, the requirement to pay and collect registration service fees applies, except that the level of registration service fees payable under this section shall be reduced 40 percent below the level in effect on September 30, 2027.

**(B) Fiscal year 2029**

During fiscal year 2029, the requirement to pay and collect registration service fees applies, except that the level of registration service fees payable under this section shall be reduced 70 percent below the level in effect on September 30, 2027.

**(C) September 30, 2029**

Effective September 30, 2029, the requirement to pay and collect registration service fees terminates.

**(D) Decision review periods**

**(i) Pending applications**

In the case of an application received under this section before September 30, 2027, the application shall be reviewed in accordance with subsection (f).

**(ii) New applications**

In the case of an application received under this section on or after September 30, 2027, subsection (f) shall not apply to the application.

(June 25, 1947, ch. 125, §33, as added Pub. L. 108–199, div. G, title V, §501(f)(2), Jan. 23, 2004, 118 Stat. 422; amended Pub. L. 110–94, §5, Oct. 9, 2007, 121 Stat. 1002; Pub. L. 110–193, §1(a), Mar. 6, 2008, 122 Stat. 649; Pub. L. 112–177, §2(a)(2)(B), (b), Sept. 28, 2012, 126 Stat. 1328, 1330; Pub. L. 116–8, §§5, 6, Mar. 8, 2019, 133 Stat. 487, 491; Pub. L. 117–328, div. HH, title VI, §§705, 706, Dec. 29, 2022, 136 Stat. 6008, 6018.)

**EDITORIAL NOTES**

## REFERENCES IN TEXT

The effective date of the Pesticide Registration Improvement Act of 2003, and the effective date of this section, referred to in text, is the effective date of section 501 of Pub. L. 108–199, which is the

about:blank    Exhibit C-1, pg. 145 of 152

date that is 60 days after Jan. 23, 2004, unless otherwise provided, see section 501(h) of Pub. L. 108–199, set out as an Effective Date of 2004 Amendment note under section 136a of this title.

The Federal Food, Drug, and Cosmetic Act, referred to in subsec. (b)(2)(B)(ii), is act June 25, 1938, ch. 675, 52 Stat. 1040, which is classified generally to chapter 9 (§301 et seq.) of Title 21, Food and Drugs. For complete classification of this Act to the Code, see section 301 of Title 21 and Tables.

Paragraph (3), referred to in subsec. (b)(6)(A), probably should be a reference to paragraph (3) (B). Amendment by section 705(a)(1)(B) of Pub. L. 117–328 substituting "paragraph (3)(B)" for "paragraph (3)" wherever appearing in subsec. (b) was followed by the general amendment of subsec. (b)(6)(A) by section 705(a)(1)(D)(i) of Pub. L. 117–328, which contained the reference to paragraph (3).

Section 2 of Public Law 89–106, referred to in subsec. (b)(7)(E)(i), was formerly classified to secton 450i of this title prior to editorial reclassification and renumbering as section 3157 of this title.

The Endangered Species Act of 1973, referred to in subsec. (c)(3)(B)(i), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified principally to chapter 35 (§1531 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of Title 16 and Tables.

The Pesticide Registration Improvement Act of 2022, referred to in subsecs. (c)(3)(C)(ii)(I), (iii)(I) (aa)(BB) and (k)(1)(A)(iv), (B)(iv), is title VI (§701 et seq.) of div. HH of Pub. L. 117–328, Dec. 29, 2022, 136 Stat. 5996. For complete classification of this Act to the Code, see Short Title of 2022 Amendment note set out under section 136 of this title and Tables.

The effective date of the Pesticide Registration Improvement Extension Act of 2018, referred to in subsec. (e), means the effective date of Pub. L. 116–8, which was approved Mar. 8, 2019.

The effective date of the Pesticide Registration Improvement Act of 2022, referred to in subsec. (f)(1), means the effective date of title VI of div. HH of Pub. L. 117–263, which was approved Dec. 29, 2022.

The Chief Financial Officers Act of 1990, referred to in subsec. (h)(1)(A), is Pub. L. 101–576, Nov. 15, 1990, 104 Stat. 2838. For complete classification of this Act to the Code, see Short Title of 1990 Amendment note set out under section 501 of Title 31, Money and Finance, and Tables.

The Government Management Reform Act of 1994, referred to in subsec. (h)(1)(B), is Pub. L. 103–356, Oct. 13, 1994, 108 Stat. 3410. For complete classification of this Act to the Code, see Short Title of 1994 Amendment note set out under section 3301 of Title 31, Money and Finance, and Tables.

Two years after enactment, referred to in subsec. (k)(1)(B)(i)(XIX), means two years after the enactment of section 136a(f)(5) of this title, as enacted by Pub. L. 117–328, which was approved Dec. 29, 2022.

## PRIOR PROVISIONS

A prior section 33 of act June 25, 1947, ch. 125, was renumbered section 34 and is classified to section 136x of this title.

## AMENDMENTS

**2022**—Subsec. (b). Pub. L. 117–328, §705(a)(1)(B), substituted "paragraph (3)(B)" for "paragraph (3)" wherever appearing. Subsec. (b)(6)(A) was subsequently amended generally by Pub. L. 117–328, §705(a)(1)(D)(i), after which "paragraph (3)" appeared in text.

Subsec. (b)(2)(E)(iii). Pub. L. 117–328, §705(a)(1)(A), substituted "on completion of, where appropriate, the initial screening of the contents of the application or the preliminary technical screening" for "after review".

Subsec. (b)(3). Pub. L. 117–328, §705(a)(1)(C), designated existing provisions as subpar. (B), inserted heading, and added subpar. (A).

Subsec. (b)(3)(B). Pub. L. 117–328, §706, added subpar. (B) and struck out former subpar. (B), as designated by section 705(a)(1)(C) of Pub. L. 117–263, which set out the schedule of covered applications and other actions and their registration service fees.

Subsec. (b)(6)(A), (B). Pub. L. 117–328, §705(a)(1)(D), which directed amendment of subpars. (A) and (B) "to read as follows" but did not include subpar. designations or headings, was executed by amending the text only and retaining the existing designations and headings, to reflect the probable intent of Congress. Prior to amendment, subpars. (A) and (B) related to fee adjustment

about:blank
Exhibit C-1, pg. 146 of 152

between Oct. 1, 2019, and Sept. 30, 2021, and an additional fee adjustment starting on Oct. 1, 2021.

Subsec. (b)(7)(A). Pub. L. 117–328, §705(a)(1)(E), substituted "(including a Gold Seal letter and a Certificate of Establishment)" for "(commonly referred to as a Gold Seal letter)".

Subsec. (c)(3)(B), (C). Pub. L. 117–328, §705(b)(1), added subpars. (B) and (C) and struck out former subpar. (B). Prior to amendment, text of subpar. (B) read as follows:

"(i) IN GENERAL.—For each of fiscal years 2013 through 2023, the Administrator shall use approximately 1/17 of the amount in the Fund (but not less than $1,000,000) to enhance scientific and regulatory activities relating to worker protection, with an emphasis on field-worker populations in the United States.

"(ii) PARTNERSHIP GRANTS.—Of the amounts in the Fund, the Administrator shall use for partnership grants, for each of fiscal years 2013 through 2023, $500,000.

"(iii) PESTICIDE SAFETY EDUCATION PROGRAM.—Of the amounts in the Fund, the Administrator shall use $500,000 for each of fiscal years 2013 through 2023 to carry out the pesticide safety education program."

Subsec. (c)(4)(B), (C). Pub. L. 117–328, §705(b)(2), added subpar. (B) and redesignated former subpar. (B) as (C).

Subsec. (d)(2). Pub. L. 117–328, §705(c), struck out "(as in existence in fiscal year 2012)" after "for the functions" and substituted "$166,000,000." for "the amount of appropriations for covered functions for fiscal year 2012 (excluding the amount of any fees appropriated for the fiscal year)."

Subsec. (e). Pub. L. 117–328, §705(d), substituted "Reforms to reduce decision time review periods and prevent double payment of registration fees" for "Reforms to reduce decision time review periods" in subsec. heading, designated existing provisions as par. (1) and inserted par. heading, and added par. (2).

Subsec. (f). Pub. L. 117–328, §705(a)(2), substituted "subsection (b)(3)(B)" for "subsection (b)(3)" wherever appearing.

Subsec. (f)(1). Pub. L. 117–328, §705(e)(1), substituted "Pesticide Registration Improvement Act of 2022" for "Pesticide Registration Improvement Extension Act of 2018".

Subsec. (f)(4)(B)(i)(III). Pub. L. 117–328, §705(e)(2)(A)(i), added subcl. (III).

Subsec. (f)(4)(B)(iii). Pub. L. 117–328, §705(e)(2)(A)(ii), inserted "automate the process, to the maximum extent practicable, and" before "determine" in introductory provisions.

Subsec. (f)(4)(B)(iv). Pub. L. 117–328, §705(e)(2)(A)(iii), struck out "determine if" after "shall" in introductory provisions, inserted "determine if" at beginning of subcls. (I) and (II), and added subcls. (III) to (VI).

Subsec. (f)(4)(E). Pub. L. 117–328, §705(e)(2)(B), added subpar. (E) and struck out former subpar. (E). Prior to amendment, text read as follows: "In the case of a covered pesticide registration application listed in the Registration Division 2003 Work Plan of the Office of Pesticide Programs of the Environmental Protection Agency, the decision time review period begins on the date that is 30 days after the effective date of the Pesticide Registration Improvement Act of 2003."

Subsec. (f)(5). Pub. L. 117–328, §705(e)(3), added par. (5) and struck out former par. (5). Prior to amendment, text read as follows: "The Administrator and the applicant may mutually agree in writing to extend a decision time review period under this subsection."

Subsec. (k). Pub. L. 117–328, §705(f), added subsec. (k) and struck out former subsec. (k) which related to publication of annual reports and submission of another report to Congress.

Subsec. (m). Pub. L. 117–328, §705(g)(1), substituted "2027" for "2023" wherever appearing.

Subsec. (m)(2)(A). Pub. L. 117–328, §705(g)(2)(A), substituted "2028" for "2024" in heading and text.

Subsec. (m)(2)(B), (C). Pub. L. 117–328, §705(g)(2)(B), substituted "2029" for "2025" in heading and text.

**2019**—Subsec. (b)(2). Pub. L. 116–8, §5(a)(1)(A), struck out "pesticide registration" after "Covered" in heading.

Subsec. (b)(2)(A). Pub. L. 116–8, §5(a)(1)(B), inserted "or for any other action covered by a table specified in paragraph (3)" after "Pesticide Registration Improvement Act of 2003".

Subsec. (b)(3). Pub. L. 116–8, §6, amended par. (3) generally. Prior to amendment, par. (3) related to schedule of covered applications and registration service fees.

Subsec. (b)(5). Pub. L. 116–8, §5(a)(2), substituted "covered applications" for "pesticide registration applications" in heading and "covered application" for "pesticide registration

application" in two places in text.

Subsec. (b)(6)(A). Pub. L. 116–8, §5(a)(3)(A), struck out "pesticide registration" after "Effective for a covered" and substituted "October 1, 2019, and ending on September 30, 2021" for "October 1, 2013, and ending on September 30, 2015".

Subsec. (b)(6)(B). Pub. L. 116–8, §5(a)(3)(B), struck out "pesticide registration" after "Effective for a covered" and substituted "2021" for "2015" in two places.

Subsec. (b)(6)(C). Pub. L. 116–8, §5(a)(3)(C), substituted "service fee schedules revised pursuant to this paragraph" for "revised registration service fee schedules".

Subsec. (b)(7)(A). Pub. L. 116–8, §5(a)(4)(A), substituted "covered application" for "covered pesticide registration" and inserted before period at end ", except that no waiver or fee reduction shall be provided in connection with a request for a letter of certification (commonly referred to as a Gold Seal letter)".

Subsec. (b)(7)(F)(i). Pub. L. 116–8, §5(a)(4)(B), struck out "pesticide registration" after "for a covered".

Subsec. (b)(8)(A). Pub. L. 116–8, §5(a)(5)(A), struck out "pesticide registration" after "a covered".

Subsec. (b)(8)(B)(i). Pub. L. 116–8, §5(a)(5)(B), struck out "pesticide registration" after "If a covered".

Subsec. (b)(8)(C)(i). Pub. L. 116–8, §5(a)(5)(C)(i), substituted "case of a covered" for "case of a pesticide registration".

Subsec. (b)(8)(C)(ii)(I). Pub. L. 116–8, §5(a)(5)(C)(ii), substituted "covered" for "pesticide registration".

Subsec. (c)(3)(B). Pub. L. 116–8, §5(b)(1), inserted ", partnership grants, and pesticide safety education" after "Worker protection" in heading.

Subsec. (c)(3)(B)(i). Pub. L. 116–8, §5(b)(2), substituted "2023" for "2017" and inserted before period at end ", with an emphasis on field-worker populations in the United States".

Subsec. (c)(3)(B)(ii). Pub. L. 116–8, §5(b)(3), substituted "2023" for "2017".

Subsec. (c)(3)(B)(iii). Pub. L. 116–8, §5(b)(4), substituted "2023" for "2017".

Subsec. (e). Pub. L. 116–8, §5(c), substituted "Pesticide Registration Improvement Extension Act of 2018" for "Pesticide Registration Improvement Extension Act of 2012" and inserted at end "Such reforms shall include identifying opportunities for streamlining review processes for applications for a new active ingredient or a new use and providing prompt feedback to applicants during such review process."

Subsec. (f)(1). Pub. L. 116–8, §5(d)(1), substituted "Pesticide Registration Improvement Extension Act of 2018" for "Pesticide Registration Improvement Extension Act of 2012" and inserted "or for any other action covered by a table specified in subsection (b)(3)" after "covered pesticide registration actions".

Subsec. (f)(3)(C). Pub. L. 116–8, §5(d)(2), added subpar. (C) and struck out former subpar. (C) which read as follows: "covered pesticide registration applications listed in the Registration Division 2003 Work Plan of the Office of Pesticide Programs of the Environmental Protection Agency."

Subsec. (f)(4)(A). Pub. L. 116–8, §5(d)(3), substituted "a covered application" for "a pesticide registration application" and "the covered application" for "the covered pesticide registration application".

Subsec. (k)(1). Pub. L. 116–8, §5(e)(1), substituted "2023" for "2017".

Subsec. (k)(2)(D)(i). Pub. L. 116–8, §5(e)(2)(A), added cl. (i) and struck out former cl. (i) which read as follows: "the number of pesticides or pesticide cases reviewed;".

Subsec. (k)(2)(G)(i). Pub. L. 116–8, §5(e)(2)(B)(i), substituted "paragraphs (4) and (5) of section 136a–1(k) of this title" for "section 136a–1(k)(4) of this title" and "such paragraphs" for "that section".

Subsec. (k)(2)(G)(ii) to (vii). Pub. L. 116–8, §5(e)(2)(B)(ii)–(iv), added cl. (ii), redesignated cl. (vii) as (iii), and struck out former cls. (ii) to (vi) which read as follows:

"(ii) implementing systems for the electronic tracking of registration submissions by December 31, 2013;

"(iii) implementing a system for tracking the status of conditional registrations, including making nonconfidential information related to the conditional registrations publicly available by December 31, 2013;

"(iv) implementing enhancements to the endangered species knowledge database, including making nonconfidential information related to the database publicly available;

"(v) implementing the capability to electronically submit and review labels submitted with registration actions;

"(vi) acquiring and implementing the capability to electronically assess and evaluate confidential statements of formula submitted with registration actions by December 31, 2014; and".

Subsec. (k)(2)(K) to (O). Pub. L. 116–8, §5(e)(2)(C)–(E), added subpars. (K) to (O).

Subsec. (m)(1). Pub. L. 116–8, §5(f)(1), substituted "2023" for "2017".

Subsec. (m)(2)(A). Pub. L. 116–8, §5(f)(2)(A), in heading, substituted "Fiscal year 2024" for "Fiscal year 2018" and in text, substituted "2024" for "2018" and "2023" for "2017".

Subsec. (m)(2)(B). Pub. L. 116–8, §5(f)(2)(B), in heading, substituted "Fiscal year 2025" for "Fiscal year 2019" and in text, substituted "2025" for "2019" and "2023" for "2017".

Subsec. (m)(2)(C). Pub. L. 116–8, §5(f)(2)(C), substituted "2025" for "2019" in heading and text.

Subsec. (m)(2)(D). Pub. L. 116–8, §5(f)(2)(D), substituted "2023" for "2017" in cls. (i) and (ii).

**2012**—Subsec. (b)(3). Pub. L. 112–177, §2(b)(1)(A), added par. (3) and struck out former par. (3) which related to schedule of covered applications and registration service fees.

Subsec. (b)(6)(A). Pub. L. 112–177, §2(b)(1)(B)(i), substituted "October 1, 2013" for "October 1, 2008" and "September 30, 2015" for "September 30, 2010".

Subsec. (b)(6)(B). Pub. L. 112–177, §2(b)(1)(B)(ii), substituted "October 1, 2015" for "October 1, 2010" and "September 30, 2015" for "September 30, 2010".

Subsec. (b)(7)(F)(i). Pub. L. 112–177, §2(a)(2)(B)(i), substituted "section 136a–1 (i)(1)(E)(ii)" for "section 136a–1(i)(5)(E)(ii)".

Subsec. (b)(7)(F)(ii). Pub. L. 112–177, §2(a)(2)(B)(i), (ii), substituted "section 136a–1 (i)(1)(E)(ii)" for "section 136a–1(i)(5)(E)(ii)" in subcl. (I) and "section 136a–1(i)(1)(E)(ii)(I)(bb)" for "136a–1(i)(5) (E)(ii)(I)(bb)" in subcl. (II).

Subsec. (b)(7)(F)(iv)(I). Pub. L. 112–177, §2(a)(2)(B)(i), substituted "section 136a–1 (i)(1)(E)(ii)" for "section 136a–1(i)(5)(E)(ii)".

Subsec. (b)(7)(F)(iv)(II). Pub. L. 112–177, §2(a)(2)(B)(ii), (iii), substituted "applicable" for "applicable.", "revenue" for "revenues", and "section 136a–1(i)(1)(E)(ii)(I)(bb)" for "section 136a–1(i)(5)(E)(ii)(I)(bb)".

Subsec. (b)(8)(C)(ii)(III). Pub. L. 112–177, §2(b)(1)(C), added subcl. (III).

Subsec. (c)(3)(B)(i). Pub. L. 112–177, §2(b)(2)(A), substituted "2013 through 2017" for "2008 through 2012".

Subsec. (c)(3)(B)(ii). Pub. L. 112–177, §2(b)(2)(B), substituted "grants, for each of fiscal years 2013 through 2017, $500,000." for "grants—

"(I) for each of fiscal years 2008 and 2009, $750,000; and

"(II) for each of fiscal years 2010 through 2012, $500,000."

Subsec. (c)(3)(B)(iii). Pub. L. 112–177, §2(b)(2)(C), substituted "2013 through 2017" for "2008 through 2012".

Subsec. (d)(2). Pub. L. 112–177, §2(b)(3)(A), substituted "2012" for "2002" in two places.

Subsec. (d)(4), (5). Pub. L. 112–177, §2(b)(3)(B), (C), redesignated par. (5) as (4) and struck out former par. (4). Prior to amendment, text of par. (4) read as follows: "The requirements of paragraph (2) shall have been considered to have been met for any fiscal year if the amount of appropriations for salaries, contracts, and expenses for the functions (as in existence in fiscal year 2002) of the Office of Pesticide Programs of the Environmental Protection Agency for the fiscal year (excluding the amount of any fees appropriated for the fiscal year) is not more than 3 percent below the amount of appropriations for covered functions for fiscal year 2002 (excluding the amount of any fees appropriated for the fiscal year)."

Subsec. (e). Pub. L. 112–177, §2(b)(4), substituted "Pesticide Registration Improvement Extension Act of 2012" for "Pesticide Registration Improvement Act of 2003".

Subsec. (f)(1). Pub. L. 112–177, §2(b)(5)(A), substituted "Pesticide Registration Improvement Extension Act of 2012, the Administrator shall make publicly available" for "Pesticide Registration Improvement Renewal Act, the Administrator shall publish in the Federal Register".

Subsec. (f)(2). Pub. L. 112–177, §2(b)(5)(B), substituted "provided under subsection (b)(3)." for "appearing in the Congressional Record on pages S10409 through S10411, dated July 31, 2007."

Subsec. (f)(4)(A). Pub. L. 112–177, §2(b)(5)(C)(i), inserted "and fee" before period at end.

Subsec. (f)(4)(B). Pub. L. 112–177, §2(b)(5)(C)(ii)(I), substituted "Initial content and preliminary technical screenings" for "Completeness of application" in heading.

Exhibit C-1, pg. 149 of 152

Subsec. (f)(4)(B)(i). Pub. L. 112–177, §2(b)(5)(C)(ii)(I), (II), substituted "Screenings" for "In general" in cl. heading, designated existing provisions as subcl. (I) and inserted subcl. heading, and added subcl. (II).

Subsec. (f)(4)(B)(ii). Pub. L. 112–177, §2(b)(5)(C)(ii)(III), added cl. (ii) and struck out former cl. (ii). Prior to amendment, text read as follows: "If the Administrator determines under clause (i) that the application does not pass the initial screening and cannot be corrected within the 21-day period, the Administrator shall reject the application not later than 10 days after making the determination."

Subsec. (f)(4)(B)(iii). Pub. L. 112–177, §2(b)(5)(C)(ii)(IV), inserted "initial content" before "screening" in heading, "content" before "screening" in introductory provisions, and substituted "appears to contain" for "contains" in subcl. (II).

Subsec. (f)(4)(B)(iv). Pub. L. 112–177, §2(b)(5)(C)(ii)(V), added cl. (iv).

Subsec. (k)(1). Pub. L. 112–177, §2(b)(6)(A), substituted "March 1, 2017" for "March 1, 2014".

Subsec. (k)(2)(A)(viii). Pub. L. 112–177, §2(b)(6)(B)(i), added cl. (viii).

Subsec. (k)(2)(G) to (J). Pub. L. 112–177, §2(b)(6)(B)(ii)–(iv), added subpars. (G) to (J).

Subsec. (k)(4). Pub. L. 112–177, §2(b)(6)(C), added par. (4).

Subsec. (m)(1). Pub. L. 112–177, §2(b)(7)(A), substituted "2017" for "2012".

Subsec. (m)(2)(A). Pub. L. 112–177, §2(b)(7)(B)(i), substituted "2018" for "2013" in heading and "2018," for "2013," and "September 30, 2017" for "September 30, 2012" in text.

Subsec. (m)(2)(B). Pub. L. 112–177, §2(b)(7)(B)(ii), substituted "2019" for "2014" in heading and "2019," for "2014," and "September 30, 2017" for "September 30, 2012" in text.

Subsec. (m)(2)(C). Pub. L. 112–177, §2(b)(7)(B)(iii), substituted "2019" for "2014" in heading and "September 30, 2019" for "September 30, 2014" in text.

Subsec. (m)(2)(D). Pub. L. 112–177, §2(b)(7)(B)(iv), substituted "2017" for "2012" in cls. (i) and (ii).

**2008**—Subsec. (b)(7)(D)(i). Pub. L. 110–193, §1(a)(1)(A)(i), added cl. (i) and struck out former cl. (i). Prior to amendment, text read as follows: "The Administrator may waive or reduce a registration service fee for an application for minor uses for a pesticide."

Subsec. (b)(7)(D)(ii). Pub. L. 110–193, §1(a)(1)(A)(ii), inserted "or exemption" after "waiver".

Subsec. (b)(7)(E). Pub. L. 110–193, §1(a)(1)(B)(ii), substituted "exempt an application from the registration service fee" for "waive the registration service fee for an application" in introductory provisions.

Pub. L. 110–193, §1(a)(1)(B)(i), substituted "exemption" for "waiver" in heading.

Subsec. (b)(7)(E)(ii). Pub. L. 110–193, §1(a)(1)(B)(iii), substituted "exemption" for "waiver".

Subsec. (m)(2)(A), (B). Pub. L. 110–193, §1(a)(2), substituted "2012" for "2008".

**2007**—Subsec. (b)(2)(C)(ii). Pub. L. 110–94, §5(a)(1), added cl. (ii) and struck out former cl. (ii) which read as follows: "a request for a waiver from or reduction of the registration service fee."

Subsec. (b)(2)(D) to (H). Pub. L. 110–94, §5(a)(2), added subpars. (D) to (H).

Subsec. (b)(3)(A). Pub. L. 110–94, §5(b)(1)(A), substituted "Pesticide Registration Improvement Renewal Act" for "Pesticide Registration Improvement Act of 2003".

Subsec. (b)(3)(B). Pub. L. 110–94, §5(b)(1)(B), substituted "S10409 through S10411, dated July 31, 2007." for "S11631 through S11633, dated September 17, 2003."

Subsec. (b)(6). Pub. L. 110–94, §5(b)(2), added par. (6) and struck out former par. (6). Prior to amendment, text of par. (6) read as follows: "Effective for a covered pesticide registration application received on or after October 1, 2005, the Administrator shall—

"(A) increase by 5 percent the service fee payable for the application under paragraph (3); and

"(B) publish in the Federal Register the revised registration service fee schedule."

Subsec. (b)(7)(F)(ii). Pub. L. 110–94, §5(c)(1), substituted "75 percent" for "all" in introductory provisions.

Subsec. (b)(7)(F)(iv)(II). Pub. L. 110–94, §5(c)(2), substituted "75 percent of the applicable." for "all".

Subsec. (b)(8)(A). Pub. L. 110–94, §5(d), substituted "25 percent." for "10 percent".

Subsec. (c)(1)(B). Pub. L. 110–94, §5(e)(1), substituted "paragraph (5)" for "paragraph (4)".

Subsec. (c)(3)(B). Pub. L. 110–94, §5(e)(2)(A), added subpar. (B) and struck out former subpar. (B). Prior to amendment, text of subpar. (B) read as follows: "For each of fiscal years 2004 through 2008, the Administrator shall use approximately 1/17 of the amount in the Fund (but not more than $1,000,000, and not less than $750,000, for any fiscal year) to enhance current scientific and regulatory activities related to worker protection."

Subsec. (c)(3)(C). Pub. L. 110–94, §5(e)(2)(B), struck out subpar. (C). Text read as follows: "For each of fiscal years 2004 and 2005, the Administrator shall use approximately 1/34 of the amount in the Fund (but not to exceed $500,000 for any fiscal year) for the review and evaluation of new inert ingredients."

Subsec. (c)(5). Pub. L. 110–94, §5(e)(3), designated existing provisions as subpar. (A), inserted heading, redesignated former subpars. (A) to (C) as cls. (i) to (iii), respectively, of subpar. (A) and added subpar. (B).

Subsec. (d)(2). Pub. L. 110–94, §5(f), which directed substitution of "Registration" for "For fiscal years 2004, 2005 and 2006 only, registration", was executed by making the substitution for text which contained a comma after "2005" to reflect the probable intent of Congress.

Subsec. (f)(1). Pub. L. 110–94, §5(g)(1), substituted "Pesticide Registration Improvement Renewal Act" for "Pesticide Registration Improvement Act of 2003".

Subsec. (f)(2). Pub. L. 110–94, §5(g)(2), substituted "S10409 through S10411, dated July 31, 2007." for "S11631 through S11633, dated September 17, 2003."

Subsec. (f)(4)(B). Pub. L. 110–94, §5(g)(3), added subpar. (B) and struck out former subpar. (B) which provided criteria for determining completeness of pesticide registration applications.

Subsec. (k)(1). Pub. L. 110–94, §5(h)(1), substituted "March 1, 2014" for "March 1, 2009".

Subsec. (k)(2)(A)(ii) to (v). Pub. L. 110–94, §5(h)(2)(A)(i), (ii), added cls. (ii) to (iv) and redesignated former cl. (ii) as (v). Former cls. (iii) and (iv) redesignated (vi) and (vii), respectively.

Subsec. (k)(2)(A)(vi). Pub. L. 110–94, §5(h)(2)(A)(i), (iii), redesignated cl. (iii) as (vi) and added subcls. (IV) and (V).

Subsec. (k)(2)(A)(vii). Pub. L. 110–94, §5(h)(2)(A)(i), redesignated cl. (iv) as (vii).

Subsec. (k)(2)(D) to (F). Pub. L. 110–94, §5(h)(2)(B)–(D), added subpars. (D) to (F).

Subsec. (m)(1). Pub. L. 110–94, §5(i)(1), substituted "2012" for "2008".

Subsec. (m)(2)(A). Pub. L. 110–94, §5(i)(2)(A), substituted "2013" for "2009" in heading and text.

Subsec. (m)(2)(B), (C). Pub. L. 110–94, §5(i)(2)(B), substituted "2014" for "2010" in headings and text.

Subsec. (m)(2)(D). Pub. L. 110–94, §5(i)(2)(C), substituted "2012" for "2008" in two places.

### Statutory Notes and Related Subsidiaries

## Effective Date of 2012 Amendment

Amendment by Pub. L. 112–177 effective Oct. 1, 2012, see section 2(c) of Pub. L. 112–177, set out as a note under section 136a–1 of this title.

## Effective Date of 2008 Amendment

Pub. L. 110–193, §1(b), Mar. 6, 2008, 122 Stat. 650, provided that: "The amendments made by subsection (a) [amending this section] take effect on October 1, 2007."

## Effective Date of 2007 Amendment

Amendment by Pub. L. 110–94 effective Oct. 1, 2007, see section 6 of Pub. L. 110–94, set out as a note under section 136a of this title.

## Effective Date

Section effective on the date that is 60 days after Jan. 23, 2004, except as otherwise provided, see section 501(h) of Pub. L. 108–199, set out as an Effective Date of 2004 Amendment note under section 136a of this title.

## Implementation Dates With Respect to Fees

Increases in registration service fees specified in this section, as amended by title VI of div. HH of Pub. L. 117–328, not effective until 60 days after Dec. 29, 2022, regardless of whether this section specifies such increases to be effective for fiscal year 2023, see section 708(a)(1) of Pub. L. 117–328, set out in a note under section 136a–1 of this title.

## Extension of Limitations on Fee Amounts and Usage of Fees

Subsection (c)(3)(B) of this section to continue in effect through Sept. 30, 2018, see section 401(a) of Pub. L. 115–141, formerly set out as a note under section 136a–1 of this title.

Pub. L. 115–141, div. M, title IV, §401(b)(2), Mar. 23, 2018, 132 Stat. 1050, extended the authority provided by this section until Sept. 30, 2018.

¹ See References in Text note below.

² So in original. The period probably should not appear.

³ So in original. There is no item (bb).

⁴ So in original.

# §136x. Severability

If any provision of this subchapter or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of this subchapter which can be given effect without regard to the invalid provision or application, and to this end the provisions of this subchapter are severable.

(June 25, 1947, ch. 125, §34, formerly §26, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 998; renumbered §30, Pub. L. 95–396, §24(1), Sept. 30, 1978, 92 Stat. 836; renumbered §33, Pub. L. 104–170, title I, §121(1), Aug. 3, 1996, 110 Stat. 1492; renumbered §34, Pub. L. 108–199, div. G, title V, §501(f)(1), Jan. 23, 2004, 118 Stat. 422.)

### EDITORIAL NOTES

### PRIOR PROVISIONS

A prior section 34 of act June 25, 1947, ch. 125, was renumbered section 35 and is classified to section 136y of this title.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

# §136y. Authorization of appropriations

There is authorized to be appropriated to carry out this subchapter (other than section 136u(a) of this title)—

(1) $83,000,000 for fiscal year 1989, of which not more than $13,735,500 shall be available for research under this subchapter;

(2) $95,000,000 for fiscal year 1990, of which not more than $14,343,600 shall be available for research under this subchapter; and

(3) $95,000,000 for fiscal year 1991, of which not more than $14,978,200 shall be available for research under this subchapter.

(June 25, 1947, ch. 125, §35, formerly §27, as added Pub. L. 92–516, §2, Oct. 21, 1972, 86 Stat. 998; amended Pub. L. 94–51, July 2, 1975, 89 Stat. 257; Pub. L. 94–109, Oct. 10, 1975, 89 Stat. 571; Pub. L. 94–140, §3, Nov. 28, 1975, 89 Stat. 752; renumbered §31 and amended Pub. L. 95–396, §§24(1), 25, Sept. 30, 1978, 92 Stat. 836, 838; Pub. L. 96–539, §3, Dec. 17, 1980, 94 Stat. 3195; Pub. L. 98–201, §2, Dec. 2, 1983, 97 Stat. 1380; Pub. L. 99–198, title XVII, §1768, Dec. 23, 1985, 99 Stat. 1656; Pub. L. 100–532, title VII, §701, Oct. 25, 1988, 102 Stat. 2679; renumbered §34, Pub. L. 104–170, title I, §121(1), Aug. 3, 1996, 110 Stat. 1492; renumbered §35, Pub. L. 108–199, div. G, title V, §501(f)(1), Jan. 23, 2004, 118 Stat. 422.)

### EDITORIAL NOTES

## CODIFICATION

Another section 1768 of Pub. L. 99–198 enacted sections 154a and 159 and amended sections 151, 154, and 157 of Title 21, Food and Drugs.

## AMENDMENTS

**1988**—Pub. L. 100–532 amended section generally. Prior to amendment, section read as follows: "There is authorized to be appropriated to carry out this subchapter for the period beginning October 1, 1985, and ending September 30, 1986, $68,604,200 of which not more than $11,993,100 shall be available for research under this subchapter."

**1985**—Pub. L. 99–198 substituted provisions authorizing appropriations of $68,604,200 for fiscal year 1986 of which not more than $11,993,100 shall be available for research for former provisions which had authorized appropriations for fiscal years 1973 through 1984.

**1983**—Pub. L. 98–201 authorized necessary appropriations for period beginning Oct. 1, 1983, and ending Sept. 30, 1984, not in excess of $64,200,000.

**1980**—Pub. L. 96–539 inserted provisions authorizing appropriations for period beginning Oct. 1, 1979, and ending Sept. 30, 1980, and for period beginning Oct. 1, 1980, and ending Sept. 30, 1981.

**1978**—Pub. L. 95–396, §25, substituted appropriations authorization of $46,636,000 for period beginning Oct. 1, 1976, and ending Sept. 30, 1977, for prior authorization of $23,600,000 for period beginning Oct. 1, 1976, and ending Mar. 31, 1977, and authorized appropriations of $54,500,000 for period beginning Oct. 1, 1977, and ending Sept. 30, 1978, and such sums as may be necessary, limited to $70,000,000, for period beginning Oct. 1, 1978, and ending Sept. 30, 1979.

**1975**—Pub. L. 94–140 authorized appropriation of $47,868,000 to carry out provisions of this subchapter for period beginning Oct. 1, 1975, and ending Sept. 30, 1976, and $23,600,000 for period beginning Oct. 1, 1976, and ending Mar. 31, 1977.

Pub. L. 94–109 inserted provisions authorizing appropriation of $5,983,500 for period beginning Oct. 1, 1975 and ending Nov. 15, 1975.

Pub. L. 94–51 authorized appropriation of $11,967,000 to carry out provisions of this subchapter for period beginning July 1, 1975, and ending Sept. 30, 1975.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–532, title VII, §701, Oct. 25, 1988, 102 Stat. 2679, provided that amendment made by Pub. L. 100–532 is effective Oct. 1, 1988.

## EFFECTIVE DATE

For effective date of section, see section 4 of Pub. L. 92–516, set out as a note under section 136 of this title.

### Office of the Secretary

## MEDICAL CARE OF U.S. EMPLOYEES OVERSEAS AND THEIR DEPENDENTS

### Special Reimbursement Rates

Pursuant to the authority provided in 24 U.S.C. 34, as implemented by Executive Order No. 11116, August 5, 1963, special reimbursement rates for medical care of U.S. employees overseas and their dependents were put into effect on January 1, 1964. Because of increases in the cost of providing medical care, changes in international economic conditions, and improvements in the Federal Employees Health Benefits Program such blanket rates are no longer valid and are in need of revision. Pursuant to the authority delegated to the Secretary of Defense by Executive Order No. 11609, July 22, 1971, as amended, the special reimbursement rates for medical care provided to employes of the United States, and their dependents by hospitals and dispensaries overseas are revised as follows:

For inpatient care, of employees of the United States who are not citizens of the United States and their dependents (This rate is now paid by employees who are citizens) $168.00 per day.

For each outpatient treatment, examination, or consulation of employees of the United States and their dependents (This rate is now paid by employees in the United States) $20.00 per visit.

(The revised reimbursement rates provided above become effective April 1, 1977, except where local union contracts or agreements with foreign governments are in effect which incorporate the old rates of reimbursement. The contracts and agreements will be honored until expiration. Requests for special rates due to unusual circumstances shall be submitted by overseas commanders to the Assistant Secretary of Defense (Comptroller) for review and approval.

MAURICE W. ROCHE,
*Director, Correspondence and
Directives OASD (Comptroller).*

NOVEMBER 15, 1976.

[FR Doc.76-34149 Filed 11-18-76; 8:45 am]

### Office of the Secretary

## DEFENSE INTELLIGENCE AGENCY SCIENTIFIC ADVISORY COMMITTEE

### Closed Meeting

Pursuant to the provisions of Subsection (d) of Section 10 of Public Law 92-463, as amended by Pub. L. 94-409, notice is hereby given that a closed meeting of a Panel of the DIA Scientific Advisory Committee will be held as follows:

Thursday, 16 December 1976, Pomponio Plaza, Rosslyn, VA.

The entire meeting commencing at 0830 hours is devoted to the discussion of classified information as defined in Section 552(b) (1), Title 5 of the U.S. Code and therefore will be closed to the public. The Panel will receive briefings and participate in discussions relative to the Defense Intelligence Agency's assess-

ments of foreign military equipment, operations, and capabilities.

Dated: November 16, 1976.

MAURICE W. ROCHE,
*Director, Correspondence and
Directives, OASD (Comptroller).*

[FR Doc.76-34187 Filed 11-18-76;8:45 am]

## ENVIRONMENTAL PROTECTION AGENCY

[FRL 646-3; OPP-33000/478 & 479]

### RECEIPT OF APPLICATION FOR PESTICIDE REGISTRATION

#### Data to be Considered in Support of Applications

On November 19, 1973, the Environmental Protection Agency (EPA) published in the FEDERAL REGISTER (39 FR 31862) its interim policy with respect to the administration of section 3(c) (1) (D) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended ("Interim Policy Statement"). On January 22, 1976, EPA published in the FEDERAL REGISTER a document entitled "Registration of a Pesticide Product—Consideration of Data by the Administrator in Support of an Application" (41 FR 3339). This document described the changes in the Agency's procedures for implementing section 3(c) (1) (D) of FIFRA, as set out in the Interim Policy Statement, which were effectuated by the enactment of the recent amendments to FIFRA on November 28, 1975 (Pub. L. 94-140), and the new regulations governing the registration and re-registration of pesticides which became effective on August 4, 1975 (40 CFR Part 162).

Pursuant to the procedures set forth in these FEDERAL REGISTER documents, EPA hereby gives notice of the applications for pesticide registration listed below. In some cases these applications have recently been received; in other cases, applications have been amended by the submission of additional supporting data, the election of a new method of support, or the submission of new "offer to pay" statements.

In the case of all applications, the labeling furnished by the applicant for the product will be available for inspection at the Environmental Protection Agency, Room 209, East Tower, 401 M Street, SW., Washington, DC 20460. In the case of applications subject to the new section 3 regulations, and applications not subject to the new section 3 regulations which utilize either the 2(a) or 2(b) method of support specified in the Interim Policy Statement, all data citations submitted or referenced by the applicant in support of the application will be made available for inspection at the above address. This information (proposed labeling and, where applicable, data citations) will also be supplied by mail, upon request. However, such a request should be made only when circumstances make it inconvenient for the inspection to be made at the Agency offices.

Any person who (a) is or has been an applicant, (b) believes that data he de-

veloped and submitted to ERA on or after January 1, 1970, is being used to support an application described in this notice, (c) desires to assert a claim under section 3(c) (1) (D) for such use of his data, and (d) wishes to preserve his right to have the Administrator determine the amount of reasonable compensation to which he is entitled for such use of the data or the status of such data under section 10 must notify the Administrator and the applicant named in the notice in the FEDERAL REGISTER of his claim by certified mail. Notification to the Administrator should be addressed to the Product Control Branch, Registration Division (WH-567), Office of Pesticide Programs, Environmental Protection Agency, 401 M St. SW, Washington DC 20460. Every such claimant must include, at a minimum, the information listed in the Interim Policy Statement of November 19, 1973.

Specific questions concerning applications made to the Agency should be addressed to the designated Product Manager (PM), Registration Division (WH-567), Office of Pesticide Programs, at the above address, or by telephone as follows:

PM 11, 12, & 13—202/755-9315
PM 21 & 22—202/426-2454
PM 24—202/755-2196
PM 31—202/426-2635
PM 33—202/755-9041
PM 15, 16, & 17—202/426-9425
PM 23—202/755-1397
PM 25—202/426-2632
PM 32—202/426-9486
PM 34—202/426-9490

The Interim Policy Statement requires that claims for compensation be filed on or before January 18, 1977. With the exception of 2(c) applications not subject to the new section 3 regulations, and for which a sixty-day hold period for claims is provided, EPA will not delay any registration pending the assertion of claims for compensation or the determination of reasonable compensation. Inquiries and assertions that data relied upon are subject to protection under Section 10 of FIFRA, as amended, should be made on or before December 20, 1976.

Dated: November 15, 1970.

JOHN B. RITCH, Jr.,
*Director,
Registration Division.*

APPLICATIONS RECEIVED (OPP-33000/478)

EPA Reg. No. 275-21. Chemical Division, Abbott Laboratories, 14th and Sheridan Rd., North Chicago IL 60064. AMICAL-48. Active Ingredients: Diiodomethyl paratolyl sulfone 95%. Method of Support: Application proceeds under 2(b) of interim policy. PM33

EPA File Symbol 352-GIN. E. I. Du Pont De Nemours & Co., Inc., Biochemicals Dept., Wilmington DE 19898. LANNATE D METHOMYL INSECTICIDE DUST. Active Ingredients: Methomyl(S-methyl N-[(methylc a r b a m o y l ) oxy]thioacetimidate) 2%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM12

**51062**

EPA File Symbol 352–GIR. E. I. Du Pont De Nemours & Co., Inc. LANNATE 5–D METH–OMYL INSECTICIDE DUST. Active Ingredients: Methomyl (S-methyl N-[methyl-carbamoyl) oxy]thioacetimidate 5%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM12

EPA Reg. No. 499–160. Whitmire Research, Inc., 3568 Tree Court Industrial Blvd., St. Louis MO 63122. NO. 110 AEROSOL GENERATOR. Active Ingredients: (5-Benzyl-3-furyl) methyl 2,2-dimethyl - 3- (2 - methylpropenyl) cyclopropane carboxylate 1.000%. Method of Support: Application proceeds under 2(a) of interim policy. Republished: Added uses. PM17

EPA Reg. No. 961–277. Lebanon Chemical Corp., PO Box 180, Lebanon PA 17042. LEBANON TURF FUNGICIDE. Active Ingredients: Chlorothalonil (Tetrachloroisophthalonitrile) 5.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration PM21

EPA Reg. No. 1526–428. Arizona Agrochemical Co., PO Box 21537, Phoenix AZ 85036. AGRO–CHEM BRAND MALATHION 5 DUST. Active Ingredients: Malathion 5.00%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16.

EPA File Symbol 1763–E. Fields Point Chemical, Inc., PO Box 2095, Edgewood Station, Providence RI 02905. SODIUM HYPOCHLORITE SOLUTION FOR INDUSTRIAL USE ONLY. Active Ingredients: Sodium Hypochlorite 10.5%. Method of Support: Application proceeds under 2(c) of interim policy. Application for reregistration. PM34.

EPA Reg. No. 2290–38. The Terre Co. of New Jersey, Inc., 1 Samson St., Saddle Brook NJ 07662. DURBAN LAWN INSECTICIDE GRANULES FOR PROFESSIONAL USE ONLY. Active Ingredients: Chlorpyrifos (O,O-diethyl O-(3,5,6-trichloro-2-pyridyl) phosphorothioate) 2.32%. Method of Support: Application proceeds under 2(b) of interim policy. Republished: Revised offer to pay statement submitted. Added use and new method of support. PM12

EPA Reg. No. 3125–122. Chemagro Corp., PO Box 4913, Kansas City MO 64120. BAYGON SPRAY CONCENTRATE INSECTICIDE. Active Ingredients: O-Isopropoxyphenyl Methylcarbamate 17.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM12

EPA Reg. No. 3125–146. Chemagro Corp. BAYGON 70% WETTABLE POWDER INSECTICIDE. Active Ingredients: 2-(1-Methylethoxy) phenol methylcarbamate 70%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. Republished: added use.

EPA Reg. No. 3125–156. Chemagro Corp. BAYGON 70% WETTABLE POWDER INSECTICIDE. Active Ingredients: 2-(1-Methylethoxy) phenol methylcarbamate 70.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. Republished: Added uses.

EPA Reg. No. 3125–214. Chemagro Corp. BAYGON 1.5 EMULSIFIABLE INSECTICIDE. Active Ingredients: 2-(1-Methylethoxy) phenol methylcarbamate 13.9%. Method of Support: Application procedes under 2(b) of interim policy. Application for reregistration. PM12

EPA File Symbol 3298–EI. Murd Co., 1945 Philip St., Philadelphia PA 19122. ZURD RESIDUAL CRAWLING INSECT KILLER. Active Ingredients: o-isopropoxyphenyl methylcarbamate 1.0%. Petroleum distillate 84.0%. Method of Support: Application proceeds under 2(c) of interim policy. Republished: Revised offer to pay statement submitted. PM12

EPA Reg. No. 6720–59. Southern Mill Creek Products Co., Inc., PO Box 1096, Tampa FL 33601. DURSBAN 2E INSECTICIDE. Active Ingredients: Chlorpyrifos (O,O-diethyl O-(3,5,6-trichloro-2-pyridyl) phosphorothioate) 23.5%; Aromatic petroleum derivative solvent 14.9%; Xylene 54.9%. Method of Support: Application proceeds under 2(b) of interim policy. PM12

EPA File Symbol 6962–UU. Madison Bionics, 11250 W. Addison St., Franklin Park IL 60131. CHEMPLEX. Active Ingredients: n-alkyl (60% C14, 30% C16, 5% C12, 5% C18) dimethylbenzyl ammonium chlorides 1.6%; n-alkyl (68% C12, 32% C14) dimethyl ethylbenzyl ammonium chlorides 1.6%; Sodium carbonate 3.0%; Tetrasodium ethylene diamine tetraacetate 1.0%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA File Symbol 7296–RU. Gem City Chemicals, Inc., 1287 Air City Ave., Dayton OH 45404. CUPRI–PELS POOL WINTERIZER. Active Ingredients: Copper [chelate (pentahydrate) Copper as Metallic (26.2%) 99%. Method of Support: Application proceeds under 2(b) of interim policy. PM22

EPA File Symbol 8329–RN. Clark Outdoor Spraying Co., Inc., 7N570 Garden Ave., Roselle IL 60172. CLARKE SKEETER SLUGS. Active Ingredients: Chlorpyrifos (O,O-diethyl O-(3,5,6-trichloro-2-pyridyl) phosphorothioate 1.0%. Method of Support: Application proceeds under 2(b) of interim policy. PM12

EPA Reg. No. 8590–252. Agway, Inc., Fertilizer-Chemical Div., Box 1333, Syracuse NY 13201. AGWAY LAWN SHIELD CRABGRASS KILLER WITH TUPERSAN. Active Ingredients: Siduron [1-(2-methylcyclohexyl) -3-phenylurea] 6.15%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA File Symbol 8730–RR. Herculite Protective Fabrics Corp., A Subsidiary of Health-Chem Corp., 1107 Broadway, New York NY 10010. INSECTAPE. Active Ingredients: 2-(1-Methylethoxy) phenol methylcarbamate 10.0%. Method of Support: Application proceeds under 2(b) of interim policy. PM12

EPA File Symbol 8950–EN. Applied Biochemists, Inc., 5300 W. County Line Rd., Mequon WI 53092. CUTRINE–PLUS II ALGAECIDE. Active Ingredients: Copper as elemental 10.88%. Method of Support: Application proceeds under 2(c) of interim policy. PM24

EPA File Symbol 11661–R. Hot Bug Organic Pesticide Sales & Services, PO Box 8274, Long Beach CA 90808. HOT BUG PESTICIDE KILLS ADULT SPIDER MITES, SALT MARSH LARVAE. Active Ingredients: Borax 2.09%. Method of Support: Application proceeds under 2(a) of interim policy. PM16

EPA File Symbol 11661–E. Hot Bug Organic Pesticides Sales & Services. HOT BUG PESTICIDE KILLS COCKROACHES. Active Ingredients: Borax 3.28%. Method of Support: Application proceeds under 2(a) of interim policy. PM16

EPA File Symbol 11661–L. Hot Bug Organic Pesticide Sales & Services. HOT BUG PESTICIDE KILLS HOUSEFLIES, MOSQUITOS. Active Ingredients: Borax 3.28%. Method of Support: Application proceeds under 2(a) of interim policy. PM16

EPA File Symbol 11687–OG. Transvaal, Inc., Suite 3200, Clark Tower, 5100 Poplar Ave., Memphis TN 38137. TRANSVAAL WEEDRHAP MCPA–6–A. Active Ingredients: Dimethylamine salt of 2-methyl-4-chloro-

phenoxyacetic acid 75.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA File Symbol 15749–E. Vermillion Chemical Service, Inc., 1306 Charity St., Abbeville, LA 70510. VERMILLON Q.A.C. Active Ingredients: n-Alkyl (60% C14, 30% C16, 5% C12, 5% C18) dimethyl benzyl ammonium chlorides 5%; n-Alkyl (68% C12, 32% C14) dimethyl ethylbenzyl ammonium chlorides 5%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA File Symbol 15749–G. Vermillion Chemical Service, Inc. V.C. ALGA–WAY. Active Ingredients: n-Alkyl (60% C14, 30% C16, 5% C12, 5% C18) dimethyl benzyl ammonium chlorides 5%; n-Alkyl (68% C12, 32% C14) dimethyl ethylbenzyl ammonium chlorides 5%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA File Symbol 20954–A. Zoecon Corp., 975 California Ave., Pulcatta CA 94304. STARBAR BLOCK IGR CATTLE SUPPLEMENT. Active Ingredients: methoprene [Isopropyl (E,E) -11-methoxy-3, 7-11-trimethyl-2, 4-dodecadienoate] 0.01%. Method of Support: Application proceeds under 2(b) of interim policy. PM17

EPA Reg. No. 27586–1. U.S. Forest Service, (1205–B LRPE), 14th & Independence Ave., SW, Washington DC 20250. TM BIOCONTROL–1 BIOLOGICAL INSECTICIDE FOR THE DOUGLAS-FIR TUSSOCK MOTH. Active Ingredients: (Polyhedral inclusion bodies of Douglas-fir tussock moth nucleopolyhedrosis virus) 3.5%. Method of Support: Application proceeds under 2(a) of interim policy. PM17

EPA Reg. 34429–4. American Chemical Corp., PO Box 296, Buyamon PR 00619. SUPER KILLER PRESSURIZED SPRAY. Active Ingredients: Petroleum distillates 68.054%; N-Octyl bicycloheptane dicarboximide 0.840%; Technical Piperonyl Butoxide 0.504%; Pyrethrins 0.252%. Method of Support: Application proceeds under 2(c) of interim policy. PM17

EPA Reg. No. 36531–4. The Friar Co., 4440 Fifth St. RD, PO Box 109, Lavalette WV 25585. SHILLELAGH 211. Active Ingredients: Didecyl dimethyl ammonium chloride 50%; Isopropyl alcohol 20%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA File Symbol 36536–R. Perc Serv., Inc., 2235 Chestnut St., Oakland CA 94607. PSI MILDEW CONTROL. Active Ingredients: Didecyl dimethyl ammonium chloride 40%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA File Symbol 38053–E. Leo Ind., Inc., 1750 W. 75th Pl., Chicago IL 60620. LEO QUAT 450 NF DISINFECTANT CLEANER, MINT. Active Ingredients: n-Alkyl (60% C14, 30% C16, 5% C12, 5% C18) dimethyl benzyl ammonium chlorides 2.25%; n-Alkyl (68% C12, 32% C14) dimethyl ethylbenzyl ammonium chlorides 2.25%; Sodium Carbonate 3.00%; Tetrasodium ethylenediamine tetraacetate 1.00%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA File Symbol 38515–R. Dabco, 3402 Dean St., Naples FL 33940. DABCO. Active Ingredients: Sodium Hypochlorite 9.2%. Method of Support: Application proceeds under 2(b) of interim policy. PM34

EPA File Symbol 38621–R. Foster Manufacturing, Inc., 1577 First St., Coachella CA 92236. EAGLE METHYL BROMIDE. Active Ingredients: Methyl Bromide 99.75%; Chloropicrin 0.25%. Method of Support: Application proceeds under 2(b) of interim policy. PM11

EPA File Symbol 39508-R. New Mexico Dept. of Agriculture, PO Box 3189, Las Cruces NM 88003. M-44 CYANIDE CAPSULES. Active Ingredients: Sodium Cyanide 88.78%. Method of Support: Application proceeds under 2(b) of interim policy. PM11

APPLICATIONS RECEIVED (OPP-33000/479)

EPA Reg. No. 239-2337. Chevron Chemical Co., Ortho Div., 940 Hensley St., Richmond CA 94804. ORTHO CRAB GRASS PREVENTER PLUS LAWN FOOD 19-3-3. Active Ingredients: S-(0,0-diisopropylphosphorodithioate) ester of N-(2-mercaptoethyl) benzenesulfonamide 4.35%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 239-2338. Chevron Chemical Co. ORTHO CRAB GRASS PREVENTER PLUS LAWN AND DICHONDRA FOOD: Active Ingredients: S-(0,0-diisopropyl phosphorodithioate) ester of N-(2-mercaptoethyl) benzenesulfonamide 5.2%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA File Symbol 323-LG. J. I. Holcomb Mfg. Co., 4415 Euclid Ave., Cleveland OH 44103. HOLCOMB SWIMMING POOL ALGAECIDE. Active Ingredients: Alkyl Dimethyl Benzyl Ammonium Chloride (C14 60%, C12 25%, C16 15%) 10%. Method of Support: Application proceeds under 2(b) of interim policy. PM24

EPA File Symbol 323-LU. J. I. Holcomb Mfg. Co. LIQUID SANITIZER. Active Ingredients: Alkyl (60% C14, 30% C16, 5% C12, 5% C18) Dimethyl Benzyl Ammonium Chlorides 1.28%; Alkyl (68% C12, 32% C14) Dimethyl Ethylbenzyl Ammonium Chlorides 1.28%; Sodium carbonate 2.00%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA Reg. No. 449-227. Techne Corp., c/o Regulatory Affairs Dept., Farmland Ind., Inc., P.O. Box 7305, Kansas City MO 64116. TECHNE LAWN GUARD. Active Ingredients: Dimethyl tetrachloroterephthalate (Dacthal (R)) 1.75%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA File Symbol 464-LUR. Dow Chemical Co., P.O. Box 1706, Midland MI 48640. TORDON 5K PELLETS HERBICIDE. Active Ingredients: Picloram (4-amino-3,5,6-trichloropicolinic acid) potassium salt 5.8%. Method of Support: Application proceeds under 2(b) of interim policy. PM25

EPA File Symbol 524-80. Monsanto Co., Agricultural Products, 800 N. Lindbergh Blvd., St. Louis MO 63166. MCP AMINE. Active Ingredients: Dimethylamine salt of 2-Methyl-4-Chlorophenoxyacetic acid 52.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA File Symbol 524-GEE. Monsanto Co. MCP AMINE. Active Ingredients: Dimethylamine sale of 2-Methyl-4-Chlorophenoxyacetic acid 52.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA Reg. No. 538-11. O. M. Scott & Sons, Marrysville OH 43040. SCOTTS HALTS BRAND CRABGRASS PREVENTER. Active Ingredients: S-(0,0-Diisopropyl phosphorodithioate) ester of N-(2-Mercaptoethyl) benzenesulfonamide 11%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 538-26. O. M. Scott & Sons. SCOTTS PROTURF BRAND. Active Ingredients: S-(0,0-Diisoprophyl phosphorodithioate) ester of N-(2-Mercaptoethyl)

benzenesulfonamide 8.50%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 538-37. O. M. Scott & Sons. SCOTTS PROTURF BRAND 28-0-7 FERTILIZER WITH WEEDGRASS PREVENTER. Active Ingredients: S-(0,0-Diisopropyl phosphorodithioate) ester of N-(2-Mercaptoethyl) benzenesulfonamide 9.00%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 538-53. O. M. Scott & Sons. SCOTTS SUPER HALTS PLUS BRAND CRABGRASS PREVENTER PLUS LAWN FERTILIZER. Active Ingredients: S-(0,0-Diisopropyl phosphorodithioate) ester of N-(2-Mercaptoethyl) benzenesulfonamide 4.60%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 538-58. O. M. Scott & Sons. TURF BUILDER PLUS HALTS CRABGRASS PREVENTER PLUS LAWN FERTILIZER. Active Ingredients: S-(0,0-Diisopropyl phosphorodithioate) ester of N-(2-Mercaptoethyl) benzenesulfonamide 5.60%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 538-177. O. M. Scott & Sons. SUPER TURF BUILDER PLUS HALTS CRABGRASS PREVENTER PLUS LAWN FERTILIZER. Active Ingredients: S-(0,0-Diisopropyl phosphorodithioate) ester of N-(2-Mercaptoethyl) benzenesulfonamide 5.75%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 538-129. O. M. Scott & Sons. SCOTTS PROTURF BRAND 32-4-4. Active Ingredients: S-(0,0-Diisopropyl phosphorodithioate) ester of N-(2-Mercaptoethyl) benzenesulfonamide 5.20%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 538-137. O. M. Scott & Sons. SCOTTS PROTURF (R) BRAND 26-0-12. Active Ingredients: S-(0,0-Diisopropyl phosphorodithioate) ester of N-(2-Mercaptoethyl (Benzenesulfonamide 7.80%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM25

EPA Reg. No. 554-60. Agsco, Inc., P.O. Box 458, Grand Folks ND 58201. MCP AMINE HERBICIDE. Active Ingredients: Dimethylamine Salt of 2-Methyl-4-chlorophenoxyacetic acid 52.47%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA Reg. No. 554-123. Agsco, Inc. AGSCO MA HERBICIDE. Active Ingredients: Diethanolamine Salt of 2-Methyl-4-chlorophenoxyacetic acid 62.33%. Method of Support: Application proceeds under 2(b) of interim policy. Application for registration. PM23

EPA Reg. No. 554-125. Agsco, Inc. AGSCO MXL HERBICIDE. Active Ingredients: 2-Methyl-4-chlorophenoxyacetic acid Isooctyl ester 75.08%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA File Symbol 900-RRE. Chemical Service, Div. of American Chemmate Corp., Howard & West Sts., Baltimore MD 21230. CREAMY BACTERIOSTATIC CLEANER. Active Ingredients: Ammonium Oxalate 1.30%; 2,2'-Methylenebis (3,4,6-Trichlorodiphenol) 0.30%; Ammonium Ethylene Diamine Tetraacetate 0.20%; 2,4,4'-Trichloro-2'-hydroxydiphenylether 0.10%; Ammonium Ortho Phenylphenate 0.05%. Method of Support: Application proceeds under 2(b) of interim policy. PM32

EPA File Symbol 900-RRE. Chemical Service. CREME-BRITE BACTERIOSTATIC CLEANER. Active Ingredients: Ammonium Oxalate 1.30%; 2,2'-Methylenebis (3,4,6-Trichlorodiphenol) 0.30%; Ammonium Ethylene Diamine Tetraacetate 0.20%; 2,4,4'-Trichloro-2'-hydroxydiphenylether 0.10%; Ammonium Ortho Phenylphenate 0.05%. Method of Support: Application proceeds under 2(b) of interim policy. PM32

EPA File Symbol 900-RRG. Chemical Service. LEMON BACTERIOSTATIC CREME CLEANER. Active Ingredients: Ammonium Oxalate 1.30%; 2,2'-Methylenebis (3,4,6-Trichlorodiphenol) 0.30%; Ammonium Ethylene Diamine Tetraacetate 0.20%; 2,4,4'-Trichloro-2'-hydroxydiphenylether 0.10%; Ammonium Ortho Phenylphenate 0.05%. Method of Support: Application proceeds under 2(b) of interim policy. PM32

EPA Reg. No. 904-146. B. G. Pratt Div., Gabriel Chemicals Ltd., 204 21st Ave., Paterson NJ 07509. PRATT DANDELION DESTROYER. Active Ingredients: Dimethylamine salt of Dicamba (3,6-dichloro-o-anisic acid) 3.43%; Dimethylamine salts of Related Acids 0.55%; Dimethylamine salt of 2,4-Dichlorophenoxyacetic acid 17.22%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA Reg. No. 904-195. B. G. Pratt Div. PRATT TURF HERBICIDE 10,000. Active Ingredients: Dimethylamine salt of 2,4-dichlorophenoxyacetic acid 12.88%; Dimethylamine salt of 2-(2-methyl-4-chlorophenoxy) propionic acid 5.84%; Dimethylamine salt of Dicamba (3,6-dichloro-o-anisic acid) 1.34%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

[FR Doc.76-34121 Filed 11-18-76; 8:45 am]

[FRL 646-4; OPP-33000/480]

RECEIPT OF APPLICATION FOR PESTICIDE REGISTRATION

Data To Be Considered In Support of Applications

On November 19, 1973, the Environmental Protection Agency (EPA) published in the FEDERAL REGISTER (39 FR 31862) its interim policy with respect to the administration of section 3(c)(1) (D) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended ("Interim Policy Statement"). On January 22, 1976, EPA published in the FEDERAL REGISTER a document entitled "Registration of a Pesticide Product—Consideration of Data by the Administrator in Support of an Application" (41 FR 3339). This document described the changes in the Agency's procedures for implementing section 3(c) (1)(D) of FIFRA, as set out in the Interim Policy Statement, which were effectuated by the enactment of the recent amendments to FIFRA on November 28, 1975 (Pub. L. 94-140), and the new regulations governing the registration and re-registration of pesticides which became effective on August 4, 1975 (40 CFR Part 162).

Pursuant to the procedures set forth in these FEDERAL REGISTER documents, EPA hereby gives notice of the applications for pesticide registration listed below. In some cases these applications have recently been received; in other cases, applications have been amended by the submission of additional supporting data.

51064                                                                                           **NOTICES**

the election of a new method of support, or the submission of new "offer to pay" statements.

In the case of all applications, the labeling furnished by the applicant for the product will be available for inspection at the Environmental Protection Agency, Room 209, East Tower, 401 M Street, SW., Washington DC 20460. In the case of applications subject to the new section 3 regulations, and applications not subject to the new section 3 regulations which utilize either the 2(a) or 2(b) method of support specified in the Interim Policy Statement, all data citations submitted to or referenced by the applicant in support of the application will be made available for inspection at the above address. This information (proposed labeling and, where applicable, data citations) will also be supplied by mail, upon request. However, such a request should be made only when circumstances make it inconvenient for the inspection to be made at the Agency offices.

Any person who (a) is or has been an applicant, (b) believes that data be developed and submitted to EPA on or after January 1, 1970, is being used to support an application described in this notice, (c) desires to assert a claim under section 3(c) (1) (D) for such use of his data, and (d) wishes to preserve his right to have the Administrator determine the amount of reasonable compensation to which he is entitled for such use of the data or the status of such data under section 10 must notify the Administrator and the applicant named in the notice in the FEDERAL REGISTER of his claim by certified mail. Notification to the Administrator should be addressed to the Product Control Branch, Registration Division (WH–567), Office of Pesticide Programs, Environmental Protection Agency, 401 M St. SW., Washington DC 20460. Every such claimant must include, at a minimum, the information listed in the Interim Policy Statement of November 19, 1973.

Specific questions concerning applications made to the Agency should be addressed to the designated Product Manager (PM), Registration Division (WH–567), Office of Pesticide Programs, at the above address, or by telephone as follows:

PM 11, 12, and 13—202/755–9315
PM 21 and 22—202/426–2454
PM 24—202/755–2196
PM 31—202/426–2635
PM 33—202/755–9041
PM 15, 16, and 17—202/426–9425
PM 23—202/755–1397
PM 25—202/426–2632
PM 32—202/426–9486
PM 34—202/426–9490

The Interim Policy Statement requires that claims for compensation be filed on or before January 18, 1976. With the exception of 2(c) applications not subject to the new section 3 regulations, and for which a sixty-day hold period for claims is provided, EPA will not delay any registration pending the assertion of claims for compensation or the determination of reasonable compensation. Inquiries and

assertions that data relied upon are subject to protection under section 10 of FIFRA, as amended, should be made on or before December 20, 1976.

Dated: November 11, 1976.

JOHN B. RITCH, Jr.,
*Director,
Registration Division.*

APPLICATIONS RECEIVED (OPP–33000/480)

EPA Reg. No. 602–87. Ralston Purina Co., Checkerboard Square, St. Louis MO 63188. PURINA MALATHION DUST. Active Ingredients: Malathion 4%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA Reg. No. 602–227. Ralston Purina Co. PURINA HOG AND CATTLE DUSTING POWDER. Active Ingredients: Malathion 4%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA File Symbol 1266–RTR. Malter International, Inc., PO Box 6099, New Orleans, LA 70114. KNOX OUT II INSECTICIDE SPRAY. Active Ingredients: (5-Benzyl-3-furyl) methyl 2,2-dimethyl-3-(2-methyl-propenyl) cyclopropanecarboxylate 0.250%; Related compounds 0.034%. Method of Support: Application proceeds under 2(b) of interim policy. PM17

EPA Reg. No. 1598–90. FCX, Inc., 121 E. Davie St., PO Box 2419, Raleigh, NC 27602. FERBAM No. 10 DUST FUNGICIDE. Active Ingredients: Ferbam (ferric dimethyl dithiocarbamate) 11.4%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM21

EPA Reg. No. 1685–45. State Chemical Manufacturing Co., 3100 Hamilton Ave., Cleveland, OH 44114. STATE FORMULA 219 STIRE-KIL SELECTIVE WEED KILLER. Active Ingredients: Dimethylamine salt of 2,4-Dichlorophenoxyacetic acid 26.75%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA Reg. No. 1990–147. Farmland Industries, Inc., c/o Regulatory Affairs Dept., PO Box 7305, Kansas City, MO 64116. CO-OP BIG 3 LAWN FERTILIZER. Active Ingredients: Dimethyl ester of tetrachloroterephathalic acid 1.25%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA Reg. No. 2124–192. W. R. Grace & Co., Agricultural Chemicals, Box 277, Memphis, TN 38101. NACO MALATHION 4 DUST. Active Ingredients: O,O-Dimethyl Dithiophosphate of Diethyl Mercaptosuccinate (Malathion) 4%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA Reg. No. 2124–404. W. R. Grace Co. NACO MALATHION 25% WETTABLE POWDER. Active Ingredients: O,O-Dimethyl Dithiophosphate of Diethyl Mercaptosuccinate (Malathion) 25.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA Reg. No. 2124–588. W. R. Grace Co. NACO MALATHION 5 DUST. Active Ingredients: O,O-Dimethyl Dithiophosphate of Diethyl Mercaptosuccinate (Malathion) 5.00%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA Reg. No. 2136–27. J. L. Hoffman Co., Inc., 1415 Court St., Allentown PA 18102. HOFFMAN'S LOUSE KILLER. Active Ingredients: Malathion (O,O-Dimethyl Dithiophosphate of Diethyl Mercaptosuccinate) 4%; Sulfur 20%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA Reg. No. 2136–28. J. L. Hoffman Co., Inc. HOFFMAN'S MALATHION 4 DUST. Active Ingredients: Malathion (O,O-Dimethyl Dithiophosphate of Diethyl Mercaptosuccinate) 4%. Method of Support: Application proceeds under 2(b) of interim policy Application for reregistration. PM16

EPA Reg. No. 2459–181. Stevens Industries, Inc., Box 272, Dawson GA 31742. MASTER BRAND 5% MALATHION DUST. Active Ingredients: Malathion 5%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA Reg. No. 2491–139. Koos, Inc., 4500 13th St., Kenosha WI 53140. HOLIDAY CRAB-GRASS PREVENTER. Active ingredients: Dimethyl ester of Tetrachloroterephthalic Acid 5.75%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA File Symbol 3160–UR. Davis Manufacturing Co., Inc., 1023 Morales St., San Antonio TX 78206. DACIDE CONCENTRATE 5776. Active Ingredients: n-Alkyl (60% C14, 30% C16, 5% C12, 5% C18) dimethyl benzyl ammonium chlorides 5%; n-Alkyl (68% C12, 32% C14) dimethyl ethylhexyl ammonium chlorides 5%. Method of Support: Application proceeds under 2(b) of interim policy. PM31

EPA Reg. No. 3743–64. Southern Agricultural Chemicals, Inc., PO Box 527, Kingstree SC 29556. 4% MALATHION DUST WITH SULFUR. Active Ingredients: Malathion 4%; Sulfur 18%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA Reg. No. 3770–188. Economy Products Co., Inc., PO Box 427, Shenandoah IA 51601. MBC NON-SELECTIVE GRANULAR HERBICIDE CONTROLS BROADLEAF AND GRASSY WEEDS. Active Ingredients: Sodium Chlorate (NaClO₃) 30%; Sodium Metaborate Tetrahydrate .Na₂B₄O₇ 4H₂O) 68%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM23

EPA Reg. No. 5602–17. Hub States Corp., 2000 N. Illinois St., Indianapolis IN 46204. MALATHION 50% DUST. Active Ingredients: Malathion (O,O-dimethyl dithiophosphate of diethyl mercaptosuccinate) 5.0%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA File Symbol 5813–RI. The Clorox Co., PO Box 493, Pleasanton CA 94566. CLOROX DISINFECTANT CLEANER. Active Ingredients: Sodium dichloro-s-triazinetrione Dihydrate 3.00%; Trisodium phosphate, anhydrous 9.71%. Method of Support: Application proceeds under 2(a) of interim policy. PM34

EPA File Symbol 6378–EA. Lab Automated Chemicals, Div. of American Chemmate Corp., Howard & West Sts., Baltimore MD 21230. LAB BRITE-CREME. Active Ingredients: Ammonium Oxalate 1.30%; 2,2'-Methylenebis (3,4,6-Trichlorophenol) 0.30%; Ammonium Ethylene Diamine Tetraacetate 0.20%; 2,4,4'-Trichloro-2'-hydroxydiphenylether 0.10%; Ammonium Ortho Phenylphenate 0.05%. Method of Support: Application proceeds under 2(b) of interim policy. PM32

EPA File Symbol 6720–EAT. Southern Mill Creek Products Co., Inc., Box 1096, Tampa FL 33601. SMCP SBP–1382 2% CONCENTRATE. Active Ingredients: (5-Benzyl-3-furyl) methyl 2,2-dimethyl-3-(2-methyl-propenyl) cyclopropanecarboxylate 2.000%. Method of Support: Application proceeds under 2(b) of interim policy. PM17

EPA Reg. No. 6735–201. Tide Products, Inc., Box 1030, Edinburg TX 78533. TIDE MALA-THION 5 DUST. Active Ingredients: Malathion (0,0-dimethyl dithiophosphate of diethyl mercaptosuccinate) 5%. Method of Support: Application proceeds under 2(b) of interim policy. Application for reregistration. PM16

EPA File Symbol 6962–LR. Madison Bionics, 11250 W. Addision St., Franklin Park, IL 60131. PROPER. Active Ingredients: Ammonium Oxalate 1.30%; 2,2'-Methylenebis (3,4,6-Trichlorophenol) 0.30%; Ammonium Ethylene Diamine Tetraacetate 0.20%; 2,4,4' – Trichloro-2' – hydroxydiphenylether 0.10%; Ammonium Ortho Phenylphenate 0.05%. Method of Support: Application proceeds under 2(b) of interim policy. PM32

EPA File Symbol 6962–LE. Madison Bionics. DISINFECTANT 4045. Active Ingredients: Isopropanol 15.00%; Potassium ortho-phenylphenate 4.40%; Potassium o-benzyl-p-chlorophenate 4.05%; Tetrasodium ethylenediamine tetraacetate 1.60%. Method of Support: Application proceeds under 2(b) of interim policy. PM32

EPA File Symbol 8075–A. Allen Chemical Co., 3235 N. W. 37th St., Miami FL 33142. ALCO TOWER BIOCIDE #13. Active Ingredients: D i s o d i u m cyanodithiomidocarbonate 3.68%; Potassium N-methylldithiocarbamate 5.07%. Method of Support: Application proceeds under 2(b) of interim policy. PM33

[FR Doc.76–34122 Filed 11–18–76; 8:45 am]

---

[FRL 646–5]

# PEST CONTRAL DEVICES AND DEVICE PRODUCERS

## Consolidation and Clarification of Requirements

### I. Purpose

• Requirements applicable to pest control devices and device producers have been set forth in various regulations promulgated pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (86 Stat. 973; 89 Stat. 751; 7 U.S.C. 136 et seq.) ("FIFRA" or "the Act"). The purpose of this notice is to provide a consolidation and clarification of all such requirements. •

### II. Definitions

At section 2(h) of FIFRA (7 U.S.C. 136 (h)) the term "device" is defined to mean:

* * * any instrument or contrivance (other than a firearm) which is intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life (other than man and other than bacteria, virus, or other microorganism on or in living man or other living animals); but not including equipment used for the application of pesticides when sold separetly therefrom.

To more clearly identify the types of products to which the requirements discussed in this Notice apply, the term "device" must be contrasted with the term "pesticide," which is defined at section 2(u) of FIFRA to mean:

* * * any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, and any substance or mixture of substances intended for use as plant regulator, defoliant, or desiccant.

Thus, if an article uses physical or mechanical means to trap, destroy, repeal, or mitigate any plant or animal life declared to be a pest at 40 CFR 162.14, it is considered to be a device. If the article incorporates a substance or mixture of substances intended to prevent, destroy, repeal, or mitigate any pest, it is considered to be a pesticide.

### III. Devices Subject to the Act

Section 25(c)(4) of FIFRA (7 U.S.C. 136w(c)(4)) provides that the Administrator may specify those classes of devices which shall be subject to any provision of paragraph 2(q)(1) (7 U.S.C. 136(q)(1)) or section 7 (7 U.S.C. 136e) of this Act upon his determination that application of such provision is necessary to effectuate the purposes of this Act. On July 3, 1975, the Administrator promulgated regulations (40 F.R. 28242) amending 40 CFR Part 162 pursuant to this authority. 40 CFR 162.15 now provides that devices as defined in FIFRA section 2(h) are subject to the requirements of FIFRA section 2(q)(1)(A)—(G) and to those provisions of FIFRA section 7 which are necessary to effectuate the purposes of FIFRA with respect to devices.

The preamble to these regulations at 40 F.R. 28266 declared that to effectuate the purposes of the Act, devices subject to sections 2(q)(1) include but are not limited to:

(A) Certain ultraviolet light systems, ozone generators, water filters and air filters (except those containing substances or mixtures of substances which are pesticides), and ultrasonic devices, for which claims are made to kill, inactivate, entrap, or suppress the growth of fungi, bacteria, or viruses in various sites; (B) certain high frequency sound generators, carbide cannons, foils, and rotating devices, for which claims are made to repel birds; (C) black light traps, fly traps, electronic and heat screens, fly ribbons, and fly paper, for which claims are made to kill or entrap certain insects; and (D) mole thumpers, sound repellents, foils and rotating devices, for which claims are made to repel certain mammals.

The preamble further specifies those instruments declared to be of a character unnecessary to be subject to this Act in order to carry out the purposes of the Act. These include:

(1) Those which depend for their effectiveness more upon the performance of the person using the device than on the performance of the device itself, and

(2) Those which operate to entrap vertebrate animals.

Products generally falling within these two categories include rat and mouse traps, fly swatters, tillage equipment for weed control and fish traps.

Section 8 of FIFRA (7 U.S.C. 136f) provides for such record-keeping and record inspection requirements as the Administrator determines necessary for effective enforcement of the Act. Section 17 specifies the requirements to be placed on the import and export of devices. In neither of these sections is there a provision that the Administrator declare those classes of devices subject to these sections of the Act; and in the attendant

regulations, no specification is made. For purposes of enforcement, the Agency will consider those classes of devices declared to be subject to regulation under section 25(c)(4) of the Act as subject to regulation under sections 8 and 17 as well.

### IV. Summary of FIFRA Provisions Applicable to Devices

Any instrument declared to be a device under 40 CFR 162.15 is, upon introduction into channels of trade, subject to the provisions discussed below. Those provisions of the amended FIFRA which pertain to devices are in many respects similar to those under the 1947 FIFRA (61 Stat. 163; 7 U.S.C. 135–135k). In both Acts the Agency is authorized to inspect records showing the delivery, movement, or holding of devices (7 U.S.C. 135c, 136f); to obtain samples of any device in the marketplace (7 U.S.C. 135d, 136g); to seize any misbranded device (7 U.S.C. 135g, 136k); to initiate criminal proceedings against any person violating any provision of the Act (7 U.S.C. 135f, 136l); and, in cooperation with the Secretary of the Treasury, to sample, examine, and detain any imported device which violates the provisions of the Act (7 U.S.C. 135h, 136o).

The differences in the provisions of the two Acts with respect to requirements applicable to devices, lie primarily in the greater specification of jurisdiction and regulatory requirements provided by the 1972 amendments. For example, while a device, unlike a pesticide, is not subject to the section 3 registration requirement of FIFRA, section 12 of the Act makes clear the intent of the Act that subject devices and persons dealing with devices be held responsible for those obligations, other than registration, that are imposed by the Act. Jurisdiction to regulate devices is expanded to intra- as well as interstate commerce (7 U.S.C. 136j(a) (1)). Similarly, section 9(a) of the amended FIFRA specifies that entry for the purpose of inspecting and obtaining samples of devices "packaged, labeled, and released for shipment is permitted into "any establishment or other place where * * * devices are held for distribution or sale (7 U.S.C. 136g(a)).

With respect to affirmative regulatory requirements, section 2(q)(1) of the amended FIFRA expands the definition of misbranding as it applies to devices subject to the Act (7 U.S.C. 136(q)(1)). Section 7 of the amended FIFRA is totally new, requiring the registration of establishments which produce devices declared subject to the Act (7 U.S.C. 136e). In addition to the provisions of the Act allowing the inspection of records kept by producers and distributors of devices, section 8(a) of the amended FIFRA requires producers of devices subject to the Act to maintain such books and records as the Administrator requires by regulation (7 U.S.C. 136f(a)). Finally, section 17(a) of FIFRA, as amended, specifically imposes the same recordkeeping requirements on producers of devices intended for export by making such producers subject to the requirements of section 8.

51066

## NOTICES

### V. Elaboration of Specific Requirements Applicable to Devices

A. *Section 2(q)(1), Misbranding Provisions (7 U.S.C. 136(q)(1))*. With promulgation of the regulations at 40 CFR 162.15, which invoked the authority of section 25(c)(4) to specify devices subject to sections 2(q) and 7 of the Act, the labeling requirements of the 1947 FIFRA to which devices had been subject were expanded (7 U.S.C. 135(z)(1)). Those misbranding provisions of section 2(q)(1) of the amended FIFRA which the Administrator has made applicable to devices are listed at 40 CFR Part 162.15(b). In summary, a device will be subject to enforcement action if

2(q)(1)(A): Its labeling bears any statements, designs, or graphic representations relative thereto or to its ingredients which are false or misleading in any particular;

2(q)(1)(B): Its packaging or wrapping fails to conform with standards established pursuant to section 25(c)(3) (Such standards have not, as of this date, been issued by the Administrator; at such time as they are, the question of their applicability to devices will be addressed);

2(q)(1)(C): It is an imitation of, or is offered for sale under the name of another device;

2(q)(1)(D): Its label fails to bear the establishment number;

2(q)(1)(E): Required information is not prominently displayed on the label;

2(q)(1)(F): It lacks adequate directions for use; or

2(q)(1)(G): It lacks an adequate warning or caution statement.

40 CFR 162.10(a)(5) provides an interpretation of what the term "false and misleading" may include in the context of FIFRA section 2(q)(1)(A) misbranding:

A false or misleading statement concerning the composition of the product;

A false or misleading statement concerning the effectiveness of the product;

A false or misleading statement about the value of the product for purposes other than as a device;

A false or misleading comparison with other devices;

Any statement directly or indirectly implying that the device is recommended or endorsed by any agency of the Federal Government;

A true statement used in such a way as to give a false or misleading impression to the purchaser;

Label disclaimers which negate or detract from labeling statements required under the Act and regulations; or

Non-numerical and/or comparative statements on the safety of the product.

B. Section 7, Registration of Establishments (7 U.S.C. 136e). On November 6, 1973, regulations (40 CFR Part 167) for the implementation of section 7, Registration of Establishments, were published in the Federal Register (38 F.R. 30557). The scope of the requirements is set forth at § 167.2(a): "All establishments, as defined in this part, which produce any pesticide or device subject to the provisions of this section, must be registered pursuant to the requirements of these regulations * * *" At § 167.1(k) the term "device" is defined as "* * * any device or class of devices as defined by the Act and determined by the Administrator

pursuant to section 25(c) to be subject to the provisions of section 7 of the Act."

Section 7 imposes three basic requirements: (1) Registration of device-producing establishments, (2) labeling which reflects the EPA establishment number assigned to the establishment in which the device was produced, and (3) submission of annual production reports.

All establishments in which devices subject to the Act are produced must be registered with the Environmental Protection Agency as producing establishments. This includes foreign establishments in which devices shipped to the United States are produced, as well as establishments located in the United States which produce devices for export. To register establishments, producers should obtain from an EPA regional office the Application for Registration of Pesticide-Producing Establishments (EPA Form 3540–8). The applications require such information as the name and address of the company headquarters and the names and addresses of all device-producing establishments owned and operated by the company. This application must be submitted to the regional office on or before January 18, 1976. Upon receipt of a completed application, the regional office shall register each establishment listed and shall assign each establishment an EPA establishment number. This EPA establishment number must be displayed on all devices released for shipment by the establishment after 90 days after the producer is notified of the assigned number.

The production reports (EPA Form 3540–16) must be submitted to the regional office within thirty days after notification of registration and by February 1 each year thereafter.

C. *Section 8, Books and Records (7 U.S.C. 136f)*. On September 18, 1974, regulations (40 CFR Part 169) for the implementation of section 8, Books and Records, were published in the Federal Register (39 F.R. 33512). Pursuant to the authority of section 8(a) of the Act, these regulations (at 40 CFR 162.2) specify those records pertaining to development, testing, production, holding, and distribution, which all producers of devices declared subject to the Act are required to maintain and submit to inspection. These requirements apply to domestic and foreign persons producing devices for sale and distribution in the United States and to domestic producers who export devices.

Specifically, producers of devices subject to the Act are required to maintain the following records:

169.2(b): Records showing the brand names and quantities of devices produced. These records shall be retained for two years.

169.2(c): Records showing the following information regarding the receipt of devices: (1) Brand name of device, (2) Name and address of shipper, (3) Name of delivering carrier, (4) Date received, and (5) Quantities received.

These records shall be retained for two years.

169.2(d): Records showing the following information regarding the shipment of devices: (1) Brand name of device, (2) Name and address of the consignee, (3) Name of originating carrier, (4) Date shipped or delivered for shipment, and (5) Quantities shipped or delivered for shipment.

These records shall be retained for two years.

169.2(e): Inventory records with respect to the types and amounts of devices in stock which he has produced. These records may be disposed of when a more current inventory record is prepared.

169.2(h): In the case of devices intended solely for export to any foreign country, copies of the specifications or directions of the foreign purchaser for the production of the devices. These records shall be retained for two years after expiration of the contract.

Pursuant to the authority of section 8(b) of the Act, 40 CFR 169.3(b) requires that distributors, carriers, dealers or other persons who sell or deliver (or offer to sell or deliver) devices declared subject to the Act, allow inspection of the records they have pertaining to the following:

(1) The delivery or holding of the device and quantity held; (2) Date of shipment and receipt; (3) Name and address of consignee and consignor; and (4) Any guarantees received pursuant to section 12(b)(1).

D. *Section 17, Imports and Exports (7 U.S.C. 136o)*. On August 1, 1975, regulations (19 CFR Part 12.1) for the implementation of section 17, Imports and Exports, were published in the Federal Register (40 FR 32321). These regulations require that devices produced by foreign manufacturers and imported into the United States comply with all requirements applicable to domestic producers. In addition, the regulations require an importer to submit to EPA a Notice of Arrival of Pesticides and Devices (EPA Form 3540–1, available at any EPA office) for review and determination as to whether the shipment should be sampled and/or permitted entry into the United States. The Act also provides that samples may be collected and examined and that shipments may be permitted entry, detained until brought into compliance, destroyed, or re-exported.

With respect to devices produced in this country for export, section 17(a) of the FIFRA as amended requires that such devices must be prepared or packed in accordance with the specifications or directions of the foreign purchaser and that producers of such devices must maintain books and records pursuant to section 8(a).

### VI. Enforcement Authorities

Section 9(a) (7 U.S.C. 136(g)(a)) of the Act authorizes officers of the Agency to inspect any establishment or other place where a device is held for distribution or sale in order to obtain a sample of the device as packaged, labeled and released for shipment, and samples of any containers or labeling for the device. Officers of the Agency are also authorized

to inspect books and records required to be maintained under section 8(a) and copies of records which are available under section 8(b).

Pursuant to section 12(a)(2)(B) of the Act, it is unlawful for any person to refuse to keep or to permit inspection of books and records, or to refuse to permit inspection of an establishment. Pursuant to section 12(a)(1)(F) of the Act, it is unlawful to sell or distribute any device which is misbranded. Finally, pursuant to section 12(a)(2)(L) of the Act, it is unlawful to violate any provision of section 7.

Upon a finding of any unlawful act, the Administrator may assess a civil penalty pursuant to section 14(a) of the Act or initiate criminal proceedings pursuant to section 14(b) of the Act. If, upon inspection or tests, a device is believed to be in violation of the Act, or if it is believed that a device is intended to be distributed or sold in violation of the Act, a Stop Sale, Use or Removal Order may be issued pursuant to section 13(a). Additionally, section 13(b) authorizes in rem seizure proceedings in a federal district court against any device which is misbranded or which, when used in accordance with the requirements imposed under the Act causes unreasonable adverse effects upon the environment. Finally, the Administrator may seek injunctive relief pursuant to section 16(c) to prevent and restrain violations of the Act.

## VII. PUBLIC COMMENT

The Administrative Procedure Act (5 U.S.C. 533(b)) provides that the solicitation of comments is not required of Federal agencies for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." EPA has determined that this Notice falls within this exemption from the requirement to solicit public comment. Nonetheless, interested persons may submit written comments regarding the policy set forth in this Notice to the Pesticides and Toxic Substances Enforcement Division (EN–342), Office of Enforcement, U.S. Environmental Protection Agency, 401 M St., SW., Washington, D.C. 20460. Three copies of these comments should be submitted to facilitate the work of the EPA and others interested in inspecting such documents.

Dated: November 8, 1976.

STANLEY W. LEGRO,
*Assistant Administrator
for Enforcement.*

[FR Doc.76-34119 Filed 11-18-76;8:45 am]

---

[FRL 646-2; OPP-30114A]

## PESTICIDE PROGRAMS

### Approval of Application to Register Pesticide Product Containing A New Active Ingredient and Waiver of Data

On April 21, 1976, the Environmental Protection Agency (EPA) gave notice (41 FR 16692) that the United States Forest Service (USFS), 1205–B (RPE), 14th and Independence Ave. SW, Wash-

ington, D.C. 20250, had filed an application with the EPA to register the pesticide product TM BIOCONTROL–1 containing 3.5 percent of the active ingredient polyhedral inclusion bodies of Douglas Fir Tussock Moth nucleopolyhedrosis virus which was not previously registered at the time of submission. The application received from the USFS proposed that the product be used in aerial application to control Douglas Fir Tussock Moth and that the product be classified for general use. PM17.

Having considered the evidence submitted by USFS in their application for registration and the data submitted in support thereof, the Administrator has made a written finding pursuant to the regulations (40 CFR 180.6(a)(3)) with respect to whether such properties of TM Biocontrol–1 are fundamentally different from the factors considered by EPA in establishing the data requirements set forth in the Registration Guidelines. Although the Guidelines were published as proposed rules in the FEDERAL REGISTER on June 25, 1975 (40 FR 26802), and have not as yet been promulgated in their final form, the basic data requirements set forth in the proposed Guidelines represent the data currently considered necessary to support the registration of a pesticide product. Accordingly, the notification of data waiver will apply to the supporting data now required by the Agency and set forth in the proposed Guidelines.

The Administrator has found that the submission of certain data is not necessary for determining whether TM Biocontrol-1 will generally cause unreasonable adverse effects on man or the environment. Specifically, the following required data have been waived by the Administrator for the polyhedral inclusion bodies of the nucleopolyhedrosis virus of the Douglas Fir Tussock Moth:

1. Avian 8-day dietary $LC_{50}$ study utilizing a native upland game bird, preferably bobwhite quail.

2. Acute $LC_{50}$ studies to 96 hours on a native cold and warm water species of fish, preferably utilizing trout and bluegill sunfish.

3. Acute aquatic invertebrate $LC_{50}$ to 48 hours, preferably utilizing *daphnia* sp.

The primary basis of this waiver is due to the natural presence of the nucleopolyhedrosis virus in the environment and its role in bringing about the collapse of epizootic Douglas Fir Tussock Moth populations. During outbreaks of the Tussock Moth, large amounts of this virus are naturally released into the environment. Moreover, data presented by the registrant demonstrate that a much greater amount of this virus is released naturally into the environment through the collapse of Douglas Fir Tussock Moth populations than is released through the application of this product as a suppression measure.

Finally, it should be noted that this product can be used against only one pest, the Douglas Fir Tussock Moth, and that infestations of this pest are cyclic in nature; the maximum use of this product

would likely be once in 6 to 10 years, and therefore exposure of fish and wildlife to this product would be minimal. Because the data submitted by the registrant have adequately demonstrated that this product is fundamentally different from the products for which the fish and wildlife testing requirements were designed, a waiver of the data listed above is both appropriate and acceptable.

This application was approved August 11, 1976, and the product has been assigned the EPA Registration No. 27586–1. Notice of registration is given in accordance with the regulations (40 CFR 180.7(d)(2)) for the enforcement of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended (86 Stat. 973; 89 Stat. 751, 7 U.S.C. 136(a) et seq.).

Test data and other information submitted in support of this registration as well as such other scientific information deemed relevant to the registration decision, except for such material protected by section 3(c)(1)(D) and section (10) of FIFRA, will be available for public inspection in the office of the Information Coordination Section, Technical Services Division (WH–569), Office of Pesticide Programs, Room EB–31, East Tower, 401 M St., Washington, D.C. 20460.

It is suggested that persons interested in viewing these data notify the Information Coordination Section, either by letter at the above address or by telephone at 202/426–2690, prior to visiting the EPA Headquarters Office so that clearance procedures may be instituted and the appropriate data made available for review purposes pursuant to the regulations for section 3(c)(2) of FIFRA (40 CFR 162.7(f)).

Dated: November 15, 1976.

EDWIN L. JOHNSON,
*Deputy Assistant, Administration
for Pesticides Program.*

[FR Doc.76-34120 Filed 11-18-76;8:45 am]

---

[FRL 647-2; OPP-30000/9]

## PESTICIDE PROGRAMS

### Intent to Process Pesticide Products for Reregistration—Sperm Whale Oil

The Deputy Assistant Administrator, Office of Pesticide Programs, Environmental Protection Agency (EPA) has determined that the use of pesticide products containing sperm whale oil which has already been stockpiled does not result in fatality to members of endangered species; accordingly, such product registrations will be returned to the Registration Division, Office of Pesticide Programs, for processing according to normal reregistration and classification procedures.

I. *Regulatory provisions.* On July 3, 1975 (40 FR 28242), EPA promulgated regulations (40 CFR 162) for the registration, reregistration, and classification of pesticides, pursuant to Section 3 of the Federal Insecticide, Fungicide and

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

Registration Division
Office of Pesticide Program
Criteria and Standards Division
Office of Drinking Water

# GUIDE STANDARD AND PROTOCOL FOR
# TESTING MICROBIOLOGICAL WATER PURIFIERS

Report of Task Force
Submitted April, 1986
Revised April, 1987

Exhibit C-3, pg.2 of 36.

## CONTENTS

<u>Page</u>

PREFACE ...................................................................................................1
SECTION 1 - GENERAL .............................................................................2
SECTION 2: PERFORMANCE REQUIREMENTS...................................5
SECTION 3. MICROBIOLOGICAL WATER PURIFIER TEST PROCEDURES....7
APPENDIX A.............................................................................................20
APPENDIX B.............................................................................................27
APPENDIX C ............................................................................................29

Exhibit C-3, pg.3 of 36.

# PREFACE

The task force began deliberations in July, 1984 and submitted its initial report in April, 1986. The task force included a broad multi-disciplinary group of experts representing the interest areas of academic and governmental research, product evaluation, development and testing, manufacturer's product registration, and governmental enforcement.

The report was provided for public comments in May, 1986. A review subcommittee was constituted to prepare a response to the public comments and to revise the report, as herewith submitted. Additional revision has been provided in response to review by the Scientific Advisory Panel (Federal Insecticide, Fungicide, and Rodenticide Act).

The recommended guide standard and testing protocol was developed to be useful in a number of ways, not only for governmental but also for industrial and consumer purposes:

-       as a basic framework, starting point for the testing and evaluation of microbiological water purifiers for EPA registration;

-       as a guide to the acceptance of water treatment units for compliance with Safe Drinking Water Act requirements where point of use units may be needed temporarily to treat a contaminated public water supply or for emergency situations, but not for use in extreme overseas situations or for the conversion of waste water to micro-biologically potable water;

-       as a testing guide to manufacturers wishing to have their units considered as microbiological water purifiers, whether registered or not, and for the evaluation of such testing data;

-       as a guide to consumers regarding what they can expect from microbiological water purifiers tested according to this standard and protocol;

-       to assist in the research and development of microbiological treatment units for possible military applications.

I want to thank the expert members of the task force for their participation in this work and particularly the chairmen of three work groups:

|  |  |
|---|---|
| Charles Gerba: | Microbiological Challenges |
| Richard Tobin: | Physical, Chemical and Operational Challenges |
| Frank A. Bell, Jr.: | Testing Protocol |

Stephen A. Schaub, Ph.D.
Chairman
U.S. Army Medical Bioengineering
Research and Development Laboratory

# SECTION 1 - GENERAL

### 1.1    Introduction

The subject of microbiological purification for waters of unknown microbiological quality repeatedly presents itself to a variety of governmental and non-governmental agencies, consumer groups, manufacturers and others. Examples of possible application of such purification capabilities include:

- backpackers and campers
- non-standard military requirements
- floods and other natural disasters
- foreign travel and stations (however, not for extreme contamination situations outside of the U.S.)
- contaminated individual sources, wells and springs (however, not for the conversion of waste water to microbiologically potable water)
- motor homes and trailers

Batch methods of water purification based on chlorine and iodine disinfection or boiling are well known, but many situations and personal choice call for the consideration of water treatment equipment. Federal agencies specifically involved in responding to questions and problems relating to microbiological purifier equipment include:

Registration Division, Office of Pesticide Programs (OPP), Environmental Protection Agency (EPA): registration of microbiological purifiers (using chemicals);

Compliance Monitoring Staff, EPA: control of microbiological purifier device claims (non-registerable products such as ultraviolet units, ozonators, chloride generators, other);

U.S. Army Medical Bioengineering Research and Development Laboratory (USAMBRDL), U.S. Army Natick Research and Development Center and other Army and military agencies: research and development for possible field applications;

Criteria and Standards Division, Office of Drinking Water (ODW), EPA: Consideration of point-of-use technology as acceptable technology under the Primary Drinking Water Regulations; consumer information and service;

Drinking Water Research, Water Engineering Research Laboratory (WERL), EPA; responsible for water treatment technology research;

Microbiology Branch, Health Effects Research Laboratory (HERL), EPA; responsible for study of health effects related to drinking water filters.

A number of representatives of the above mentioned agencies provided excellent participation in the task force to develop microbiological testing protocols for water purifiers. Major participation was also provided by the following:

- a technical representative from the Water Quality Association;
- a technical representative from the Environmental Health Center, Department of Health and Welfare of Canada; and
- an associate professor (microbiology) from the University of Arizona.

Exhibit C-3, pg.5 of 36.

## 1.2    Basic Principles

1.2.1    Definitions:  As set forth in EPA Enforcement Strategy and as supported by a Federal Trade Commission (FTC) decision (FTC v. Sibco Products Co., Inc. *et al.*, Nov. 22, 1965), a unit, in order to be called a microbiological water purifier, must remove, kill or inactivate all types of disease-causing microorganisms from the water, including bacteria, viruses and protozoan cysts so as to render the processed water safe for drinking.  Therefore, to qualify, a microbiological  water purifier must treat or remove all types of challenge organisms to most specified standards.

1.2.2    General Guide:  The standard and protocol will be a general guide and, in some cases, may present only the minimum features and framework for testing.  While basic features of the standard and protocol have been tested, it was not feasible to conduct full-fledges testing for all possible types of units.  Consequently, protocol users should include pre-testing of their units in a testing rig, including the sampling techniques to be used.  Where users of the protocol find good reason to alter or add to the guide in order to meet specific operational problems, to use an alternate organism or laboratory procedure, or to respond to innovative treatment units without decreasing the level of testing or altering the intent of the protocol, they should feel free to do so.  For example, the OPP Registration Division might find it necessary to amend the guide somewhat for different types of treatment units.    Another example would be ultraviolet (U.V.) units, which may have specific requirements in addition to the guide protocol.

1.2.3    Performance-Based:  The standard will be performance-based, utilizing realistic worst case challenges and test conditions and shall result in water quality equivalent to that of a public water supply meeting the microbiological requirements and intent of the National Primary Drinking Water Regulations.

1.2.4    Exceptions  A microbiological water purifier must remove, kill or inactivate all types of pathogenic organisms if claims are made for any organism.  However, an exception for limited claim may be allowed for units removing specific organisms to serve a definable environmental need (i.e., cyst reduction units which can be used on otherwise disinfected and microbiologically safe drinking water, such as a disinfected but unfiltered surface water containing cysts.  Such units are not called microbiological water purifiers and should not be used as sole treatment for an untreated raw water.)

1.2.5    Not to Cover non-Microbiological Reduction Claims:  The treatment of water to achieve specific chemical removal from water or other non-microbiological claims will not be a part of this standard.  National Sanitation Foundation (NSF) Standards 42 (Aesthetic Effects) and 53 (Health Effects) provide partial guides for chemical removal and other claims testing.

1.2.6    Construction and Informational Exclusions:  While the standard recommends safe responsible construction of units with non-toxic materials for optimum operation, all such items and associated operational considerations are excluded as being beyond  the scope of the standard.  Included in the exclusion are materials of construction, electrical and safety aspects, design and construction details, operational instructions and information, and mechanical performance testing.

1.2.7    Research Needs Excluded:  The guide standard and protocol must represent a practical testing program and not include research recommendations.  For example, consideration of mutant organisms or differentiation between injured and dead organism would be research items at this time and not appropriate for including in the standard.

Exhibit C-3, pg.6 of 36.

1.2.8   Not To Consider Sabotage:  Esoteric problems which could be presented by a variety of hypothetical terrorist (or wartime) situations, would provide an unnecessary complication, and are not appropriate for inclusion in the standard.

1.2.9   Continuity:  The guide standard and protocol will be a living document, subject to revision and updating with the onset of new technology and knowledge.  It is recommended that the responsible authorities for registration and drinking water quality review potential needs every two to three years and reconvene the task force upon need or upon request from the water quality industry, to review and update the standard and testing protocol.

1.3   Treatment Units Coverage

1.3.1   Universe of Possible Treatment Units   A review of treatment units that might be considered as microbiological purifiers  discloses a number of different types covering treatment principles ranging from filtration and chemical disinfection to ultraviolet light radiation.

1.3.2   Coverage of This Standard:  In view of the limited technical data available and in order to expedite the work of the task force, the initial coverage is limited, on a priority basis, to three basic types of microbiological water purifiers or active components with their principal means of action as follows:

1.3.2.1   Ceramic Filtration Candles or Units (may or may not contain a chemical bacteriostatic agent):  filtration, and adsorption, and chemical anti-microbial activity if a chemical is included.

1.3.2.2   Halogenated Resins and Units:  chemical disinfection and possible filtration. (Note: While not included in this guide standard, halogen products for disinfection or systems using halogen addition and fine filtration may be tested using many of its elements, i.e., test water parameters, microbiological challenge and reduction requirements, analytical techniques and other pertinent elements.)

1.3.2.3   Ultraviolet (UV) Units:   UV irradiation with possible add-on treatment for adsorption and filtration, (not applicable to UV units for treating potable water from public water supply systems).

1.3.3   Application of Principles to Other Units:  While only three types of units are covered in this standard, the principles and approaches outlined should provide an initial guide for the testing of any of a number of other types of units and/or systems for the microbiological purification of contaminated water.

Exhibit C-3, pg.7 of 36.

# SECTION 2: PERFORMANCE REQUIREMENTS

2.1   Microbiological Water Purifier

In order to make the claim of "microbiological water purifier, " units must be tested and demonstrated to meet the microbiological reduction requirements of Table 1 according to the test procedures described in Section 3 for the specific type of unit involved.

2.2   Chemical Health Limits

Where silver or some other pesticidal chemical is used in a unit, that chemical concentration in the effluent water must meet any National Primary Drinking Water Maximum Contaminant Level (MCL), additional Federal guidance or otherwise be demonstrated not to constitute a threat to health from consumption or contact where no MCL exists.

2.3   Stability of Pesticidal Chemical

Where a pesticidal chemical is used in the treatment unit, the stability of the chemical for disinfectant effectiveness should be sufficient for the potential shelf life and the projected use life of the unit based on manufacturer's data.  Where stability cannot be assured from historical data and information, additional tests will be required.

2.4   Performance Limitations

2.4.1   Effective Lifetime

The manufacturer must provide an explicit indication or assurance of the unit's effective use lifetime to warn the consumer of potential diminished treatment capability either through

a.   Having  the unit terminate discharge of treated water, or

b.   Sounding an alarm, or

c.   Providing single, explicit instructions for servicing or replacing units within the recommended use life (measurable in terms of volume throughput, specific time frame or other appropriate method).

2.4.2   Limitation on Use of Iodine

EPA policy initially developed in 1973 and reaffirmed in 1982 (memo of March 3, 1982 from J. A. Cotruvo to G. A. Jones, subject: "Policy on Iodine Disinfection") is that iodine disinfection is acceptable for short-term or limited or emergency use but that it is not recommended for long-term or routine community water supply application where iodine-containing species may remain in the drinking water.

Exhibit C-3, pg.8 of 36.

TABLE 1

<u>MICROBIOLOGICAL REDUCTION REQUIREMENTS</u>

*Klebsiella terrigena*, a common coliform, was selected as the challenge organism to represent the coliform group. Poliovirus 1 (LSc) and rotavirus (Wa oe SA-11) are common environmental viruses and show resistance to different treatment processes, thereby providing good challenges for the virus group. *Giardia* was selected as the cyst challenge representative because of its widespread disease impact and its resistance to chemical disinfection. The use of 4-6 micron particles or beads for testing the occlusion filtration of cysts has been demonstrated to be an accurate and practical substitute for the use of live cyst challenges. It is included as an option where disinfection or other active processes are not involved.

| Organism | Influent Challenge | Minimum Required Reduction | |
|---|---|---|---|
| | | Log | % |
| Bacteria: *Klebsiella terrigena* (ATCC-33257 | $10^7$/100 mL | 6 | 99.9999 |
| Virus: a. Poliovirus 1 (LSc) (ATCC-VR-59 and, | $1 \times 10^7$/L | 4 | 99.99** |
| b. Rotavirus (Wa or SA-11) (ATCC-VR-899 or VR-2018) | $1 \times 10^7$/L | | |
| Cyst (Protozoan): *Giardia*\*\*\* a: *Giardia muris* or *Giardia lamblia* or | $10^6$/L | 3 | 99.9 |
| b. As an option for units or components based on occlusion filtration: particles or spheres, 4-6 microns | $10^7$/L | 3 | 99.9 |

(Testing according to National Sanitation Foundation Standard 53 for cyst reduction will be acceptable)

\*      The influent challenges may constitute greater concentrations than would be anticipated in source waters, but these are necessary to properly test, analyze, and quantitatively determine the indicated log reductions.

\*\*     Virus types are to be mixed in roughly equal $1 \times 10^7$/L concentrations and a joint 4 log reduction will be acceptable

\*\*\*   It should be noted that new data and information with respect to cysts (i.e., *Cryptosporidium* or others) may in the future necessitate a review of the organism of choice and of the challenge and reduction requirements.

# SECTION 3. MICROBIOLOGICAL WATER PURIFIER TEST PROCEDURES

### 3.1　PURPOSE

These test are performed on ceramic filtration candles or units, halogentated resins and units and ultraviolet (UV) units in order to substantiate their microbiological removal capabilities over the effective use life of the purifier as defined in Table 1 and, where a pesticidal chemical is used, to determine that said chemical is not present in the effluent at excessive levels (see Section 3.5.3.4.

### 3.2　Apparatus

Three production units of a type are to be tested, simultaneously, if feasible, otherwise, in a manner as similar to that as possible.

Design of the testing rig must parallel and simulate projected field use conditions. For plumbed-in units a guide for design of the test rig may be taken from "Figure 1: Test Apparatus-Schematic" (p. A-2 of Standard Number 53 "Drinking Water Treatment Units— Health Effects," National Sanitation Foundation). Otherwise, the test rig must be designed to simulate field use conditions (worst case) for the unit to be tested.

### 3.3　Test Waters – Non-Microbiological Parameters

In addition to the microbiological influent challenges, the various test waters will be constituted with chemical and physical characteristics as follows:

### 3.3.1　Test Water #1 (General Test Water)

This water is intended for the normal non-stressed (non-challenge) phase of testing for all units and shall have specific characteristics which may easily be obtained by the adjustment of many public system tap waters, as follows:

(a) It shall be free of any chlorine or other disinfectant residual:

(b) pH – 6.5 - 8..5;

(c) Total Organic Carbon (TOC) 0.1 - - 5.0 mg/L;

(d) Turbidity 0.1 - 5 NTU;

(e) Temperature 20°C ± 5 °C; and

(f) Total Dissolved Solids (TDS) 50 - 500 mg/L

### 3.3.2　Test Water #2 (Challenge Test Water/Halogen Disinfection)

This water is intended for the stressed challenge phase of testing where units involve halogen disinfectants (halogen resins or other units) and shall have the following specific characteristics:

　　a. Free of chlorine or other disinfectant residual:

    **b.**  (1)    pH 9.0 ± .2, and

    (2) for iodine-based units a pH of 5.0 ± .2 (current information indicates that the low pH will be the most severe test for virus reduction by iodine disinfection):

  **c.**   Total Organic Carbon (TOC) not less that 10 mg/L;

  **d.**   Turbidity not less than 30 NTU;

  **e.**   Temperature 4°C ± .1°C; and

  **f.**   Total Dissolved Solids (TDS) 1,500 mg/L ± 150 mg/L.

### 3.3.3 Test Water #3 (Challenge Test Water/Ceramic Candle or Units With or Without Silver Impregnation)

This water is intended for the stressed challenge phase of testing for the indicated units but not for such units when impregnated with a halogen disinfectant (for the latter, use Test Water #2). It shall have the following specific characteristics:

**a.** It shall be free of any chlorine or other disinfectant residual;

**b.** pH 9.0 ± .2;

**c.** Total Organic Carbon (TOC) – not less than 10 mg/L;

**d.** Turbidity – not less than 30 NTU;

**e.** Temperature 4°C ± 1°C; and

**f.** Total Dissolved Solids (TDS) – 1500 mg/L ± 150 mg/L.

### 3.3.4 Test Water #4 (Challenge Test Water for Ultraviolet Units)

This water is intended for the stressed phase of testing for UV units and shall have the following specific characteristics:

**a.** Free of chlorine or other disinfectant residual;

**b.** pH 6.5 - 8.5;

**c.** Total Organic Carbon (TOC) – not less than 10 mg/L;

**d.** Turbidity – not less than 30 NTU;

**e.** Temperature 4°C ± 1°C;

**f.** Total Dissolved Solids (TDS) --1500 mg/L ± 150 mg/L

**g.** Color U.V. Absorption (absorption at 254 nm) – Sufficient parahydroxybenzoic acid (PHBH) to be just below the trigger point of the warning alarm on the U.V. unit. ([Note that Section 3.5.1.1 provides an alternative of adjusting the U.V. lamp electronically, especially when the U.V. lamp is preceded by activated carbon treatment.]

3.3.5   Test Water #5 (Leaching Test Water for Units Containing Silver)

This water is intended for stressed leaching tests of units containing silver to assure that excess levels of silver will not be leached into the drinking water. It shall have the following specific characteristics:

a.   Free of chlorine or other disinfectant residual;

b.   pH – 5.0 ± 0.2;

c.   Total Organic Carbon (TOC) – approximately 1.0 mg/L;

d.   Turbidity – 0.1 - 5NTU;

e.   Temperature – 20°C ± 5°C; and

f.   Total Dissolved Solids (TDS) -- - 100 mg/L

3.3.6   Recommended Materials for Adjusting Test Water Characteristics

a.   pH; inorganic acids or bases (i.e., HCl, NaOH);

b.   Total Organic Carbon (TOC): humic acids;

c.   Turbidity: A.C. Fine Test Dust (Part No. 1543094)
        from:   A.C. Spark Plug Division
                General Motors Corporation
                1300 North Dort Highway
                Flint, MI  48556;

d.   Total Dissolved Solids (TDS): sea salts, Sigma Chemical CO., S9883 (St. Louis, MO) or another equivalent source of TDS:

e.   Color U.V. Absorption: p-hydroxybenzoic acid (grade: general purpose reagent).

3.4   Analytical Methods

3.4.1   Microbiological Methods

Methods in this section are considered "state-of-the-art" at the time of its preparation and subsequent improvements should be expected. Methods used for microbiological analyses should be compatible with and equal to or better than those given below.

3.4.1.1 Bacterial Tests:

a.   Chosen Organism: *Klebsiella terrigena* (ATCC-33257);

b.   Method of Production: The test organism will be prepared by overnight growth in nutrient broth or equivalent to obtain the organism in the stationary growth phase [Reference: Asburg, E.D., 1983, Methods of Testing Sanitizers and Bacteriostatic Substances; in Disinfection, Sterilization and Preservation (Seymour S. Block, ed.), pp. 964-980]. The organism will be collected by centrifugation and washed three times in phosphate buffered saline before use. Alternatively, the organisms may be grown overnight on nutrient agar

9

slants or equivalent and washed from the slants with phosphate buffered saline. The suspensions should be filtered through sterile Whatman Number 2 filter paper (or equivalent) to remove any bacterial clumps. New batches of organisms must be prepared daily for use in challenge testing.

c. State of organism: Organisms in the stationary growth phase and suspended in phosphate buffered saline will be used.

d. Assay Techniques: Assay may be by the spread plate, pour plate or membrane filter technique on nutrient agar, M.F.C. or m-Endo medium (Standard Methods for the Examination of Water and Wastewater, 16th edition, 1985, APHA),. Each sample dilution will be assayed in triplicate.

3.4.1.2 Virus Tests:

a. Chosen Organism: Poliovirus type 1 (LSc) (ATCC-VR-59), and Rotavirus Strain SA-11 (ATCC-VR-899) or WA (ATCC-VR-2018).

b. Method of Production: All stocks should be grown by a method described by Smith and Gerba (1982, in Methods in Environmental Virology, pp. 15-47) and purified by the procedure of Sharp, et al. (1975, Appl. Microbiol., 29:94-101), or similar procedure (Berman and Hoff, 1984, Appl. Environ. Microbiol., 48:317-323), as these methods will produce largely monodispersed virion particles.

c. State of the Organism: Preparation procedure will largely produce monodispersed particles.

d. Assay Techniques: Poliovirus type 1 may be grown in the BGM, MA-104 or other cell line which will support the growth of this virus. The rotaviruses are best grown in the MA-104 cell line. Since both viruses can be assayed on the MA-104 cell line a challenge test may consist of equal amounts of both viruses as a mixture (i.e., the mixture must contain at least $1.0 \times 10^7$/mL of each virus). Assays may be as plaque forming units (PFU) or as immunofluorescence foci (IF) (Smith and Gerba, 1982, in Methods in Environmental Virology, pp. 15-47). Each dilution will be assayed in triplicate.

3.4.1.3 Cyst Tests:

a. Chosen Organism:

1. Giardia lamblia or the related organism, Giardia muris, may be used as the challenge cyst.

2. Where filtration is involved, tests with 4-6 micron spheres or particles have been found to be satisfactory and may be used as a substitute for tests of occlusion using live organisms (see Table 1) Spheres or particles may only be used to evaluate filtration of efficacy. Disinfection efficacy can only be evaluated with the use of viable Giardia cysts.

**b.** Method of Production:  *Giardia muris* may be produced in laboratory mice and *Giardia lamblia* may be produced in Mongolian gergils; inactivation results based on excystation measurements correlate well with animal infectivity results.

**c.** State of the Organism:  Organisms may be separated from fecal material by the procedure described by Sauch (1984, Appl. Environ. Microbiol., 48: 454-455) or by the procedure described by Bingham, *et al*, (1979, Esp. Parasitol., 47: 284-291).

**d.** Assay Techniques:   Cysts are first reconsentrated (500 mL., minimum sample size) according to the method of Rice, Hoff and Schaefer (1982, Appl. Environ. Microbiol.   43: 250-251).   The excystation method described by Schaefer, *et al.* (1984, Trans., Royal Soc. Of Trop. Med. & Hyg. 78: 795-800) shall be used to evaluate *Giardia muris* cyst viability.   For *Giardia lamblia* cysts, the excystation method described by Bingham and Meyer (1979, Nature, 277:301-302) or Rice and Schaefer (1981, J. Clin. Microbiol., 14: 709-710) shall be used.  Cyst viability may also be determined by an assay method involving the counting of trophozoites as well as intact cysts (Bingham, *et al.*, 1979, Exp. Parasitol., 47: 284-291).

3.4.2    Chemical and Physical Methods

All physical and chemical analyses shall be conducted in accordance with procedures in Standard Methods for the Examination of Water and Wastewater, 18th Edition, American Public Health Association, or equivalent.

3.5    Test Procedures

3.5.1    Procedure - Plumbed-in Units

**a.** (1)  Install three production units of a type as shown in Figure 1 and condition each unit prior to the start of the test in accordance with the manufacturer's instructions with the test water without the addition of the test contaminant. Measure the flow rate through each unit.  The unit shall be tested at the maximum system pressure of 60 psig static and flow rate will not be artificially controlled.

(2)  Test waters shall have the defined characteristics continuously except for test waters 2, 3 and 4 with respect to turbidity.  The background non-sampling turbidity level will be maintained at 0.1-5 NTU but the turbidity shall be increased to the challenge level of not less than 30 NTU in the following manner:

- in the "on" period(s) prior to the sampling "on" period.

- in the sampling "on" period when the sample actually will be taken. (Note at least 10 unit void volumes of the 30 NTU water shall pass through the unit prior to actual sampling so as to provide adequate seasoning and uniformity before sample collection.)

**b.** (1) Use appropriate techniques of dilution and insure continual mixing to prepare a challenge solution containing the bacterial contaminant.  Then

11

spike test water continuously with the influent concentration specified in Table 1.

(2) Use appropriate technique to prepare concentrated virus and *Giardia* suspensions. Feed these suspensions into the influent stress so as to achieve the influent concentrations specified in Table 1 in the following manner:

- in the "on" period(s) prior to the sampling "on" period.

- in the sampling "on" period when the sample actually will be taken. [Note: at least 10 unit void volumes of seeded water shall pass through the unit prior to sampling so as to provide adequate seasoning and uniformity before sample collection.]

**c.** Purge the system of the uncontaminated water with a sufficient flow of contaminated test water. Start an operating cycle of 10 percent on, 90 percent off with a 15 to 40 minute cycle (Example: 3 minutes on, 27 minutes off) with the contaminated test water. This cycle shall be continued for not more than 16 hours per day (minimum daily rest period of 8 hours). The total program shall extend to 100% of estimated volume capacity for halogenated resins or units and for 10 ½ days for ceramic candles or units and for U. V. units.

**d.** Sampling: Samples of influent and effluent water at the specified sampling points shall be collected as shown below for the various units; these are minimum sampling plans which may be increased in number by the investigator. All samples shall be collected in duplicate from the following water during the sampling "on" portion of the cycle and they shall be one "unit void volume" in quantity (or of appropriate quantity for analysis) and represent worse case challenge conditions. Effluent samples shall usually be collected near the middle of the sampling "on" period (or the whole volume during one "on" period) except for samples following the specified "stagnation" periods, for which sampling shall be conducted on the first water volume out of the unit. Each sample will be taken in duplicate and shall be retained and appropriately preserved, if required, for chemical or microbiological analysis in the event verification is required. (For units where the volume of a single "on" period is insufficient for the required analysis, samples from successive "on" periods may be accumulated until a sufficient volume has been collected.)

Exhibit C-3, pg.15 of 36.

1(a).  Sampling Plan:  Halogenated Resins or Units (Non-iodine Based)

| Test Point (% of Estimated Capacity) | Test Water | Influent Background | Active Agent/ Residual | Microbiological |
|---|---|---|---|---|
| Start | General | X | X | X |
| 25% | | | X | X |
| 50% | | | X | X |
| After 48 hours stagnation | | | X | X |
| 60% | Challenge pH | | X | X |
| 75% | 9.0 ± 0.2 | | X | X |
| After 48 hours stagnation | | | X | X |
| 100% | | | X | X |

Exhibit C-3, pg.16 of 36.

1(b).  Sampling Plan:  Iodinated Resins or Units

| Test Point (% of Estimated Capacity) | Test Water | Tests | | |
|---|---|---|---|---|
| | | Influent Background | Active Agent/ Residual | Microbiological |
| Start | General | X | X | X |
| 25% | | | X | X |
| 50% | | | X | X |
| After 48 hours stagnation | | | X | X |
| 60% | Challenge pH | | X | X |
| 75% | 9.0 ± 0.2 | | X | X |
| After 48 hours stagnation | | | X | X |
| 90% | Challenge pH | | X | X |
| 100% | 5.0 ± 0.2 | | X | X |
| After 48 hours stagnation | | | | |

14

Exhibit C-3, pg.17 of 36.

2. Sampling Plan:  Ceramic Candles or Units and U.V. Units

| Test Point | Test Water | Tests Influent Background | Tests Microbiological |
|---|---|---|---|
| Start | General | X | X |
| Day 3 (middle) | | | X |
| Day 6 (middle) | | | X |
| After 48 hours stagnation | | | X |
| Day 7 (middle) | Challenge | | X |
| Day 8 (near end) | | | X |
| After 48 hours stagnation | | | X |
| Day 10 ½ | | | X |

> (Note: all days are "running days" and exclude stagnation periods.  When the units contain silver, a leaching test shall be conducted as shown in Section 3.5.1.a and silver residual will be measured at each microbiological sampling point.

e.     Leaching Tests for Silverized Units:  Where the unit contains silver, additional tests utilizing Test Water #5 will be conducted as follows:

| Test Point | Tests Influent Background | Silver/Residual |
|---|---|---|
| Start | X | X |
| Day 2 | | X |
| After 48 hours stagnation | | X |

f.     Alternate Sampling Plans:

   1.     Since some laboratories may find it inconvenient to test some units on a 16 hour on/8 hour off cycle, two alternates are recognized:

   ---     go to a shorter operational day but lengthen the days of test proportionally.

15

Exhibit C-3, pg.18 of 36.

---     use up to 20 percent "on"/80 percent "off for a proportionally shorter operational day

2.     Sampling points must be appropriately adjusted in any alternate sampling plan.

g.     Application of Test Waters:

The application of test waters is designed to provide information on performance under both normal and stressed conditions; it should be the same or equivalent to the following;

1.     (a)     Halogenated Resins or Units (Non-iodine based) –

| | |
|---|---|
| First 50% of test period: | Test Water 1 (General) |
| Last 50% of test period: | Test Water 2 (Challenge) |
| | (pH - 9.0 ± 0.2) |

    (b)     Iodinated Resins or Units—

| | |
|---|---|
| First 50% of test period: | Test Water 1 (General) |
| Next 25% of test period | Test Water 2 (Challenge) |
| | (pH - 9.0 ± 0.2) |
| Last 25% of test period: | Test Water 2 (Challenge) |
| | (but with pH - 5.0 ± 0.2) |

2.     Ceramic Candles or Units –

| | |
|---|---|
| First 6 days of testing: | Test Water 1 (General) |
| Last 4-1/2 days of testing: | Test Water 3 (Challenge) |

3.     Ultraviolet (U.V.) Units –

| | |
|---|---|
| First 6 days of testing: | Test Water 1 (General) |
| Last 4 ½ days of testing: | Test Water 3 (Challenge) |

h.     Analyses and Monitoring:

1. Microbiological sampling and analysis shall be conducted of the specified influent and effluent sampling points during each indicated sampling period.

2. Test Water Monitoring: The specified parameters of the various test waters (see Section 3.3) will be measured and recorded at each microbiological sampling point; the specified parameters will be measured at least once in non-sampling days when the units are being operated.

3. Background chemical analyses of influent water shall be conducted at least once at the start of each test period to determine the concentration of the U.S. EPA primary inorganic contaminants, secondary contaminants and routine water parameters, not otherwise covered in the described test waters.

4. In addition, quality assurance testing shall be conducted for the seed bacteria under environmental conditions on the first and last days of testing to make sure that there is no significant change over the test day. Populations will be measured (for example, as dispersed in the supply tank) at the beginning and end of the test day to detect possible incidental effects such as proliferation, die-off, adsorption to surfaces, etc. Relatively stable bacterial seed populations are essential to an acceptable test program.

5. When a unit contains a halogen or silver, the active agent residual will be measured in the effluent at each microbiological test (sampling) point.

6. Silver will additionally be measured three times in the effluent as specified in Section 3.5.1.e.

i.  Neutralization of Disinfection Activity:  Immediately after collection, each test sample must be treated to neutralize any residual disinfectant.  For Halogen-and silver-based disinfectants this may be done by addition of thioglycollate-thiosulfate neutralizer solution (Chambers, et al., J. Amer. Water Works Assoc., 54: 208-216, 1962).  This solution should be prepared daily.  All results are invalid unless samples are neutralized immediately upon collection.

j.  Special Provisions for Ceramic Candles or Units:

1. Provisions for slow flow:  Ceramic units may be subject to clogging and greatly reduced flow over the test period.  An attempt should be made to maintain manufacturer rated or claimed flow rates, but even at reduced flows the sampling program set forth in Section 3.5.1.1.d.2 shall be maintained.

2. Cleaning of ceramic units:  Units should be cleaned according to manufacturer's directions.  Two cleanings should occur during the period of test (in order to prove the unit's durability through the cleaning procedure).  However, near the time of microbiological sampling, the units should not be cleaned until after the sampling.  Further, no anti-microbial chemical (for cleaning or sanitizing) may be applied to the units during the test period unless the manufacturer specifies the same as part of routine maintenance.

k.  Halogenated units or U.V. units with mechanical filtration processes separate from the microbiological disinfection components shall have the mechanical filtration components replaced or serviced when significant flow reduction (clogging) occurs in accordance with the manufacturer's instructions in order to maintain the test flow rate.  Units with non-removable mechanical filtration components will be run until flow is below that considered acceptable for consumer convenience.  (If premature clogging presents a problem, some specialized units may require a customized test plan.)

1. Special Provisions for Ultraviolet (U.V.) Units:

1. The units will be adequately challenged by the prescribed test waters; consequently they will be operated at normal intensity.  However, where the U.V. treatment component is preceded by activated carbon treatment, the output of the U.V. lamp shall be adjusted electronically,

such as by reducing the current to the lamp or other appropriate means., to be just above the alarm point.   This option shall be available for use under other U.V. configurations, at the choice of the persons responsible for testing, as an alternative to the use of the U.V. absorbent, p-hydroxybenzoic acid.

2.   Fail/safe:  Units will provide and will be tested for fail/safe warnings in the event of water quality changes or equipment failures which may interfere with its microbiological purification function.

3.   Cleaning:   Manufacturer's guidance with respect to cleaning will be followed.

### 3.5.2    Procedure:  Non-Plumbed Units

**a.**   General   The basic procedures given in Section 3.5.1 shall be used with necessary adaptations to allow for the specific design of the unit.   In any event, the testing procedures shall provide a test challenge equivalent to those for plumbed-in units.

**b.**   Test conditions and apparatus should be adapted to reflect proposed or actual use conditions in consultation with the manufacturer, including flow rate and number of people to be served per day.   In some cases variable flow or other non-standard conditions may be necessary to reflect a worst-case test.

### 3.5.3    Acceptance and Records

3.5.3.1  To quality as a microbiological  water purifier, three production units of a type must continuously meet or exceed the reduction requirements of Table 1, within allowable measurement tolerances for not more than ten percent of influent/effluent sample parts, defined as follows:

Virus:             one order of magnitude

Bacteria:        one order of magnitude

Cysts:            one/half order of magnitude

The geometric mean of all microbiological reductions must meet or exceed the requirements of Table 1.  An example is given as follows:

-       Unit:     iodinated resin.

-       Number of sample pairs over the completed test program: 10 per unit – 3 units = 30.

-       Number  of allowable sample pairs where log reduction is insufficient: 10% of 30 = 3 sample pairs.

-       Allowable minimum log reductions in these 3 pairs:

    •       Bacteria - 5 log

- Virus - 3 log

- cyst - 2½ log

- Conclusion: If the geometric mean of all reductions meets or exceeds the requirements of Table 1, the indicated insufficient sample pairs will be allowed.

3.5.3.2  Records: All pertinent procedures and data shall be recorded in a standard format and retained for possible review until the report of results has been completely accepted by review authorities, in no case for less than a year.

3.5.3.3  Scaling up or down: Where a manufacturer has several similar units using the same basic technology and parallel construction and operation, it may sometimes be appropriate to allow the test of one unit to be considered representative of others. Where any serious doubt exists, all units of various sizes may require testing. A "rule of three" is suggested as a matter of judgment. Scaling up to three times larger or one-third, based on the size of either the test unit or of its operative element, may be allowed. However, for UV units, any size scale-up must be accompanied by a parallel increase in radiation dose.

3.5.3.4  Where silver or some other chemical is used in the unit, concentrations in the effluent water must meet any National Primary Drinking Water Maximum Contaminant Level (MCL), additional Federal guidelines, or otherwise not constitute a threat to health where no MCL exists.

# APPENDIX A

## SUMMARY FOR BASIS OF STANDARDS AND TEST WATER PARAMETERS

A:    Microbiological Reduction Requirements

1.    Bacteria

Current standards for the microbiological safety of drinking water are based on the presence of coliform bacteria of which *Klebsiella* is a member. Members of the genus *Klebsiella* are also potential pathogens of man (Vlassof, 1977). *Klebsiella terrigena* is designated as the test organism since it is commonly found in surface waters (Izard, *et al.*, 1981)

Experience with the use of coliform bacteria to estimate the presence of enteric bacterial pathogens in drinking water as performed over the last 75 years indicates a high degree of reliability. Required testing of more than one bacterial pathogen appears unjustified since viral and *Giardia* testing will be required. Enteric viruses and *Giardia* are known to be more resistant to common disinfectants than enteric bacterial pathogens and viruses are more resistant to removal by treatments such as filtration. Thus, any treatment which would give a good removal of both virus and *Giardia* pathogens would most likely reduce enteric bacteria below levels considered infectious (Jarroll, *et al.*, 1981; Liu, *et al.*, 1971).

The concentration of coliform bacteria in raw sewage is approximately 109/100 .mL. Concentrations in polluted stream waters have been found to exceed $10^5$ per 100 mL (Culp, *et al.*, 1978, Table 10.

Based on the over $10^5$/100 ml concentrations observed in highly polluted stream water and a target effluent concentration of less than 1/100 mL, a 6 log reduction is recommended.

2.    Virus

In the United States concentrations of enteroviruses are estimated to range from $10^3$-$10^4$/liter in raw sewage (Farrah and Schaub, 1971). Based on this observation it is estimated that natural waters contaminated with raw sewage may contain from $10^1$ to $10^2$ enteric viruses per liter.

There are currently no standards for viruses in drinking water in the United States. However, EPA has proposed a non-enforceable health-based recommended maximum contaminant level (RMCL) of zero for viruses (EPA, 1985). Several individuals and organizations have developed guidelines for the presence of viruses in drinking water and various experts have proposed standards (WHO, 1979, 1984; Berg, 1971; Melnick, 1976). It has generally been felt that drinking water should be free of infectious virus since even one virus is potentially infectious and suggested standards are largely based on technological limits of our detection methodology. Guidelines suggested by the World Health Organization (1984) and others recommend that volumes to be tested be in the order of 100-1,000 liters and that viruses be absent in these volumes.

Assuming a target effluent level of less than one virus in 100 liters of water and a concentration of $10^4$ enteric viruses in 100 liters of sewage-contaminated waters, the water purifier units should achieve at least 4 logs of virus removal.

The relative resistance of enteric viruses to different disinfectants varies greatly among the enteric viruses and even among members of the same group (i.e., enteroviruses). For example, while f2 coliphage is one of the most resistant viruses to inactivation by chlorine it is one of the most susceptible to inactivation by ozone (Harakeh and Butler, 1984). Ionic conditions and pH can also affect the relative resistance of different viruses to a disinfectant (Englebrecht, et al., 1980). On this basis it is felt that more than one enteric virus should be tested to ensure the efficacy of any disinfection system. Poliovirus type 1 (Strain LSc) was chosen as one of the test viruses because it has been extensively used in disinfection and environmental studies as representative of the enterovirus family. It is recognized that it is not the most resistant virus to inactivation to chlorine, but is still resistant enough to serve as a useful indicator. Rotavirus is selected as the second test enteric virus since it represents another group of enteric viruses in nucleic acid composition and size. It is also a major cause of viral gastroenteritis and has been documented as a cause of waterborne gastroenteritis (Gerba, et al., 1985). The human rotavirus or the similar Simian rotavirus may be used in the test procedure. A net 4-log reduction for a joint challenge of $1 \times 10^{7}$/L each for poliovirus and rotavirus is recommended.

3.   Cysts (Protozoan)

Over the past several years, giardiasis has consistently been one of the most frequently reported waterborne diseases transmitted by drinking water in the United States (Craun, 1984). EPA has proposed a RMCL of zero for *Giardia* (EPA, 1985).. Its occurrence has generally been associated with treatment deficiencies including either inadequate or not filtration. *Giardia* has not been known to occur from drinking water produced by well-operated filtration treatment plants. De Walle, et al. (1984), in a study of filtration treatment plant efficiencies, cited percent removals for *Giardia* in pilot plant tests as follows:

- rapid filtration with coagulation-sedimentation; 96.6-99.9%;

- direct filtration with coagulation: 95.9-99.9%

From this research and from the lack of *Giardia* cases in systems where adequate filtration exists, a 3-log (99.9%) reduction requirement is considered to be conservative and to provide a comparable level of protection for water purifiers to a well-operated filtration treatment plant.

Data on environmental levels for cysts in natural waters is limited because of the difficulties of sampling and analysis. Unpublished data indicate very löw levels from less than 1/L to less than 10/L. Here a 3-log reduction would provide an effluent of less than 1/100 L, comparable to the recommended virus reduction requirements.

Either *Giardia lamblia* or the related organism, *Giardia muris*, which is reported to be a satisfactory test organism (Hoff, et al., 1985), may be used as the challenge organism. Tests will be conducted with a challenge of $10^{6}$ organisms per liter for a 3-log reduction.

Where the treatment unit or component for cysts is based on the principle of occlusion filtration alone, testing for a 3-log reduction of 4-6 micron particle or spheres (National Sanitation Foundation Standard 53, as an example) is acceptable. Difficulties in the cyst production and measurement technologies by lesser-equipped laboratories may require the use of such alternative tests where applicable.

21

B.    Microbiological Purifier Test Procedures

1.    Test Waters

a.    The general test water (test water #1) is designed for the normal, non-stressed phase of testing with characteristics that may easily be obtained by the adjustment of many public system tap waters.

b.    Test water #2 is intended for the stressed phase of testing where units involve halogen disinfectants.

1) Since the disinfection activity of some halogens falls with a rising pH, it is important to stress test at an elected pH. The recommended level of 9.0 ± 0.2, while exceeding the recommended secondary level (Environmental Protection Agency, 1984) is still within a range seen in some natural waters (Environmental Protection Agency, 1976). However, for iodine-based units, a second stressful condition is provided – a pH of 5.0 ± 0.2 since current information indicates that the disinfection activity of iodine falls with a low pH (National Research Council, 1980). While beneath the recommended secondary level (Environmental Protection Agency, 1984) a pH of 5.0 is not unusual in natural-waters (Environmental Protection Agency, 1976).

2) Organic matter as total organic carbon (TOC) is known to interfere with halogen disinfection. While this TOC is higher than levels in many natural waters, the designated concentration of 10 mg/L is cited as typical in stream waters (Culp/Wesner/Culp, 1978).

3) High concentrations of turbidity can shield microorganisms and interfere with disinfection. While the recommended level of not less than 30 NTU is in the range of turbidities seen in secondary wastewater effluents, this level is also found in many surface waters, especially during periods of heavy rainfall and snow melt (Culp/Wesner/Culp, 1978).

4) Studies with *Giardia* cysts have shown decreasing halogen disinfection activity with lower temperatures (Jarroll, *et al.*, 1980); 4° C, a common low temperature in many natural waters, is recommended for the stress test.

5) The amount of dissolved solids (TDS) may impact the disinfection effectiveness of units that rely on displaceable or exchange elements by displacement of halogens or resins, or it may interfere with adsorptive processes. While TDS levels of 10,000 mg/L are considered unusable for drinking, many supplies with over 2,000 mg/L are used for potable purposes (Environmental Protection Agency, 1984) The recommended level of 1,500 mg/L represents a realistic stress challenge.

c.    Test water #3 is intended for the stressed phase of testing of ceramic filtration candles or units with or without silver impregnation

1) Since viruses are typically eluted from adsorbing media at high pHs (Environmental Protection Agency, 1978) it may be concluded that a high pH will provide the most stressful testing for a ceramic-type unit; consequently, the high natural water pH of 9.0 is recommended.

22

2) Expert opinion also holds that organic material will interfere with adsorption of viruses. Thus, a high total organic carbon level of not less than 10 mg/L is recommended.

3) Turbidity may enhance the entrapment and removal of microorganisms but it also may stimulate "short-circuiting" through some units. A turbidity level of 30 NTU will provide stress at time of sampling but the non-sampling level of 0.1-5 NTU will allow routine operation of units.

4) Expert opinion was that low water temperatures and high TDS would most likely interfere with virus reduction by adsorption; consequently, a 4° C temperature and 1,500 mg/L TDS are recommended.

d. Test water #4 is intended for the stressed phase of testing for ultraviolet (UV) units.

1) In general, high TOC, turbidity and TDS and low temperature are considered most stressful for UV, and the indicated challenge levels are the same as for test water #2.

2) The pH is not critical and may range from 6.5 to 8.5.

3) In order to test the UV units at their most vulnerable stage of operation, a color challenge (light absorption at 254 nm) is to be maintained at a level where UV light intensity is just above the unit's low intensity warning alarm point. However, an alternate to the absorption challenge is provided through adjusting the light intensity output of the UV lamp electronically by reducing current to the lamp, or other appropriate means, to be just above the alarm point; this approach would be particularly necessary where the UV lamp is preceded by activated carbon treatment.

e. Test water #5 is intended for the stressed leaching tests of units containing silver. Low pH, TOC, turbidity, and TDS and higher temperature are felt to be the characteristics associated with increased leachability. The recommended pH of 5 ± .2, while being beneath the recommended secondary range of 6.5-8.5 (Environmental Protection Agency, 1984) is still found in some natural waters.

2.  Test Procedures

The plan for testing and sampling is designed to reveal unit performance under both "normal" and "stressed" operating conditions. The Stressed phase would utilize a set of water quality and operating conditions to give the units a realistic worst case challenge. Testing plans for a specific model might involve modifications to the recommended plan; more samples could be taken and analyzed; more units could be studied. The principle of demonstrating adequate performance even under realistic worst case conditions should be maintained and the final selected test procedures should be agreed as between investigators and reviewers or regulators.

Exhibit C-3, pg.26 of 36.

While some aspects of the testing procedures have been utilized in actual experiments, the proposed protocol has not been verified or utilized in actual experiments, the proposed protocol has not been verified or utilized for the various units that may be considered.  Consequently, investigators and users of this protocol may find reasons to alter some aspects through their practical experience; needed changes should be discussed and cleared with involved reviewers/regulators.

## APPENDIX A REFERENCES:

Berg, G. 1971. Integrated approach to the problem of viruses in water. J. ASCE, Sanit Eng. Div. 97:867-882.

Culp/Wesner/Culp. 1978. Guidance for planning the location of water supply intakes downstream from municipal wastewater treatment facilities. EPA Report, Office of Drinking Water. Washington, DC.

Craun, G. F. 1984. Waterborne outbreaks of giardiasis; Current status, pp. 243-261. In: D. L. Erlandsen and E. a. Meyer (eds.), *Giardia* and giardiasis. Plenum Press, New York.

DeWalle, F. B., J. Engeset and W. Lawrence. 1984. Removal of *Giardia lamblia* cyst by drinking water treatment plants. Report No. EPA-600/52-84-069, Office of Research and Development, Cincinnati, OH.

Engelbrecht, R. S., et al. 1980. Comparative inactivation of viruses by chlorine. Appl. Environ. Microbiol. 40:249-256.

Environmental Protection Agency. 1976. Quality criteria for water. Washington, DC.

Environmental Protection Agency. 1978. Human Viruses in the aquatic environment. Report to Congress.. EPA-570-9-78-006.

Environmental Protection Agency. 1984. National secondary drinking water regulations. EPA-570-9-76-000, Washington, DC.

Environmental Protection Agency. 1985. National primary drinking water regulations; synthetic organic chemicals, inorganic chemicals and microorganisms; Proposed rule. Federal Register, Nov. 13, 1985.

Farrah, S. R., and S. A. Schaub. 1983. Viruses in wastewater sludges. In: Viral Pollution of the Environment (G. Berg. ed.). CRC Press, Boca Raton, Florida. pp. 161-163.

Gerba, C. P., J. B. Rose and S. N. Singh. 1985. Waterborne gastroenteritis and viral Hepatitis. CRC Critical Rev. Environ. Contr. 15:213-236.

Harakeh, M., and M. Butler, 1984. Inactivation of human rotavirus, SA-11 and other enteric viruses in effluent by disinfectants. J. Hyg. Camb., 93:157-163.

Hoff, J. C., E. W. Rice and F. W. Schaefer. 1985. Comparison of animal infectivity and excystation as measures of *Giardia muris* cyst inactivation by chlorine. Appl. Environ. Microbiol. 50:1115-1117.

Izard, D., C. Farragut, F. Gavini, K. Kersters, J. DeLay and H. Leclerc. 1981. *Klebsiella terrigena*, a new species from water and soil. Int. J. Systematic Bacteriol. 31: 116-127.

Jakubowski, W. 1984. Detection of *Giardia* cysts in drinking water. In *Giardia* and Giardiasis (S. L. Erlandsen and E. A. Meyer, eds.). Plenum Press, NY. pp. 263-286

Jarroll, E. L., A. K. Bingham and E. A. Meyer. 1980. *Giardia* cyst destruction: Effectiveness of six small-quantity water disinfection methods. Am. J. Trop. Med. 29:8-11.

Jarroll, E. L., A. K. Bingham and E. A> Meyer. 1981. Effect of chlorine on *Giardia* cyst viability. Appl. Environ. Microbiol. 43: 483-487.

Liu, O. C., *et al.* 1971. Relative resistance of 20 human enteric viruses to free chlorine in Potomac River water. Proceedings of the 13th Water Quality Conference (V. Snoeyink and V. Griffin, eds.), pp. 171-195. University of Illinois.

Melnick, J. L. 1976. Viruses in water. In.: Viruses in Water (G. Berg, H. L. Bodily, E. H. Lennette, J. L. Melnick and T. G. Metcalf, eds.) Amer. Public Hlth. Assoc. Washington, DC. Pp. 3-11.

National Research Council. 1980. The disinfection of drinking water, pp. 5-137. In: Drinking Water and Health. Volume 2. Washington, DC.

National Sanitation Foundation. 1982. Drinking water treatment units: Health effects. Standard 53. Ann Arbor, MI.

Vlassoff, L. T. 1977. *Klebsiella.* In: Bacterial Indicators/Health Hazards Associated with Water (A. W. Hoadley and B. J. Dutka, eds.). American Society for Testing and Materials. Philadelphia, PA pp. 275-288.

World Health Organization. 1979. Human Viruses in Water, Technical Support Series 639, World Health Organization, Geneva.

World Health Organization. 1984. Guidelines for Drinking Water Quality. Volume 1. Recommendations. World Health Organization, Geneva.

Exhibit C-3, pg.29 of 36.

# APPENDIX B

### LIST OF PARTICIPANTS: TASK FORCE ON GUIDE STANDARD AND PROTOCOL

### FOR TESTING MICROBIOLOGICAL WATER PURIFIERS

Stephen A. Schaub, Chairman – U.S. Army Medical Bioengineering Research and Development Laboratory (USAMBRDL), Fort Detrick, Maryland 21701, FTS: 8/935-7207 – Comm: 301/663-7207.

Frank A. Bell, Jr., Secretary – Criteria and Standards Division, Office of Drinking Water (WH-550), Environmental Protection Agency, Washington, D.C. 20460. Phone: 202/382-3027.

Paul Berger, Ph.D. – Criteria and Standards Division, Office of Drinking Water (WH-550), Environmental Protection Agency, Washington, D.C. 20460, Phone: 202/382-3039.

Art Castillo – Disinfectants Branch, Office of Pesticide Programs (TS-767C), Environmental Protection Agency, Washington, D.C. 20460, Phone: 703/557-3965.

Ruth Douglas –Disinfectants Branch, Office of Pesticide Programs (TS-767C), Environmental Protection Agency, Washington, D.C. 20460. Phone: 703/557-3675.

Al Dufour – Microbiology Branch, Health Effects Research Laboratory, Environmental Protection Agency, 26 W. St. Clair Street, Cincinnati, Ohio 45268, Phone: FTS: 8/684-7870 – Comm. 513/569-7870.

Ed Geldreich – Chief, Microbiological Treatment Branch, Water Engineering Research Laboratory, Environmental Protection Agency, 26 W. St. Clair Street, Cincinnati, Ohio 45268, Phone: FTS: 8/684-7232 – Comm: 513/569-7232.

Charles Gerba – Associate Professor, Department of Microbiology and Immunology, University of Arizona, Tucson, Arizona 85721, Phone: 602/621-6906.

John Hoff – Microbiological Treatment Branch, Water Engineering Research Laboratory, Environmental Protection Agency, 26 W. St. Clair Street, Cincinnati, Ohio 45268, Phone: FTS 8/684-7331 – Comm:513/569-7331

Art Kaplan – U. S. Army, Natick R&D Center, Attn: STRNC-YE, Natick, Massachusetts 01760-5020, Phone: 617/651-5525 (5526).

Bala Krishnan – Office of Research and Development (RD-681) Environmental Protection Agency, Washington, D.C. 20460, Phone: 202/382-2583.

John Lee – Disinfectants Branch, Office of Pesticide Programs (TS-767C) Environmental Protection Agency, Washington, D.C. 20460. Phone: 703/557-3663.

Exhibit C-3, pg.30 of 36.

Dorothy Portner – Disinfectants Branch, Office of Pesticide Programs (TS-767-C), Environmental Protection Agency, Washington, D.C. 20460. Phone 703/557-0484..

Don Reasoner – Microbiological Treatment Branch, Water Engineering Research Laboratory, Environmental Protection Agency, 26 W. St. Clair Street, Cincinnati, Ohio 45268, Phone: FTS: 8/684-7234 – Comm. 513/569-7234.

P. Regunathan (Regu) – Everpure, Inc., 660 N. Blackhawk Drive, Westmont, Illinois 60559, Phone: 312/654-4000.

David Stangel – Policy and Analysis Branch, Office of Compliance Monitoring, Environmental Protection Agency, Washington, D.C., Phone: 202/382-7845.

Richard Tobin – Monitoring and Criteria Division, Environmental Health Center, Department of Health and Welfare of Canada, Tunney's Pasture, Ottawa, Ontario, K1A 0L2, Canada, Phone: 613/990-8982.

# APPENDIX C

<u>RESPONSE BY REVIEW SUBCOMMITTEE* TO PUBLIC COMMENTS ON
GUIDE STANDARD AND PROTOCOL FOR TESTING MICROBIOLOGICAL WATER
PURIFIERS</u>

A.  Recommendation for the use of *Giardia lamblia* cysts as a replacement for *Giardia muris* cysts as the protozoan cyst test organisms.

<u>Recommendation:</u>

The subcommittee concurs with the recommendation and further endorses the use of *Giardia lamblia* as the preferred cyst test for evaluation of all treatment units and devices.  Obviously the use of the protozoan organisms of actual health concern in testing is the most desirable. Anyone finding the *Giardia lamblia* strain feasible for testing and cost-effective to work with is encouraged to use same instead of *Giardia muris*.

B.  Substitution of 4-6 micron bead of particle tests as an alternate option instead of the *Giardia* cysts for evaluating devices that rely strictly on occlusion filtration for microbiological removal: Several commenters criticized the use of beads or particles (e.g., A. C. fine dust) and recommended only use of live *Giardia* cysts for performance tests.

<u>Discussion</u>

The subcommittee recognizes and favors the use of the natural human parasite, *Giardia lamblia*, but was not aware of any convincing scientific data which would disallow the optional use of testing with beads or particles for units or devices using only occlusion filtration to remove microorganisms.  Previous development of the national Sanitation Standard (NSF) 53 (1982) requirement for cyst reduction (using 4-6 micron particles as cyst models) was based on engineering and scientific opinion and experimental evidence at that time.  Specifically, Logsdon[1] used radioactive cyst models in the initial phase of a study of removal efficiencies for diatomaceous earth filters; subsequent experiments with *Giardia muris* cysts confirmed the efficacy of the diatomaceous earth filters.  Further studies by Hendricks [2] and DeWalle[3] with *Giardia lamblia* cysts also showed comparable reduction efficiencies for diatomaceous earth filters.

Subsequently confirmatory parallel testing results have been developed vis-a-vis 4-6 micron particles as compared to *Giardia lamblia* cysts.  Specifically, two units listed by NSF for cyst reduction (using 4-6 micron particles)[4] have also been tested and listed for 100% efficiency reduction (using *Giardia lamblia* cysts) by Hibler[5]:

---

*S. A. Schaub; F. A. Bell, Jr..; P. Berger; C. Gerba; J. Hoff; P. Regunathan; and R. Tobin. (Includes additional revision pursuant to Scientific Advisory Panel review (Federal Insecticide, Fungicide, and Rodenticide Act)

(1)    Everpure Model QC 4-SC

(2)    Royal Doulton Model F303.

Again we prefer the use of the human pathogen, *Giardia lamblia*; however, no experimental data has been provided regarding the lack of validity or of failure in previous tests utilizing beads or particles of 4-6 microns. In most cases the bacterial or viral challenges to occlusion filters will represent a greater problem in terms of microbiological reduction requirements than will cysts. Therefore, without substantiation of deficiencies, the use of 4-6 micron beads or particles is considered to be as feasible as the use of live cysts for routine performance testing of water filtration (occlusion devices.

Recommendation:

Recommend retaining the optional use of 4-6 micron particles or beads for cyst reduction testing in occlusion filtration devices only.

References

(1)    Logsdon, G. s., *et al*. Alternative Filtration Methods for Removal of <u>Giardia</u> Cysts and Cyst Models, JAWWA, February, 1981.

(2)    Logsdon, G. S., Hendricks, D. W., *et al*. Control of *Giardia* Cysts by Filtration. The Laboratory's Role, presented AWWA Water Quality Technology Conference, December 6, 1983.

(3)    De Walle, <u>et al</u>. Removal of *Giardia lamblia* Cysts by Drinking Water Treatment Plants, Grant NO. R806127, Report to Drinking Water Research Division, U.S. EPA (ORD/MERL), Cincinnati, Ohio.

(4)    National Sanitation Foundation, 1986, Listing of Drinking Water Treatment Units , Standard 53. May 21, 1986.

(5)    Hibler, C. P. 1984. An Evaluation of Filters in the Removal of *Giardia lamblia*. Water Technology, July, 1984, pp. 34-36.

C.    Alternate assay techniques for cyst tests (Jensen): Proposed alterations in cyst tests include a different method for separating cysts from fecal material and an assay method involving the counting of trophozoites as well as intact cysts. Both alterations have been used by Bingham, *et al*. (1979, Exp. Parasitol., 47:284-291).

Recommendation

These alterations appear to be reasonable laboratory procedures, supported by a peer-reviewed article and will be included in the Report as options for possible development and use by interested laboratories.

D.    The use of pour plate techniques as an option for *Klebsiella terrigena* bacterial analyses.

Recommendation:

The pour plate technique adds a heat stress factor to the bacteria which constitutes a possible deficiency. However, it is a recognized standard method and probably will not adversely

30

affect the *Klebsiella terrigena*. Consequently, it will be added to the Report as one of the acceptable techniques

E.  Option of using *Escherichia coli* in lieu of *Klebsiella terrigena* for the bacterial tests

Discussion:

Appendix A, Section A.1. of the Guide Standards and Protocol sets forth the basis for selection of *K. terrigena* as the test bacteria. The selection was made along pragmatic lines emphasizing the occurrence of *K. terrigena* in surface waters and that it would represent the enteric bacteria. It was also pointed out that the tests with virus and *Giardia* were expected to be more severe than the bacterial tests. For comprehensiveness, bacterial tests were included in the protocol but were not felt to be as crucial as the virus and *Giardia* tests.

*E.coli*, or any number of other generally accepted indicator bacteria, could be used for the test program if they were shown to have good testing and survival characteristics (equivalent to *K. terrigena*) by the interested research laboratory.

Recommendation:

The intent of the Guide Standard and Protocol is to provide a base-line program subject to modification when properly supported by an interested laboratory. Consequently, any laboratory could propose and with proper support (demonstrating challenge and test equivalency to *K. terrigena*) use *Escherichia coli* or one of the other enteric bacteria. This idea will be included in revised wording in Section 1.2.2, "General Guide.""

F.  Performance requirements for *Giardia* cysts and virus in relation to the EPA-Recommended Maximum Contamination levels (RMCLs) of zero.

Discussion:

The RMCLs of zero for *Giardia* and viruses which have been proposed by EPA are health goals. The are not enforceable standards since to assure the presence of "no organisms" would require an infinite sample. The rationale for the recommended performance requirements for *Giardia* cysts and virus is set forth in Sections A.2 and A.3 of Appendix A. We feel that these requirements together with the application of realistic worst case test conditions will provide a conservative test for units resulting in treated effluent water equivalent to that of a public water supply meeting the microbiological requirements and intent of the National Primary Drinking Water Regulations.

Recommendation:

Retain recommended performance (log reduction) requirements for cyst and virus reduction.

G.  Rotavirus and its proposed assay: One commenter states that the rotavirus tests are impractical because Amirtharajah (1966, JAWWA, 78:3:34-49) cites "no satisfactory culture procedure available for analysis of these pathogens and, therefore, monitoring would not be feasible."

Discussion:

Section 3.4.1.2, "Virus Tests" of the Report, presents means for culturing and assaying rotaviruses. The means for doing the rotavirus tests are available and are practical for application in the laboratory. Dr. Amirtharajah was referring to the field collection,

identification in the presence of a wide variety of microorganisms, and quantification as not being "satisfactory." Laboratory analysis of rotaviruses is practical but their field monitoring may not yet be feasible.

Further, the selection of both poliovirus and rotavirus as test viruses was necessitated by the fact that the surface adsorptive properties and disinfection resistance of the various enteric viruses have been shown to differ significantly by virus group and by strains of a specific virus. While all enteric viruses and their strains could not be economically tested, it was determined by the task force that at least two distinctly different virus types should be tested to achieve some idea of the diversity of removal by the various types of water purifiers. Polio and rota viruses have distinctly different physical and chemical characteristics representative of the viruses of concern. Polioviruses are small single stranded RNA viruses with generally good adsorptive properties to surfaces and filter media while rotaviruses are over twice as large, are double stranded RNA and in some studies have been found to possess less potential for adsorption onto surfaces or filter media. These two viruses also have been demonstrated to have somewhat different disinfection kinetics.

Recommendation:

Retain the rotavirus test requirements.

H. Definition of microbiological water purifier: One general comment requested redefinition based on "lack of any virus removal" requirement in the EPA primary drinking water regulations, so that no virus reduction requirement should be included. Also, it was claimed that the separation of purifiers from non-purifiers would be a "disservice to consumers and other users."

Discussion:

Virus are recognized in the EPA regulations vis-a-vis a proposed recommended maximum contaminant level of zero. Since virus monitoring for compliance with a possible MCL is not yet feasible, a treatment requirement is necessary. Virus control will be considered in the Safe Drinking Water Act filtration and disinfection treatment regulations. The reduction of viruses by treatment is discussed by Amirtharajah (1986, JAWWA, 78:3:34-49).

With respect to consumers and other users, we feel that the current definition is appropriate and necessary. The average consumer cannot be expected to know the difference between viruses, bacteria and cysts, or when a raw water will or will not contain any of these organisms. In order to protect the average consumer, the subject units either alone or with supplementary treatment, should be able to cope with all of the specified organisms.

Recommendation:

Retain the current definition for microbiological water purifier.

I. Coverage of units: Several comments related to the coverage of units. These questions are addressed individually as follows:

    1. Ultraviolet units that are used for supplemental treatment of water from public water system taps should not be covered. We agree that such units are not covered and parenthetical language has been included in Section 1.3.2.3 to clarify this point.

2. A special status should be given to units which remove *Giardia* and bacteria but not virus. Specifically, the meaning of Section 1.2.4, "Exceptions," was addressed. The "Exceptions" section was specifically developed to relate to the problem of public water systems having disinfection but no filtration on a surface supply. Cysts alone have been found to survive disinfection treatment and could be present in such treated waters. In this case an effective cyst filter serves an independent, beneficial purpose and should not be required to be a microbiological water purifier. However, such a unit should not be used as sole treatment for untreated raw water. Additional parenthetical language has been added to Section 1.2.4.

3. The entire treatment unit or system should be tested, not just a single component. We agree but believe that it is sufficiently clear without providing additional language.

4. The protocol should be expanded to cover units for the reduction of TCE, EDB and other chemical pollutants. We felt that the introduction of non-microbiological claims to the standard would make it large, unwieldy and duplicative of an existing third-party standards and testing program (see Section 1.2.5).

J. Alleged preference of National Sanitation Foundation (NSF) over other laboratories for conducting the microbiological water purifier testing protocol. The comment indicated that we were giving NSF preferential treatment "to the detriment of other laboratories well qualified to perform the required protocol."

Discussion

We have made appropriate references to existing standards (#42 and #53) developed by the NSF standards development process. Standard 53, the health effects standard, was developed by broadly based Drinking Water Treatment Units Committee, including representatives from local, State and Federal health and environmental agencies, universities, professional and technical associations, as well as water quality industry representatives. It was adopted in 1982 and the only test from it utilized in our Report has been substantiated as described in Part B of this "Response."

Nowhere in our report have wee advocated NSF (or any other laboratory) as the prime or only laboratory for implementing "the required protocol."

Recommendation:

No action needed.

K. Instruction concerning effective lifetime. One comment described an alternate means for determining lifetime where a ceramic unit is "brushed" to renew its utility and is gradually reduced in diameter. A gauge is provided to measure diameter and to determine when replacement is needed.

Recommendation:

Where a manufacturer provides a satisfactory "other" means of determining lifetime, this should be accepted. Appropriate words have been added to Section 2.4.1.C.

Exhibit C-3, pg.36 of 36.

L. Ceramic candles should not be cleaned during testing because some consumers would not clean them and this would provide the "worst case test." One comment asserted this point.

Discussion:

   There is some truth to this proposition. However, the other approach may also have validity. Frequent brushing may reduce filtration efficiency. In any event, where a manufacturer prescribes filter cleaning and how to do it, and provides a gauge to determine lifetime, we feel the testing program is bound to follow the manufacturer's directions.

Recommendation:

   No change needed.

M. Scaling up or down. One comment points out that one or more manufacturers may vary size of treatment units by increasing or decreasing the number of operative units rather than the size of the operative unit. The comment suggests allowing scaling based on size of operative unit.

Recommendation:

   We agree with the comment and have added clarifying words to Section 3.5.3.3

N. Turbidity level of "not less than 30 NTU" for ceramic candles or units. One comment states that "Such levels are impossible to utilize in testing mechanical filtration devices which will clog entirely or require such frequent brushing as to render the test impossible as a practical matter."

Discussion

   We recognized the potential "clogging problems" in Section 3.5.1.a(2) where the 30 NTU water is only to be applied immediately before and during each sampling event; the non-sampling turbidity level, which will be applied over 90% of the "on" time, is currently set at not less than 10 NTU.

   Turbidity levels of 30 NTU are commonly found in surface waters during heavy rainfall or snow melt. Treatment units may be used under these circumstances, so this challenge level should be retained. However, most usage will occur under background conditions so the non-sampling turbidity levels should be 0.1-5 NTU.

Recommendations:

   (1) Retain sampling turbidity level of not less than 30 NTU, and

   (2) Change non-sampling turbidity level to 0.1-5 NTU. Appropriate wording changes have been introduced in Section 3.5.1.a(2) and in Appendix A, Section B.

O. Chlorine in test water #5. One comment asserts that chlorine "tends to increase silver ion leaching activity" and that a high chlorine level should be included in the silver leaching test; but no reference or evidence, however, is provided to back this assertion.

34

February 23, 2023

## Pesticide Registration Notice (PR Notice) 2023-01

**NOTICE TO MANUFACTURERS, FORMULATORS, PRODUCERS, REGISTRANTS AND APPLICATORS OF PESTICIDE PRODUCTS**

**ATTENTION:**  Persons Responsible for Public Health Programs and Those Responsible for Registration of Pesticide Products

**SUBJECT:**  Lists of Pests of Significant Public Health Importance – Revised 2023

This notice updates and replaces PR Notice 2002-1, which identifies pests of significant public health importance. Section 28(d) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) requires the United States Environmental Protection Agency (EPA), in coordination with the United States Department of Health and Human Services (HHS) and United States Department of Agriculture (USDA), to identify pests of significant public health importance and to develop and implement programs to improve and facilitate the safe and necessary use of chemical, biological and other methods to combat and control such pests of public health importance.

The lists were first published in 2002, fulfilling the requirement of FIFRA section to identify pests of significant public health importance. EPA, HHS and USDA believe that pests, diseases, and control techniques have changed since 2002. The lists provide an interagency baseline for the federal government and the public to begin any discussions on government regulation and control of disease or vectors of disease agents. EPA makes this information available, in part, to establish a platform for stakeholders, such as public health departments or pesticide registrants to prioritize their workloads and resource allocations. The Office of Pesticide Programs, EPA, coordinated the review by experts in public health and/or pesticide use patterns to compile these lists. No person is required to take any action in response to this notice.

The publication of these lists do not affect the regulatory status of any pesticide registration, pesticide registration exemption under FIFRA section 25(b), pesticide device, or application for registration of any pesticide product or device. These lists do not, by itself, determine whether a pesticide product might be considered a "public health pesticide" as that term is used in FIFRA. That term is defined in FIFRA section 2(nn); determining whether any specific pesticide is a public health pesticide is beyond the scope of this PR Notice.

The Agency has determined that the lists of pests of significant public health importance required under FIFRA section 28(d) can be established independently of the definition of "public health pesticide" in section 2(nn). EPA is interpreting the term "significant public health importance" broadly, to include pests that pose a widely recognized risk to considerable numbers of people.

## I.    BACKGROUND

FIFRA section 28(d) charges EPA with identifying "pests of significant public health importance." FIFRA section 2(t) defines the term "pest" as meaning:

(1) any insect, rodent, nematode, fungus, weed, or (2) any other form of terrestrial or aquatic plant or animal life or virus, bacteria, or other micro-organism (except viruses, bacteria, or other micro-organism on or in living man or other living animals) which the Administrator declares to be a pest under section 25(c)(1).

Pursuant to the authorization in the second part of this definition, EPA has broadly declared that the term pest includes all members of each of the categories of organisms identified in FIFRA section 2(t) in circumstances where they are deleterious to man or the environment, except for the organisms specifically excluded by the definition (See 40 CFR 152.5).

## II.    THE LISTS

EPA has determined that the pests identified in the Appendix are pests of significant public health importance as that term is used in FIFRA section 28(d). Although these lists are derived in large part from review of the pesticide/pest combinations for which efficacy (product performance) data are generally required to be submitted and reviewed prior to registration; in no way should this be interpreted to mean that EPA has or would base any regulatory action solely on these lists. EPA is publishing these lists separate from any statutory or regulatory conclusions which may be associated with public health pesticides. Additionally, these lists do not account for unanticipated nomenclature changes and/or novel pests. A brief description of the pests and their potential impact on the public's health each is provided below:

> Arthropods. The listed arthropods may cause asthma or trigger allergies, contaminate food, irritate skin, cause direct injury, or carry agents causing diseases such as Lyme disease, epidemic typhus, trench fever, epidemic relapsing fever, malaria, encephalitis (St. Louis, Eastern, Western, West Nile and LaCrosse), yellow fever, dengue fever and many others.

> Vertebrates. The listed organisms have the potential for direct human injury and can act as disease reservoirs for rabies and other diseases. The rats and mice include those that spread rodent-borne diseases and contaminate food for human consumption.

> Microorganisms and acellular particles.  This category includes listed bacteria, fungi, protozoans, viruses, virusoids, and prions. The microorganisms and acellular particles listed in this category cause diseases such as COVID-19, cholera, meningitis, Legionnaire's Disease and many others.

As with the original 2002 lists (PR Notice 2002-1)[1], these lists identify the pests that EPA, HHS and USDA currently consider to be of significant public health importance. As deemed necessary, the Agency will update the lists of pests of significant public health importance. Also, EPA notes that the listings in the "Public Health Importance/Possible Clinical Significance" column are not exhaustive and can vary in their presence and severity (up to and including death) based on a variety of situation specific factors.

---

[1] https://www.epa.gov/sites/production/files/2014-04/documents/pr2002-1.pdf

Interested parties are invited to petition the Agency regarding the amendment of these lists. This petition should include the common use name and scientific name of the pest, and a rationale regarding the public health threat posed by this pest. These petitions can be sent to the contact under **Part V. For Additional Information**.

## III.   USE OF THE LISTS OF PESTS OF SIGNIFICANT PUBLIC HEALTH IMPORTANCE BY THE AGENCY

The Agency will use the lists of pests of significant public health importance to:

1. Fulfill the requirements set forth in FIFRA section 28(d)

2. Together with other federal agencies, develop and implement programs to improve and facilitate the safe and necessary use of chemical, biological and other methods to control pests of public health importance

3. To identify pests that might warrant additional scrutiny and analyses of benefits before changing, restricting or eliminating a use to control a pest of public health significance

## IV.   WHAT REGISTRANTS SHOULD DO

Registrants do not need to do anything in response to this notice.

## V.   FOR ADDITIONAL INFORMATION

If you have questions regarding this PR Notice, please contact one of the following individuals:

Name: Susan Jennings
phone: (706) 355-8574
e-mail: jennings.susan@epa.gov

You may also mail a written inquiry to EPA using the following address:

U.S. Environmental Protection Agency
Office of Pesticide Programs (Mailcode 7505M)
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

## VI.   Signature

This PR Notice is digitally signed today, February 23, 2023.

MICHAEL
GOODIS
Digitally signed by MICHAEL GOODIS
Date: 2023.02.23 14:25:50 -05'00'

**Michael Goodis,**
Acting Director, Office of Pesticide Programs.

**Appendix**

# Appendix to PR Notice 2023-01 (02/23/2023)

Arthropod Pests.................................................................................................................... 2

Vertebrate Pests ................................................................................................................... 7

Microorganisms .................................................................................................................. 11

| Arthropod Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| **ARACHNIDS** | | |
| **Ixodida** | | |
| Soft Ticks | Argasidae | |
| Relapsing fever ticks (and allied species) | *Ornithodoros turicata* | Tick-borne relapsing fever |
| | *Ornithodoros hermsi* | |
| | *Ornithodoros parkeri* | |
| Hard Ticks | Ixodidae | |
| American dog tick | *Dermacentor variabilis* | Rocky Mountain spotted fever, Tularemia, tick paralysis, |
| Rocky Mountain wood tick | *Dermacentor andersoni* | Colorado tick fever, Rocky Mountain spotted fever, Tularemia, tick paralysis, |
| Pacific Coast tick | *Dermacentor occidentalis* | Pacific Coast tick fever |
| Western blacklegged tick | *Ixodes pacificus* | Anaplasmosis, *Borrelia miyamotoi* disease, Lyme disease |
| Blacklegged tick (deer tick) | *Ixodes scapularis* | Anaplasmosis, *Borrelia miyamotoi* disease, Lyme disease, Babesiosis, Powassan encephalitis |
| Brown dog tick | *Rhipicephalus sanguineus* | Rocky Mountain spotted fever |
| Lone star tick | *Amblyomma americanum* | Ehrlichiosis, Bourbon virus disease, Heartland virus disease, Alpha-gal syndrome (red meat allergy) |
| Gulf Coast tick | *Amblyomma maculatum* | *Rickettsia parkeri* rickettsiosis |
| **Trombidiformes** | | |
| Chigger mites | Trombiculidae | |
| Common chiggers | *Eutrombicula* spp. | Dermatitis with risk of secondary infection |
| Follicle mites | Demodicidae | |
| Dog follicle mite | *Demodex canis* | Scabies |
| Human follicle mites | *Demodex brevis* | Roseacea, Demodicosis, Demodicidosis, eye infections |
| | *Demodex folliculorum* | |
| **Sarcoptiformes** | | |
| Dust Mites | Pyroglyphidae | |
| American house dust mite | *Dermatophagoides farina* | Allergic reaction, Asthma |
| European house dust mite | *Chorioptes pteronyssinus* | |
| Itch Mites | Sarcopidae | |
| Scabies mite | *Sarcoptes scabiei* | Scabies |

PR Notice 2023-01; Appendix

| Arthropod Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| **Araneae** | | |
| Spiders | | |
| Widow spiders, including: Southern black widow Northern black widow Western black widow Brown widow | *Latrodectus mactans* *Latrodectus variolus* *Latrodectus hesperus* *Latrodectus geometricus* | Venomous bite |
| Recluse spiders, including: Brown recluse | *Loxosceles reclusa* | |
| **Scorpiones** | | |
| Scorpions | | |
| Bark scorpions | *Centruroides sculpturatus* *Centruroides exilicauda* *Centruroides vittatus* | Venomous sting |
| **Chilopoda** | | |
| Centipedes | | |
| House centipede | *Scutigera coleoptrata* | Venomous bite |
| Florida blue centipede | *Hemiscolopendra marginata* | |
| Scolopendra centipedes | *Scolopendra* spp. | |
| **INSECTS** | | |
| **Blattodea** | | |
| Cockroaches | | |
| American cockroach | *Periplaneta americana* | Allergic reaction, asthma, Salmonellosis, *E. coli* infection, hepatitis |
| Australian cockroach | *Periplaneta australasiae* | |
| Brown cockroach | *Periplaneta brunnea* | |
| Smokybrown cockroach | *Periplaneta fuliginosa* | |
| Brownbanded cockroach | *Supella longipalpa* | |
| German cockroach | *Blattella germanica* | |
| Oriental cockroach | *Blatta orientalis* | |
| **Anoplura** | | |
| Sucking lice | | |
| Body louse (cootie) | *Pediculus humanus humanus* | Epidemic typhus, epidemic relapsing fever, Trench fever, dermatitis with risk of secondary infection |
| Head louse | *Pediculus humanus capitis* | |
| Crab louse (crabs) | *Phthirus pubis* | |

| Arthropod Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| **Heteroptera** | | |
| True bugs | | |
| Bed bug | *Cimex lectularis* | Bites, allergic reactions |
| Tropical bed bug | *Cimex hemipterus* | |
| Masked hunter | *Reduvius personatus* | Chagas disease, allergic reactions |
| Large kissing bug | *Triatoma rubrofasciata* | Chagas disease, allergic reactions |
| Bloodsucking conenose | *Triatoma sanguisuga* | |
| Western bloodsucking conenose | *Triatoma protracta* | |
| **Diptera** | | |
| Horse & Deer Flies | | |
| Horse flies | *Tabanus spp.* | Painful Bite, allergic reactions, mechanical transmission of anthrax |
| Deer flies | *Chrysops* spp. | Painful Bite, allergic reactions, Tularemia |
| Calyptrate Flies | | |
| House fly | *Musca domestica* | Salmonellosis, Shigella, dysentery, myiasis, allergic reactions |
| Stable fly | *Stomoxys calcitrans* | |
| Little house fly | *Fannia canicularis* | |
| Horse bot fly | *Gasterophilus intestinalis* | Ocular myiasis, cutaneous myiasis |
| Nose bot fly | *Gasterophilus haemorrhoidalis* | |
| Torsalo (human bot fly) | *Dermatobia hominus* | |
| Sheep ked | *Melophagus ovinus* | Myiasis |
| Flesh flies | Sarcophagidae, including *Sarcophaga* and *Wohlfahrtia* spp. | Myiasis, mechanical vector of pathogens |
| Blow flies | Calliphoridae, including *Phaenicia* and *Calliphora* spp. | Myiasis, mechanical vector of pathogens |
| Screwworm | *Cochliomyia hominivorax* | Myiasis |
| Secondary screwworm | *Cochliomyia macellaria* | |

Case: 23-11189    Document: 12    Page: 204    Date Filed: 12/10/2023
Exhibit C-4, pg.8 of 19.

PR Notice 2023-01; Appendix

| Arthropod Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| Biting Midges and Sand Flies | | |
| "No-See-Ums" | *Culicoides* spp.*, Leptoconops* spp. | Dermatitis with risk of secondary infection, allergic reactions |
| Punkies | | |
| Biting midges | | |
| Sand flies | *Lutzomyia* spp.*, Phlebotomus* spp. | Dermatitis with risk of secondary infection, American dermal leishmaniasis |
| Black flies | Simuliidae; includes *Simulium* and *Prosimulium* spp. | River blindness, dermatitis with risk of secondary infection, painful bite, allergic reactions |
| Black gnats | | |
| Mosquitoes | Culicidae | |
| Mosquito species that vector disease | *Aedes* spp. *Culex* spp. *Culiseta* spp. *Ochlerotatus* spp. *Anopheles* spp. *Psorophora* spp. *Coquillettidia* spp. *Mansonia* spp. | Viral diseases, such as: West Nile, St. Louis encephalitis Eastern equine encephalitis, Western equine encephalitis, Venezuelan equine encephalitis, LaCrosse, Jamestown Canyon, Cache Valley virus disease, Dengue fever, Yellow fever, Malaria, Zika, Chikungunya, Japanese encephalitis (note: not all diseases are vectored by every genera) |
| **Siphonaptera** | | |
| Fleas | | |
| Cat flea | *Ctenocephalides felis* | Bartonella, Murine typhus, tapeworm infection, dermatitis with a risk of secondary infection, allergic reactions, painful bite |
| Dog flea | *Ctenocephalides canis* | |
| Human flea | *Pulex irritans* | Dermatitis with risk of secondary infection, allergic reactions, painful bite |
| Sticktight flea | *Echidnophaga gallinacea* | Bubonic plague, Murine plague (endemic typhus), Dermatitis with risk of secondary infection, allergic reactions, painful bite |
| Oriental rat flea | *Xenopsylla cheopis* | |
| Chigoe | *Tunga penetrans* | |
| Other fleas | *Oropsylla* spp. *Thrassis* spp. *Ceratophyllus gallinae* | |

PR Notice 2023-01; Appendix

| Arthropod Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| **Hymenoptera** | | |
| Stinging Wasps, Bees, & Ants | | |
| Yellowjackets | *Vespula* spp. | Painful stings, allergic reactions |
| European hornet | *Vespa crabro* | |
| Bald-faced hornet | *Dolichovespula maculata* | |
| Paper wasps | *Polistes* spp. | |
| Thread-waisted wasps (including mud daubers) | Sphecidae: Various species | |
| Ants | Formicidae | |
| Pharaoh ant | *Monomorium pharaonis* | Feed on wounds |
| Fire ants, including: Southern fire ant Tropical fire ant Red imported fire ant Black imported fire ant European fire ant | *Solenopsis* spp. *Solenopsis xyloni* *Solenopsis geminata* *Solenopsis invicta,* *Solenopsis richteri* *Myrmica rubra* | Painful stings, allergic reactions |
| Harvester ants | *Pogonomyrmex* spp. | Painful stings, allergic reactions |
| Bees | Apidae | |
| Africanized honey bee | *Apis mellifera scutellata* | Painful stings, allergic reactions |

PR Notice 2023-01; Appendix

| Vertebrate Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| **Reptiles** | | |
| Rattlesnakes | *Crotalus* spp. | Direct injury, venomous bites |
| Copperhead and cottonmouth snakes | *Agkistrodon* spp. | |
| Coral snakes | *Micrurus* spp. | |
| Brown tree snake | *Boiga irregularis* | |
| **Fish** | | |
| Great white shark | *Carcharodon carcharias* | Direct Injury |
| Tiger shark | *Galeocerdo cuvier* | |
| Bull shark | *Carcharhinus leucas* | |
| Asian carps | *Cyprinus* spp. *Ctenopharyngodon* spp. *Hypophthalmichthys* spp. | |
| **Birds** | | |
| Geese | Subfamily Anserinae | Histoplasmosis, cryptococcosis, psittacosis, avian influenza, direct injury, bird strike at airports |
| Mute swan | *Cygus olor* | |
| Gulls | Subfamily Larinae | |
| Coot | *Fulica americana* | |
| Rock dove (domestic pigeon) | *Columba livia* | |
| Cliff swallow | *Petrochelidon pyrrhonota* | |
| Barn swallow | *Hirundo rustica* | |
| House (English) sparrow | *Passer domesticus* | |
| American crow | *Corvus brachyrhynchos* | |
| Fish crow | *Corvus ossifragus* | |
| European starling | *Sturnus vulgaris* | |
| House finch | *Cardodacus purpureus* | |
| Blackbirds | Family Icteridae | |
| Common raven | *Corvus corax* | |
| Chihuahuan raven | *Corvus cryptoleucus* | |
| Black vulture | *Cathartes aura* | |
| Turkey vulture | *Coragyps atratus* | |

PR Notice 2023-01; Appendix

| Vertebrate Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| **Mammals** | | |
| Bats | | |
| Big brown bat | *Eptesicus fuscus* | Rabies, histoplasmosis, salmonellosis, yersiniosis, Nipah virus, Ebola virus, SARS coronavirus |
| Little brown bat | *Myotis lucifugus* | |
| Brazilian (Mexican) free-tailed bat | *Tadarida brasiliensis* | |
| Big eared bat | *Corynorhinus townsendii* | |
| Common vampire bat | *Desmodus rotundus* | |
| Mice | | |
| House mouse | *Mus musculus* | Hantavirus, salmonellosis, tularemia, leptospirosis, lymphocytic chorio-meningitis, rat bite fever, other diseases, allergy and asthma triggers from urine/hair/dander |
| Deer mouse | *Peromyscus maniculatus* | |
| Cotton mouse | *Peromyscus gossypinus* | |
| White-footed mouse (White-footed deer mouse) | *Peromyscus leucopus* | |
| Eastern harvest mouse | *Reithrodontomys humuli* | |
| Golden mouse | *Ochrotomys nuttalli* | |
| Rats | | |
| Norway rat | *Rattus norvegicus* | Leptospirosis, plague, rat bite fever, salmonellosis, tularemia, lymphocytic chorio-meningitis, direct injury, allergy and asthma triggers from urine/hair/dander |
| Roof rat | *Rattus rattus* | |
| Polynesian rat | *Rattus exulans* | |
| Cotton rats | *Sigmodon* spp. | |
| Mexican woodrat | *Neotoma mexicana* | |
| Southern plains woodrat | *Neotoma micropus* | |
| White-throated woodrat | *Neotoma albigula* | |

PR Notice 2023-01; Appendix

| Vertebrate Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| Squirrels | | |
| Flying squirrels | *Glaucomys* spp. | Sylvatic typhus, leptospirosis |
| Ground squirrels and prairie dogs | *Urocitellus* spp.*, Spermophilus* spp.*, Ictidomys* spp.*, Poliocitellus* spp.*, Cynomys* spp.*, Xerospermophilus* spp.*, Callospermophilus* spp.*, Otospermopjilus* spp.*, Ammospermophilus* spp. | Plague, tularemia |
| Tree squirrels and chipmunks | *Sciurus* spp., *Tamias* spp., *Eutamias* spp., *Tamiasciurus* spp. | Leptospirosis, salmonellosis, tularemia, rabies, direct injury |
| Woodchuck | *Marmota monax* | |
| Yellow-bellied marmot | *Marmota flaviventris* | |
| **Other Mammals** | | |
| Bears | Family Ursidae | Toxoplasmosis, brucellosis, trichinellosis, direct injury |
| Coyote | *Canis latrans* | Rabies, canine distemper virus, leptospirosis, direct injury |
| Arctic fox | *Alopex lagopus* | |
| Gray fox | *Urocyon cinereoargenteus* | |
| Red fox | *Vulpes vulpes* | |
| Gray wolf | *Canis lupus* | |
| Wild (feral) dog | *Canis lupus familiaris* | |
| Wild (feral) cat | *Felis catus* | Toxoplasmosis, rabies, direct injury |
| Wild (feral) horse | *Equus caballus* | Rabies, leptospirosis, salmonellosis, campylobacterosis, cryptosporidiosis, direct injury |
| Wild (feral) swine Javelina (collared peccary) | *Sus scrofa* *Dicotyles tajacu* | Leptospirosis, brucellosis, *E. coli* infection, salmonellosis, toxoplasmosis, rabies, swine influenza viruses, trichinosis, giardiasis, cryptosporidiosis, direct injury |
| Deer and elk | Family Cervidae | Leptospirosis, salmonellosis, chlamydiosis, campylobacterosis, cryptosporidiosis, giardiasis, direct injury |
| American bison | *Bison bison* | Brucellosis, direct injury |
| Mongooses | Family Herpestidae | Leptospirosis, direct injury |

PR Notice 2023-01; Appendix

| Vertebrate Pests | | |
|---|---|---|
| **Pest** | **Scientific Name** | **Public Health Importance/ Possible Clinical Significance** |
| **Other Mammals (continued)** | | |
| Mountain lion (cougar) | *Puma concolor* | Toxoplasmosis, plague, rabies, direct injury |
| Nutria | *Myocastor coypus* | Tuberculosis, septicemia, rabies, leptospirosis |
| Porcupine | *Erethizon dorsatum* | Rabies, tularemia, direct injury |
| North American beaver | *Castor canadensis* | Giardiasis, leptospirosis, hantavirus, direct injury, waterway impoundment that can lead to life-threatening flooding |
| Badger | *Taxidea taxus* | Rabies, direct injury |
| Muskrat | *Ondatra zibethicus* | Leptospirosis, tularemia |
| Striped skunk | *Mephitis mephitis* | Leptospirosis, tularemia, direct injury |
| Spotted skunk | *Spilogale putorius* | |
| Raccoon | *Procyon lotor* | |
| Rabbits | Family Leporidae | Cryptosporidoisis, tularemia, rabbit hemorrhagic fever |
| Virginia opossum | *Didelphis virginiana* | Leptospirosis, tularemia, direct injury |
| Nine-banded armadillo | *Dasypus novemcinctus* | Leprosy, Chagas disease |

PR Notice 2023-01; Appendix

| Microorganisms | |
|---|---|
| **Taxonomic Name (Organism or Particle Type)** | **Public Health Importance (Possible Clinical Significance)** |
| **Bacteria** | |
| Spirochetes | |
| *Borrelia* spp. | Lyme disease, *Borrelia miyamotoi* disease, tick-borne relapsing fever |
| *Leptospira* spp. | Leptospirosis |
| *Treponema* spp. | Syphilis, yaws, pinta |
| Gram-Negative Bacteria – aerobic rods and cocci | |
| *Campylobacter* spp. | Enteritis, abscesses, |
| *Pseudomonas* spp. | Septicemia, abscesses, respiratory and urinary infections, bacteremia |
| *Stenotrophomonas* spp. | Respiratory infections, urinary tract infections |
| *Burkholderia* spp. | Endocarditis, septicemia, wound infections |
| *Legionella* spp. | Legionnaires' Disease, pneumonia |
| *Neisseria* spp. | Meningitis, gonorrhea, urinary tract infections |
| *Elizabethkingia* spp. *(Chryseobacterium - Flavobacteria* spp.*)* | Nosocomial infection, meningitis, septicemia |
| *Bordetella* spp. | Whooping cough |
| *Brucella* spp. | Brucellosis, undulant fever |
| *Moraxella* spp. | Conjunctivitis |
| *Acinetobacter* spp. | Nosocomial infections |
| *Aeromonas* spp. | Gastroenteritis, wound, septicemia |
| *Haemophilus* spp. | Bronchitis, sinusitis, otitis, septicemia, venereal disease |
| *Chromobacterium* spp. | Pyogenic infections, septicemia |
| Gram-Negative Bacteria –facultatively anaerobic rods | |
| *Vibrio* spp. | Cholera, gastroenteritis, septicemia, ear infections |
| *Plesiomonas* spp. | Gastroenteritis |
| *Pasteurella* spp. | Meningitis, arthritis, otitis, septicemia, sinusitis, encephalitis |
| *Actinobacillus* spp. | Pneumonia, bronchitis, septicemia, sinusitis |
| *Bacteroide* spp. | Diarrhea, intra-abdominal abscesses, peritoneal infections, inflammatory bowel disease, anaerobic bacteremia, colon cancer |
| *Cardiobacterium* spp. | Endocarditis |
| *Gardnerella* spp. | Vaginitis |
| *Eikenella* spp. | Sinusitis, pulmonary infections, arthritis, endocarditis, pancreatic abscesses |

PR Notice 2023-01; Appendix

| Microorganisms | |
|---|---|
| **Taxonomic Name (Organism or Particle Type)** | **Public Health Importance (Possible Clinical Significance)** |
| Enteric Bacteria | |
| *Escherichia* spp. | Urinary tract infections, septicemia, diarrhea, hemorrhagic colitis |
| *Shigella* spp. | Dysentery, diarrhea |
| *Salmonella* spp. | Gastroenteritis, septicemia, bacteremia, arthritis, typhoid fever, enterocolitis, gallbladder infection |
| *Citrobacter* spp. | Opportunistic infections, neonatal meningitis |
| *Klebsiella* spp. | Pneumoniae, infant diarrhea and urinary tract infection |
| *Enterobacter* spp./Other related species | Wound infection, nosocomial infections, urinary tract infections, gastroenteritis |
| *Hafnia* spp. | Opportunistic infections |
| *Proteus* spp. | Urinary tract infections, infant diarrhea, respiratory infections |
| *Serratia* spp. | Cystitis, bloodstream and central nervous system infections |
| *Providencia* spp. | Nosocomial infections, urinary tract infections, burn wound infections |
| *Morganella* spp. | Bacteremia, respiratory/urinary tract infections, wound infections |
| *Yersinia* spp. | Gastroenteritis, wound infections, septicemia |
| Gram-Negative, Anaerobic, Straight, Curved, and Helical Rods | |
| *Bacterioides* spp. | Periodontal disease, bacteremia |
| *Fusobacterium* spp. | Abscesses |
| **Rickettsia and Chlamydia – obligate, intracellular parasites** | |
| Rickettsia—Rod-shaped bacteria or Coccobacilli, Gram-Negative, Non-motile, Most transmitted by arthropods | |
| *Rickettsia* spp. | Rickettsialpox, Rocky Mountain spotted fever, *Rickettsia parkeri* rickettsiosis, Pacific Coast tick fever |
| *Anaplasma* spp. | Anaplasmosis |
| *Ehrlichia* spp. | Ehrlichiosis |
| *Coxiella* spp. | Q fever |
| Chlamydia –coccoid bacteria, Gram-negative, non-motile | |
| *Chlamydia* spp. | Trachoma (blindness), nongonococcal urethritis, lymphoma venereum, pneumonia |
| *Mycoplasma* spp. | Pneumonia, urogenital tract infections |
| *Ureaplasma* spp. | Urogenital tract infections |

PR Notice 2023-01; Appendix

| Microorganisms | |
|---|---|
| **Taxonomic Name**<br>**(Organism or Particle Type)** | **Public Health Importance**<br>**(Possible Clinical Significance)** |
| Gram-Positive Cocci | |
| *Staphylococcus* spp. | Cellulitis, boils, carbuncles, impetigo, toxic shock syndrome, bacteremia, endocarditis, meningitis, pneumonia, osteomyelitis |
| Coagulase-negative *Staphylococcus* spp. | Bacteremia, endocarditis, peritonitis, genitourinary tract infections |
| Group A *Streptococci* spp. | Pharyngitis, tonsillitis, sinusitis, arthritis, rheumatic fever, scarlet fever, impetigo |
| Group B *Streptococci* spp. | Neonatal disease, pneumonia, septicemia, meningitis, endocarditis |
| Group C *Streptococci* spp. | Pneumonia, pharyngitis, endocarditis, meningitis |
| *Enterococcus* spp. | Wound infections, bacteremia, endocarditis, meningitis |
| Additional *Streptococci* spp. | Pneumonia, otitis media, bacteremia, meningitis |
| Endospore-forming Gram-positive rods and cocci | |
| *Bacillus* spp. | Anthrax, gastroenteritis |
| *Clostridioides* spp. | Pseudomembranous colitis |
| *Clostridium* spp. | Tetanus, botulism, gangrene |
| Non-Endospore forming Gram-Positive Rods | |
| *Listeria* spp. | Food poisoning, abscess, abortion, meningitis |
| *Erysipelothrix* spp. | Erysipeloid, arthritis, endocarditis |
| Irregular, non-endospore forming, Gram-positive rods | |
| *Corynebacterium* spp. | Diphtheria |
| *Actinomyces* spp. | Actinomyces-granulomatous, ocular infections, caries, periodontal disease, intrauterine infection |
| *Propionibacterium* spp. | Acne |
| *Mycobacterium* spp. | Tuberculosis, pulmonary disease, cutaneous abscesses, post-operative wound infections |
| Actinomycetes—Irregular, non-endospore forming, Gram-positive | |
| *Nocardia* spp. | Cutaneous/subcutaneous infections, nocardiosis, mycetoma |
| *Rhodococcus* spp. | Opportunist pathogens |
| *Streptomyces* spp. | Actinomycetoma |
| *Actinomadura* spp. | |

PR Notice 2023-01; Appendix

| Microorganisms | |
|---|---|
| **Taxonomic Name (Organism or Particle Type)** | **Public Health Importance (Possible Clinical Significance)** |
| **Fungi** | |
| *Rhizopus* spp. | Opportunistic infections--Mucormycosis |
| *Rhizomucor* spp. | |
| *Absidia* spp. | |
| *Mucor* spp. | |
| *Cunninghamella* spp. | |
| *Mortierella* spp. | |
| *Saksenaea* spp. | |
| *Apophysomyces* spp. | |
| *Penicillium* spp. | Pneumonia, endocarditis, urinary tract infections |
| *Candida* spp. | Candidiasis, thrush, iatrogenic infections, Genitourinary tract infections |
| *Fusarium* spp. | Disseminated skin lesions in patients with leukemia |
| *Pseudalleschericia* spp. | Local lesions in paranasal sinuses, disseminated in kidney, thyroid, brain, heart |
| *Cryptococcus* spp. | Meningitis |
| *Trichosporon* spp. | Trichosporonosis |
| *Epidermophyton* spp. | Tinea cruris, tinea pedis |
| *Malassezia* spp. | Tinea versicolor |
| *Exophiala* spp. | Tinea nigra palmaris |
| *Trichophyton* spp. | Athlete's foot, tinea pedis, tinea corporis, tinea pedis, tinea barbae, tinea cruris, tinea capitis, tinea favosa |
| *Microsporum* spp. | Tinea capitis |
| *Pneumocystis* spp. | Pneumonia |
| *Histoplasma* spp. | Histoplasmosis |
| *Coccidioides* spp. | Coccidioidomycosis |
| *Paracoccidioides* spp. | Paracoccidioidomycosis |
| *Blastomyces* spp. | Blastomycosis |
| *Sporothrix* spp. | Sporotrichosis |
| *Aspergillus* spp. | Aspergillosis, pneumonia, ear infections, food-borne intoxication (aflatoxin) |
| *Stachybotrys* spp. / *Memnoniella* spp. | Allergic reactions |
| **Protozoans** | |
| Amoebas | |
| *Entamoeba* spp. | Amoebic dysentery |
| *Naegleria* spp. | Meningoencephalitis |
| *Acanthamoeba* spp. | Keratitis, chronic granulomatous amoebic encephalitis |

PR Notice 2023-01; Appendix

| Microorganisms | |
|---|---|
| **Taxonomic Name** **(Organism or Particle Type)** | **Public Health Importance** **(Possible Clinical Significance)** |
| Flagellates | |
| *Giardia* spp. | Dysentery |
| *Trichomonas* spp. | Urethritis, vaginitis |
| Ciliates | |
| *Balantidium* spp. | Dysentery |
| Sporozoans | |
| *Babesia* spp. | Babesiosis |
| *Cryptosporidium* spp. | Diarrhea |
| *Cyclospora* spp. | Food poisoning |
| *Toxoplasma* spp. | Toxoplasmosis |
| *Isospora* spp. | Watery diarrhea, abdominal pain/cramping, vomiting, fever |
| **Viruses** | |
| Adenoviruses (Infectious canine hepatitis virus) | Bronchitis, pneumonia, diarrhea, conjunctivitis, fever, bladder inflammation |
| Alphaviruses (Eastern equine encephalitis virus, chikungunya virus) | Fever, headache, joint swelling, pain, seizures, neurocognitive symptoms |
| Papillomaviruses (HPV), | Cancers, papilloma, warts |
| Polyomaviruses (simian vacuolating virus, Simian Virus 40, BK virus) | Usually asymptomatic, hemorrhagic cystitis, |
| Herpesviruses (herpes simplex viruses, varicella-zoster virus, cytomegalovirus, Epstein-Barr virus) | Shingles, chicken pox, fever, sore throat, swollen glands, hepatitis |
| Parvoviruses (parvovirus B19, canine parvovirus) | Fifth disease, rash, rhinitis, headache, painful joints |
| Poxviruses (smallpox virus, cow pox virus, sheep pox virus, monkey pox virus, vaccinia virus, molluscum contagiosum) | Lesions, skin nodules, disseminated rash |
| Picornaviruses (poliovirus, rhinovirus, coxsackie virus, enterovirus, hepatovirus, cardiovirus) | Hand, foot, and mouth disease, viral meningitis, myocarditis, acute flaccid paralysis, inflammatory muscle disease, stomach pain, nausea |
| Reoviruses (rotavirus) | Acute necrotizing encephalopathy, vomiting, diarrhea, abdominal pain |
| Caliciviruses (norovirus) | Diarrhea, vomiting, stomach pain |
| Togoviruses (rubella virus, alphavirus) | German measles, rash, sore throat |
| Flaviviruses (dengue virus, hepatitis C virus, yellow fever virus, Zika virus, West Nile virus, Powassan virus, tick-borne encephalitis virus) | Fever, headache, neurological symptoms, nausea, vomiting, rash, aches, pains, bleeding from nose or gums |
| Orthomyxoviruses (influenza viruses, Thogotovirus) | Fever, child, cough, sore throat, rhinitis |

PR Notice 2023-01; Appendix

| Microorganisms | |
|---|---|
| **Taxonomic Name**<br>**(Organism or Particle Type)** | **Public Health Importance**<br>**(Possible Clinical Significance)** |
| **Viruses (continued)** | |
| Paramyxoviruses (measles virus, measles virus, respiratory syncytial virus (RSV), canine distemper virus) | High fever, coryza, conjunctivitis, coughing, wheezing, |
| Bunyaviruses (California encephalitis virus, hantavirus, Crimean-Congo hemorrhagic fever) | Fever, fatigue, muscle aches, vomiting, diarrhea, lethargy, shortness of breath |
| Rhabdoviruses (rabies virus) | Flu-like symptoms, weakness, fever, headache |
| Filoviruses (Ebola virus, Marburg virus) | Muscle pains, fatigue, diarrhea, unexplained bleeding or bruising |
| Coronaviruses (coronavirus, SARS-CoV, MERS-CoV) | Rhinitis, cough, sore throat, fever, fatigue, difficulty breathing |
| Astroviruses (astrovirus) | Vomiting, diarrhea |
| Retroviruses (HIV) | Night sweats, continual fevers, extreme fatigue, prolonged swelling of lymph glands, immune deficiency (i.e., AIDS) |
| Hepeviruses (Hepatitis E virus) | Nausea, jaundice, liver failure |
| Hepadnaviruses (Hepatitis B virus) | Fever, vomiting, nausea, dark urine, jaundice |
| Arenaviruses (Lymphocytic choriomeningitis virus (LCMV), Lujo Hemorrhagic Fever (LHF) virus, Sabia Virus, Lassa virus) | Meningitis, encephalitis, hydrocephalus, rash on face and trunk, respiratory distress, circulatory issues |
| **Prions** | |
| *TSEs (transmissible spongiform encephalopathies)* | Gerstmann-Straussler-Scheinker Syndrome, fatal familial insomnia, kuru, Creutzfeldt-Jakob Disease, bovine spongiform encephalopathy, scrapie, transmissible mink encephalopathy, feline spongiform encephalopathy, ungulate spongiform encephalopathy, chronic wasting disease |

Exhibit C-5, pg.1 of 15.

🇺🇸 An official website of the United States government

MAIN MENU

Search EPA.gov

**Pesticide Registration**

CONTACT US <https://epa.gov/pesticide-registration/forms/contact-us-about-pesticide-registration>

# Pesticide Registration Manual: Chapter 13 – Devices

**In this chapter:**

- Devices - Introduction
- How to Obtain a Device Determination from EPA
- Devices Subject to Regulation
- Devices Not Subject to Regulation
- Requirements for a Device Subject to Regulation
  - Registration Not Required
  - Production Requirements
  - Labeling Requirements
  - Device Efficacy
  - Child-Resistant Packaging
- Import and Export of Devices
- Contacts for Additional Information
- References Cited in Chapter 13

### Registration Manual Table of Contents

Pesticides Registration Manual Home Page <https://epa.gov/pesticide-registration/pesticide-registration-manual>

Introduction <https://epa.gov/pesticide-registration/pesticide-registration-manual-introduction>

How to Register a Pesticide Product – A Guide for Applicants New to the Process <https://epa.gov/pesticide-registration/how-register-pesticide-guide-applicants-new-process>

## Devices – Introduction

This chapter describes how EPA regulates pesticidal devices and clarifies which types of devices are subject to regulatory oversight and what requirements apply to them.

In 1976, EPA issued a Federal Register Notice concerning the regulatory status of devices <https://epa.gov/pesticide-registration/pest-

control-devices-and-device-producers-1976-federal-register-notice>. In that notice, EPA also explained its interpretation of the distinction between a "pesticide" and a "device." More information can be found on the EPA's Pest Control Devices and Device Producers: 1976 Federal Register Notice webpage <https://epa.gov/pesticide-registration/pest-control-devices-and-device-producers-1976-federal-register-notice>.

FIFRA defines a device as any instrument or contrivance (other than a firearm) that is intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life (other than man and other than bacteria, virus, or other microorganism on or in living man or other living animals); but not including equipment used for the application of pesticides when sold separately therefrom. Refer to FIFRA section 2(h) <https://epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act>.

In general, if an article is an instrument or contrivance that uses physical or mechanical means to trap, destroy, repel, or mitigate any plant or animal life declared to be a pest at 40 CFR 152.5, it is considered to be a device and subject to regulation under FIFRA. However, devices are not subject to the registration requirements that apply to pesticides and pesticide products under FIFRA section 3. Further information can be found on EPA's Pest Control Devices Webpage. <https://epa.gov/pesticides/pesticide-devices-guide-consumers>

If a product consists of an object or article that incorporates a substance or mixture of substances intended to prevent, destroy, repel, or mitigate any pest, the entire product is considered to be a pesticide and is subject to registration under FIFRA section 3. Also, if such a product is sold with any substance that functions as a precursor for creation of a pesticidal substance, the entire product is generally considered to be a pesticide and subject to registration under FIFRA section 3.

If the product is an instrument or contrivance and claims to control pests through physical or mechanical means, the product is considered to be a device, unless it is a firearm.

Distinctions among devices, pesticides, and pesticide

1. Requirements for Pesticide Registration and Registrant Obligations
   <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-1-overview-requirements-pesticide>

2. Registering a Pesticide Product <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-2-registering-pesticide-product>

3. Additional Considerations for Biopesticide Products
   <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-3-additional-considerations>

4. Additional Considerations for Antimicrobial Products
   <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-4-additional-considerations>

5. Registration Fees
   <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-5-registration-fees>

application equipment can be illustrated by comparing products that are outwardly similar but are treated differently under FIFRA. For example, a bait station that is sold by itself to be used in conjunction with other products in the control of insects or rodents is considered to be pesticide application equipment and is not directly regulated under FIFRA, although the labels for registered pesticide products may require them to be used in bait stations in some or all applications.

If the same design of bait station is sold with toxic bait in it (or packaged with it for use in it), the entire product is considered a "pesticide product" and is regulated and labeled as such. If the bait station is sold with a sticky trap inside it (or is packaged with sticky traps that are to be placed inside it), the entire product is a device, and is regulated under FIFRA because it achieves pest control by physical means.

6. Amending a Registered Pesticide Product

<https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-6-amending-registered-pesticide>

7. Notifications and Minor Formulation Amendments

<https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-7-notifications-and-minor-formulation>

8. Inert Ingredients

<https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-8-inert-ingredients>

9. Supplemental Distribution of a Registered Pesticide

<https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-9-supplemental-distribution-registered>

10. Data Compensation Requirements

<https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-10-data-compensation-requirements>

11. Tolerance Petitions

<https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-11-tolerance-petitions>

Exhibit C-5, pg.4 of 15.

12. Applying for an Experimental Use Permit <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-12-applying-experimental-use-permit>

13. **Devices**

14. How to Obtain an EPA Establishment Number <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-14-how-obtain-epa-company-or>

15. Submitting Data and Confidential Business Information <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-15-submitting-data-and-confidential>

16. Transfer of Product Registrations and Data Rights <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-16-transfer-product-registrations-and>

17. State Regulatory Authority <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-17-state-regulatory-authority>

Exhibit C-5, pg.5 of 15.

18. Other Federal or State
    Agency Requirements
    <https://epa.gov/pesticide-
    registration/pesticide-
    registration-manual-chapter-
    18-other-federal-or-state-
    agency>

19. How to Obtain
    Publications
    <https://epa.gov/pesticide-
    registration/pesticide-
    registration-manual-chapter-
    19-how-obtain-publications>

20. Forms and How to
    Obtain Them
    <https://epa.gov/pesticide-
    registration/pesticide-
    registration-manual-chapter-
    20-forms-and-how-obtain-
    them>

21. Directions for
    Submitting Applications
    and Contacting EPA
    <https://epa.gov/pesticide-
    registration/pesticide-
    registration-manual-chapter-
    21-directions-submitting-
    applications>

**Appendices**

- Appendix A: Guidance
  Documents
  <https://epa.gov/pesticide-
  registration/pesticide-
  registration-manual-appendix-
  guidance-documents>

Exhibit C-5, pg.6 of 15.

- Appendix B: Examples of Registrant Documents <https://epa.gov/pesticide-registration/pesticide-registration-manual-appendix-b-examples-registrant-documents>
- Appendix C: Pesticide Forms Overview Table <https://epa.gov/pesticide-registration/pesticide-registration-manual-appendix-c-pesticide-forms-overview-table>
- Appendix D: Examples of Completed Forms <https://epa.gov/pesticide-registration/pesticide-registration-manual-appendix-d-examples-completed-forms-0>

- Pesticidal devices must be produced in an EPA registered pesticide-producing establishment. It is important to note that EPA establishment numbers, which are required for devices, are not the same as EPA pesticide registration numbers required for pesticide products. Obtaining an establishment number <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-14-how-obtain-epa-company-or> is an administrative process, completed upon request to the EPA. In contrast, obtaining an EPA pesticide registration requires a fee for review of product specific data and is a longer process.
- EPA establishment numbers are composed of a company number, followed by a 2-letter U.S. State or 3-letter Country abbreviation, followed by the unique facility number (e.g., xxxx-PA-xx; xxxxx-CHN-xxxx)
- EPA Registration Numbers are composed of a company number followed by a product number (e.g., xxxxx-xxxx). For registered distributor products, the company number and product number are followed by the distributor company number (e.g., xxxxx-xx-xxxx)

- **See Chapter 14** <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-14-how-obtain-epa-company-or> **for information on how to register a pesticide–producing establishment. Devices are also subject to certain labeling requirements. Refer to FIFRA section 2(q)(1)** <https://epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act> **and 40 CFR Part 156.**

---

# How to Obtain a Device Determination from EPA

If you are uncertain about whether your product requires EPA registration as a pesticide, you may request a determination from EPA. If you would like a determination from EPA as to whether your product is considered a pesticidal device, please submit a request to the Agency using PRIA code M009. The cost is $2,482* and the timeframe is 4 months. Please submit the following information with your request:

- Submit 8570-1 application form (select "miscellaneous" and provide an explanation in the space provided);
- Submit a cover letter on company letterhead requesting a device determination and include as much of the following information as possible:
  - Your EPA issued company number;
  - The complete brand names of the product;
  - Complete copy of the label for the product, and a statement of all claims to be made for the product, including all written, printed, or broadcast claims made for the product;
  - Directions for use and warnings or cautionary statements;
  - All material distributed with the product;
  - A detailed written description of how the product works to kill, destroy, repel, or mitigate a pest;
  - Starting material inputs or ingredients or specifications used in the operation of the product. Ingredients in the product must be identified by common name and CAS number if applicable;
  - Schematic diagram or detailed engineering drawings, diagrams, flow diagrams or patent(s) application information. Note: if a patent(s) has been issued, please include copies;
  - Photographs of the product from all sides, including digital copies available upon request; and
  - Comparisons to current industry products;
- Provide proof of payment;

Once all of the submitted information is reviewed by the Agency, a determination letter will be issued to the applicant within the 4-month PRIA timeframe.

*There are provisions for waiving up to 75% of the fee if you qualify as a small business (waiver information is also on the website <https://epa.gov/pria-fees/pria-fee-waivers-small-businesses>). The fee waiver application must be submitted with the registration application.

- Fees may be reduced under some circumstances <https://epa.gov/pria-fees/overview-pria-fee-reduction-and-refund-formula>.

If you have questions, please contact us at OPP_FIFRA_Jurisdictional_Issues@epa.gov.

Case: 23-1189          Document: 12          Page: 224          Date Filed: 12/19/2023

# Devices Subject to Regulation

In a *Federal Register* notice published on November 19, 1976 (Pest Control Devices and Device Producers <https://epa.gov/pesticide-registration/pest-control-devices-and-device-producers-1976-federal-register-notice>), EPA stated that devices subject to FIFRA section 2(q)(1) and section 7 include, but are not limited to:

- certain ultraviolet light systems, ozone generators, water filters and air filters (except those containing substances), and ultrasonic devices for which claims are made to kill, inactivate, entrap, or suppress the growth of fungi, bacteria, or viruses in various sites;
- certain high frequency sound generators, carbide cannons, foils, and rotating devices for which claims are made to repel birds;
- black light traps, fly traps, electronic and heat screens, fly ribbons, and fly paper for which claims are made to kill or entrap certain insects; and
- mole thumpers, sound repellents, foils, and rotating devices for which claims are made to repel certain mammals.

Since that notice was issued, EPA has determined that products of the following types also fall within the definition of device:

- products that are claimed to control pests via **electromagnetic and/or electrical emissions** (e.g., hand held bug zappers, eletric flea combs);
- products that are claimed to control burrowing animals via **product-caused subterranean explosions**; and
- products that work via principles indicated in the 1976 *Federal Register Notice* for one category of pest but are claimed to control pests of different types (e.g., sticky traps for rodents (without attractants), light or laser repellents for birds, etc.).

**Important Note**: In applying the definition of "device" in FIFRA section 2(h), EPA examines each individual product on a case-by-case basis. For instance, the public should be aware that EPA has reviewed a number of individual products that claim to provide pest control through the use of electromagnetic radiation and has found these products to be devices within the meaning of section 2(h). In addition, EPA has found that a silver ion generating washing machine marketed with claims that

odor causing bacteria will be killed on laundry must be registered as a pesticide. Read more about regulation of ion generating equipment <https://epa.gov/pesticide-registration/pesticide-registration-clarification-ion-generating-equipment>.

# Devices Not Subject to Regulation

The November 19, 1976, *Federal Register* Notice Pest Control Devices and Device Producers <https://epa.gov/pesticide-registration/pest-control-devices-and-device-producers-1976-federal-register-notice> also provided examples of those types of devices that are not subject to regulation under FIFRA:

- devices that depend for their effectiveness more upon the performance of the person using the device than on the performance of the device itself; and
- devices that operate to entrap vertebrate animals.

Products generally falling within these two categories include rat and mousetraps, fly swatters, tillage equipment for weed control, and fish traps.

# Requirements for a Device Subject to Regulation

## Registration Not Required

A device is not required to be registered under FIFRA section 3. However, devices are subject to certain requirements of FIFRA as specified in 40 CFR 152.500 .

## Production Requirements

Pesticidal devices must be produced in a registered pesticide-producing establishment. Refer to 40 CFR 152.500(b)(2). See Chapter 14 <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-14-how-obtain-epa-company-or> for information on registering a site.

## Labeling Requirements

Devices are subject to the labeling requirements of FIFRA section 2(q)(1) and 40 CFR Part 156. These requirements are summarized below.

***Misbranding*** - Under FIFRA section 2(q)(1) a device is considered to be misbranded and subject to enforcement action if:

- the labeling bears any statements, designs, or graphic representations that are false or misleading (see 40 CFR 156.10(a)(5));
- its packaging or wrapping does not conform to standards established pursuant to FIFRA section 25(c)(3) (as of 2010, such standards have yet to be established for devices);
- it is an imitation of, or is offered for sale under the name of another device;
- the label fails to bear the establishment number of the establishment where it was produced;
- any required information is not prominently displayed on the label;
- it lacks adequate directions for use; or
- it lacks an adequate warning or caution statement.

## Device Efficacy

Unlike registrants of pesticide products, FIFRA does not require device producers to submit any data concerning either safety or efficacy of a device prior to distribution or sale. This is particularly important to note for antimicrobial pesticide devices that claim to disinfect, sanitize, and/or sterilize items or ambient air. Because microbial pests are not visible to the naked eye, users of such devices generally cannot evaluate the actual performance of the device. The device may be "misbranded" if labels, labeling, and/or websites for devices including general or specific efficacy claims include any statement, design, or graphic representation that is "false or misleading in any particular." Distribution or sale of a misbranded device is prohibited under FIFRA. Therefore, every producer or seller of devices is responsible for ensuring that these products perform as claimed, and that such performance claims are not misleading to the intended user.

Also, please note that some state laws have requirements for devices in addition to those imposed by FIFRA. Some state governments require registration of devices, including submission and review of efficacy data and labeling, before a device can be sold or distributed in that state. Therefore, compliance with FIFRA's requirements does not ensure that a device can be legally sold in those states. Click the link below for a contact list of state lead agencies.

http://npic.orst.edu/reg/state_agencies.html <http://npic.orst.edu/reg/state_agencies.html>

## Child-Resistant Packaging

Exhibit C-5, pg.12 of 15.

Devices are subject to child-resistant packaging (CRP) requirements when they meet certain toxicity and use criteria. For information concerning CRP requirements, see:

- Child-Resistant Packaging for Pesticides <https://epa.gov/pesticide-registration/child-resistant-packaging-pesticides>
- EPA regulations on child-resistant packaging --40 CFR 157.20 – 157.36

Child-resistant packaging is defined as packaging designed or constructed to be significantly difficult for children less than five years of age to open or obtain a toxic or harmful amount of the substance contained therein within a reasonable time, and that is not difficult for normal adults to use properly. 40 CFR 157.21(b).

# Import and Export of Devices

Please refer to FIFRA section 17 <https://epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act> for information concerning import and export requirements for devices. U.S. Customs regulations at 19 CFR 12.1(b) related to the implementation of FIFRA section 17 require, in part, that devices produced by foreign manufacturers and imported into the U.S. comply with all requirements applicable to domestic producers. In addition, the regulations require an importer to submit to EPA a Notice of Arrival of Pesticides and Devices <https://epa.gov/compliance/importing-and-exporting-pesticides-and-devices> (EPA Form 3540-1) for review and determination as to whether the shipment should be sampled and/or permitted entry into the U.S.

FIFRA section 17 states that no device produced solely for export to any foreign country shall be deemed in violation of FIFRA when prepared or packaged to the specifications or directions of the foreign producer, except that producers of such devices are subject to labeling requirements and certain misbranding restrictions found in sections 2(p) and 2(q) of FIFRA.

In addition, producers of devices are subject to record keeping and inspection requirements in accordance with section 8 of FIFRA <https://epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act>.

# Contacts for Additional Information

If you have any questions concerning regulatory requirements for devices that are not subject to registration, please contact:

OPP_FIFRA_Jurisdictional_Issues@epa.gov

Exhibit C-5, pg.13 of 15.

# References Cited in Chapter 13

Refer to Chapter 19 <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-19-how-obtain-publications> for information on the source of these documents.

Code of Federal Regulation, Title 40

- Part 152 – Pesticide registration and classification procedures
- Part 153 – Statement of policies and interpretations
- Part 156 – Labeling requirements for pesticides and devices
- Part 157 – Packaging requirements for pesticides and devices
- Part 167 – Registration of pesticide-producing establishments, submission of pesticide reports, and labeling
- Part 169 – Books and records of pesticide production and distribution

Federal Insecticide, Fungicide, and Rodenticide Act <https://epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act>, as amended by the Food Quality Protection Act of August 3, 1996

- Section 2 – Definitions
- Section 3 – Registration of pesticides
- Section 7 – Registration of establishments
- Section 8 – Books and records
- Section 9 – Inspection of establishments, etc.
- Section 12 – Unlawful acts
- Section 13 – Stop sale, use, removal, and seizure
- Section 14 – Penalties
- Section 17 – Imports and exports
- Section 25 – Child-resistant packaging

*Federal Register* Notice, Pest Control Devices and Device Producers <https://epa.gov/pesticide-registration/pest-control-devices-and-device-producers-1976-federal-register-notice>, (41 FR 51065), November 19, 1976

Exhibit C-5, pg.14 of 15.

Pesticide Registration Home <https://epa.gov/pesticide-registration>

About Pesticide Registration <https://epa.gov/pesticide-registration/about-pesticide-registration>

Electronic Submission of Applications <https://epa.gov/pesticide-registration/electronic-submissions-pesticide-applications>

Pesticide Registration Manual <https://epa.gov/pesticide-registration/pesticide-registration-manual>

Fees and Waivers <https://epa.gov/pesticide-registration/pesticide-registration-fees-and-fee-waivers>

Registration Information by Type of Pesticide <https://epa.gov/pesticide-registration/registration-information-type-pesticide>

— Antimicrobial Registration <https://epa.gov/pesticide-registration/antimicrobial-pesticide-registration>

— Biopesticide Registration <https://epa.gov/pesticide-registration/biopesticide-registration>

— Conventional Registration <https://epa.gov/pesticide-registration/conventional-pesticide-registration>

— Inert Ingredient Regulation <https://epa.gov/pesticide-registration/inert-ingredients-regulation>

Requirements and Guidance <https://epa.gov/pesticide-registration/registration-requirements-and-guidance>

— Data <https://epa.gov/pesticide-registration/data-requirements-pesticide-registration>

— Forms <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-20-forms-and-how-obtain-them>

— Labeling <https://epa.gov/pesticide-registration/labeling-requirements>

Contact Us <https://epa.gov/pesticide-registration/forms/contact-us-about-pesticide-registration> to ask a question, provide feedback, or report a problem.

LAST UPDATED ON MARCH 1, 2023



# Discover.

## Accessibility Statement
<https://epa.gov/accessibility/epa-accessibility-statement>

## Budget & Performance
<https://epa.gov/planandbudget>

# Connect.

## Data.gov
<https://www.data.gov/>

## Inspector General
<https://epa.gov/office-inspector-general/about-epas-office-inspector-general>

## Jobs <https://epa.gov/careers>

# Ask.

## Contact EPA
<https://epa.gov/home/forms/contact-epa>

## EPA Disclaimers
<https://epa.gov/web-policies-and-procedures/epa-disclaimers>

**Contracting**

<https://epa.gov/contracts>

**EPA www Web Snapshot**

<https://epa.gov/utilities/wwwepagov-snapshots>

**Grants** <https://epa.gov/grants>

**No FEAR Act Data**

<https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

**Plain Writing**

<https://epa.gov/web-policies-and-procedures/plain-writing>

**Privacy** <https://epa.gov/privacy>

**Privacy and Security Notice**

<https://epa.gov/privacy/privacy-and-security-notice>

**Newsroom**

<https://epa.gov/newsroom>

**Open Government**

<https://epa.gov/data>

**Regulations.gov**

<https://www.regulations.gov/>

**Subscribe**

<https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

**USA.gov**

<https://www.usa.gov/>

**White House**

<https://www.whitehouse.gov/>

**Hotlines** <https://epa.gov/aboutepa/epa-hotlines>

**FOIA Requests**

<https://epa.gov/foia>

**Frequent Questions**

<https://epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.

🇺🇸 An official website of the United States government

MAIN MENU

Search EPA.gov

## Pesticides

CONTACT US <https://epa.gov/pesticides/forms/contact-us-about-pesticides>

# Pesticide Devices: A Guide for Consumers

This guide for consumers explains key facts about pesticidal devices (called devices in this document) and how they differ from registered pesticide products. Device producers and those seeking more information may also wish to consult the Pesticide Registration Manual - Chapter 13 - Devices <https://epa.gov/pesticide-registration/pesticide-registration-manual-chapter-13-devices>.

**On this page:**

- What is a Device?
- The differences between pesticide devices and pesticide products and how they are regulated
- Products commonly mistaken as devices
- Recognizing a device by reading the label
- Understanding what EPA has reviewed on a device label and advertising
- Related information
- Examples of regulated pesticide devices
- Additional device information

> ### Additional Information
>
> - COVID-19 Compliance Advisory for UV Light Devices <https://epa.gov/compliance/compliance-advisory-epa-regulations-about-uv-lights-claim-kill-or-be-effective-against>

- State regulation of devices

# What is a Device?

Devices are instruments or contrivances intended to control pests, often through physical or mechanical means like filtration, UV light, or electricity. According to FIFRA, a device is:

> "any instrument or contrivance (other than a firearm) [that] is intended for trapping, destroying, repelling, or mitigating any pest . . . ."

This definition excludes equipment used for applying pesticides when sold separately from the pesticides themselves. Generally, a device is not considered a pesticide when the pesticidal substance and the device are sold separately. Pesticides are substances or mixtures of substances that are intended to prevent, destroy, repel, or mitigate pests, such as insecticides, fungicides, rodenticides, antimicrobials (e.g., disinfectants), herbicides, and many pest repellents and attractants. (Pesticides can also be plant regulators or nitrogen stabilizers.) Application equipment is an article used for the application of pesticides. Such equipment may be part of a pesticide product if sold or distributed with a pesticide. For Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) <https://epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act> and regulatory definitions, *see* FIFRA §§ 2(h), 2(u), 40 C.F.R. § 152.3 <https://www.ecfr.gov/current/title-40/chapter-i/subchapter-e/part-152/subpart-a/section-152.3> ("pesticide product"), and 41 Fed. Reg. 51,065 (Nov. 19, 1976) <https://archives.federalregister.gov/issue_slice/1976/11/19/51061-51067.pdf>.

Under FIFRA, EPA regulates both pesticides and devices. How a particular product is regulated depends on whether it is a pesticide or a device; the product's specific claims,

- EPA Letter on Generic Efficacy Claims for UV Lights

  <https://epa.gov/safepestcontrol/epa-letter-national-electrical-manufacturers-association-generic-efficacy-claims-uv>

- Office of Research and Development COVID-19 Webinar on UVC Lights

  <https://epa.gov/emergency-response-research/covid-19-uv-c-devices-and-methods-surface-disinfection-webinar>

intended use, design, and function; and whether the product is used or sold/distributed with a pesticide or a precursor substance.

# The Differences Between How Devices and Pesticides Work and How They Are Regulated

To better understand the key differences between devices, pesticides, and application equipment, below is a general discussion of how each type of product is regulated.

## Pesticides and Pesticide Products

*Key Feature:* A substance or mixture of substances that is intended to destroy, repel, prevent, or mitigate a pest.

*Examples:* Insecticides, fungicides, rodenticides, antimicrobials (e.g., disinfectants), herbicides, and many pest repellants and attractants (e.g., substances that attract pests to lessen their impact, such as by attracting pests to a trap).

- For more information on the types of products that may be pesticides, please see Types of Pesticide Ingredients <https://epa.gov/ingredients-used-pesticide-products/types-pesticide-ingredients>.

*How EPA Regulates:* "Registration" (FIFRA § 3)—a premarket review of the product.

- It is generally unlawful to sell or distribute a pesticide that is not registered by EPA. Therefore, most pesticide products must be registered by EPA unless they qualify for an exemption (see, e.g., 40 C.F.R. § 152.25 <https://www.ecfr.gov/current/title-40/chapter-i/subchapter-e/part-152/subpart-b/section-152.25>). Please see the Pesticide Registration Manual <https://epa.gov/pesticide-registration/pesticide-registration-manual> for more information.

## Devices

*Key Feature:* an instrument or contrivance, generally working by physical means (e.g., electricity, light, or other mechanical or physical means) and not containing a

Pesticide Devices: A Guide for Consumers | US EPA    Case: 28-ur+1489    Document: 12    Pages 234w.epDate/Filed:-t2/10/2023ices-guide-consumers#2

Exhibit C-6, pg.4 of 18.

substance or mixture of substances, that is intended to trap, destroy, repel, or mitigate a pest.

*Examples:* UV lights, water and air filters not treated with a pesticidal substance, ultrasonic devices, replacement parts (e.g., bulbs) for devices that are themselves intended for pesticidal purposes.

*Pesticides v. Devices:* Some products commonly mistaken for devices that are actually pesticides include:

- Pesticide products in liquid, dust, or coating form are generally pesticides and not devices because they are not an "instrument or contrivance."
  - For pesticidal coating products, EPA considers cleaning as physically removing dirt and organic matter from surfaces primarily using soap or detergents. While most cleaning products do not need to be registered with EPA, registration is required for any cleaning product that claims to kill viruses or bacteria that cause human illness. Additionally, products that are impregnated with ingredients that claim to be "self-cleaning" are generally not exempt from EPA regulation.
- Pesticide products for controlling microorganisms that generate metal ions <https://epa.gov/pesticide-registration/pesticide-registration-clarification-ion-generating-equipment>, such as silver, are generally pesticides and not devices because they contain a pesticidal substance.
- An apparatus sold with a substance (e.g., salt) that is used to generate a pesticide are generally pesticides, not devices.

*Pesticidal Devices v. Medical Devices:* The Food and Drug Administration (FDA) <https://www.fda.gov/> regulates medical "devices" intended, among other things, for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease in man or other animals. However, there are products that may meet both the FIFRA definition of device (regulated by EPA) and the device definition under the Federal Food, Drug, and Cosmetic Act (FFDCA) <https://epa.gov/laws-regulations /summary-federal-food-drug-and-cosmetic-act> (regulated by FDA) and are dually regulated by FDA and EPA (e.g., ventilator filters, devices used to treat Continuous Positive Airway Pressure (CPAP) accessories, air purifiers, or UV light devices used in FDA-regulated healthcare settings).

*How EPA Regulates:* "Misbranding" (FIFRA § 2(q), 40 C.F.R. pt. 156), which generally means that the label or labeling is deficient in some way.

- For products regulated as devices, there is no required premarket review. Unlike pesticides, FIFRA does not require registration of devices. However, EPA does still regulate these products with some limited exceptions including devices that depend more upon the performance of the user than the performance of the device itself to be effective (such as flyswatters); and devices that trap vertebrate animals (such as mouse snap traps, raccoon cages, and bear traps).

# Products Commonly Mistaken as Devices

**Combination products:** Where a product that would otherwise be a device also incorporates a pesticidal substance, it may be considered a pesticide product. For example, a filter that physically traps microbial pests (generally a device) would be an antimicrobial pesticide product if it also incorporated a pesticidal substance that kills those pests to improve the efficacy of the entire system.

**Firearms:** FIFRA excludes firearms from the device definition. For example, a rifle used to control feral hogs is not a device. The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) <https://www.atf.gov/> (not EPA) regulates firearms.

**Pesticide Application Equipment:** Equipment used to apply a pesticide is often sold separately from or packaged with a pesticide. Such equipment serves as a delivery mechanism for the pesticide. Application equipment is not a device. Application equipment that is sold or distributed with the pesticide is generally registered along with the pesticide as part of the pesticide product, per 40 C.F.R. § 152.3 <https://www.ecfr.gov/current/title-40/chapter-i/subchapter-e/part-152/subpart-a/section-152.3>. For example, a sprayer for a lawn herbicide that is sold with a registered herbicide (*e.g.*, a full-size container, a sample) must be included in the herbicide registration. Pesticide application equipment that is sold and distributed separately from the pesticide itself is neither a device nor part of a pesticide product. For example, if the same sprayer for a lawn herbicide were sold and distributed separately from the registered herbicide, it would not be regulated by EPA.

# Recognizing a Device by Reading the Label

Devices are regulated by EPA. A compliant EPA-regulated device *will include* an **EPA Establishment Number** on the label (associated with the location where the device is produced). It *will not* include an **EPA Registration Number**, which would only be found on registered pesticide products. Registered pesticide products will include an **EPA Establishment Number** and an **EPA Registration Number**. Pesticide products undergo a thorough review of data supporting the registration, including product performance (efficacy) studies.



# Understanding What EPA Has Reviewed on a Device Label and Advertising

As noted above, FIFRA does not require devices to undergo premarket review and registration before being sold and distributed, as it does for pesticides. Generally, device manufacturers, sellers, and distributors do not submit their claims or efficacy and safety data to EPA (for approval or otherwise) before selling or distributing a device.

However, EPA does regulate devices and may find that some devices are misbranded

(FIFRA § 2(q), 40 C.F.R. pt. 156) upon review at import or in the marketplace. Misbranding issues with device labels and labeling may include:

- **Missing Establishment Number:** Devices must be produced in an EPA-registered establishment and the final establishment number must be visible on the outer packaging of the device. An EPA establishment number on device packaging does **NOT** indicate that the product has been reviewed for safety or efficacy by EPA, nor does it imply EPA product approval, registration, certification, or endorsement.

- **Missing Directions for Use:** Devices must include directions for use, allowing the user to properly operate the product.

- **False or Misleading Claims:** Devices may not include "false or misleading claims" on their labels or labeling. A claim about the effectiveness or safety of devices that cannot be supported by the company's scientific data could be an example of a false or misleading claim. Device manufacturers, sellers, and/or distributors are responsible for maintaining records and data to support their claims.

Consumers can report a device that appears misbranded on EPA's website for all environmental violations <https://echo.epa.gov/report-environmental-violations>.

# Related Information

EPA recommends that consumers use devices consistent with any precautionary language and directions for use. In addition, EPA recommends that consumers should contact the manufacturer or seller of the device directly with any questions regarding the proper use of the product

# Examples of Regulated Devices

Devices EPA Regulates with Examples of Uses

| Devices EPA Regulates with Examples of Uses | |
|---|---|
| **Ultraviolet Light Units** | Claim to kill, inactivate, or suppress growth of microorganisms such as fungi, bacteria or viruses. They may also be used to attract insects or kill plant pathogens (e.g., powdery mildew on strawberries).<br><br>• Water and air treatment units<br>• Antimicrobial lamps<br>• Individual water purification devices<br><br>See: Additional Device Information below |

| Devices EPA Regulates with Examples of Uses | |
|---|---|
| **Air Purifiers, Filters or Air Treatment Devices** | Claim to reduce microorganisms, unqualified organic contaminants, unqualified allergens or purify the air. These products may filter the air, generate substances, or both.<br><br>• Air filters that make pesticidal claims (see additional information below)<br>• UV lights (see additional information below)<br>• Air purifiers<br>• Ozone generators<br>• Plasma generators<br>• Bipolar ionization generators (see additional information below)<br>• Photocatalytic air treatment device (see additional information below)<br>• Combinations of the types of products in this category<br><br>Products that create ions from the air are generally regulated as devices, unless they contain or are sold with a pesticidal substance or have a pesticidal coating or film causing the pesticidal effect.<br><br>Air treatment products that do not claim to purify the air or kill pests are regulated by the U.S. Consumer Product Safety Commission <https://www.cpsc.gov/>.<br><br>Note: HEPA filters that limit claims to particle size and do not claim to purify the air or mitigate microorganisms are generally not regulated under FIFRA. |

Exhibit C-6, pg.10 of 18.

**Devices EPA Regulates with Examples of Uses**

See: Additional Device Information below

| **Devices EPA Regulates with Examples of Uses** | |
|---|---|
| **Hypochlorous Acid Generators (includeing electrolyzed water)** | Claim to kill, inactivate, or suppress growth of microorganisms, including fungi, algae, bacteria, or viruses.<br><br>Generally, EPA considers these generators to be devices.<br><br>However, if the generator is sold or distributed (e.g. , transported to another location for use) with a substance (e.g., salt) or the output solutions, the generator may be part of a pesticide product.<br><br>On September 14, 2022, EPA issued an exemption for residues \<https://www.federalregister.gov/documents/2022/09/14/2022-19799/hypochlorous-acid-exemption-from-the-requirement-of-a-tolerance\> of the antimicrobial pesticide ingredient hypochlorous acid from the requirement of a tolerance when used on or applied to food-contact surfaces in public eating places.<br><br>Note: Electrolyzed water is another name for hypochlorous acid \<https://www.regulations.gov/docket/epa-hq-opp-2020-0244/document\>. As EPA has assessed hypochlorous acid and determined the potential for adverse effects, EPA recommends that electrolyzed water generated by these devices not be ingested or applied to the human body \<https://epa.gov/coronavirus/can-disinfectant-products-be-used-people\>.<br><br>See: Additional Device Information below. |

| **Devices EPA Regulates with Examples of Uses** | |
|---|---|
| **Water Purifiers or Water Treatment Units** | Claim to kill, inactivate, or suppress growth of fungi, algae, bacteria, viruses, or cysts.<br><br>• Certain drinking water filter units. The filter in such a unit removes microbial pests by physical or mechanical means. However, if the unit contains any substance intended to disinfect the water, then the unit is generally considered a pesticide that must be registered in order to be sold and distributed.<br>• Certain pool and spa electrolysis units. Such units also must not be sold or distributed with or contain a pesticidal substance intended to disinfect the water, unless registered.<br>• Ozonation units (gaseous or aqueous)<br>• Ozone bubble generation technology<br>• Algal bloom treatment units – must not be sold/distributed with a substance unless registered.<br><br>Note: Water filters that limit claims to taste, odor, or sediment and do not claim to purify water or mitigate microorganisms are generally not considered pesticidal devices and thus are not regulated under FIFRA. |

| Devices EPA Regulates with Examples of Uses | |
|---|---|
| **Insect Devices** | Claim to kill or entrap insects and similar pests through physical means, which can include UV light or ozone.<br><br>• Black-light traps<br>• Bug zappers, including hand-held or racquet-type bug zappers<br><br>• Insect traps<br>• Fly ribbons/fly paper/sticky traps (without an attractant)<br>• Glue boards (without an attractant)<br>• Electric flea combs |
| **Gopher and Rodent Control Systems** | Claim to control subterranean animals via carbon monoxide generation or subterranean explosion when sold or distributed without a substance. If sold with a substance, registration is required.<br>• Carbon monoxide generators<br>• Subterranean explosive devices |

Pesticide Devices: A Guide for... U.S EPA | Case: 23-unn189 Document: 12 Pages: 244 ...w.epa...Filed: 12/10/2023 ...ices-guide-consumers#2

Exhibit C-6, pg.14 of 18.

| Devices EPA Regulates with Examples of Uses | |
|---|---|
| **Sound, Airwave, and Vibration Generators** | Claim to repel pests such as birds, mice, and underground animals.<br><br>• Carbide cannons: a device that emits a loud boom or blast at around 125 decibels<br>• Rotating devices: devices with rotating arms<br>• High frequency (ultrasonic) sound generators<br>• Mole thumpers<br>• Pinwheel vibrators<br><br>• Non-lethal bear (or other pest) sound-based deterrents (not regulated by the ATF as a firearm) |
| **Gamma Irradiation Units** | Claim to treat insects, mold, and other microorganisms on raw agricultural commodities and other inanimate objects. These are regulated under FIFRA unless they are otherwise exempt. |

# Additional Device Information

**UV lights and filters:** UV lights or certain filters that make pesticidal claims are examples of EPA-regulated devices, provided that they do not contain or are not sold with a substance intended to elicit the pesticidal effect. Examples of pesticidal substances could include silver, zinc or copper. See EPA's Compliance Advisory on UV Lights <https://epa.gov/compliance/compliance-advisory-epa-regulations-about-uv-lights-claim-kill-or-be-effective-against> and EPA's webpage on Consumer Products Treated with Pesticides <https://epa.gov/safepestcontrol/consumer-products-treated-pesticides>. See EPA's research on UV lights <https://epa.gov/emergency-response-research/covid-19-uv-c-devices-and-methods-surface-

disinfection-webinar>.

**Devices that generate a substance:** Generally, products that generate a substance (through physical means), such as ozone or hypochlorous acid/electrolyzed water generators, are considered devices and do not require EPA registration unless they are sold with or contain a substance. However, if a company provides a service using a device that contains a substance (e.g., hypochlorous acid generator used as part of a sanitization service), this may be considered sale or distribution of a pesticide. Consumers should ask companies who are applying a pesticidal solution generated onsite for the product's EPA registration number.

> **Note:** An unregistered output solution generated by a device that is a pesticide cannot be sold or distributed without violating FIFRA. An example of distribution would include providing the output substance from the device (with or without payment) to a neighbor or friend.

- *Photocatalytic Products:* At this time, photocatalytic air and surface treatment products that use materials with photocatalytic properties (e.g., titanium dioxide) to generate reactive oxygen species may be pesticides.

  > **Note:** EPA has previously determined that photocatalytic products in liquid, dust, or coating form are pesticides, not devices, because these products contain a substance and are not an instrument or contrivance. These products would likely require a FIFRA Section 3 registration as a pesticide. Please see the Pesticide Registration Manual <https://epa.gov/pesticide-registration/pesticide-registration-manual> for more information on pesticide registration.

- *Bipolar Ionization Devices:* Bipolar ionization (also called needlepoint bipolar ionization) is a technology that can be used in heating, ventilation, and air conditioning (HVAC) systems or portable air purifiers to generate positively and negatively charged particles. These products may be considered devices unless there is a pesticidal substance integral to the product's performance sold with and used in the ion generation process.

  Bipolar ionization has the potential to generate ozone and other potentially harmful by-products indoors unless specific precautions are taken in the product design and maintenance. To avoid such byproducts from use of bipolar ionization

Pesticide Devices: A Guide for... - US EPA   Case 2:23-mc-00189 EPA   Document: 12   Pages 246 w.epa...es/...des-guide-consumers#2   Date Filed: 12/10/2023

Exhibit C-6, pg.16 of 18.

devices, EPA recommends using a device that meets UL 2998 standard certification (Environmental Claim Validation Procedure (ECVP) for Zero Ozone Emissions from Air Cleaners). Please see additional information on Bipolar ionization and COVID-19 <https://epa.gov/coronavirus/can-air-cleaning-devices-use-bipolar-ionization-including-portable-air-cleaners-and>.

**Electromagnetic and/or Electrical Devices:** Products claiming to control pests via electromagnetic and/or electrical means (e.g., ultrasonic insect and rodent repellers, hand-held bug zappers, electric flea combs) are devices, provided that that the product is not sold with a pesticidal substance.

Ozone-generating and certain UV light devices may generate unintentional ozone. Claims that ozone generating devices are safe and effective for controlling indoor air pollution—and the potential threat to human health from high concentrations of ozone—prompted EPA and other federal agencies to publicly address the use of such devices. Please see additional information on Ozone Generators that are Sold as Air Cleaners <https://epa.gov/indoor-air-quality-iaq/ozone-generators-are-sold-air-cleaners>.

# State Regulation of Devices

Some states have regulatory requirements for devices in addition to those imposed by FIFRA. Some states require registration of devices, including submission and review of efficacy data and labeling before a device can be sold or distributed in that state. Therefore, compliance with EPA's FIFRA requirements does not ensure that a device can be legally sold in those states. See the American Association of Pest Control Officials (AAPCO) <https://aapco.org/2015/07/28/resources-2/> website for a list of state lead agencies.

---

Pesticides Home <https://epa.gov/pesticides>

---

A-Z Index <https://epa.gov/pesticides/z-index-pesticide-topics>

---

Bed Bugs <https://epa.gov/bedbugs>

---

Antimicrobial Pesticides <https://epa.gov/pesticides/antimicrobial-pesticides>

Biopesticides <https://epa.gov/pesticides/biopesticides>

Freedom of Information Act Requests <https://epa.gov/foia>

International Activities Related to Pesticides <https://epa.gov/pesticides/international-activities-related-pesticides>

Pest Control and Pesticide Safety for Consumers <https://epa.gov/safepestcontrol>

Pesticide Registration <https://epa.gov/pesticide-registration>

Contact Us <https://epa.gov/pesticides/forms/contact-us-about-pesticides> to ask a question, provide feedback, or report a problem.

LAST UPDATED ON DECEMBER 29, 2022



# Discover

.

**Accessibility Statement** <https://epa.gov/accessibility/epa-accessibility-statement>

**Budget & Performance** <https://epa.gov/planandbudget>

**Contracting** <https://epa.gov/contracts>

**EPA www Web Snapshot** <https://epa.gov/utilities/wwwepagov-snapshots>

# Connect.

**Data.gov** <https://www.data.gov/>

**Inspector General** <https://epa.gov/office-inspector-general/about-epas-office-inspector-general>

**Jobs** <https://epa.gov/careers>

**Newsroom** <https://epa.gov/newsroom>

**Open Government** <https://epa.gov/data>

# Ask.

**Contact EPA** <https://epa.gov/home/forms/contact-epa>

**EPA Disclaimers** <https://epa.gov/web-policies-and-procedures/epa-disclaimers>

**Hotlines** <https://epa.gov/aboutepa/epa-hotlines>

**FOIA Requests** <https://epa.gov/foia>

Pesticide Devices: A Guide for... US EPA    Case: 23-1189    Document: 12    Page: 248    Date Filed: 12/10/2023 ...w.epa.../...ices-guide-consumers#2

Exhibit C-6, pg.18 of 18.

## Grants

<https://epa.gov/grants>

## No FEAR Act
## Data <https://epa.gov
/ocr/whistleblower-
protections-epa-and-
how-they-relate-non-
disclosure-agreements-
signed-epa>

## Plain Writing

<https://epa.gov/web-
policies-and-procedures
/plain-writing>

## Privacy

<https://epa.gov/privacy>

## Privacy and
## Security Notice

<https://epa.gov/privacy
/privacy-and-security-
notice>

## Regulations.gov

<https://www.regulations
.gov/>

## Subscribe

<https://epa.gov
/newsroom/email-
subscriptions-epa-news-
releases>

## USA.gov

<https://www.usa.gov/>

## White House

<https://www.whitehouse
.gov/>

## Frequent
## Questions

<https://epa.gov
/home/frequent-
questions-specific-epa-
programstopics>

# Follow.

APPEAL,CLOSED,JURY

# U.S. District Court
## Northern District of Texas (Fort Worth)
### CIVIL DOCKET FOR CASE #: 4:23-cv-00826-P

Shepherd et al v. Regan et al
Assigned to: Judge Mark Pittman
Demand: $9,999,000
Case in other court: United States Court of Appeals 5th Circuit, 23-11189
Cause: 05:702 Administrative Procedure Act

Date Filed: 08/08/2023
Date Terminated: 11/17/2023
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes: Administrative
Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**James Shepherd**
*Trustee for the James B. Shepard Trust*

represented by **Warren V Norred**
Norred Law PLLC
515 E Border Street
Arlington, TX 76010
817-704-3984
Fax: 817-524-6686
Email: warren@norredlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**New Millennium Concepts, Ltd.**

represented by **Warren V Norred**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James B. Shepherd Trust**

represented by **Warren V Norred**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Case: 23-11189     Document: 12     Page: 249     Date Filed: 12/10/2023

**Michael S Regan**
*Administrator*

represented by   **Shari Howard**
DOJ-Enrd
150 M Street NE
Suite 4th Floor
Washington, DC 20002
202-514-0135
Email: shari.howard@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Coghlan**
United States Department of Justice
Environment & Natural Resources Division
PO Box 7611
Washington, DC 20002
202-598-9407
Fax: 202-514-8865

**Mark L Walters**
U.S. Department of Justice
Environment & Natural Resources Division, EDS
P.O. Box 7611
Washington, DC 20044-7611
202-616-9190
Fax: 202-514-8865
Email: mark.walters@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Environmental Protection Agency**

represented by   **Shari Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Coghlan**
(See above for address)

**Mark L Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christine Tokarz**

represented by **Shari Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Coghlan**
(See above for address)

**Mark L Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**David Cobb**

represented by **Shari Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Coghlan**
(See above for address)

**Mark L Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Carol Kemker**

represented by **Shari Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Coghlan**
(See above for address)

**Mark L Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Keriema Newman**

represented by **Shari Howard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Coghlan**
(See above for address)

**Mark L Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/09/2023 | 1 | COMPLAINT WITH JURY DEMAND against All Defendants filed by New Millennium Concepts, Ltd., James Shepherd. (Filing fee $402; Receipt number ATXNDC-13941974) Clerk to issue summons(es) for federal defendant(s). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Declaration(s) Shepherd, # 2 Declaration(s) Spaar, # 3 Exhibit(s) Relevant Law, # 4 COIP, # 5 Cover Sheet) (Norred, Warren) (Entered: 08/09/2023) |
| 08/09/2023 | 2 | New Case Notes: A filing fee has been paid. File to: Judge Means. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. (wxc) (Entered: 08/09/2023) |
| 08/09/2023 | 3 | ***DISREGARD-SUMMONS HAS BEEN RE-ISSUED*** Summons Issued as to All Defendants. (wxc) Modified on 8/11/2023 (wxc). (Entered: 08/09/2023) |
| 08/09/2023 | 4 | NOTICE OF RECUSAL: The undersigned judge, having assumed senior status, desires to have this case re-assigned to an active-status judge. Case is assigned to the docket of Judge Mark Pittman. Future filings should indicate the case number as: 4:23-cv-826-Y. Senior Judge Terry R Means no longer assigned to case. (Ordered by Senior Judge Terry R Means on 8/9/2023) (bdb) (Entered: 08/09/2023) |
| 08/09/2023 | | CERTIFICATE OF INTERESTED PERSONS by New Millennium Concepts, Ltd., James Shepherd. (Clerk QC note: Affiliate entry indicated). (See doc 1 for image) (bdb) (Entered: 08/10/2023) |
| 08/09/2023 | 5 | MOTION for Temporary Restraining Order filed by New Millennium Concepts, Ltd., James Shepherd. (See doc 1 for image) (bdb) (Entered: 08/10/2023) |

| 08/10/2023 | 6 | ORDER: Plaintiffs' request for a TRO is DENIED. The Court, however, finds that expedited briefing on the preliminary injunction sought by Plaintiffs is warranted. As such, it is ORDERED that Defendants shall file their response to Plaintiff's motion for a preliminary injunction on or before August 17, 2023. It is further ORDERED that Plaintiffs shall file their reply on or before August 24, 2023. (Ordered by Judge Mark Pittman on 8/10/2023) (bdb) (Main Document 6 replaced on 8/11/2023) (bdb). (Main Document 6 replaced on 8/11/2023) (bdb). (Entered: 08/10/2023) |
|---|---|---|
| 08/11/2023 | 7 | Summons issued as to All Defendants, U.S. Attorney, and U.S. Attorney General. (wxc) (Entered: 08/11/2023) |
| 08/11/2023 | 8 | CERTIFICATE OF SERVICE by New Millennium Concepts, Ltd., James Shepherd (Norred, Warren) (Entered: 08/11/2023) |
| 08/17/2023 | 9 | RESPONSE filed by Environmental Protection Agency, Michael S Regan re: 5 MOTION for Temporary Restraining Order (Howard, Shari) (Entered: 08/17/2023) |
| 08/17/2023 | 10 | Brief/Memorandum in Support filed by Environmental Protection Agency, Michael S Regan re 9 Response/Objection *in Support of Opposition to Motion for Preliminary Injunction* (Howard, Shari) (Entered: 08/17/2023) |
| 08/17/2023 | 11 | Appendix in Support filed by Environmental Protection Agency, Michael S Regan re 9 Response/Objection *in Support of Opposition to Motion for Preliminary Injunction* (Howard, Shari) (Entered: 08/17/2023) |
| 08/18/2023 | 12 | NOTICE of Attorney Appearance by Shari Howard on behalf of Environmental Protection Agency, Michael S Regan. (Filer confirms contact info in ECF is current.) (Howard, Shari) (Entered: 08/18/2023) |
| 08/24/2023 | 13 | (Document Restricted) PLAINTIFFS MOTION TO FILE AND PRESERVE IN PERPETUITY UNDER SEAL DOCUMENT CONTAINING TRADE SECRET INFORMATION (Sealed pursuant to motion to seal) filed by New Millennium Concepts, Ltd. (Attachments: # 1 Declaration(s) TO BE SEALED) (Norred, Warren) (Entered: 08/24/2023) |
| 08/24/2023 | 14 | AMENDED COMPLAINT WITH JURY DEMAND against All Defendants filed by James B. Shepherd Trust. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Declaration(s) Jim Shepherd, # 2 Declaration(s) Susan Spaar, # 3 Relevant Law (Amended), # 4 Second Shepherd Declaration) (Norred, Warren) (Entered: 08/24/2023) |
| 08/24/2023 | 15 | REPLY filed by New Millennium Concepts, Ltd. re: 5 MOTION for Temporary Restraining Order (Norred, Warren) (Entered: 08/24/2023) |
| 08/28/2023 | 16 | ORDER: Because the First Amended Complaint does not refer to or incorporate prior pleadings and attempts to rectify issues identified in the First Motion for Preliminary Injunction, the First Motion for a Preliminary Injunction (ECF No. 1 ) is DENIED as moot. The Court thus takes up the Amended Preliminary Injunction (ECF No. 14 ) and ORDERS the following expedited briefing schedule: Defendants' Response: on or before August 31, 2023. Plaintiffs' Reply: on or before September 5, 2023. It is further ORDERED that the preliminary-injunction hearing scheduled for August 30, 2023, is hereby CANCELED. If needed, a new date for the hearing will be set by the Court after the motion is ripe. (Ordered by Judge Mark Pittman on 8/28/2023) (sre) (Entered: 08/28/2023) |

| 08/31/2023 | 17 | RESPONSE filed by David Cobb, Environmental Protection Agency, Carol Kemker, Keriema Newman, Michael S Regan, Christine Tokarz re: 5 MOTION for Temporary Restraining Order (Walters, Mark) (Entered: 08/31/2023) |
|---|---|---|
| 08/31/2023 | 18 | Brief/Memorandum in Support filed by David Cobb, Environmental Protection Agency, Carol Kemker, Keriema Newman, Michael S Regan, Christine Tokarz re 17 Response/Objection *to Plaintiffs' Amended Motion for Preliminary Injunction* (Walters, Mark) (Entered: 08/31/2023) |
| 08/31/2023 | 19 | Appendix in Support filed by David Cobb, Environmental Protection Agency, Carol Kemker, Keriema Newman, Michael S Regan, Christine Tokarz re 18 Brief/Memorandum in Support of Motion, 17 Response/Objection *to Plaintiffs' Amended Motion for Preliminary Injunction* (Walters, Mark) (Entered: 08/31/2023) |
| 09/05/2023 | 20 | REPLY filed by James B. Shepherd Trust, New Millennium Concepts, Ltd., James Shepherd re: 5 MOTION for Temporary Restraining Order (Attachments: # 1 Affidavit(s)) (Norred, Warren) (Entered: 09/05/2023) |
| 09/07/2023 | 21 | OBJECTION filed by David Cobb, Environmental Protection Agency, Carol Kemker, Keriema Newman, Michael S Regan, Christine Tokarz re: 20 Reply (Howard, Shari) (Entered: 09/07/2023) |
| 09/12/2023 | 22 | ORDER: The Court ORDERS Plaintiffs to provide supplemental briefing of no more than five pages addressing their legal and/or commercial connection to Berkey International and explaining why Plaintiffs bring this action, rather than Berkey International, on or before September 15, 2023. Thereafter, Defendants may submit up to three pages of reply briefing addressing the same points on or before September 20, 2023. (Ordered by Judge Mark Pittman on 9/12/2023) (mmw) (Entered: 09/12/2023) |
| 09/15/2023 | 23 | Supplemental Document by James Shepherd as to 22 Order Setting Deadline/Hearing, . (Norred, Warren) (Entered: 09/15/2023) |
| 09/15/2023 | 24 | REPLY filed by James Shepherd re: 21 Response/Objection (Norred, Warren) (Entered: 09/15/2023) |
| 09/20/2023 | 25 | REPLY filed by David Cobb, Environmental Protection Agency, Carol Kemker, Keriema Newman, Michael S Regan re: 23 Supplemental Document (Howard, Shari) (Entered: 09/20/2023) |
| 09/20/2023 | 26 | Appendix in Support filed by David Cobb, Environmental Protection Agency, Carol Kemker, Keriema Newman, Michael S Regan re 25 Reply *to Plaintiffs' Supplemental Brief* (Howard, Shari) (Entered: 09/20/2023) |
| 09/26/2023 | 27 | (Document Restricted) Sealed ORDER granting sealed motion 13 . The Court GRANTS the Motion. Accordingly, the documents attached as Exhibit A to Plaintiff's Motion shall be considered filed under seal as of September 26, 2023, and are part of the Court's record for purposes of Plaintiff's First Amended Complaint and Reply in support of Application for Preliminary Injunction. (Ordered by Judge Mark Pittman on 9/26/2023) (tjc) (Entered: 09/26/2023) |
| 09/26/2023 | 28 | MOTION for Leave to File Sur-Reply filed by James Shepherd with Brief/Memorandum in Support. (Attachments: # 1 Proposed Order, # 2 Proposed Sur-Reply) (Norred, Warren) (Entered: 09/26/2023) |
| 10/03/2023 | 29 | ORDER denying 28 Motion for Leave to File. Having considered the Motion and the current status of the case, the Court finds that the Motion should be and hereby is DENIED. (Ordered by Judge Mark Pittman on 10/3/2023) (tjc) (Entered: 10/03/2023) |

| 10/25/2023 | 30 | ORDER: The Court ORDERS the Parties to file written objections to the Court advancing Plaintiffs' Amended Motion for Preliminary Injunction to a determination on the merits on or before November 6, 2023. (Ordered by Judge Mark Pittman on 10/25/2023) (sre) (Entered: 10/25/2023) |
| --- | --- | --- |
| 11/06/2023 | 31 | RESPONSE filed by New Millennium Concepts, Ltd. re: 30 Order Setting Deadline/Hearing, (Norred, Warren) (Entered: 11/06/2023) |
| 11/17/2023 | 32 | MEMORANDUM OPINION & ORDER: This case must be DISMISSED for want of subject matter jurisdiction. (Ordered by Judge Mark Pittman on 11/17/2023) (bdb) (Entered: 11/17/2023) |
| 11/17/2023 | 33 | FINAL JUDGMENT: This final judgment is issued pursuant to Federal Rule of Civil Procedure 58(a). In accordance with the Court's Order on this same day, this case is DISMISSED. (Ordered by Judge Mark Pittman on 11/17/2023) (bdb) (Entered: 11/17/2023) |
| 11/20/2023 | 34 | NOTICE OF APPEAL as to 33 Judgment, 32 Memorandum Opinion and Order to the Fifth Circuit by James B. Shepherd Trust, James Shepherd. Filing fee $505, receipt number ATXNDC-14188171. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Norred, Warren) (Entered: 11/20/2023) |
| 12/01/2023 | 35 | USCA Case Number 23-11189 in United States Court of Appeals 5th Circuit for 34 Notice of Appeal, filed by James B. Shepherd Trust, James Shepherd. (tle) (Entered: 12/01/2023) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 12/07/2023 13:13:18 | | |
| **PACER Login:** | warrennorred | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:23-cv-00826-P |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**JAMES SHEPHERD, ET AL.,**

　　Plaintiffs,

v.                                                    **No. 4:23-cv-00826-P**

**MICHAEL S. REGAN, ADMINISTRATOR
OF THE ENVIRONMENTAL PROTECTION
AGENCY, ET AL.,**

　　Defendants.

### MEMORANDUM OPINION & ORDER

Before the Court is Plaintiffs' amended request for a Preliminary Injunction filed August 24, 2023. ECF No. 14. On October 25, 2023, this Court issued an Order advancing Plaintiffs' Amended Motion for Preliminary Injunction to a determination on the merits. ECF No. 30. However, due to Plaintiffs' lack of standing to bring this case, the Court must **DISMISS** Plaintiffs' claims.

### BACKGROUND

This case centers around the Environmental Protection Agency's ("EPA") issuance of a Stop, Sale, Use, or Removal Order ("SSURO") to manufacturers and sellers of Berkey water filtration products.

In 2022, the EPA became aware that Berkey water filtration systems contain silver for antimicrobial purposes. The EPA has regulated silver in microbial pesticide products since 1954. After investigating, the EPA determined Berkey water filtration systems are not registered as required by the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA"). Between December 2022 and March 2023, the EPA issued SSUROs to certain third-party distributors and manufactures of Berkey filtration products. These SSUROs required each recipient to stop the sale, use, and distribution of the offending products, and to provide the EPA with an update on compliance with the SSURO every thirty days until the offender no longer had FIFRA-violating products.

In August 2023, Plaintiffs James Shepherd, on behalf of the James B. Shepherd Trust, and New Millennium Concepts, LTD ("NMCL") filed this suit against the EPA. In their lawsuit, Plaintiffs requested a temporary restraining order ("TRO"), along with preliminary and permanent injunctions estopping the EPA from issuing SSUROs pertaining to the Berkey filtration systems. But neither Shepherd nor NMCL ever received an SSURO from the EPA. On August 10, this Court denied Plaintiffs' TRO request and set an expedited briefing schedule for Plaintiffs' preliminary injunction. On October 25, the Court issued an order advancing the request for a preliminary injunction to a determination on the merits under Federal Rule of Civil Procedure 65. However, before the Court can reach the merits of the case, it must first address standing under Federal Rule of Civil Procedure 12(b)(1).

## LEGAL STANDARD

A Rule 12(b)(1) motion "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006). A court must dismiss the action if it determines that it lacks jurisdiction over the subject matter. FED. R. CIV. P. 12(h)(3); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam). A dismissal under Rule 12(b)(1) "is not a determination of the merits," and it "does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Id.* Accordingly, considering Rule 12(b)(1) motions first "prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Id.*

A district court may dismiss for lack of subject matter jurisdiction based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). A motion to dismiss based on the complaint alone presents a "facial attack" that

requires the court to decide whether the complaint's allegations, which are presumed to be true, sufficiently state a basis for subject matter jurisdiction. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1998). If sufficient, those allegations alone provide jurisdiction. *Id.*

## ANALYSIS

### A. Plaintiffs Have No Article III Standing

Defendants argue in their Response in Opposition to Plaintiffs' First Motion for Preliminary Injunction that Plaintiffs lack Article III standing. *See* ECF No. 10 at 21. While Defendants' subsequent briefing assumes arguendo that Plaintiffs "may" have Article III standing, Defendants reserved the right to address Article III standing at a later stage. ECF No. 18 at 21. The Court is duty-bound to address standing at this juncture. *See Filer v. Donley,* 690 F.3d 643, 646 (5th Cir. 2012) (It is the duty of a federal court to first decide, *sua sponte* if necessary, whether it has jurisdiction before the merits of the case can be addressed).

"Article III of the Constitution limits federal 'Judicial Power,' that is, federal-court jurisdiction, to 'Cases' and 'Controversies.'" *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Similar to other jurisdictional requirements, this standing requirement cannot be waived. *See Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). The Supreme Court insists upon strict compliance with the standing requirement. *See Raines*, 521 U.S. at 811. "Even when standing is not raised by the parties, the Court must, where necessary, raise the issue *sua sponte*." *Reed v. Rawlings*, 3:18-CV-1032-B, 2018 WL 5113143, at *3 (N.D. Tex. Oct. 19, 2018) (citing *Collins v. Mnuchin*, 896 F.3d 640, 654 n.83 (5th Cir. 2018)) (Boyle, J.). Courts are to assess a plaintiff's "standing to bring each of its claims against each defendant." *Coastal Habitat Alliance v. Patterson*, 601 F. Supp. 2d 868, 877 (W.D. Tex. 2008) (citing *James v. City of Dall.*, 254 F.3d 551, 563 (5th Cir. 2001)).

A plaintiff must have standing to request a preliminary injunction. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020). To satisfy the prerequisites of Article III standing, "[the] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements[, and when] a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element." *Id.* (citations omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998). At the pleading stage, general factual allegations are sufficient to establish standing. *See Stallworth v. Bryant*, 936 F.3d 224, 230 (5th Cir. 2019). But, if the allegations are not sufficient to establish standing, the district court is powerless to create jurisdiction on its own accord. *See Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990). "[I]f the plaintiff does not carry his burden clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute, then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (internal citation omitted).

## I.     Injury In Fact

The Court first addresses the first prong in *Spokeo*—injury in fact. To demonstrate an injury in fact, a plaintiff "must show that [he] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo. Inc.,* 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id*. A "concrete" injury must "actually exist... [the injury must be] real, and not abstract." *Id*. at 340. (cleaned up).

Here, Plaintiffs have not established how they have suffered an invasion of a legally protected interest that is either concrete or particularized. Plaintiffs claim that the royalties they receive from licensing the right to sell Berkey water filters to Berkey International, LLC provide them with standing because the diminishing royalties

serve as an injury in fact. *See* ECF No. 14 at 23–24. This connection is too attenuated to the EPA's actions to be considered a "concrete" injury. Plaintiffs are unable to specify and quantify any potential losses of royalties beyond mere conclusory statements that such losses would occur. *See generally* ECF Nos. 14 and 20. These statements fall far short of the particularized injury required to establish Article III standing.

Further, the Court is flummoxed as to why Berkey, a recipient of an SSURO, has not been impleaded into this case.[1] Considering Plaintiffs acknowledge that the James B. Shepherd Trust has a controlling interest in both NMCL and Berkey, it makes little sense to the Court why Plaintiffs would not implead a party that is directly impacted by the actions at issue, instead of rolling the proverbial standing dice with a significantly attenuated injury—or better yet, why Berkey has not filed suit on its own accord against the EPA. Plaintiffs cite an unreported, out-of-district case to support their argument that owed royalties serve as grounds for standing. *See* ECF No. 14 at 23 (citing *Pizza Hut, LLC v. Ronak Foods, LLC*, 2022 WL 3544403 (E.D. Tex. June 17, 2022), *aff'd sub nom. Pizza Hut L.L.C. v. Pandya,* 79 F.4th 535 (5th Cir. 2023)). However, in *Pizza Hut*, the "royalties" at issue were advertising fees that franchisees had to pay in order to receive credit to offset payment obligations owed to Pizza Hut. *See Pizza Hut, LLC,* 2022 WL 3544403 at *11–12. Further, in *Pizza Hut,* the defendants alleged that Pizza Hut had no standing as to advertising fees because the fees were payable to the International Pizza Hut Franchise Holders Association, who were not a party to the case. *Id.* at 12. The Court held that Pizza Hut had standing to recover the advertising fees because if they were not paid to the Franchise Holders Association, the payment obligations defendants owed to Pizza Hut would not be offset and Pizza Hut would be owed the amount due in any event. *Id.* at 39. Thus,

---

[1] In a September 12, 2023 Order, the Court instructed Plaintiffs to provide briefing as to why Berkey International, LLC was not bringing this action as an actual recipient of an SSURO from the EPA. The Court was perplexed when Plaintiffs provided no rational explanation, but instead focused on how the two Plaintiffs, neither of whom received an SSURO, had standing. *See* ECF Nos. 22 and 23.

payments to the non-party Franchise Holders Association ipso facto served as payments to Pizza Hut, who *was* a party to the case.

This case is different. The case here does not deal with royalties or fees the defendant owes the plaintiff, but rather potential royalties owed by a third party to a plaintiff. Further, the royalties in *Pizza Hut* were a concrete injury that was enumerated and specified, not merely hypothesized as is the case here. *Id.* at 20. The royalties were also tied directly to the cause of action in that case, not a tangential, conjectural outcome affecting a third-party. Even further, Plaintiffs cite *Pizza Hut* in their Amended Complaint to support the notion that standing can be achieved based on diminished royalty payments "due to an agency action." ECF No. 14 at 23–24. But *Pizza Hut* never mentions agency action as a causal factor for the relevant dispute. Thus, the Court sees no relevance to this out-of-district, unreported case and is unconvinced there is an injury in fact facing the Plaintiffs here.

## II.    Traceability

The Court next turns to whether Plaintiffs' injury is fairly traceable to Defendants' challenged conduct. Assuming arguendo that there was an injury in fact (the Court determined there is not), the supposed injury that Plaintiffs claim (loss of royalties) must be traceable to the EPA issuing SSUROs to third-parties. *See California v. Texas*, 141 S. Ct. 2104, 2113 (2021). The Court determines they are not. There could be a multitude of reasons as to why Plaintiffs have received diminished royalties. There could be a change in consumer preferences to water filters, change in market conditions generally, and as Defendants point out, a class action lawsuit has been filed against NMCL concerning Berkey products in this district. *See* ECF No. 18 at 32; *see also Farrell, et al. v. New Millennium Concepts, LTD*, 3:22-cv-728-M   (N.D. Tex.) (Lynn, J., presiding). Plaintiffs offer no substantive evidence to show that their supposed injury is fairly traceable to the EPA issuing SSUROs to third parties.

## III.    Redressability

The Court finally addresses the question of redressability. Here, Plaintiffs cannot show that a favorable decision would redress Plaintiffs'

supposed injuries. Once again, even assuming Plaintiffs satisfy the first two prongs of *Spokeo*, there is no guarantee a stay of the EPA's issuances of SSUROs to third parties would increase the royalties that Plaintiffs receive. As discussed above, there are outside factors that can affect the sales for which Plaintiffs receive royalties. For example, consumers could be aware that it took an injunction for the SSUROs to be lifted, not action taken by the EPA themselves, and still decide to not purchase Berkey products until they get assurances from the EPA that they are safe. There is no guarantee an injunction will redress the Plaintiffs' supposed injury here.

While the higher courts have done no favors for the district court by giving them a distinct blueprint to identify standing[2], the Court simply does not see an injury in fact facing the Plaintiffs, cannot fairly trace the supposed injury to conduct by the EPA, and does not believe granting an injunction would redress Plaintiffs' alleged injury. Royalties from sales from a third party are not enough to support standing and the Court has found no precedent in this Circuit to find standing under such circumstances.

---

[2] Standing jurisprudence has been aptly described as a "morass of imprecision." *N.H. Rt. to Life Pol. Action Comm. v. Gardner*, 99 F. 3d 8, 12 (1st Cir. 1996). Recent decisions from the Supreme Court on this issue are notoriously difficult to reconcile. *See, e.g., Haaland v. Brackeen*, 599 U.S. 255, 277 (2023) (holding that a state lacks standing to challenge federal law preempting state laws on foster child placement, despite that "Congress's Article I powers rarely touch state family law."); *contra. Massachusetts, et al. v. EPA, et al.*, 549 U.S. 497, 519 (2007) (holding that a state had standing to challenge the EPA's decision not to regulate emissions of greenhouse gases because that power was preempted and greenhouse gases affected "the earth and air within [their] domain"); *contra. United States v. Texas*, 599 U.S. 670, 671 (2023) (holding that states near an international border lacked standing to challenge the federal government's immigration enforcement policies because the state's financial injury was not "legally cognizable"); *but see Biden, et al. v. Nebraska, et al,* 143 S. Ct. 2355, 2358 (2023) (holding that Missouri established standing by showing that it "suffered ... a concrete injury to a legally protected interest, like property or money"); *contra. Dept. of Ed. v. Brown*, 600 U.S. 551, 568 (2023) (holding that individual loan borrowers lacked standing to allege the federal government unlawfully excluded them from a one-time direct benefit program purportedly designed to address harm caused by an indiscriminate global pandemic).

### IV.    NMCL is not "Effectively and Constructively" Stopped

Plaintiffs also claim the third-party SSUROs "effectively and constructively" stop NMCL from selling Berkey filtration systems, thus granting them standing to challenge the SSUROs. ECF No. 23 a 4–5. However, as the facts stand currently, neither James Shepherd, on behalf of the James Shepherd Trust, nor NMCL are at the risk of being held liable by any EPA actions. While Plaintiffs state that NMCL may become subject to the stop orders, the relief sought is a preliminary injunction enjoining the EPA from issuing such SSUROs. *Id.* at 3–4. The Court is unable to grant relief vis-à-vis *existing* SSUROs that would ameliorate a threat of *future* action. Thus, the Court currently has no subject matter jurisdiction to any potential claims NMCL might have in the future. The mere possibility of future harm does not confer Article III standing. *See Clapper,* 568 U.S. at 409 (threatened injury must be certainly impending to constitute injury in fact and allegations of possible future injury are not sufficient).

### B. Plaintiffs Lack Third-Party Standing

The Supreme Court generally frowns upon third-party standing. A plaintiff must "assert his own legal rights and interests, and cannot rest his claims to relief on the legal rights of interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). To invoke third-party standing, a party must have a close relationship to the holder of the rights and the holder must face obstacles to bringing the lawsuit personally. *See e.g., Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Singleton v. Wulff*, 428 U.S. 106, 114–116 (1976) (plurality opinion).

As discussed above ad nauseum, the Court struggles to understand why Berkey cannot bring suit on its own behalf for alleged wrongs it has faced at the hands of the EPA. While Plaintiffs have a close relationship with Berkey, there is nothing in the record or briefing to suggest that Berkey, the holder of the rights at issue, cannot bring suit on its own behalf. Accordingly, the Court finds that Plaintiffs do not have third-party standing to bring this suit on Berkey's behalf. If Berkey wants to challenge the EPA's actions, it should bring a lawsuit itself, as this Court signaled in a prior Order. *See* ECF No. 22.

## C. Conclusion

Given a preliminary injunction cannot be requested by a plaintiff who lacks standing, the Court had to first determine whether Plaintiffs have standing to challenge the EPA's SSUROs at issue here. *See Fenves*, 979 F.3d at 329. As explained above, the Court finds that they do not. Accordingly, this case must be **DISMISSED** for want of subject matter jurisdiction.[3]

**SO ORDERED** on this **17th day of November 2023.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

---

[3] In finding that standing is lacking in this case, the Court is in no way disparaging, or opining on, Plaintiffs' claims. Indeed, if true, the claims are quite concerning. However, it is incumbent on the judicial branch to always keep in mind its proper role under our Constitution. The concepts of standing and the case or controversy requirement helps ensure that federal judges "stay in their lane." Otherwise, we risk fulfilling Thomas Jefferson's prediction written 45 years after he wrote the Declaration of Independence:

> It has long however been my opinion, and I have never shrunk from its expression, ... that the germ of dissolution of our federal government is in the constitution of the federal judiciary; ... working like gravity by night and by day, gaining a little to-day and a little tomorrow, and advancing it's noiseless step like a thief, over the field of jurisdiction, until all shall be usurped from the states, and the government of all be consolidated into one. To this I am opposed; because whenever all government, domestic and foreign, in little as in great things, shall be drawn to Washington as the center of all power, it will render powerless the checks provided of one government on another, and will become as venal and oppressive as the government from which we separated.

Letter from Thomas Jefferson to Charles Hammond (August 18, 1821), in 15 THE WRITINGS OF THOMAS JEFFERSON 330–33 (Albert Ellery Bergh Ed.) (1905).